DENNIS J. HERRERA, State Bar #139669
City Attorney
ELIZABETH SALVESON, State Bar #83788
Chief Labor Attorney
JONATHAN C. ROLNICK, State Bar #151814
Deputy City Attorney
Fox Plaza
1390 Market Street, 5th Floor
San Francisco, California 94102-5408
Telephone:    (415) 554-3815
Facsimile:    (415) 554-4248

Attorneys for Defendants
CITY AND COUNTY OF SAN FRANCISCO
and WILLIAM FRAZIER

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUSIE ABRAM,<br><br>          Plaintiff,<br><br>     vs.<br><br>CITY AND COUNTY OF SAN FRANCISCO, DEPARTMENT OF PUBLIC HEALTH; WILLIAM FRAZIER, DIRECTOR OF THERAPEUTIC ACTIVITIES, LAGUNA HONDA HOSPITAL<br><br>          Defendant. | Case No. C07-3006 PJH<br><br>*E-filing case*<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:        June 18, 2008<br>Time:        9:00 a.m.<br>Courtroom:   3, 17th Floor<br>             Hon. Phyllis J. Hamilton<br><br>Action Filed: June 8, 2007 |

## TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT ....................................1

MEMORANDUM OF POINTS AND AUTHORITIES ....................................................3

I.  INTRODUCTION ........................................................................3

II. STATEMENT OF FACTS .................................................................3

    A. The City Hires Abram in 1986 as a Activities Therapist............................3

    B. Defendant William Frazier Is the Director of Therapeutic Activities at Laguna Honda........................................................................4

    C. In May, 2002, Abram Began Reporting to Activity Therapist Supervisor Christine Hansen........................................................................4

    D. Abram Challenges Numerous Events That Occurred More Than Four Years Before The June 8, 2007 Filing of This Lawsuit...............................5

    E. Hanson Puts Abram on a Job Performance Development Plan in July 2003........................................................................7

    F. Hanson Initiated Disciplinary Act Against Abram In August 2003 Due to Job Performance Issues........................................................................8

    G. Hanson Initiated Disciplinary Action Against Abram In October 2003 Because Abram Failed to Comply With The Development Plan ...............8

    H. In November 2003 Abram Began A Ten-Month Leave of Absence ..........9

    I. Abram Returned to Work in September 2004, Reporting to a New Supervisor, Barbara Taoramina ....................................................9

    J. Abram Voluntarily Resigned From City Service in June 2005 and Retires Effective July 15, 2005 ....................................................10

    K. Abram Files Suit Two Years Later on June 8, 2007................................10

III. ARGUMENT ..........................................................................10

    A. Abram Claims Are Barred, In Part, By The Statute of Limitations...........11

        1. Abram's Claim for Discrimination Is Barred To The Extent It Is Based on Conduct Before June 8, 2005 ........................................12

        2. Abram's Claims For Retaliation And Harassment Are Barred To The Extent They Are Based On Conduct Before June 8, 2003 .....12

    B. The City and Frazier Are Entitled to Summary Judgment On Abram's Discrimination Claim........................................................................13

        1. Abrams Cannot Establish a *Prima Facie* Case ............................13

        2. Defendants Had Legitimate Non-Discriminatory Reasons for Their Actions, Abram Cannot Meet Her Burden to Show Pretext 14

    C. The City and Frazier Are Entitled to Summary Judgment On Abram's Retaliation Claim ........................................................................16

D.      The City and Frazier Are Entitled To Summary Judgment On Abram Racial Harassment Claims Because She Cannot Show That Her Workplace Was Permeated With Discriminatory Intimidation, Ridicule and Insult...................................................................................................16

E.      The City Is Not Liable Under Section 1981 For The Conduct Of Its Employees Unless Those Employees Are Final Policymakers With Respect To The Conduct At Issue ...........................................................17

        1.      The City's Civil Service Commission Is The Final Policymaker With Respect To Employment Matters In San Francisco.............19

        2.      The Conduct At Issue Cannot Be Attributed To The Civil Service Commission ...................................................................19

IV.     CONCLUSION.......................................................................................21

# TABLE OF AUTHORITIES

**State Cases**

*Choate v. County of Orange*
    86 Cal.App.4th 312 (2000) ...................................................................................21

**State Statutes & Codes**

Code of Civil Procedure
    §335.1 ...............................................................................................................11

**Federal Cases**

*Abbott v. Village of Winthrop Harbor*
    205 F.3d 976 (7th Cir. 2000) ..............................................................................19

*Addisu v. Fred Meyer, Inc.*
    198 F.3d 1130 (9th Cir. 2000) ............................................................................11

*Alvarado v. Fedex Corp.*
    2006 WL 644875, *21 (N.D. Cal., March 13, 2006)...........................................12

*Auriemma v. Rice*
    957 F.2d 397 (7th Cir. 1992) ..............................................................................17

*Brooks v. City of San Mateo*
    229 F.3d 917 (9th Cir. 2000) ..............................................................................13

*Cholla Ready Mix, Inc. v. Civish,* BLM
    382 F.3d 969, 974n.5 (9th Cir. 2004) ..................................................................11

*Christie v. Iopa*
    176 F.3d 1231 (9th Cir. 1999) ............................................................................18

*City of St. Louis v. Prapotnik*
    485 U.S. 112 (1988 .................................................................................18, 19, 20

*Doe v. Claiborne County*
    103 F.3d 495 (6th Cir. 1996) ..............................................................................21

*Faragher v. City of Boca Raton*
    524 U.S. 775 (1998) ............................................................................................16

*Gernetzke v. Kenosha Unified Sch. Dist. No. 1,*
    274 F.3d 464 (7th Cir. 2001) ..............................................................................18

*Goodman & Lukens Steel Co.*
    482 U.S. 66 (1987)...............................................................................................11

*Harris v. Forklift Systems, Inc.*
    510 U.S. 17 (1993)...............................................................................................16

*Humphries v. CBOCS West*
    474 F.3d 387 (7th Cir. 2007)
    *cert. granted*, 128 S.Ct. 30 (2007) ....................................................................16

*Hyland v. Wonder*
    117 F.3d 405 (9th Cir. 1997) ....................................................................19, 20

*Jett v. Dallas Independent School Dist.*
    491 U.S. 701 (1989) ....................................................................18, 20

*Jones v. R.R. Donnelley Sons & Co.*
    541 U.S. 369 (2004) ....................................................................11, 12

*Kortan v. California Youth Authority*
    217 F.3d 1104 (9th Cir. 2000) ....................................................................17

*Manatt v. Bank of America*
    339 F.3d 798 (2003) ....................................................................17

*McDonnell Douglas v. Green*
    411 U.S. 792 (1973) ....................................................................13

*Monell v. Department of Social Services*
    436 U.S. 658 (1978) ....................................................................1, 3, 17, 19, 21

*Mustafa v. Clark County School Dist.*
    157 F.3d 1169 (9th Cir. 1998) ....................................................................11

*National Railroad Passenger Corp. v. Morgan*
    536 U.S. 101 (2002.) ....................................................................12

*Oncale v. Sundowner Offshore Services, Inc.*
    523 U.S. 75 (1998) ....................................................................16

*Patterson v. McLean Credit Union*
    491 U.S. 164 (1989) ....................................................................11

*Pembaur v. City of Cincinnati*
    475 U.S. 469 (1986) ....................................................................18, 20

*Penn State Police v. Suders*
    542 U.S. 129 (2004) ....................................................................13

*Poland v. Chertoff*
    494 F.3d 1174 (9th Cir. 2007) ....................................................................13

*Reeves v. Sanderson Plumbing Products Inc.*
    530 U.S. 133 (2000) ....................................................................14

*Smith v. Barton*
    914 F.2d 1330 (9th Cir. 1990) ....................................................................14, 18

*St. Mary's Honor Ctr. v. Hicks*
509 U.S. 502 (1993).............................................................................14, 16

*Surrell v. California Water Service Co.*
518 F.3d 1097 (9th Cir. 2007) ...........................................................11, 13

*Thomas v. City of Chattanooga*
398 F.3d 426 (6th Cir. 2005) .............................................................18, 21

*United Federation of African American Contractor v. Oakland*
96 F.3d 1204 (9th Cir. 1996) ....................................................................17

**Federal Statutes**

28 U.S.C.
§1658(a) ...................................................................................................11

42 U.S.C.
§1981(a) ...................................................................................................10

42 U.S.C.
§1981(b) ...................................................................................................11

42 U.S.C.
§1981 .......................................................1, 3, 10, 13, 16, 17, 21

Federal Rules of Evidence
§801 ..........................................................................................................15

Federal Rules of Evidence
§802 ..........................................................................................................15

**San Francisco Statutes, Codes & Ordinances**

San Francisco Civil Service Commission Rule
§10.100 .....................................................................................................19

San Francisco Civil Service Commission Rule
§103 ..........................................................................................................19

San Francisco Civil Service Commission Rule
§104 ..........................................................................................................19

San Francisco Civil Service Commission Rule
§122 ..........................................................................................................19

San Francisco Civil Service Commission Rule
§422 ..........................................................................................................19

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

**TO PLAINTIFF AND HIS ATTORNEY OF RECORD:**

PLEASE TAKE NOTICE THAT on June 18, 2008 at 9:00 a.m., or as soon thereafter as the matter may be heard in Courtroom 3, 17th Floor of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue in San Francisco, California, the Honorable Phyllis J. Hamilton presiding, Defendants City and County of San Francisco (the "City") and William Frazier (collectively "Defendants") will and hereby does move this Court for an order granting summary judgment on Plaintiff Susie Abram's claims for relief as alleged in the Complaint. This motion is made under Federal Rule of Civil Procedure 56 on the grounds that there are no genuine issues of disputed fact and:

1. The City is entitled to summary judgment on Plaintiff's claim under 42 U.S.C. §1981 because Plaintiff cannot establish that the City is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

2. Defendants are entitled to partial summary judgment on Plaintiff's claim under 42 U.S.C. §1981 because her claims are barred in part by the applicable statutes of limitation.

3. The Defendants are entitled to summary judgment on Plaintiff's claim under 42 U.S.C. §1981 because she cannot establish a *prima facie* claim under any theory of relief.

4. The Defendants are entitled to summary judgment on Plaintiff's claim under 42 U.S.C. §1981 because Defendants had legitimate nondiscriminatory and nonretaliatory reasons for their actions and Plaintiff cannot present sufficient evidence to show those reasons are untrue or pretextual.

/ / /
/ / /
/ / /
/ / /
/ / /

Defendants' Motion is based upon this Notice and accompanying Memorandum of Points and Authorities, the declaration of William Frazier, Christine Hanson, and Jonathan Rolnick, the papers and records on file with the Court in this action, and such argument and evidence as may be presented at the hearing on this Motion.

Dated: May 14, 2008

DENNIS J. HERRERA
City Attorney
ELIZABETH S. SALVESON
Chief Labor Attorney
JONATHAN C. ROLNICK
Deputy City Attorney


By: s:/Jonathan C. Rolnick
JONATHAN C. ROLNICK

Attorneys for Defendants
CITY AND COUNTY OF SAN FRANCISCO and
WILLIAM FRAZIER

1

2

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

3

Plaintiff Susie Abram resigned her position with the City and County of San Francisco's

4

Laguna Honda Hospital in June 2005.  Two years later she filed suit claiming she had been the victim

5

of unlawful discrimination in violation of 42 U.S.C. §1981.  She claims a laundry list of adverse

6

actions dating back to 2000, but has little, if any, evidence to show that any of those action were

7

motivated in any fashion by her race.  In fact, the undisputed evidence demonstrates that the City and

8

Defendant William Frazier acted at all times, within the bounds of normal supervisory authority and

9

for legitimate concerns regarding the quality of Abram's job performance.  Not only are many of

10

those actions at issue barred by the applicable statutes of limitation, Defendants are entitled to

11

summary judgment because Plaintiff cannot meet her burden to show either a *prima facie* case under

12

any theory of relief or that the City and Frazier' articulate reasons for their actions are pretextual.

13

Moreover, Abram cannot establish liability against the City under *Monell v. Department of Social*

14

*Services*, 436 U.S. 658 (1978).

15

The Court should grant summary judgment in favor of the City and Frazier.

16

### II.    STATEMENT OF FACTS

#### A.    The City Hires Abram in 1986 as a Activities Therapist

17

18

The City hired Abram in April 1982 as an Activities Therapist (Civil Service Class 2587

19

Health Worker III).  (Abram Depo. 8:12-22.)[1]  Through out her tenure with the City, Abram worked

20

at Laguna Honda Hospital and Rehabilitation Center ("Laguna Honda" or the "Hospital").  (Abram

Depo. 8:24-9:12.)

21

22

Laguna Honda is a licensed acute-care hospital and skilled nursing facility operated by the

23

City.  (Declaration of William Frazier in Support of Motion for Summary Judgment ("Frazier Decl.")

24

¶ 2.)  It is the largest single-site municipally owned and operated skilled nursing care facility in the

25

country.  (*Id*.)  The health care professionals at Laguna Honda provide a wide range of inpatient and

26

outpatient services, including rehabilitation services.  (*Id*.)  Laguna Honda provides a full range of

27

28

_____

[1] Excerpts from the deposition of plaintiff Susie Abram are attached as Exhibits A-B to the Declaration of Jonathan Rolnick in Support of Defendants' Motion for Summary Judgment.

skilled nursing services to disabled or chronically ill adult residents of San Francisco, including specialized care for those with wounds, head trauma, stroke, spinal cord injuries, orthopedic injuries, AIDS and dementia. The hospital also has a hospice program.  (*Id*.)

As an Activity Therapist, Abram delivered social, cognitive, physical, creative, and off-campus activities for the Laguna Honda residents.  (Abram Depo. 10:5-11:14; Frazier Decl. ¶¶ 3-5; Declaration of Christine Hanson in Support of Motion for Summary Judgment ("Hanson Decl.") ¶ 3.)  Like all of the Activity Therapist at the Hospital, Abram worked with an interdisciplinary team of health care professionals including doctors, nurses, dieticians, and social workers to develop and provide a plan of care for the residents under their care.  (Abram Depo. 12:18- 14:11.)

Because, Laguna Honda is a residential hospital and dependent on Federal and state funding, Activity Therapists and others are required to maintain certain records regarding the care provided to residents.  Federal and state regulations require that Laguna Honda prepare and maintain an assessment of the physical and mental status of each resident including a quarterly review, activity attendance records, and a care plan.  (Hanson Decl. ¶ 4; Frazier Decl. ¶ 8; Abram Depo. 103:3-105:23.)

**B.    Defendant William Frazier Is the Director of Therapeutic Activities at Laguna Honda**

Defendant William Frazier, is the Director of Therapeutic Activities as Laguna Honda.  He has held that position since June 1998.  (Frazier Decl. ¶ 1.)  In that capacity he oversees Laguna Honda's Activity and Vocational Therapy departments, as well as the Volunteer Services, and Spiritual Care programs.  (*Id*. at ¶ 3.)  Within the Activity Therapy program he directly supervises approximately 5 Activity Therapist Supervisors (Civil Service Classifications 2588 Health Worker IV).  (*Id*.; Abram Depo. 18:11-21.)  Those Activity Therapist Supervisors directly supervised the approximately 40 Activity Therapist such as Abram.  (Frazier Decl. ¶ 3.)  Frazier did not directly supervise Abram or her fellow Activity Therapists.  (*Id*. at ¶¶ 3-4.)

**C.    In May, 2002, Abram Began Reporting to Activity Therapist Supervisor Christine Hansen**

In May 2002, Christine Hanson, an Activity Therapist Supervisor, began supervising Abram on the D3 psychosocial "cluster."  (Hanson Decl. ¶ 3; Frazier Decl. ¶¶5-6.)  From the start, Hanson

found Abram had job performance issues.  (Hanson Decl. ¶ 4.)  These performance issues were two-fold.  First, Abram lacked necessary skills in a variety of areas.  For example, she frequently failed to provide required documentation on a timely basis for the residents under her care or prepared documentation that was incomplete or inaccurate.  (*Id.* at ¶¶ 4-7, Exh. A; Frazier Decl. ¶¶ 8-9.)  Hanson also found Abram was not effective in providing skill development and therapeutic activities for Hospital residents, developing monthly program calendars, and planning off-site activities.  (Hanson Decl. at ¶¶ 5-6, Exh. A-B.)  A second concern about Abram's job performance was her resistance, and at times hostility, to the efforts of her supervisors to monitor and improve her job performance.  She was unnecessarily confrontational about even minor issues or disagreements.  (*Id.* at ¶ 8)  Abram's previous supervisors had also advised Frazier of Abram's job performance issues.  (Frazier Decl. ¶¶ 8-9.)

Abram had several different supervisors during her tenure at Laguna Honda.  (Frazier Decl. ¶ 4.)  But her claims in this case focus only on the conduct of Frazier and Hanson.  (Abram Dep. 25:2-11.)  According to Abram, Hansen and Frazier "singled her out" and treated her differently than the other Activity Therapists.  (Abrams Depo. 34:17-23, 37:14-40:22)  She claims their conduct constitutes discrimination, harassment, and retaliation because Hansen and Frazier did not engage in similar conduct towards "white co-workers."  (*Id.*)

Abram alleges a laundry list of transgressions by Hansen and/or Frazier in support of her claims.  Many of these events occurred more than four years before the June 3, 2007 filing of this lawsuit, and thus, fall outside the applicable statute of limitation period.  Defendants set forth the events below by segregating those events that occurred more than four years ago from those that occurred within the statute of limitations period.[2]

### D. Abram Challenges Numerous Events That Occurred More Than Four Years Before The June 8, 2007 Filing of This Lawsuit

Many of the incidents Abram challenges in this lawsuit occurred four or more years before she filed this lawsuit.

---

[2] The statute of limitations applicable to Abram's claims varies depending on her theory of relief.  See, *infra* at Section III(A).

- *June 1999 Fishing Trip*:  According to Abram, Frazier questioned Abram about certain details of an off-site fishing trip she planned for residents around June 1999.  (Abram Depo. 62:6-63:11, 152:24-156:22, Exh. 9.)  Abram expressed her frustration to Frazier with what she viewed as meddling by Frazier.  (Frazier Decl. ¶ 20.)  Frazier supported this activity but, in advance of this trip, made some inquiries to Abram regarding its logistics including whether the bus that would transport the residents would be able to drive up to the fishing facility and how fishing equipment would be provided.  (*Id.*)

- *February 2001 Black History Month Program*:  In February 2001, Abram and Frazier disagreed over Abram's coordination in late 2000 and early 2001 of an annual program to celebrate Black History Month.  Abram contends that Frazier "humiliated" her by interfering with her plans for the program at the Hospital.  (Abram Depo. 27:5-31:7.)  Abram had helped plan this program for Laguna Honda residents each February.  Frazier advised Abram well in advance of the 2001 event that he wanted in the program to have a more educational theme.  (Frazier Decl. ¶¶ 10-11.)

- *April 21, 2001 Chicken Frying Activity*:  Abram also alleges that Frazier again meddled in one of her programs in April 2001 when he raised questions regarding a plan to fry chicken on one of the units.  (Frazier Decl. ¶¶ 18-19, Exh. E.)  When Frazier learned of this activity, he advised Abram that the Hospital's Nutritional Services Department had expressed concern to him about previous activities involving the frying of food.  (Id.)  He told Abram that he wanted to consult with the Nutritional Services Department to identify the nature of their concerns about such activities so we could better plan future activities.  He also told Abram that she could proceed with her activity as planned.  (*Id.*; Abram Depo. 192:3-195:22, 196:13-17, Exh. 16.)

- *April 2001 Conflict between Abram and a Co-worker*:  Abram also expressed frustration with the manner in which Frazier handled a conflict between her and a co-worker, Pat Zelaya-Wagner.  (Abram Depo. 31:2-32:21.)  In early April 2001, Ms. Zelaya-Wagner approached Frazier regarding an interaction she had with Abram on March 30.  According to Ms. Zelaya-Wagner, Abram shared unfavorable information with several residents regarding Ms. Zelaya-Wagner and had also shared this information with co-workers.  Frazier met with Abram, to discuss these events.  Abram apologized for what had transpired and indicated that her comments were made in jest and were not intended to cause any harm.  Frazier took Abram's apology to be a sincere one.  (Frazier Decl. ¶¶ 12-17, Exhs. A-D.)

- *In 2002 Hanson Requires Abram to Use Computer*:  Abram claims Hanson discriminated against her because she required Abram to perform certain work-related activities using an office computer, in particular a calendar program.  (Abram Depo. 36:3-21, 99:8-100:8.)  In 2002, Hanson encouraged Abram to prepare her monthly activity calendars using a computerized calendar.  (Abram Depo. 36:2-21; Hanson Decl. ¶ 17.)  Hanson did so because Abram's calendars were difficult to read and often lacked necessary detail.  (*Id.* at ¶ 17, Exh. A.)  Hanson worked with her on numerous occasions to improve her computer skills to perform these basic tasks and recommended computer skills training programs made available by the City.  (Hanson Decl. ¶ 17.)  Hanson encouraged all the other Activity Therapist she supervised to use this computerized calendar, including Lynn Lustgarten.  (*Id.*)  Plaintiff concedes that computer training was made available, that she was not denied the opportunity to take this training, and that she in fact took computer training.  (Abram. Depo. 36:22-37:10.)

- *September 2002 Hanson Cuts of Lock on D3 Activity Locker*:  In order to provide services to the D3 residents Hanson needed access to materials Abram kept in the unit

locker on the D3 ward.  (Hanson Decl. ¶ 9, Exh. C; Abram Depo. 138:19-139:9.)[3]
Abram was on month long vacation and had not left a key to the locker.  (*Id.*)  Because
Hanson could not get into the locker, she requested that Plant Services cut off the lock.
(*Id.*)  Hanson believed that all items in the locker were activity related and had been
purchased with Hospital funds.  (*Id.*)  On her return in October, Abram complained
about Hanson having gone into locker and that certain personal items including music
CDs had gone missing.  (*Id.*; Abram Depo. 56:23-57:23, 143:21-144:15.)  Hanson met
with Abram on October 16, 2002 to discuss this issue as well as others.  Hanson
apologized for any misunderstanding regarding the locker and the CDs.  Hanson
advised Abram that if she put in request, the Hospital would reimburse for any lost
personal items. (Hanson Decl. ¶ 9, Exh. C.)  Abram concedes many of the items in the
locker were purchased with Hospital funds.  (Abram Depo. 141:20-142:13.)

- *December 2002 Hanson Recommends Discipline*:  Hanson initiated disciplinary action
  against Abram in December 2002.  (Hanson Decl. ¶¶ 10-11, Exh.D.)  Hanson prepared
  an Employee Conference Form noting  Abram's failure to prepare certain required
  quarterly and annual documentation regarding the care of several of her residents.
  Hanson had requested that Abram prepare this important document in advance of a
  scheduled vacation.  Abram failed to do so and, despite Hanson's efforts, failed to
  complete the documentation as of December 1.  (*Id.*)  Hanson sought a 3-day
  suspension as punishment.  (*Id.*)  Frazier reduced the discipline in this matter to a
  written warning.  (Frazier Decl. ¶¶ 22-23, Exh. F.)

- *May 9, 2003 Off-site Trip to Chevys*:  Abram took several residents in the D3 cluster
  for a restaurant outing at Chevy's.  On her return, Abram's reimbursement requests for
  staff lunches exceeded the amount that was reimbursable by $1.98.  (Hanson Decl. ¶
  16, Exh. G.)  Hanson asked that she cover that amount and advix Abram to provide
  appropriate invoices to cover the reimbursement of resident lunches. (*Id.*)

E.    **Hanson Puts Abram on a Job Performance Development Plan in July 2003**

In May 2003, Hanson prepared a Performance Appraisal Report for Abram for the time period

June 1, 2002 to March 15, 2003.  (Hanson Dec. ¶ 12, Exh. F.)  Therein, she noted Abram's strength as

well as her weaknesses, rating her performance as "exceeds expectation" or "competent and effective"

in numerous areas.  (*Id.*)  Hanson also noted Abram needed to improve in a number of areas of the

review including assessments, documentation, planning, implementation, and communications.  (*Id.*)

Hanson gave Abram an overall evaluation rating of "development needed," and prepared

Developmental Plans for Abram in three areas of core competency:  (a) improved implementation of

activities; (b) improved planning skills; and (c) timely and appropriate completion of required

documentation.  (*Id.*)  Hanson presented Abram with a copy of the Performance Appraisal Report and

Developmental Plans on or about May 13, 2003.  (*Id.*)  Abram refused to sign the Performance

---

[3] This locker was used to store activity related materials, not personal items.  (Hanson Decl. ¶
9.)

Appraisal Report or the Developmental Plans.  Instead, she provided a written response to the Report.  (*Id*. at ¶ 13, Exh. F.)

She requested that Bill Frazier, the Director of Activity Therapy, review the Performance Appraisal Report.  He indicated that he agreed to go forward with the Developmental Plans, but asked Hanson to revise the dates for the Developmental Plans to cover the period July 1 to September 1, 2003.  (Hanson Decl. ¶ 14, Exh. F; Frazier Decl. ¶¶ 24-25, Exh. G.)

**F.    Hanson Initiated Disciplinary Act Against Abram In August 2003 Due to Job Performance Issues**

Shortly thereafter, Hanson also initiated formal disciplinary action against Abram.  In August 2003, she prepared an Employee Conference Form regarding Abram's inattention to duty, failure to properly manage a cluster wide activity, and dishonesty.  (Hanson Decl. ¶¶ 20-22, Exh. H.)  This disciplinary issue arose as a result of a "summer/garage sale" Abram organized for the psychosocial cluster.  As detailed in the Employee Conference Form the activity was disorganized, Abram failed to ensure cleanup after the activity, and there were significant questions regarding the funds raised during this activity.  (*Id.*)  Hanson recommended a two-day suspension.  (*Id.*)  Abram again took a month long vacation in September so Hanson did not present this Employee Conference Form to Abram and her union representative until October 2003.  (*Id.*)

Abram again requested that Bill Frazier review this disciplinary matter.  He did so and reduced the recommended discipline to a one-day suspension.  (*Id.*; Frazier Decl. ¶¶ 30-31, Exh. I.)

**G.    Hanson Initiated Disciplinary Action Against Abram In October 2003 Because Abram Failed to Comply With The Development Plan**

Hanson again initiated formal disciplinary action against Abram in October 2003.  (Hanson Decl.¶¶ 24-25, Exh. I.)  Abram's failure to meet the goals of the Developmental Plans instituted following her performance evaluation.  (*Id.*)  As detailed in the Employee Conference Form, Abram failed to show satisfactory performance improvement in several of the core competency areas identified in the Development Plans.  (*Id.*)  Hanson recommended a four-day suspension.  (*Id.*)  Abram appealed this recommendation to Bill Frazier and later filed a grievance.  (Frazier Decl. ¶¶ 32-34, 37, Exh. J.)

**H.    In November 2003 Abram Began A Ten-Month Leave of Absence**

Before the City could move forward with the grievance of either disciplinary matter, on November 3, 2003 Abram began an extended leave of absence.  (Abram. Depo. 20:5-15; Frazier Decl. ¶¶ 34-37, Exhs. I-K.)  She would not return to work until ten month later, on September 17, 2004.)  (Abram Depo. 20:5-15; Frazier Decl. ¶ 34.)  She had no contact with Ms. Hanson during this time, and her only contact with Mr. Frazier was receipt of a letter advising her of the need to return to work.  (Abram Depo. 20:16-21: 3.)

**I.    Abram Returned to Work in September 2004, Reporting to a New Supervisor, Barbara Taoramina**

When she did return, in September 2004, she had a new supervisor, Barbara Taoramina. (Abram Depo. 86:12-15; Hanson Decl. ¶ 24; Frazier Decl. ¶ 35.)

A couple of months after Abram's return, Frazier got the two outstanding disciplinary matters back on schedule.  Abram moved both disciplinary suspensions into the grievance process set forth in the MOU between the City and Abram's union, SEIU Local 790.  (Frazier Decl. ¶¶ 34-37, Exh. K.)

In late September 2004, shortly after her return from leave, Abrams expressed concerns to Frazier regarding the behavior of Christine Hanson's dog Teemu.  Specifically, she complained that Teemu had been running free in the Department and startled Abrams by jumping on her and causing Abram to urinate on herself.  (Frazier Decl. ¶ 39.)  Teemu occasionally came to work with Ms. Hanson as part the of Activity Department's Animal Assisted Therapy Program.  (*Id.*)  To qualify for this program, Teemu underwent behavioral testing to assure that he was appropriate as a therapy animal.  (*Id*; Hanson Decl. ¶27.)

Although Frazier initially advised Abram that he prepared to ban Teemu from the Department, she indicated that requiring the dog to be on a leash and confined to Ms. Hanson's office would be sufficient.  Thereafter, Frazier told Ms. Hanson that the dog needed to be kept in her office and not be allowed in the hallway.  (Frazier Decl. ¶¶ 34-41, Exh. M.)

Notwithstanding, Abrams complained to Frazier on November 4 that he had not follow-up on my plan regarding the dog.  Abram also complained about the behavior of another co-worker's dog named Lulu who she claimed had nipped at her.  Pending an evaluation of the situation, Frazier asked Ms. Hanson not to bring Teemu to work and she complied with that request.  (*Id.*)

On November 22, 2004, Frazier advised Abrams in writing of his decision to allow the dogs to resume their visits to the Hospital as part of the Animal Assisted Therapy Program.  He also advised Abram that Ms. Hanson would be required to manage the behavior of Teemu to ensure that the dog would not cause stress to Abram or anyone else at the Hospital.  (*Id.*)

**J.    Abram Voluntarily Resigned From City Service in June 2005 and Retires Effective July 15, 2005**

With hearings set for both grievances, Abram tendered her resignation and stopped working on June 24, 2005.  She retired from City service effective July 15, 2005.  (Complaint ¶ 6; Abram Depo. 42:1-43:13, Exh. 1.)

**K.    Abram Files Suit Two Years Later on June 8, 2007**

Almost two years after her last day of work, Abram filed this action alleging violation of the Civil Rights Act of 1866, 42 U.S.C. Section 1981 ("Section 1981").  She contends that she was "compelled to resign her job."  (Complaint ¶ 6.)  She alleges that the City and Frazier "subjected her to a pattern and practice of unlawful discriminatory employment practices" discriminated against her on the basis of her race, color and national origin.  (Complaint ¶¶ 8-9.)  She claims this discrimination include:

- false performance evaluations;
- unwarranted threats of disciplinary action;
- unwarranted disciplinary actions;
- humiliation;
- unwarranted close scrutiny;
- continuing harassment; and
- continuing hostility.  (Complaint ¶ 8.)

She also contends that the City and Frazier retaliated against her for protesting her discriminatory treatment.  (*Id.*)

**III.    ARGUMENT**

Section 1981(a) guarantees "all persons" the same rights as white citizens to "make and enforce contracts."  42 U.S.C. § 1981(a).  The statute defines the term "make an enforce contracts" as

"the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). When analyzing employment discrimination claims under Section 1981, a district court should be guided by the same principles as those applied to claims under Title VII. *Surrell v. California Water Service Co.*, 518 F.3d 1097, 1103, 1105 (9th Cir. 2007). To prevail on a claim under Section 1981, a plaintiff must prove that the defendants acted with intent to discriminate. *Mustafa v. Clark County School Dist.*, 157 F.3d 1169, 1180 (9th Cir. 1998).

Although Abram's complaint sets forth only a single claim under Section 1981, she appears to allege three separate theories of relief: (a) racial discrimination; (b) retaliation; and (c) racial harassment.[4] She concedes that this allegedly unlawful conduct was perpetrated by two individuals, Defendant Frazier and Ms. Hanson. (Abram Depo. 27:19-28:9.) Abram cannot prevail on any theory of relief.

### A.    Abram Claims Are Barred, In Part, By The Statute of Limitations

Since it does not contain its own statute of limitations, the statute of limitations for Section 1981 claims is governed either by the forum state's law for personal injury torts or the four-year catchall provision of 28 U.S.C. §1658(a). *Jones v. R.R. Donnelley Sons & Co.,* 541 U.S. 369, 382-83 (2004); *Goodman & Lukens Steel Co.*, 482 U.S. 66, 661-62 (1987); *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1140 (9th Cir. 2000). The Supreme Court has limited the application of the four-year catchall statute to those claims that do not "allege a violation of the pre-1980 version of Section 1981 but [do] allege violations of the amended statute." *R.R. Donnelley,* 541 U.S. at 382-83; *Cholla Ready Mix, Inc. v. Civish,* BLM, 382 F.3d 969, 974n.5 (9th Cir. 2004).

Thus, California's two-year statue of limitations for personal injury actions, California Code of Civil Procedure Section 335.1, governs Abram's claim of disparate treatment discrimination. *Patterson v. McLean Credit Union*, 491 U.S. 164, 180-82 (1989)(racial discrimination as proscribed by Section 1981 is limited to the right to make and enforce contracts and includes a claim for "refusal

---

[4] Abram alleges that actions taken against her against her were motivated by her "race, color and national origin (African American – Black)." (Complaint ¶ 9.) Defendant's reference to "race" herein should be construed as including Abram's color and national origin.

to enter into an employment contract on the basis of race."; *Alvarado v. Fedex Corp.*, 2006 WL 644875, *21 (N.D. Cal., March 13, 2006)(Plaintiff's failure to promote claim would have been actionable prior to Civil Rights Act of 1991, and thus are subject to California's personal injury statute of limitations).

However, Abram's claims of retaliation and racial harassment are subject to the four-year catchall limitations period. *R.R. Donnelley,* 541 U.S. at 382-83.

### 1. Abram's Claim for Discrimination Is Barred To The Extent It Is Based on Conduct Before June 8, 2005

Discrete acts such as discriminatory termination, failure to promote, or discipline are separate and discrete actionable events that accrue at the time they occur. *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002.)  Accordingly, the only acts of discrimination that are actionable would be ones that occurred on or after June 8, 2005, *i.e.*, within two years of the June 8, 2007 filing of this action.

The only action that occurred within this time period was Abram's alleged constructive termination sometime in June or July of 2005.  As described in greater detail above, all of the other alleged discrete acts of discrimination including Abram's performance evaluations, disciplinary matters, conflicts or disagreements with supervisors or co-workers occurred well before June 8, 2005.

### 2. Abram's Claims For Retaliation And Harassment Are Barred To The Extent They Are Based On Conduct Before June 8, 2003

Acts of retaliation, like acts of discrimination, are separate and distinct.  Thus, such claims accrue when the act occurs.  *Morgan*, 535 U.S. at 115, 116.  Accordingly, the only acts of retaliation that are actionable are those that occurred on or after June 8, 2003.  Similarly, Abram's claims of harassment hinge upon a showing that one or more action(s) constituting harassment occurred within this statutory period.

1

2

**B.    The City and Frazier Are Entitled to Summary Judgment On Abram's Discrimination Claim**

    **1.    Abrams Cannot Establish a *Prima Facie* Case**

3

4

To resolve claims of employment discrimination including those under Section 1981, courts apply the *McDonnell Douglas*[5] "shifting burdens" analytical framework.  *Surrell*, 518 F.3d at 1105. Under this framework, a plaintiff must first prove a *prima facie* case that (a) she is a member of a protected class; (2) that she suffered an adverse employment action; and (c) that there is a causal link between plaintiff's status and the adverse action.  *Id.*  Abram cannot establish a *prima facie* case because she cannot show she suffered any adverse employment action.

5

6

7

8

As noted above, the only actionable adverse act is Abram's allege constructive termination. But she cannot show that her working conditions were sufficiently intolerable to meet the high hurdle of showing such an adverse action.  A constructive discharge claim arises where an employee's decision to resign is deemed reasonable because she was forced to work under "unendurable working conditions."  *Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007).  The appropriate inquiry to determine whether such a resignation constitutes a constructive discharge is objective:  "did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign."  *Id*. quoting *Penn State Police v. Suders*, 542 U.S. 129, 141 (2004).   The working condition must become so "sufficiently extraordinary and egregious" as to overcome the "normal motivation of a competent, diligent, and reasonable employee to remain on the job."  *Poland*, 494 F.3d at 1184.  "We set the bar high" for a constructive discharge claim "because antidiscrimination policies are better served when they are challenged within an on-going employment relationship."  *Id*. at 1184-85; see also, *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000)(it is impossible for a plaintiff who fails to demonstrate a hostile work environment to meet the higher standard of constructive discharge).

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Abram cannot show that her resignation occurred under such unendurable, extraordinary, and gregarious conditions.  She concedes that the only individuals who subjected her to discrimination were Frazier and Hanson.  (Abram Depo. 25:2-11.)  But Hanson stopped supervising Abram in

24

25

26

27

        [5] *McDonnell Douglas v. Green*, 411 U.S. 792 (1973).

28

November 2003, more that a year and one half before her resignation.  The only conflict between Abram and Hanson during this period of time concerned the presence of Hanson's dog in the workplace.  ( Hanson Decl. ¶27; Frazier Decl. ¶¶ 39-41, Exh. M.)  The evidence shows that Frazier effectively dealt with this September 2004 issue by restricting Abram's exposure to the dog.  (*Id.*)  There is no evidence of any further conflict with Hanson.

As to Frazier, Abram does not identify any action taken after her September 2004 return to work that a reasonable person would construe as creating intolerable conditions.  The only action Frazier took during this period were to move forward Abram's two grievances.  Abram's concern about Hanson's dog.  (Frazier Dec. ¶¶ 31-38, Exhs. I-L.)  In doing so, Frazier engaged in the type of day-to-day managerial activity that occurs every day in the workplace.  Frazier made an effort shortly after Abram's return from leave to resolve these issues so Abram could move forward.  (*Id.*)  Abram rejected that overture.  (*Id.*)  Moreover, this process ran of an extended period of time through no fault of Frazier or the City.  This conduct falls far short of the high bar set for constructive discharge claims and defeats any slowing of adverse employment action.

### 2.     Defendants Had Legitimate Non-Discriminatory Reasons for Their Actions, Abram Cannot Meet Her Burden to Show Pretext

If Abram can establish a *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for its actions.  *Smith v. Barton*, 914 F.2d 1330, 1339-1340 (9th Cir. 1990).  The employer's burden is only one of production, not one of persuasion.  Once it meets that burden, the inference of retaliation raised by the *prima facie* case is dispelled.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993).  The burden then shifts back to the plaintiff to show that the asserted reason was a pretext for retaliation.  *Reeves v. Sanderson Plumbing Products Inc.*, 530 U.S. 133, 146-150 (2000).

Here, the City and Frazier had legitimate non-discriminatory reasons for all of the adverse actions Abram challenges that fall within the statute of limitations, whether a two or four year period applies.  Those actions were motivated by legitimate concerns regarding the quality of Abram's job performance including:  (a) Abram's May 2003 Job Appraisal Evaluation and Developmental Plan (Frazier Decl. ¶¶ 24-25, Exhs. G; Hanson Decl. ¶¶ 13-15, Exhs. F.); (b)  the disciplinary action

1  initiated in August 2003 (Frazier Decl. ¶¶ 30-31, Exh. I; Hanson Decl. ¶¶ 21-22, Exh. H.); (c) the

2  disciplinary action initiated in October 2003 (Frazier Decl. ¶¶ 32-33, Exh. J; Hanson Decl. ¶¶ 25-26,

3  Exh. I.); (d) Frazier's response to Abram's complaints regarding Hanson's dog (Frazier Decl. ¶¶ 39-

4  41, Exhs. M; Hanson Decl. ¶ 27.).

5         Abram cannot meet her burden to show that these legitimate non-discriminatory reasons are

6  pretextual.  She offers little more than speculation that Frazier or Hanson were motivated by racial

7  *animus* in exercising their supervisory authority over Abram's job performance.  She claims that

8  Frazier showed "favoritism," "treated her differently," or "singled [her] out" from other Activity

9  Therapists.  (Abram Depo. 37:14-40:22.)  She assumes that race must have motivated this conduct,

10 but cannot present any evidence to raise such an inference.  She concedes that she never heard Frazier

11 utter a racial slur or talk about African-Americans in a discriminatory fashion.  (Abram Depo. 38:2-

12 6)[6]  She also concedes that Frazier did not single out or treat differently the other African-American

13 Activity Therapists.  (Abram Depo. 40:8-22.)  She did not offer any testimony creating an inference

14 of racial animus with respect to Frazier.

15        Similarly, she has no evidence of racial *animus* with respect to Hanson.  Abram concedes that

16 she never heard Hanson make a racial or any statement derogatory of African-Americans.  (Abram

17 Depo. 46:8-18.)  She also concedes that she has no personal knowledge as to whether Hanson wrote

18 up other employees for the kinds of actions she claims Hanson took against her.  (Abram Depo.

19 59:16-60:8.)

20        Abram's evidence of *animus* comes down to her contention that it must be racially motivated

21 because she is African-American and she suffered adverse action.  (Abram Depo. 61:9-15)  But a

22 Plaintiff must do more than establish her protected status in order to show pretext and survive

23 summary judgment.  Abram fails to do so and her claims of discrimination against Frazier and the

24 City fail.

25

26

27        [6] Abram contends that a co-worker, Norman Burns, once told her that he had heard Frazier
   state "he was white, and he is always right."  (Abram Depo. 38:7-18.)  Of course, this isolated
28 statement is inadmissible hearsay.  Fed. R. Evid. 801-802

1

2

### C. The City and Frazier Are Entitled to Summary Judgment On Abram's Retaliation Claim

The Supreme Court is currently considering whether retaliation claims lie under Section 1981. See *Humphries v. CBOCS West*, 474 F.3d 387 (7th Cir. 2007) *cert. granted*, 128 S.Ct. 30 (2007). The Court heard oral argument in the case on February 20, 2008 and should issue an opinion shortly.

Courts utilize the same "shifting burdens" framework noted above to address claims of retaliation. *St. Mary's*, 509 U.S. at 506; *Surrell*, 518 F.3d at 1107-08. First, to establish a *prima facie* claim for retaliation, a plaintiff must establish that (1) she engaged in a protected activity; (2) that she was thereafter subjected to an adverse employment action; and (3) that there exists a causal link between the protected activity and the adverse employment action. *Id*. Once a plaintiff establishes a *prima facie* case, the burden then shifts to the employer to articulate a legitimate, non-retaliatory reason for its actions, at that point. The employer's burden is only one of production, the burden then shifts back to the plaintiff to show that the asserted reason was a pretext for retaliation. *Id*.

For all the reasons previously discussed above, Abram cannot show the City's legitimate non-retaliatory reasons for its actions are pretextual. Accordingly, Frazier and the City are entitled to summary judgment on Abram's retaliation claim.

### D. The City and Frazier Are Entitled To Summary Judgment On Abram Racial Harassment Claims Because She Cannot Show That Her Workplace Was Permeated With Discriminatory Intimidation, Ridicule and Insult

To prevail on a hostile workplace claim, the plaintiff must show that her "workplace [was] permeated with discriminatory intimidation, ridicule and insult that [was] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) The plaintiff must prove that, considering all the circumstances, her working environment was "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). "[C]onduct must be extreme to amount to a change in the terms and conditions of employment . . .." Id. at 788. "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id*. at 788, citing *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81-82 (1998). Unless extremely serious, isolated

1  incidents are not sufficient to alter the conditions of employment as a matter of law.  *Manatt v. Bank*

2  *of America,* 339 F.3d 798 (2003)(using phrase "China man" and pulling eyes back in an attempt to

3  imitate or mock the appearance of Asians was not severe nor pervasive enough to alter conditions of

4  employment); see also *Kortan v. California Youth Authority*, 217 F.3d 1104, 1110-1111 (9th Cir.

5  2000) use of words such as "castrating bitch" insufficient to create hostile work environment.)

6          Abram cannot meet this burden .  As noted above, she has no evidence that Frazier or

7  Hanson's conduct was motivated by her race.  Moreover, she does not have evidence of a workplace

8  permeated by severe or pervasive discriminatory intimidation, ridicule, or insult.  The conduct she

9  challenges involved Frazier and Hanson efforts to supervise her job performance, *e.g.* conducting

10  performance evaluations, initiating discipline, or discussing the manner in which she carried out a

11  particular program activity.  Although it is clear that Abram did not welcome these events and

12  believed they were unfair, no reasonable person would find supervisors exercising their supervisory

13  authority in these circumstances to be objectively or subjectively offense.

14          Accordingly, the City and Frazier are entitled to summary judgment on Abram's racial

15  harassment claim.

**E.      The City Is Not Liable Under Section 1981 For The Conduct Of Its Employees
16         Unless Those Employees Are Final Policymakers With Respect To The Conduct
17         At Issue**

18          Finally, the City is not liable on any of Abram's claims under Section 1981 because she cannot

19  meet her burden to prove that any of the conduct at issue is attributable to the City under *Monell v.*

20  *Dept. of Social Services*, 436 U.S. 658, 691 (1978); *United Federation of African American*

21  *Contractor v. Oakland*, 96 F.3d 1204, 1215 (9th Cir. 1996)(the amendment to 42 U.S.C. §1981

22  preserves the "policy or custom requirement in suits against state actors.").  It is well-settled law that

23  "municipalities are answerable only for their own decisions and policies; they are not vicariously

24  liable for the constitutional tort of their agents."  *Auriemma v. Rice*, 957 F.2d 397, 399 (7th Cir.

25  1992).  As the Supreme Court made clear in *Monell* "Congress did not intend municipalities to be

26  held liable unless action pursuant to an official municipal policy of some nature caused a

27  constitutional tort . . . . [A] municipality cannot be held liable under § 1983 on a respondeat superior

28  theory."  *Monell*, 436 U.S. at 691

1    *Monell* is not an affirmative defense; rather, municipal liability is an element of a Section

2    1981 cause of action.  Accordingly, the burden always remains on the plaintiff to demonstrate that a

3    constitutional tort was committed pursuant to a municipal policy or custom.  *Smith v. Chicago Sch.*

4    *Reform Bd. of Trustees*, 165 F.3d 1142, 1149 (7th Cir. 1998).  And because of the strong policy

5    against imposing respondeat superior liability on cities, "the plaintiff bears a heavy burden in proving

6    municipal liability . . ."  *Thomas v. City of Chattanooga*, 398 F.3d 426, 433 (6th Cir. 2005).

7        When a municipal employee commits a constitutional tort, the trial court must inquire whether

8    that employee had "final policymaking authority" over the matter in question.  *City of St. Louis v.*

9    *Prapotnik*, 485 U.S. 112, 123 (1988) (plurality opinion).  "[T]he identification of policymaking

10    officials is a question of state law."  *Id*. at 124;  See also *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th

11    Cir. 1999).  The identification of those officials whose decisions represent the official policy of the

12    local government unit is itself a legal question to be resolved by the trial judge.  *Jett v. Dallas*

13    *Independent School Dist.*, 491 U.S. 701, 737 (1989).

14        Importantly, the fact that a city employee has independent decision-making power does not

15    render him a final policymaker for purposes of municipal liability.  "If the mere exercise of discretion

16    by an employee could give rise to a constitutional violation, the result would be indistinguishable

17    from respondeat superior liability."  *Prapotnik*, 485 U.S. at 126; *Pembaur v. City of Cincinnati*, 475

18    U.S. 469, 484 n.12 (1986) ("[I]f county employment policy was set by the Board of County

19    Commissioners, only that body's decisions would provide a basis for county liability.  This would be

20    true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised

21    that discretion in an unconstitutional manner; the decision to act unlawfully would not be a decision

22    of the Board.").  In sum, for municipal liability to attach, "the official who commits the alleged

23    violation of the plaintiff's rights [must have] authority that is final in the special sense that there is no

24    higher authority."  *Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 469 (7th Cir. 2001)

25    (emphasis added).

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 1.    The City's Civil Service Commission Is The Final Policymaker With Respect To Employment Matters In San Francisco

In deciding whether an employee is a final policymaker, a court "would not be justified in assuming that municipal policymaking authority lies somewhere other than where the applicable law purports to put it." *Prapotnik*, 485 U.S. at 126.  See also *Abbott v. Village of Winthrop Harbor*, 205 F.3d 976, 982 (7th Cir. 2000).  And under California law, "a city's Charter determines municipal affairs such as personnel matters."  *Hyland v. Wonder*, 117 F.3d 405, 414 (9th Cir. 1997).

The Charter of the City and County of San Francisco makes clear that the Civil Service Commission is the final policymaker with respect to employment matters.  Section 10.100 states that the CSC "is charged with the duty of providing qualified persons for appointment to the service of the City and County."   Section 10.101 makes it the responsibility of the CSC to adopt "rules, policies and procedures" to govern an exhaustive list of topics relating to city employment.  The CSC has exercised this grant of power by adopting numerous rules on issues ranging from job announcements and examinations to equal opportunity and employer-employee relations.  See Civil Service Commission Rules 103, 104, 122, 422.

The case law makes clear that under circumstances like this, the Civil Service Commission is the final policymaker with respect to employment matters.  *Prapotnik*, 485 U.S. at 126, 129.  The law of the Ninth Circuit confirms that for purposes of municipal liability the CSC is the final policymaker for employment matters in San Francisco.  See, e.g. *Hyland*, 117 F.3d 404 (9th Cir. 1997).

### 2.    The Conduct At Issue Cannot Be Attributed To The Civil Service Commission

In discovery, the City requested that Abram identify the policy, practice, or custom that caused his injuries.  (Rolnick Decl. ¶ 4, Exh.C.)  Therein, Abram did not identify any specific policy of the City, Civil Service Commission, or MUNI.  (*Id.*, See Response Nos. 2.)  In fact, she concedes that the City has policies and practices prohibiting employment discrimination, harassment, and retaliation.  (Abram Depo. 61:23-62:18.)  She provided absolutely no details regarding the specific actions taken against her by Frazier evidence of *Monell* liability.  (*Id.*, See Responses Nos. 2-5.)  When asked to identify the final policymaking authority for these practices she identified Frazier.

1    (*Id.* Response No. 5.)  She did not identify the Civil Service Commission.  (*Id.*)  Of course, neither

2    Frazier nor Hanson are final policymakers with respect to employment matters.

3         This is not to say, of course, that the City may never be liable for employment discrimination

4    committed by an individual department or employee unless the CSC is implicated in the

5    discriminatory conduct.  Municipal liability could attach, for example, if the CSC (or the Board of

6    Supervisors) were to delegate final policymaking authority to a department head, and that person

7    subsequently committed a constitutional tort.  See, e.g., *Hyland*, 117 F.3d at 415.  Or, a plaintiff may

8    establish municipal liability by proving that the CSC ratified the policy that led to the discriminatory

9    conduct.  *Id.*  Finally, a plaintiff could show that the Hospital acted pursuant to a "longstanding

10   practice or custom" of racial discrimination by the City and County of San Francisco which amounts

11   to a "standard operating procedure."  *Jett*, 491 U.S. at 737.  However, Abram has not and cannot

12   make any of these showings.

13        Abram cannot show that the CSC delegated final policymaking authority to any of these

14   individuals.  As the final policymaker for personnel matters, the CSC is free to delegate broad

15   operational authority to a municipal department – including authority over personnel policy – without

16   turning that department into a "final policymaker" for purposes of municipal liability.  *Prapotnik*, 485

17   U.S. at 127-28; *Pembaur*, 475 U.S. at 484 n.12.  Accordingly, even if there was some evidence that

18   any of the individuals identified by Abram as the final policymaker had their own "policy" with

19   respect to the practices identified in his discovery responses, that evidence would be insufficient as a

20   matter of law to support a finding of municipal liability in the absence, as here, of a delegation of

21   authority.  Abram cannot present any evidence that the CSC delegate final policymaking authority to

22   the individuals identified in his discovery responses.  The Commission explicitly retains the final

23   word with respect to employment matters.  The Charter gives the CSC jurisdiction over virtually

24   every conceivable personnel action.  See Charter §10.101.  Nor can she show that the CSC ratified

25   the conduct at issue.  There is no evidence that the CSC even knew of the conduct identified in her

26   interrogatory responses.

27        Nor can she show ratification of the conduct at issue by the CSC, or even the Hospital

28   administrators.

Finally, Abram cannot show that the conduct at issue was taken pursuant to any longstanding City custom.  A plaintiff's burden to establish a custom of constitutional violations is particularly heavy – he must establish that the custom was "so widespread in usage as to constitute the functional equivalent of an express policy."  *Choate v. County of Orange*, 86 Cal.App.4th 312, 328 (2000).  As described by the Sixth Circuit:

> A "custom" for purposes of Monell liability must be so permanent and well settled as to constitute a custom or usage with the force of law.  [Citation omitted].  In turn, the notion of "law" must include deeply embedded traditional ways of carrying out state policy.  [Citation omitted].  It must reflect a course of action deliberately chosen from among various alternatives.  [Citation omitted].  In short, a "custom" is a "legal institution" not memorialized by written law.  *Doe v. Claiborne County* (6th Cir. 1996) 103 F.3d 495, 507-508 (internal quotations omitted).

Far from presenting evidence that the constitutional violations were a "legal institution" in San Francisco, Abram presents a picture of actions taken against her, and only her.  (Rolnick Decl. ¶ 4, Exh. C.)  She does not and cannot present evidence of one other case in which the City has allegedly taken the actions she complains about.  (*Id.*).  See *Thomas*, 398 F.3d at 433 (". . . the plaintiff bears a heavy burden in proving municipal liability, and he cannot rely solely on a single instance to infer a policy of [unconstitutional conduct]").  There is no evidence of a widespread custom of deprivation of due process rights or retaliation such that it was the functional equivalent of an express policy.

Abram falls far short of meeting her burden to show *Monell* liability.  Thus, the Court should grant summary judgment in favor of the City on all of Plaintiff's claim under Section 1981.

## IV.    CONCLUSION

For all the reasons above, Defendants are entitled to summary judgment.

Dated: May 14, 2008

                                DENNIS J. HERRERA
                                City Attorney
                                ELIZABETH SALVESON
                                Chief Labor Attorney
                                JONATHAN C. ROLNICK
                                Deputy City Attorney

                        By:  s:/Jonathan C. Rolnick
                                JONATHAN C. ROLNICK

                                Attorneys for Defendants
                                CITY AND COUNTY OF SAN FRANCISCO
                                and WILLIAM FRAZIER