1  DENNIS J. HERRERA, State Bar #139669
   City Attorney
2  ELIZABETH SALVESON, State Bar #83788
   Chief Labor Attorney
3  JONATHAN C. ROLNICK, State Bar #151814
   Deputy City Attorney
4  Fox Plaza
   1390 Market Street, Floor #5
5  San Francisco, California 94102-5408
   Telephone:    (415) 554-4247
6  Facsimile:    (415) 554-4248

7

8  Attorneys for Defendants
   CITY AND COUNTY OF SAN FRANCISCO
9  and WILLIAM FRAZIER

10              IN THE UNITED STATES DISTRICT COURT

11              NORTHERN DISTRICT OF CALIFORNIA

12

13  SUSIE ABRAM,                          Case No. C07-3006 PJH

                   Plaintiff,             *E-filing case*
14
           vs.                            **DECLARATION OF WILLIAM
15                                        FRAZIER IN SUPPORT OF
   CITY AND COUNTY OF SAN                 DEFENDANTS' MOTION FOR
16  FRANCISCO, DEPARTMENT OF              SUMMARY JUDGMENT**
   PUBLIC HEALTH; WILLIAM FRAZIER,
17  DIRECTOR OF THERAPEUTIC               Date:       June 18, 2008
   ACTIVITIES, LAGUNA HONDA               Time:       9:00 a.m.
18  HOSPITAL                              Courtroom:  3, 17th Floor
                                                      Hon. Phyllis J. Hamilton
19              Defendant.
                                          Action Filed: June 8, 2007
20

21

22         I, William Frazier, declare as follows:

23         1.     I am the Director of Therapeutic Activities at Laguna Honda Hospital and

24  Rehabilitation Center ("Laguna Honda" or the "Hospital"). I have held this position since June 1998.

25  I have personal knowledge of the matters herein and, if called as a witness, could and would

26  competently testify to the matters set forth below.

27         2.     Laguna Honda is a licensed acute-care hospital and skilled nursing facility operated

28  by the City. It is one of the largest single site municipally owned and operated skilled nursing care

facilities in the country. The health care professionals at Laguna Honda provide a wide range of inpatient and outpatient services, including rehabilitation services. Laguna Honda provides a full range of skilled nursing services to adults who are disabled or chronically ill, including specialized care for those with wounds, head trauma, stroke, spinal cord injuries, orthopedic injuries, AIDS and dementia. The Hospital also has a hospice program.

3.    As Director of Therapeutic Activities, I oversee the social, cognitive, physical, and creative therapeutic activities Laguna Honda provides for its residents. I also am responsible for management of the Hospital's Vocational Rehabilitation, Volunteer Services, and Spiritual Care programs. The Activity Therapy program is staffed by approximately 45 City employees, approximately 40 Activity Therapists (Civil Service Class 2587 Health Worker III) and 5 Activity Therapy Supervisors (Civil Service Class 2588 Health Worker IV). The Activity Therapists report directly to the Activity Therapy Supervisors who, in turn, report directly to me.

4.    Plaintiff Susie Abram worked at the Hospital as an Activity Therapist throughout my tenure until she retired in June 2005. During this time, Abram had five different supervisors: Charlotte Gibson; Paul Croeger; Lisa Randon; Christine Hanson; and Barbara Taormina. I did not directly supervise Abram, but her supervisors reported directly to me.

5.    Each Activity Therapy Supervisor and the team of Activity Therapists working under them are responsible for an established group or "cluster" of residents. These clusters are organized based on the diagnoses or the physical and/or mental status of the residents. For example, the "psychosocial" cluster is comprised of residents with psychological or behavioral challenges such as bi-polar disorder and personality disorders. Another cluster, "chronic care", is comprised of residents with significant physical and cognitive impairment requiring a very high level of support for basic functions such eating, toileting, hygiene, and dressing.

6.    From the beginning of my tenure in 1998, Abram was assigned to unit D3. Shortly thereafter, the Hospital adopted the cluster system of classifying and grouping resident units. Unit D3 was grouped within the psychosocial cluster. From May of 2002 until September of 2004, Ms. Hanson was the Activity Therapy Supervisor assigned to that cluster. Ms. Hanson supervised Abram on this unit from May 2002 to early November 2003.

7.    Activity Therapists were assigned to resident units through a seniority based bidding process set forth in the Memorandum of Understanding between the City and SEIU Local 790, the union representing the City's Health Workers.  The bidding process for unit assignments is further defined by the Activity Therapy Staffing Plan.

8.    All of Abram's supervisors advised me of job performance issues with Abram.  These issues were two fold.  First, these supervisors recognized that Abram's skills did not keep up the increasing demands of her job particularly in the areas of record keeping and program planning.  The Hospital depends on Federal and state funding, and that funding is often tied to timely and accurate assessment of resident needs.  Also, documentation of the care provided to Hospital residents including annual assessment, care plans, quarterly progress notes and participation records are relevant to maintaining the Hospital's license during annual surveys by the California Department of Human Services.

9.    Second, Abram was resistant, and at times hostile, to the efforts of her supervisors to monitor and improve her job performance.  She was unnecessarily confrontational about even minor issues or disagreements with her supervisors.  I personally had similar issues with Abram's job performance.

10.    In February 2001, Abram and I disagreed over her coordination of an annual program to celebrate Black History Month.  Abram had helped plan this program for Laguna Honda residents each February.  I advised Abram well in advance of the 2001 event that I wanted the program to have more of an educational theme.  In the previous years, the program consisted of a musical performance and an exhibit of black inventors.  I believed it was important to expand on the educational theme in order to enhance the experience for the residents in celebration of African-American culture and its contributions to our society.

11.    Shortly after the event, I met with Abram and one of her co-workers, Sandra Johnson.  They expressed frustration and irritation with my involvement in this program.  In particular, they told me that they felt the planning of Black History events should be left to the purview of African-American staff and that my involvement was "belittling" of their efforts.  I apologized for any hard feeling regarding my involvement.  I also told them that I believed it was

1  within my authority and responsibility to provide input into the quality and nature of this annual

2  program. Abram also commented about this event in her rebuttal to her Performance Appraisal

3  Report for the period January 1, 2001 to March 31, 2002. After February 2002, Abram chose not to

4  participate in the planning of future Black History Month programs.

5       12.    Abram also expressed frustration with the manner in which I handled a conflict

6  between her and a co-worker, Pat Zelaya-Wagner in early April 2001. At that time, Ms. Zelaya-

7  Wagner approached me regarding an interaction she had with Abram on March 30. According to Ms.

8  Zelaya-Wagner, Abram shared unfavorable information about Ms. Zelaya-Wagner with several

9  residents and co-workers. Ms. Zelaya-Wagner told me that she felt humiliated by these events.

10      13.    On April 3, I sent a memorandum to Abram alerting her to this complaint and

11 requesting that she discuss it with me. Therein, I advised her that she would be allowed to have a

12 union representative present if she wished. Attached as **Exhibit A** is a true and correct copy of that

13 April 3, 2001 memorandum.

14      14.    I met with Abram, her union representative, and Katherine Dere, Laguna Honda

15 Hospital Department Personnel Officer, to discuss these events. Ms. Zelaya-Wagner joined the

16 meeting later. Abram was given an opportunity to respond to Ms. Zelaya-Wagner's charges. Abram

17 apologized for what had transpired and indicated that her comments were made in jest and were not

18 intended to cause any harm. I took Abram's apology to be a sincere one. I asked that she be mindful

19 of maintaining professional boundaries in her interactions with residents as well as co-workers. I

20 commemorated the substance of that April 13 meeting in a memorandum dated April 30, 2001.

21 Attached as **Exhibit B** is a true and correct copy of that memorandum.

22      15.    Several days later, I received a letter from Abram raising several concerns about the

23 fashion in which I handled this incident. In particular, Abram indicated that she felt that I had

24 determined that she was at fault for this incident before I had ever spoken with her. Attached as

25 **Exhibit C** is a true and correct copy of the letter dated April 24, 2001 from Abram.

26      16.    I responded to this letter in another memorandum dated April 30, 2001. Therein, I

27 provided my response to each of Abram's charges. In particular, I noted my efforts to ensure that

28 Abram had a full and fair opportunity to respond to all of Ms. Zelaya-Wagner's assertions and to

FRAZIER DECL. ISO MSJ – CASE NO. C07-3006 PJH        4        n:\labor\li2007\080114\00481563.doc

1    ensure that she had union representation throughout the process if she so desired. I also noted that

2    Abram's union representative had not expressed any concerns about the manner in which I handled

3    the situation and reviewed the many opportunities I gave Abram to provide her side of the story.

4    Attached as **Exhibit D** is a true and correct copy of that April 30, 2001 memorandum.

5          17.    This incident did not result in any disciplinary action against Abrams, formal or

6    otherwise. However, I did schedule an in-service training for all Activity Therapy staff to address

7    professional boundaries in the workplace.

8          18.    In April 2001, Abram and I also had discussions regarding her plan to fry chicken

9    for the residents in her cluster. When I learned of this plan, I advised Abram that the Hospital's

10    Nutritional Services Department had expressed concern to me about these types of cooking activities

11    in the past. I told Abram that I wanted to consult with the Nutritional Services Department to identify

12    the nature of its concerns so we could better plan future activities. I also told Abram that she could

13    proceed with her activity as planned.

14          19.    Three days later, Abram came to my office and, in a tone I found to be hostile,

15    indicated that she believed I was in no position to inquire about the activity she had planned and that I

16    had done so only to harm her reputation at the Hospital. I explained to Abram that Nutritional

17    Services Department had indicated that it had legitimate safety concerns regarding frying foods, and

18    that my inquiry had everything to do with those concerns and nothing to do with any desire to

19    undermine her reputation. I also explained my belief that my inquiry was well within my authority as

20    the Director of Activity Therapy. I commemorated the substance of our conversation in a

21    memorandum dated April 13, 2001. Attached as **Exhibit E** is a true and correct copy of that

22    memorandum.

23          20.    On another occasion in 1999 or 2000, Abram expressed her frustration with what

24    she viewed as meddling in an off-site fishing trip she had planned for some residents. I supported this

25    activity but, in advance of this trip, I made some inquiries to Abram regarding its logistics including

26    whether the bus that would transport the residents would be able to drive up to the fishing facility and

27    how fishing equipment would be provided. On this later point, I suggested that Abram find a location

28

1    where the fishing equipment could be rented because purchasing such equipment would not be

2    practical.

3           21.    During my tenure at the Hospital, Abram's supervisors initiated formal disciplinary

4    action was against Abram on three occasions: (a) December 2002; (b) August 2003; and (c) October

5    2003. Ms. Hanson recommended the discipline on all three occasions. In each instance, I determined

6    that disciplinary action was warranted and motivated by deficiencies in Abram's job performance.

7           22.    On or about December 3, 2002, Ms. Hanson gave Abram notice of an employee

8    conference to recommend discipline for inattention to duty and insubordination-refusal of

9    assignment. Specifically, Hanson asserted that Abram had failed to complete in a timely fashion

10    required quarterly and annual documentation due for certain Hospital residents. Hanson

11    recommended a three-day suspension. She held a conference with Abram and her union

12    representative, Ruben Garcia, on December 11, 2002. She commemorated that conference in a

13    memorandum. Abram requested a review of the recommended discipline.

14           23.    I met with her and her union representative on January 3, 2003. Following the

15    meeting and as a sign of good faith, I determined that the discipline should be reduced to written

16    warning. I commemorated the substance of that meeting as well as the reasons for my

17    recommendation in a written memorandum prepared that day. Attached as **Exhibit F** are true and

18    correct copies of the Employee Conference Form prepared by Ms. Hanson, Hanson's memorandum

19    commemorating her conference with Abrams on December 11, and the review and recommendation I

20    prepared following my January 3 conference with Abrams.

21           24.    In May 2003, Ms. Hanson delivered a Performance Appraisal Report to Abram.

22    Therein, Ms. Hanson noted Abram's strengths as well as her weaknesses. Ms. Hanson rated Abram's

23    performance as "exceeds expectations" or "competent and effective" in numerous areas, but also

24    noted her need to improve in a number of areas of the review including assessments, documentation,

25    planning, implementation, and communications. Ms. Hanson gave Abram an overall evaluation

26    rating of "development needed" and prepared Development Plans for Abram in three areas of core

27    competency: (a) improved implementation of activities; (b) improved planning skills; and (c) timely

28    and appropriate completion of required documentation.

25.     Abram refused to sign the Performance Appraisal Report or the Development Plans. Instead, she provided a written response to Report and requested that I review the Performance Appraisal Report. I met with Abram on July 13. She told me that she did not agree with Ms. Hanson's report and, in particular, the fact that Ms. Hanson had established certain development plans for Abram. In advance to the conference, I reviewed Ms. Hanson's report as well as Abram's May 13, 2003 written rebuttal to that report. During my conference with Abram, we discussed her concerns about the accuracy of the appraisal as well as Ms. Hanson's role as a supervisor. I asked Abram to comply with the Development Plans presented by Ms. Hanson in the report. I also encouraged her to contact me if she felt she was being treated unfairly. I approved the performance appraisal report and commemorated the substance of my conference with Abrams in a memorandum dated July 14, 2003. Shortly thereafter, I spoke with Ms. Hanson about Abram's concerns and asked her to adjust the dates of the development plan to take effect in July 2003. Attached as **Exhibit G** are true and correct copies of the Performance Appraisal Report and Development Plans, Abram's written rebuttal, and my July 14 memorandum.

26.     This was not the first time Abrams refused to sign her Performance Appraisal Report. Although in each case, her supervisor gave her an overall rating of "competent and effective," she also refused to sign her three previous Performance Appraisal Reports presented by Lisa Randon in July 2002 and March 2001, and by Paul Croeger in January 2000.

27.     On July 29, 2003, I met with Abram and her union representative Ruben Garcia-Rodriguez. Mr. Garcia-Rodriguez had alerted me that Abram wished to make a complaint against Ms. Hanson. At the start of the meeting he stated that Abram believed there was a "discriminatory situation" and provided me with a list of incidents that Abram wished to complain about including that Ms. Hanson: (a) required Abram to complete her monthly activity calendars on a computer, but did not require other staff to do the same; (b) brought her dog into a meeting with Abram even though Abram had told Ms. Hanson that she was allergic to dogs; (c) cut off the lock to the storage locker on the D3 ward while Abram was on vacation resulting in the loss of Abram's personal CDs; (d) told a co-worker that Abram was "a problem;" (e) refused to provide volunteer support for an off-site trip to a casino; and (f) harassed Abram about not supporting programming at Moran Hall. Although Mr.

1    Garcia indicated that there was a "discriminatory situation," neither he nor Abram indicated in any

2    fashion that they believed Ms. Hanson conduct was motivated by Abram's racial *animus*, only that

3    Abram felt she was being treated unfairly.

4         28.    I told them that I was aware of many of these issues from previous conversations

5    with Abram and/or Ms. Hanson. Nonetheless, I told them that I would investigate these claims and

6    report back to them. During this meeting Abram also indicated that she intended to bid out of Ms.

7    Hanson's cluster at the upcoming bidding process.

8         29.    I reported back to Abram and her union representative in August 2003. At that

9    time, I provided them with a memorandum that commemorated the substance of our July 29 meeting

10   as well as the results of my investigation. Attached as **Exhibit H** is a true and correct copy of that

11   memorandum. I determined that Abram had not to be the victim of any unfair treatment. I did find

12   Ms. Hanson could have handled some of these issues more effectively.

13        30.    Ms. Hanson initiated formal disciplinary action against Abram a second time in

14   August 2003. In this case, Ms. Hanson charged Abram with inattention to duty, failure to properly

15   manage a cluster wide activity, and dishonesty. This disciplinary issue arose as a result of a

16   "summer/garage sale" Abram organized for the psychosocial cluster. As detailed in the Employee

17   Conference Form prepared by Ms. Hanson, the activity was disorganized, Abram failed to ensure

18   clean up after the activity, and there were significant questions regarding the funds raised during this

19   activity. Ms. Hanson recommended a two-day suspension. Because Abram took a month long

20   vacation in September, Ms. Hanson did not present this Employee Conference Form to Abram and

21   her union representative until October 2003.

22        31.    Abram again requested that I review this disciplinary matter. However, for the

23   reason noted below in paragraph 34, my review did not take place until more than a year later. On

24   November 4, 2004, I met with Abram and her union representative to discuss the disciplinary matter.

25   Following my review I prepared a review and recommendation form wherein I commemorated my

26   reasons for recommending discipline in this case. I did reduce the recommended discipline from two-

27   days suspension to one. Attached as **Exhibit I** are true and correct copies of the Employee

1  Conference Form, Ms. Hanson's memorandum commemorating her meeting with Abram, Abram's

2  written response, and my November 2004 review and recommendation regarding discipline.

3        32.    Ms. Hanson initiated formal discipline against Abram for a third time in October

4  2003. This disciplinary issue concerned Abram's failure to meet the goals of the Development Plans

5  instituted following her Performance Appraisal Report in May 2003. As detailed in the Employee

6  Conference Form, Abram failed to show satisfactory performance improvement in several of the core

7  competency areas identified in the Development Plans. Ms. Hanson recommended a four-day

8  suspension.

9        33.    Abram again appealed Ms. Hanson's recommendation to me and again my review

10  was delayed for more than a year. I held a meeting with Abram and her union representative on

11  January 20, 2005. Thereafter, I prepared a review and recommendation form in which I set for the

12  reasons for imposing discipline in this case. I prepared that form on or about February 18, 2005 and

13  shortly thereafter gave a copy to Abram. Although I agreed with Ms. Hanson that discipline was

14  warranted, I reduced the recommended suspension from four-days to two. Attached as **Exhibit J** are

15  true and correct copies of the Employee Conference Form and supporting documents prepared by Ms.

16  Hanson, a memorandum Ms. Hanson prepared reflecting the substance of my October 23, 2003

17  conference with Abram and her union representative, and my written review and recommendation

18  regarding this disciplinary issue.

19        34.    I did not prepare my review and recommendation of the disciplinary matters

20  identified in paragraphs 30 and 32 because Abrams began an extended leave of absence on November

21  3, 2003. Abram did not return to work until ten-months later, on or about September 17, 2004.

22  During her leave I did not have any contact with her.

23        35.    Upon her return, Abrams began reporting to a new supervisor, Barbara Taormina.

24  in the chronic care cluster. During her final ten months at the Hospital, Abram worked under Ms.

25  Taormina.

26        36.    Shortly after her return, on September 27, I met with Abrams, her union

27  representative, and Willie Ramirez, a Department personnel officer, to discuss the status of the two

28  outstanding disciplinary matters identified in paragraphs 30 and 32. During that meeting, I proposed

1  a resolution of converting the August 2003 disciplinary matter from a one day suspension to a written

2  warning and requiring Abram to serve a two day suspension for the October 2003 disciplinary matter.

3  Abrams rejected this offer. I commemorated the substance of this meeting in a memorandum dated

4  October 25, 2004. A true and correct copy of that memo is attached as **Exhibit K**. Thereafter, I

5  moved forward with review and recommendation of both disciplinary matters as reflected in

6  paragraphs 31 and 33.

7       37.    Abram grieved both disciplinary recommendations under the grievance provisions

8  of the Memorandum of Understanding ("MOU") between the City and her union SEIU Local 790.

9  The MOU provides a four-step grievance process. The first step provides for an informal appeal to

10  the employee's immediate supervisor. The second step, appeal to a Department Head or her designee

11  involved my review of Hanson's recommendation. The third step of the grievance process is an

12  appeal of my decision to Director of Employee Relations for the City. Thereafter, the union could

13  move the grievance to step four, final and binding arbitration.

14       38.    As of June 2005 neither grievance had made it to final binding arbitration. Abram

15  resigned her City employment before the grievances were ever resolved. Attached as **Exhibit** L is a

16  true and correct copy of a June 22, 2005 letter noting the scheduling of both grievances for September

17  26, 2005.

18       39.    In late September 2004, shortly after her return from leave, Abrams expressed

19  concerns to me regarding the behavior of Christine Hanson's dog Teemu. Specifically, she

20  complained that Teemu had been running free in the Department and startled Abrams by jumping on

21  her and causing Abrams to urinate on herself. Teemu occasionally came to work with Ms. Hanson as

22  part of the Activity Department's Animal Assisted Therapy program. To qualify for this program,

23  Teemu underwent behavioral testing to assure that he was appropriate as a therapy animal. Although

24  I initially advised Abram that I was prepared to ban Teemu from the Department, she indicated that

25  requiring the dog to be on a leash and confined to Ms. Hanson's office would be sufficient.

26  Thereafter, I told Ms. Hanson that the dog needed to be kept in her office and not be allowed in the

27  hallway.

28

    n:\labor\li2007\080114\00481563.doc

40.    Notwithstanding, Abram complained to me on November 4 that I had not follow-up on my plan regarding the dog. Abram also complained about the behavior of another co-workers' dog named Lulu who she claimed had nipped at her. Pending an evaluation of the situation, I asked Ms. Hanson to not bring Teemu to work and she complied with that request.

41.    On November 22, 2004, I advised Abram in writing of my decision to allow the dogs to resume their visits to the Hospital as part of the Animal Assisted Therapy program. Therein, I commemorated the substance of our conversations regarding the dogs, explained in detail the reasons why I was allowing the dogs to return, and advised that I would instruct Ms. Hanson to manage the behavior of Teemu to ensure that the dog would not cause stress to Abram or anyone else at the Hospital. Attached as **Exhibit M** is a true and correct copy of my November 22 memorandum to Abrams.

42.    In June 2005, one of the Department's human resource officers Abram advised me that Abram would be resigning from City service.

43.    Although Abram repeatedly complained to me about what she felt was unfair treatment by Hanson and me, she did not once indicate that she believed this allegedly unfair treatment was the result of racial *animus*. She indicated over and over that she felt she was being singled out, but never indicated why she felt this was the case other than to state her belief that the job performance and/or behavior of the other Activity Therapist were not subjected to similar scrutiny. To the extent Ms. Hanson and I scrutinized Abram, such scrutiny focused on the nature and quality of Abram job performance, not her race.

I declare under penalty of perjury under the law of the State of California that the foregoing is true and correct, and that this declaration was executed on May 13, 2008, in San Francisco, California.

WILLIAM FRAZIER

FRAZIER DECL. ISO MSJ – CASE NO. C07-3006 PJH          11

# EXHIBIT A

INTRADEPARTMENTAL MEMORANDUM
Activity Therapy Department

To:     Susie Abram
From:   William Frazier
Re:     Complaint from Staff Member
        4/3/01

One of your colleagues in the Activity Therapy Department has approached me
with a complaint regarding an interaction between she and you that took place on
Friday, March 30th, 2001. I wish to discuss this issue with you. I feel it
appropriate to give you the opportunity for representation during our discussion. I
had the chance to speak with Ruben Garcia today on another matter. He is
planning to be at Laguna Honda Hospital on the morning of Wednesday, April
11th. He has agreed to make himself available at 10:00 a.m. to meet with us.
Please let me know if this date and time is convenient to you. If not, please
contact Mr. Garcia or another person whom you wish represent you and arrange
an alternate date and time. Then, coordinate the date and time with me. If you
wish to waive your right to representation, contact me to arrange a meeting.
Please let me know your preference at your earliest convenience.

CC:     Ruben Garcia
        Lisa Randon

CCSF 01258

# EXHIBIT B

INTRADEPARTMENTAL MEMORANDUM
Activity Therapy Department

To:    Susie Abram
From:  William Frazier
Re:    Summary of Meeting on April 13 and Follow-up
       4/30/01

The purpose of this memorandum is to document a summary of the meeting that took place on April 13th, 2001. I wish also to address related issues that arose following that meeting.

You were alerted of a complaint that was made against you by a co-worker in a memorandum dated 4/3/01. A proposal was made for a meeting to take place on April 11th. That meeting date and time did not work out and another meeting was scheduled for April 13th. You and I met initially with Ruben Garcia and Katherine Dere. Pat Zelaya-Wagner joined the meeting later.

I presented you with information regarding Pat's concerns about an interaction that the two of you had on Friday, March 25th. The claim was that you shared with Pat information from a conversation that you had with a group of residents. The conversation included unfavorable information and opinions of Pat. The claim was also that you discussed this information with Pat in the presence of other co-workers. I shared with you Pat's reaction including her feeling humiliated and generally unsupported. I shared with you that Pat had been very upset about the interaction. You were given the opportunity to present your views and concerns. Your response was to ask why Pat was not present to the meeting.

Pat was invited to join the meeting to share with you directly her concerns about the interaction. You acknowledged Pat's concerns and apologized. You indicated that you intended the interaction to be taken in jest and that you in no way meant to create ill feelings. Pat responded with concerns about previous interactions between the two of you. She also expressed her perception that a general lack of professionalism and respect for co-workers existed within the department

Acknowledging the sincerity of your position on this issue, I believe that we all can gain a greater understanding of the potential impact of out actions and interaction on our colleagues. We, as human service providers, should not engage in gossip with our clients. We should support our fellow staff members so as not to compromise their role and authority in providing service to our clients. We should also be cognizant of what we say to our colleagues and where the conversations take place.

CCSF 01253

I wish to draw your attention to two incidents that took place on the very same day following our meeting that causes me to question your understanding of the issues at the core of this situation.

On the afternoon of April 13th, Sharon Grover came to my office and informed me that she understood that her name was mentioned during our meeting. She asked if I needed any information from her. I declined the information as I considered the matter resolved. Shortly after, you came to my office and complained that I had not taken the information from Sharon. It was obvious to me that you were discussing an issue that was specific to Pat and you with other staff members.

On the afternoon of April 13th, a resident from your assigned unit approached me and indicated that she was aware of the meeting that had taken place earlier in the day. The resident began to offer information to me about the issue. I indicated that it was inappropriate for me to discuss the issue with her. Despite the content of our meeting, it was apparent to me that you continued to share information inappropriately with the resident. I found this most troubling.

I wish to encourage you to be mindful of the issues related to the events that led up to out meeting. I encourage you to maintain professional boundaries during interactions with residents. I encourage you to consider the impact of your actions and interactions on your co-workers so that all staff can enjoy the right to work in an environment that is professional and free of hostility.

If you have any questions and/or concerns about the information within this memorandum, please come to my office for discussion or to arrange a formal meeting. Thank you.

CC:    Lisa Randon
       Ruben Garcia

# EXHIBIT C

# Laguna Honda hospital

April 24, 2001

William Frazier
375 Laguna Honda Blvd.
San Francisco, Ca'
94116

Dear Mr. Frazier:

This letter is in response to the memo dated 4/3/01. The memo pertained to a complaint against me from another colleague. In my opinion I feel that you Bill Frazier had already determined that I was at fault. I have reached this conclusion from the following information:

- Formal action (memo) was taken prior to any verbal warning being given or investigation into the complaint-taking place. This is seen through the following actions that you took:

  o You contacted Ruben Garcia my union representative regarding this matter prior to giving me the memo.

  o In the memo you stated that I should have a representative present during our conference.

  o You never made any attempts to get my side of the story prior to writing the memo.

- The memo did not disclose the colleague who filed the complaint.

- You never attempted to resolve this situation by bringing it two my supervisors attention or by bringing the two involved parties together to see if the conflict could be settled.

In closing I am requesting another meeting with all involved parties (Bill Frazier, Ruben Garcia, Katherine Dere, and Pat and Jim) I would appreciate if you would make arrangements for this meeting to take place.

Sincerely,

Susie Abrams
Activity therapist

CCSF 01259

# EXHIBIT D

INTRADEPARTMENTAL MEMORANDUM
Activity Therapy Department

To:      Susie Abram
From:   William Frazier
Re:      Response to Your Letter of April 24th
         4/30/01

I received a letter from you on Wednesday April 25th, 2001, in which you accused
me of finding you at fault for a conflict that arose between you and a colleague
without providing you with due process. You made a number of points in your
letter to support your accusation. I wish to respond to each of your points and
your letter in general.

You indicated that I took formal action in the form of a memorandum prior to
giving a verbal warning or investigating the complaint. In order to meet my
responsibility to investigate a complaint, I sought to have a discussion with you. I
needed to speak to you to get your side of the story. By issuing the memorandum,
I made you aware that a complaint had been made and of my need to speak with
you. The memorandum was a tool for communication and is not related to
disciplinary action.

You claim that my memorandum stated that you "*should* have a representative
present during our conference." My memorandum stated that "I feel it
appropriate to give you the opportunity for representation during our discussion."
A copy of the memorandum is attached. You were given the choice as whether
you wanted representation. Under the Weingarten rules, it is a manager's
responsibility to allow for representation during a conference if there is a chance
that disciplinary action may result. Failure to do so is subject to the grievance
process. I did not anticipate that disciplinary action would result from the
complaint. I chose to give allow you the opportunity for representation if you
desired such. This was done as a benefit to you and to ensure that your rights
were accommodated.

You claim that I contacted your union representative about this matter prior to
giving you the memorandum. As the memorandum indicated, I had the chance to
speak with Ruben Garcia on a matter unrelated to yours. Ruben and I had
arranged to meet at on April 11th at 9:00 a.m. During our conversation, I took the
opportunity to set a second meeting to take place at 10:00 a.m., so that he could
be available to represent you if you chose to have him do so. It is the
responsibility of the employee to arrange the representation. You were given the
option for alternatives if the pre-arranged date and time was not convenient to you
or if you desired to have someone other that Ruben represent you. You were
directed to arrange a meeting time with me if you wished to wave your right to
representation. The arrangements with Ruben Garcia were made for your
convenience. You took advantage of the opportunity afforded you.

Ruben Garcia is responsible to both parties involved in the conflict. It is my opinion that it would be appropriate for him to be made aware of a situation that involves a conflict between two union members. The rights of both individuals must be protected. Additionally, Ruben has not expressed concern about my handling of this situation.

On April 3rd, you came to my office after receiving the memorandum. You inquired as to why the complaint had not been brought to your attention earlier. The timing of the incident and existing schedules would not have allowed earlier notification. I offered to discuss the issue at that time if you were willing to waive your right to representation. You declined to waive your right to representation. You made the decision to wait until the proposed meeting to discuss the issue. I could not work on resolving the issue until I had the opportunity speak with you and get your account of what took place.

You make the point that I did not disclose the identity of the person making the complaint in my memorandum. It is my opinion that there is nothing improper about that. You would learn the identity of that person during our initial discussion. You were given the option to arrange a meeting date and time that was convenient to you. You made the decision to wait to the proposed meeting to discuss the issue.

You claim that I never attempted to resolve the situation by bringing the conflict to the attention of your supervisor or by bringing the two parties together for resolution. Lisa Randon was made aware of the conflict prior to my memorandum. I made the decision to handle the investigation and resolution of the issue as appropriate, given my position as Director of the department. I believe that I have explained the process and the rationale thoroughly. I have also pointed out the options that were afforded you.

This issue involved a conflict between two staff members. I acted to resolve the conflict by first getting information from both staff members and then getting the two staff members together so that the two could express their views to each other. You had the opportunity to present your views or any other related information at the meeting that took place on April 13th. I was cognizant of the need to protect the rights of both employees. No disciplinary action resulted from this situation. My goal was to facilitate communication and resolve the conflict. I believe the process was effective. I consider the issue between you and Pat to be resolved.

I am also interested that these types of conflicts do not happen again. By Pat's expressing her concerns, you have a greater awareness of potential impact of interactions and the circumstances of those interactions on your colleagues. I hope to extend that sensitivity to the entire staff. This is why I have scheduled an inservice for May 3rd to discuss professional boundaries.

CCSF 01256

It is apparent from your letter that you are not satisfied with my handling of the situation. I consider the opinion expressed in your letter to be totally unfounded. I am confident that my actions were appropriate and sought to respect the interests of both staff members as well as the department in general. I encourage you to exercise the options available to you in order to gain satisfaction. My suggestion would be for you to seek a discussion with my supervisor, Mary Louise Fleming. However, I do not think it appropriate for me to arrange a second meeting of the parties involved in the initial meeting. I will not accommodate your request that I do so. I would be glad to discuss the issues in an appropriate setting as arranged by you or a representative.

Please contact me if you have any questions and/or concerns about my response or if you wish to set up a meeting. Thank you.

CC:    Lisa Randon
       Ruben Garcia

CCSF 01257

# EXHIBIT E

# INTRADEPARTMENTAL MEMORANDUM
## Activity Therapy Department

To:   Susie Abram
From: William Frazier
Re:   Interactions Related to Proposed Cooking Activity on D3
      4/13/01

On Tuesday, April 10th, 2001, we had a discussion in the hallway on B-400 during which I learned of your plans to fry chicken on D3 as part of a food activity that you had planned with your residents. I indicated to you that staff form the Nutritional Services Department had expressed their concern about the frying of food on D3 that had taken place in the past. I told you that I would not ask you to change the activity, but I would consult with Nutritional Services to determine their specific concerns for future planning.

You came to my office today to express your concern about the interaction that we had yesterday. Your tone of speech was hostile in my opinion. I explained my reasoning for questioning the activity. I again, told you that you would not be required to change your activity. You indicated that you would not implement the activity because you were concerned that I was attempting to create a situation that would have negative consequences for you. You also indicated that my questioning you about the activity was inappropriate.

I immediately went to Nutritional Services to consult with them on your proposed activity. I negotiated an arrangement that would satisfy their concerns and allow you to implement the activity.

Upon return to the Activity Therapy Department, I encountered you in the hallway and requested to speak to you. I offered my apologies for any misunderstandings or hard feelings. Your turned and walked away and said that you did not want to speak with me. I requested that you return to discuss the issue with me twice. You continued to walk away and refuse to speak with me.

As the Director of Therapeutic Activities, I am ultimately responsible for the actions the Activity Therapy staff. Resident safety is a primary consideration for any operation or activity at Laguna Honda Hospital. Not questioning a staff member on a safety related matter would be negligent on my part.

I am very concerned about your behavior related to this issue. You have insinuated accusation that I am creating situations specifically to harm your reputation and standing within the organization. You refused to comply with a direct request from a supervisor. You have failed to professionally interact with me regarding an issue basic to the operation of the hospital.

(what supervisor? What request?)

It is my opinion that I have acted in good faith on this issue. I expressed my concern about the safety of the activity, but gave you approval to proceed. Despite your hostility and accusations, I took time from my schedule to consult with Nutritional Services and negotiate a settlement. I offered my apologies to you despite the fact that my involvement in the issue was appropriate and well within my rights and responsibilities.

My intention in writing this memorandum is to help you understand my point of view related to this issue and facilitate a more effective working relationship with you.


CC: Lisa Randon

# EXHIBIT F

# EMPLOYEE CONFERENCE FORM

| | | |
|---|---|---|
| | NOTIFICATION DATE<br>12/3/02 | RECEIVED<br>03 MAR 25 PM 3:5( |

| EMPLOYEE<br>Susie Abrams | CLASS<br>HWIII 2587 Activity Therapist | HU---<br>DE------<br>LAGUNA HONDA HOSPITAL |
|---|---|---|

| DEPARTMENT/WORK LOCATION<br>LHH/Activity Therapy | | SHIFT<br>Days  Tues-Sat |
|---|---|---|

| HOURS<br>8:30-5:00 | DAYS OFF<br>Sunday/Monday | SUPERVISOR<br>Christine Hanson | TITLE  Activity Therapy<br>Supervisor |
|---|---|---|---|

| YOU ARE SCHEDULED FOR A CONFERENCE ON:<br>Wednesday | DATE:<br>12/11/02 | TIME:<br>4pm | PLACE:<br>A-401 |
|---|---|---|---|

YOU HAVE THE RIGHT TO REPRESENTATION AT THIS CONFERENCE

HAS CONFERENCE BEEN HELD WITH EMPLOYEE PREVIOUSLY REGARDING DISCIPLINARY PROBLEMS?    YES        NO   X

| SUBJECT(S), DATE, AND DISPOSITION OF PRIOR CONFERENCE(S) | | | | |
|---|---|---|---|---|
| | | | | **CCSF 00289** |

LIST CHARGE(S); Inattention to Duty:  Insubordinate Behavior—Refusal of assignment

SUBJECT(S) OF THIS CONFERENCE:

## 1.  Inattention to Duty:

On Saturday August 31, 2002 you began a month long vacation. Prior to your vacation, the second week of August, I gave you the list of residents, which may be due for quarterly or annual documentation. Then, during the last week of August the MIS sheet was given to you, the formal list of documentation due for the month of September. These forms and information were to assist you in completing the September documentation before you went on vacation. I made the expectation clear that you must complete the documentation. You returned form your vacation on October 4, 2002. I asked for your September MIS sheet a month after that, November 5, 2002. That gave you a month to finish the documentation. You did not have it. You made it clear that you were not planning to complete the assignment by stating you were not here and you didn't have time. There were 15 documents due during September. It has always been the departmental policy to complete documentation regardless of days off or vacation.   To date I do not have the completed MIS sheet (copy attached). The tardiness of documentation due during your vacations is clearly documented in your performance appraisal (see attached).

## 2.    Insubordination—Refusal of assignment:

The evening of November 5, 2002, I reviewed the D3 charts for September documentation. Of the 15 documents that were due, 2 were completed on August 28 2002, before your vacation. The rest were not completed. As a matter of fact, the previous years documentation for September is also missing from the charts. You took vacation then as well. Lisa Randon, your previous supervisor, directed you to complete the 2001 MIS documentation for September and they were not completed (see attached). Nevertheless, I wrote you a memo dated November 12, 2002 directing you to complete the remaining September 2002 documentation by 11/27/02 (copy attached). I asked you about your questions or concerns regarding the assignment during our meeting the next day. You stated, "I will do the best I can". On 11/27/02, I reviewed the charts again. None of the 13 missing documents had been completed. In the 2 weeks you had to complete documentation, you have completed none. Since you did not come to me to request an extension, it appears you never intended on completing this assignment.

Failure to comply with the state regulations involving documentation could result in the hospital being cited. I will be recommending a 3 days suspension for disciplinary action.

Attachments: 2 memos by Lisa Randon (10/15/01)(10/18/01), Copies of 2001 & 2002 MIS sheets, Memo from Christine Hanson (11/12/02), Performance Appraisal

☐ Employee Copy          ☐ Department Copy          ☐ File Copy          3/21/03

NAME:                              CHARGE(S                              NOTIFICATION DATE:

EMPLOYEE'S STATEMENT (OPTIONAL):

ACTION BY IMMEDIATE SUPERVISOR

See attached

ACTION RECOMMENDED:    O DISCIPLINARY          X DISCIPLINARY          O TERMINATION/
                            WARNING              SUSPENSION  3          DISMISSAL
                                                           DAYS

                        O OTHER, SPECIFY: _____

I ACKNOWLEDGE THIS CONFERENCE, WHILE NOT NECESSARILY AGREEING TO THE ABOVE ALLEGATIONS:

12 | 11 | 02                                                          anson , CTRS
DATE OF CONFERENCE              EMPLOYEE SIGNATURE                    SUPERVISOR SIGNATURE

COPY OF CONFERENCE FORM:

              X GIVEN TO EMPLOYEE _____    OR    O SENT CERTIFIED _____
                                    DATE                  MAIL            DATE

YOU MAY REQUEST A REVIEW OF THIS RECOMMENDATION TO THE REVIEWER BY ___ 12/18/02 ___.
                                                                          (Date)

                                        __William Frazier, Director of Therapeutic Activities__
                                        NAME AND TITLE OF REVIEWER
                                        (Division Head or Designee)

        ☐ Employee Copy    ☐ Department Copy    ☐ File Copy

From: Christine Hanson _CH_

The employee conference occurred on 12/11/02 at 4pm in B104. The parties in attendance were Susie Abram, Ruben Gracia (union rep) and myself, Christine Hanson.

Ruben Gracia did not have the entire set of documents prior to the meeting. Susie failed to give him a copy of the memo, which directed her to complete the documentation with a deadline. He was given a copy of the memo.

The employee brought many issues up which impacted her ability to complete the documentation.
1) Susie stated that she was working on other units in November. She was implying she did not have time to complete the documents. She was scheduled on other units on 3 days during that month. Which totaled 3 hours off her unit. If she had not been assigned to those units, she would have been expected to plan another activity on her own unit.
2) Susie brought a few documents with her to the meeting. They were apparently annual assessments that were due. The documents were not in the charts on 11/27/02.
3) She also stated she was holding onto the assessments to get them approved by me. She has not shown me any of the documents she was directed to do prior to this meeting, nor has she asked for my assistance on any other required documents.

The information has been considered. Susie Abram was given more than 3 months to complete the documents for which she is responsible. August she was given a list of residents who may be due while she would be gone and later in the month given the MIS sheet (formal list of required documents). She completed 2 of the quarterly reviews required. September she was on vacation. October, she was given the opportunity to complete the documents independently. Then in November, she was given written direction to complete the remainder of the documentation. She did not complete any of the required documents that remained (13). I continue to recommend a 3-day suspension for insubordination and inattention to duty.

CCSF 00291

DEPARTMENT OF PUBLIC HEALTH

# REVIEWER

| | | |
|---|---|---|
| Susie Abram | Inattention to Duty, Insubordination | December 3, 2002 |
| NAME | CHARGE(S): | NOTIFICATION DATE: |

REVIEW AND RECOMMENDATION BY REVIEWER

See Attached

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

ACTION RECOMMENDED:    X DISCIPLINARY WARNING     ◯ DISCIPLINARY SUSPENSION._____ DAYS     ◯ TERMINATION/ DISMISSAL

◯ OTHER, SPECIFY: _____

◯

January 3rd, 2003
_____
DATE OF REVIEW

SIGNED: _William D. Faz____
Director of Therapeutic Activities
REVIEWER  (NAME AND TITLE)

COPY OF CONFERENCE FORM: _____

φ GIVEN TO EMPLOYEE 2/24/03  OR  ◯ SENT CERTIFIED MAIL _____
DATE                                                   DATE

☐ Employee Copy     ☐ Department Copy     ☒ File Copy

CCSF 00292

On January 3, 2003, a review meeting was held on the recommended disciplinary action (3 day suspension) against Susie Abram, Health Worker IV. Present at the meeting were Susie Abram, Health Worker IV; Ruben Garcia, SEIU Representative; and myself, William Frazier, Director of Therapeutic Activities.

I opened the meeting summarizing the purpose of the meeting. Ruben asserted that it was his opinion that the disciplinary action should be a verbal warning and that the recommendation of a three-day suspension did not represent progressive disciplinary action. I pointed out that one of the charges was insubordination and that guidelines for progressive disciplinary action developed by the City and County suggest a 5-day suspension for the first offense. Ruben expressed his opinion that the charge of insubordination was inappropriate in this case. Ruben indicated that Susie had not been subjected to disciplinary action within the past three years.

Susie presented information related to her heavy workload during the month of August including covering units other than her primary unit and doing preparatory work for her upcoming vacation. I pointed out that the issue was her not completing an assignment after she returned from vacation in early October. Susie indicated that she had to cover another unit in October as well. Susie began to discuss an issue concerning her supervisor access a storage cabinet on her assigned unit and audio compact discs being lost. I asked her if that issue was pertinent to this conversation. Susie indicated that this and many of the changes that were taking place on her unit caused her stress which affected her ability to complete the work as assigned. Susie said that she had been working hard to complete all of the work that had been assigned to her. She indicated that the documentation due in September had been completed. She indicated that she dated the assessments or progress notes on the date completed and noted that the documentation was "for September." I asked her for clarify that the progress notes and assessments that were due in September were complete. I pointed out that three months had passed and the residents who were due for documentation in September were due again in December. Susie stated that she had completed both sets of documentation. Susie stated that she tried on several occasions to discuss her progress with her supervisor and that she was not accommodated.

Susie then indicated that it was her belief that disciplinary action related to documentation was not applied consistently within the department. I expressed my disagreement and concern with her statement.

I told Susie and Ruben that I would investigate the issue to determine if a good faith effort had been made to complete the assignments as well as efforts to communicate her progress with her supervisor. I told Susie and Ruben that my determination in regards to the appeal would be included in a written report and sent to them.

CCSF 00293

Susie then expressed her concern for two interactions between her and myself, unrelated to this issue. I responded to her concerns.

I questioned Christine Hanson about Susie's claim that she was not accommodated when requesting meetings with Christine to discuss her documentation. Christine indicated that a weekly meeting had been established between the two on Wednesday afternoons. Three meeting were scheduled spanning from the time Susie received the memorandum and the deadline it gave for completion of the delinquent documentation. Christine reports that Susie failed to attend two of those meeting without notice. Christine reports that during this time, Susie did requested an additional meeting of which Christine could not accommodate as her schedule would not allow. However, Christine indicated that the topic of the discussion was to be related to scheduling of Community Meetings on unit D3.

I reviewed 14 medical records for which Susie Abram was responsible on Wednesday, January 8th. I found the documentation for September, as well as the documentation for December to be significantly incomplete. I was able to determine that Susie's claim the documentation was complete to be untrue. Additionally, I further found the quality of the documentation to be lacking with many irregularities and non-compliance with established practice within the Activity Therapy Department including the use of out-dated assessment forms, improperly dated documents and sections of the assessment forms left blank. I will forward a copy of my findings to Susie and her your supervisor to ensure that these files are reassessed and documented properly. I will also request that Susie and her supervisor work together to improve the case documentation via a developmental plan and I hope to see marked improvements in Susie's ability to document her assigned cases.

It is also noted that Susie failed to acknowledge any responsibility in addressing the lack of performance and her failure to comply with multiple requests made by her supervisor to complete the required documentation, which is required of all employees in her position within this department.

These are very serious charges that place the hospital in non-compliance with licensing and certification bodies. There have been a number of performance and professionalism issues involving Susie Abram over the past several years. This is the first time that an issue has been confronted in a formal disciplinary action. I am reducing the recommended disciplinary from a three day suspension to a written warning. This reduction is being made as a demonstration of good faith on the part of the leadership of the Activity Therapy Department. Susie will be expected to make a good faith effort to comply with departmental standards and put forth effort in improving her skills and attitude toward supervision.

**CCSF 00294**

From: Christine Hanson

The employee conference occurred on 12/11/02 at 4pm in B104. The parties in attendance were Susie Abrams, Ruben Gracia (union rep) and myself, Christine Hanson.

The employee brought many issues up.
1) Susie stated that she was working on other units in November. She was implying she did not have time to complete the documents. I do not feel that is true. She was scheduled on other units on 3 days during that month. Which totaled 3 hours off her unit. If she had not been assigned to those units, she would have been expected to plan another activity on her own unit.
2) Susie brought a few documents with her to the meeting. They were apparently annual assessments that were due. The documents were not on the proper form; they had many dates on them and were not in the charts on 11/27/02. She also stated she was holding onto them to get them approved by me. That has never happened in the past. Also, she has not shown me any of the documents she was directed to do prior to this meeting.
3) Susie asked a few questions. First, she asked if other supervisors were writing up staff for these offenses. She also asked why her previous supervisors didn't write her up in the past. I stated, "I can't answer those questions. She would have to ask those people herself." She then asked if other people were being written up for their offences. I stated that if other staff did what she did, they too would receive a recommendation for disciplinary action. She asked why I was "picking" on her. I explained this was not personal. I was setting performance standards, as my job requires.

Ruben Gracia did not have the entire set of documents prior to the meeting. Susie failed to give him a copy of the memo, which directed her to complete the documentation with a deadline. He was given a copy of the memo, but then proceeded to attempt to get the charge of insubordination eliminated. I directed his attention back to the documents included with the conference form.

Lastly, the documents were signed and Susie wanted to discuss one more issue. I agreed. It was in regards to some CD's being left out on her unit. I explained to them both: while Susie was on vacation, Lucy, the nurse manager, called needing to get into the activity closet to restore items that Susie had left out in the nurses station. The DOJ was scheduled to visit the following week (Susie would still be gone). Therefore, I took down the key from our office labeled D3. It did not open the cabinet.

I had the lock cut off the following day and had a new one to replace it with keys for AT department, Susie, myself and the nurses on D3. However, when I opened the cabinet, it was "stuffed". I could not get everything back into the cabinet. There were some CD's (about 10) which I left out under the CD player. That way the residents could enjoy them at their leisure. I was under the impression they belonged to the department or the unit. That was not the case. They may have belonged to Susie, the hospital or another therapist. That was never clarified.

Susie brought it to my attention when she returned that the CD's were not in the same condition as when she left and some were missing. I never saw what remained of the CD's. However, we followed up with a police report (see IP for information). Bill Frazier or I were waiting for information about the CD's, number, titles, etc. to replace them. Susie never followed up. As a matter of fact, she shrugged it off in one of our weekly meetings when I attempted follow up. I had also made it clear that personal items, as a rule, should not be in the unit cabinets. They really should not be allowed at all in the hospital. I spoke with IP and they can not protect personal items on hospital grounds. One of the officers had mentioned that he had had a conversation with Susie in the past about this issue.

At the end of the meeting, Susie stated, "You should get a 3 day suspension for losing my CD's!". I directed her to speak with the director, Bill Frazier, about that. She stated the suspension issue and the CD's again. I told her it was a good thing for me she was not my boss.

Susie stated when signing the conference form she intended on appealing the recommendation.

CCSF 01373

This evening, 12/11/02 I went to D3 again to check the documentation. I think it should be mentioned that MIS sheet for this month is the same people as last September. The difference is the types of documents due are different for 10 of the 15 residents. I have included a copy of December 2002 MIS.

I looked for the initial assessment and the 3 annual assessments due in September.

The initial was completed today.   Three and a half months after the readmission.

One of the annual assessments due, the chart was gone because the resident had been discharged on 11/7, readmitted 11/13. A new initial assessment was due 11/19. There was no assessment in the chart on 11/27. However, there is one tonight, dated 11/17. I believe a forged date.

The other two annual assessments are not in the charts.

I did not check the quarterly reviews since each resident is due for another review this month.

CCSF 01374

# EXHIBIT G

City
and
County
of
San Francisco



# Performance Appraisal Report

## Identification

| 1. LAST NAME, FIRST NAME, MIDDLE INITIAL | 2. CLASS No. AND TITLE | | 3. STATUS |
|---|---|---|---|
| Susie Abram | Health Worker III, 2587 | | Perm |
| 4. WORK LOCATION & DIVISION | 5. DEPARTMENT | 6. REASON FOR REPORT | 7. 1ST DATE IN CLASS |
| Activity Therapy, LHH | | Annual | 4/5/1982 |
| | 8. PERIOD OF REPORT 6/1/02 – 3/15/03 | | 9. PROBATION ENDS |

ID COUNTY OF SAN FRANCISCO/PERFORMANCE APPRAISAL REPORTICSC 8-05, (REV January 1996)

CCSF 00006

**Working Title:**

**2587 Health Worker III, Activity Therapist**

## Position Summary:

The Health Worker III – Activity Therapist works to enhance the quality of life and functional abilities for the residents of Laguna Honda Hospital. Each Activity Therapist participates on interdisciplinary team who collaboratively design a plan of care to meet the physical, intellectual, psychosocial, and spiritual needs of each resident. The Activity Therapist provides interventions and facilitates positive leisure opportunities to individual residents, small groups, and the entire hospital population.

## Reporting Relationships:

- Reports directly to the Activity Therapy Supervisor and the Director of Therapeutic Activities
- Evaluated by the Activity Therapy Supervisor
- Collaborates with physicians, nurses, and other healthcare providers.

## Major Responsibilities:

- Performs comprehensive assessments to determine the individual needs of assigned residents.
- Participates in the interdisciplinary approach to resident care planning.
- Performs appropriate documentation related to the care of assigned residents.
- Plans, implements, and evaluates individual and groups activities for residents in accordance with Title 22 and OBRA guidelines.
- Provides on average, 5 hours of direct service and/or intervention per day.
- Collaborates with other disciplines and hospital departments to provide assigned residents with the necessary opportunities and resources to achieve leisure related goals with the highest degree of independence possible.
- Plans and implements resident bus trips and outings into the community.
- Collaborates with fellow Activity Therapy staff members in the implementation of floor-based activities
- Prepares and maintains activities calendar on assigned unit(s).
- Contributes to the social dining experience on assigned unit(s).
- Plans and implements hospital-wide programs and special events.
- Supervises and directs volunteers and student interns as assigned.
- Effectively manages equipment, supplies, and other program resources
- Participates in department based and hospital-wide training programs.
- Attends and participates in department staff meetings.
- Contributes to the enhancement of department operations
- Communicates effectively with residents, family members, visitors, and staff
- Adheres to all department and hospital policies and procedures.
- Completes tasks as assigned by the Activity Therapy Supervisor and the Director of Therapeutic Activities
- Performs all tasks and responsibilities with a high level of productivity.

JOB TITLE:  ___HWIII___

Employee Name:  ___Susie Abram___

Rating Period: From  ___6/02___  To ___3/03___

| I | II | Rating and Comments |
|---|---|---|

## Performance Elements and Standards
(Relate to Major Responsibilities outlined in the Job Description.)

Performance Criteria

### Rating/Comments on Actual Performance
Select a rating number and comment on all sections.

1-Unacceptable          3-Competent and Effective      5-Outstanding
2-Development Needed     4-Exceeds Standards

**ASSESSMENT**
a. Utilizes appropriate assessment technique
   - Interview of resident.
   - Observation.
   - Review of the medical record
   - Collaboration with family, friends, and interdisciplinary team members.
b. Appropriately utilizes RAI to identify resident needs. Demonstrates awareness of resident status and ability to modify care plan

1.

**2  Rating/Comments**

Concerns have been raised over the accuracy of the MDS coding. D: nursing staff have communicated that Susie overestimates the time residents are involved in activity. In a few cases, residents who have transferred from MS have arrived without an assessment. Susie has overlooked the need to check for an assessment and complete one if necessary. The quality of the assessments that I have reviewed need improvement. Often, the assessments are incomplete and out-dated forms have been used. The assessments, in general, do not provide reader with a thorough picture of the residents needs and interests.

**DOCUMENTATION**
a. Completes initial and annual Activity Therapy Assessment forms completely and within established timelines.
b. Accurately codes required MDS entries and within established timelines.
c. Effectively Completes RAP notes.
   - Timely

2.

**2  Rating/Comments**

Regularly scheduled documentation such as annual assessments and quarterly progress notes are usually timely. However, Susie frequently fails to check the documentation when residents are transferred or admitted directly to her unit. Susie took vacation during the entire month of Sept. and the required documentation for that month was not completed without supervisor intervention. This problem has been not each of the last three years.

CCSF 00008

| I | Performance Criteria | II | Rating and Comments |
|---|---|---|---|
| | • Follows format | | July/Aug/Sept 2002=63% (0% for 9/02) |
| d. | Effectively documents plan of care including | | Oct/Nov/Dec 2002=81% |
| | • Behavior specific problem statements. | | Jan 2003=70% (Missing assessments) |
| | • Measurable goals individualized for the resident. | | |
| | • Specific, measurable interventions that include activities of resident preference. | | Activity attendance records are maintained. However, it was noted that the IDT has had trouble locating the record when Susie is not on duty. Records should consistently be kept in the nurses' station to allow access for all staff. |
| | • Appropriately links on to other care plan problems, goals, and interventions. | | |
| e. | Completes quarterly notes as appropriate. | | Susie has had difficulty with care planning. Problem statements, goal statements and interventions are frequently unrelated. Additionally, Susie has not been reviewing and modifying care plans appropriately. |
| | • Review of resident progress in relation to current plan of care. | | |
| | • Resident involvement in activities and reaction to plan of care. | | Susie often continues care plans instead of developing new goals and interventions. The care plans are often more than 6 month old. We spent much time in 8/02 revising care plans prior to Susies' vacation in Sept 2002. After the discussion of the care plans on D3, I noticed in cases, the care plans, which I wrote with Susie, were not in the CP. So they were replaced with a CP Susie wrote and no longer conveyed what we had discussed. I have been alerted to the problem that Susie has been developing care plans in an area, which is outside the scope of Activity Therapy intervention and according to the NM, not a problem for the resident. |
| | • General focus of future Activity Therapy interventions. | | |
| f. | Completes transfer notes | | |
| | • Review of current plan of care | | |
| | • General focus of future Activity Therapy interventions | | |
| g. | Maintains resident participation records. | | |
| | • Maintains daily participation records for assigned residents. | | |
| | • Informs staff of resident participation in hospital-wide programs and special events. | | |
| | • Ensures the transfer of participation records of to appropriate ward upon resident relocation | | |

CCSF 00009

3.

PLANNING

a. Attends and participates in resident care conferences.
b. Prepares and maintains monthly calendars for assigned ward(s).
   - Calendars satisfy department and Title 22 requirements.
   - Calendars are prepared, approved, and distributed in a timely fashion.
   - Calendars are legible with good presentation
   - Changes to the calendar are reported to appropriate staff and documented.
c. Participates in the planning of floor based activities
d. Plans bus trips and community outings
   - Appropriately utilizes Bus Trip Planning form
   - Makes timely and appropriate food orders
   - Secures volunteers
   - Consults with IDT regarding concerns related to outings.
e. Participates in the planning and implementations of hospital-wide programs
f. Participates in the planning of special events

| 2 Rating/Comments |
| --- |

Susie attends all IDT and Prosocials meetings. Susie also attends monthly AT information exchanges and monthly cluster program meetings. Susie works hard to have the calendar completed for approval. I am pleased that Susie has been working on the Excel computer program, to improve the presentation of the small calendar. We are exploring ways of improving the presentation of the large calendar. I would evaluate Susie's performance as a 3 in these areas.

Susie completes the bustrip planning forms. However, often the RNs report the information is not communicated to them prior to the day of the trip. Susie needs to give a list of residents expected to participate the RN's at least two weeks prior to the event. Also, Susie has not been ordering lunch from the kitchen for the D3 shopping trips stating the residents prefer to purchase their lunch at the mall. On the 3/7/03 resident did not have her own money to spend, requiring a volunteer to loan the resident money for lunch. Susie needs to ensure that residents have the resources to engage in all outings.

I have found inconsistencies in the small and large calendar with the not matching. This has resulted in approved activities not being provided.

4.

IMPLEMENTATION          CCSF 00010

a. Implements ward-based activities.
   - Activities are stimulating
   - Activities are congruent with the resident interests
   - Activities contribute to resident functional status
   - Demonstrates the ability to adapt activities to meet the needs of residents.
b. Participates in the implementation of floor-based programs and activities
c. Participates in the implementation hospital-wide programs.
d. Satisfies department requirement for involvement in special event implementation.
e. Satisfies department requirement for implementation of bus trips and community outings

| 2   Rating/Comments |
| --- |

Susie has provided the required number of bustrips, hospital wide events and special events during this reporting period. The Saturday supervisor reports that Susie has been an asset to the Saturday staff during special events. Susie has been involved in the cluster, Moran Hall, programming for almost 9 months. Susie has been inconsistent in her support of these programs. Susie states, "Residents need to go to the unit" when discussing programs with me. Unfortunately, the NM reports that in the IDT meetings, Susie stated "we were taking things away from these patients". Susie has stated that the residents don't want the changes, they would be confused or they will not leave their bedside. This inconsistent support and commitment has contributed to poor attendance in Mon, Wed and Fri. Moran Hall programs as documented in the MH attendance book. Susie has not performed to standard when facilitating the bingo in Moran Hall. Susie sits with an

residents who are not in need of assistance during the program. She does not assist residents who require assistance with their cards, call out the numbers or assist in the selection of prizes.

D3 residents are rarely referred to off-unit programs, (i.e. Art therapy, Hydrotherapy, ceramics, etc.). I have observed D3 residents spending much of their day sitting at their bedside. Much of the current program offered on the unit fail to contribute to the improvement of residents functional ability.

3  Rating/Comments

Susie assists in coordinating an intergenerational program monthly with success. Susie is encouraged to effectively engage volunteers to provide more services to a greater number of residents.

4  Rating/Comments

Susie attends all departmental inservices and staff meetings, and mandatory hospital inservices . Susie has been working regularly on the computer to learn the Excel program to develop her calendar. She is also making progress in learning to use the email system. She regularly works on the computer to increase her skills using email.

The psychosocial cluster has also had a number of trainings, which Susie usually attends including; prosocial exchanges between AT's monthly, Pathfinding, HIV information, etc.

5.
SUPERVISION

Provides appropriate supervision and encouragement to volunteers and student interns.

6.
STAFF DEVELOPMENT
a. Maintains and upgrades own knowledge, skills, and abilities by participating in:
- Mandatory hospital training sessions.
- Department inservice training program.
- Department staff meetings.
- Reviewing and providing appropriate input on policies and procedures.

CCSF 00011

7.

**COMMUNICATION – COLLABORATION – COLLEGIALITY**

a. Communicates effectively with others by:

- Communicating in a constructive, non-judgmental manner.
- Listening attentively and showing empathy.
- Managing conflict by addressing issues in a manner that maintains good working relationships.
- Communicates concerns to colleagues and supervisors promptly

b. Contributes to the professional development of others by:

- Sharing knowledge and skills.
- Providing and accepting constructive feedback.
- Establishing collaborative practice with IDT members and other healthcare professionals.

| 2 | Rating/Comments |
|---|---|

Susie has difficulty with effective communication. During meetings Susie often appears uninterested or upset. She doesn't make eye contact. She covers her face, rolls her eyes and sits far from the group. There have been situations when Susie has turned her back on the person speaking.

In my supervision, when performance issues are discussed, Susie has difficulty problem-solving improvement. Susie has spoken of engaging a lawyer and made unprofessional statements and disclosure of information. In one case, I needed 3rd party from HR to mediate because she became very loud and uncooperative.

Follow through with individual treatment plans, which the team has decided to implement, has been insufficient. Susie has shared her discontent in regards to the treatment plans with other AT's during meetings. She has stated she would not follow "show of support" with residents. A safety training was offered to the D3 staff 11/20/02 to increase their understanding of techniques used with the psychosocial population. Susie called in sick that day. She will need this training.

**CCSF 00012**

8.

PATIENT, VISITOR, AND STAFF RELATIONS & ETHICS

a. Maintains and promotes a "customer service" philosophy by:

- Demonstrating good interpersonal skills.
- Maintaining professional appearance and clean work space.
- Cooperating with all levels of staff throughout the organization.
- Demonstrating flexibility in adapting to changes to meet organizational mission and goals.
- Respecting patient and employee rights.
- Managing problems and concerns.
- Communicating in a courteous and helpful manner.

b. Supports autonomy, dignity, and rights of residents and others by:

- Preserving resident privacy and maintaining confidentiality of information.

| 2 | Rating/Comments |
|---|---|

Susie has struggled with flexibility in adapting to changes in the treatment goals within the Psychosocial Cluster. Susie had been approached several times by many disciplines, in IDT meetings, planning meetings and specially set meetings, in order to accommodate other programs. While Susie did eventually make the requested changes, she had not supported the needs of other team members.

Susie's last appraisal mentions a problem with the cleanliness of her cubicle space. This continues to be a problem and includes the orderliness of the supply cabinet on the unit. When spoken to about the issue, Susie deflects responsibility stating, "Look at everyone else's cubicles. They are just as bad."

Deflection of responsibility also is a problem when Susie has stated to residents, "I am only doing what I am told. My supervisor wants me to do this". The "selling" of new programs is ineffective when presented in this manner. Or when questioned about planning a party or a bus trip on the same day as other responsibilities, Susie has claimed the NM approves

- Performing tasks in a non-judgmental, non-discriminatory manner that is sensitive to individual needs, cultural diversity, sexual orientation and personal limitations.

programs, (i.e. Valentine's Day Party 2/13/03, bustrip 1/16/03, both conflicted with the MH responsibility.)  These requests appear that Su may be attempting to avoid the Moran Hall responsibilities.

9.

USE OF EQUIPMENT

a. Appropriately reserves equipment and supplies.
b. Utilizes checkout procedures for equipment.
c. Returns equipment in a timely fashion.
d. Returns equipment clean and in good condition.
e. Reports the needs for repair or replacement of equipment.

**3**  Rating/Comments

As appropriate

10.

HEALTH, SAFETY, AND INFECTION CONTROL

a. Adheres to health, safety, infection control policies and resource utilization standards by:

- Complying with employee health requirements.
- Maintaining a clean and safe environment.
- Adhering to and promoting safety practices and identifying and reporting hazards, including:
  Using equipment safely and correctly.
  Using proper techniques to avoid work related injuries.
- Using Universal Body Substance Precautions.

b. Demonstrating knowledge of emergency response/disaster plan.

c. Demonstrates proper food handling and safety techniques.

**3**  Rating/Comments

Susie is encouraged to arrange her cubicle to enhance the utility of the workspace.

CCSF 00013

11.
PERSONNEL & PRODUCTIVITY
a. Adheres to hospital/departmental personnel policies
   - Sexual harassment, violence in the workplace.
b. Manages work time effectively, efficiently and productively by organizing and prioritizing work to maximize productivity.
c. Reports unscheduled absences in a timely fashion
d. Maintains appropriate level of attendance
   - No more than 1 unscheduled absence per month on average.
e. Reports to work is a consistently punctual fashion

3  Rating/Comments

Susie's attendance record is within normal limits.  She is always punctual.  Susie is encouraged to maximize her time management an productivity.  Susie spends an unusually large amount of time completing documentation.  This interferes with time spent with residents.

12.
LEADERSHIP
a. Participates in Performance Improvement activities.
   Makes appropriate suggestions for program development and the improvement of department practices.

3  rating/comments

CCSF 00014

## III. Overall Evaluation

| Competent and Effective | Exceeds Standards | Outstanding | Development Needed | Unacceptable |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☒ | ☐ |

## IV. Work Plan for Next Report Period:

See 3 Developmental Plans 1) planning skills, 2) implementation of activities and 3) documentation

## V. Recommendations:

Susie has been with the City & County of San Francisco for more than 20 years. In the last 5 years, LHH has gone through vast changes requiring new knowledge and skills from the staff. Susie is encouraged to work closely with her supervisor to develop her ability to provide Activity Therapy interventions would compliment the work of the IDT while enhancing the quality of life, independence, and functional skills of the residents. Susie would benefit from increased flexibility and refraining from deflecting responsibility. Susie is encouraged to be aware of her body language and develop her ability to cooperate with the IDT and other hospital and department staff.

## VI. Reporting Manager

1. NAME, WORK ADDRESS
Christine Hanson
375 Laguna Honda Blvd
SF, CA 94044 94116

2. CLASS No. AND TITLE
HNIV 2588

3. DATE OF REPORT
6/1/02 - 3/15/03

4. CONFERENCE REPORT WITH (Manager's Signature)
5/6/03

5. SIGNATURE
_(signature)_ Hanson, HRS
5-6-03

## VII. Employee's Statement (See Handbook for Statement of Employee Rights)

| ☐ I AGREE WITH THIS REPORT. | ☒ I DO NOT AGREE WITH THIS REPORT. | SECT. ___ | NO. ___ |
|---|---|---|---|

☐ I REQUEST A CONFERENCE WITH THE REVIEWER

☒ REBUTTAL ATTACHED

2. DATE OF COUNSELING INTERVIEW

**CCSF 00015**

## VIII. Reviewer's Certification

1. NAME, WORK ADDRESS
WILLIAM G. FRAZIER
375 LAGUNA HONDA BLVD
SAN FRANCISCO, CA. 94116

2. CLASS No. AND TITLE
2557
DIRECTOR OF THERAPEUTIC ACTIVITIES

3. DATE OF REVIEW
4/3/03

3. SIGNATURE CERTIFIES I HAVE READ REPORT
_(signature)_ Susie

4. DATE OF CONFERENCE / INITIALS OF THOSE PRESENT
4/3/03
WGF SFA

☐ I CERTIFY THAT I HAVE REVIEWED THIS REPORT.

5. ☒ I HAVE TAKEN THE FOLLOWING ACTION: SEE ATTACHED

6. SIGNATURE
_(signature)_ William G. Frazier

# DEVELOPMENTAL PLAN

**Employee: Susie Abram**
Title: HWIII

**Target Performance:** Improved Implementation of Activities

**Current Status:** Susie is not contributing to the success of Moran Hall programs. She plans other activities to avoid participation in cluster programs, does not follow the protocol for the bingo program when facilitating, frames changes in a less than desirable manner to decrease the likelihood of residents and staff supporting the programs.

**Goal:** Susie will support MH/cluster based programs by

- Enlisting at least 4 residents from her unit per activity to participate in each program,
- Assist/transport residents to the programs daily,
- Remind staff and residents of the programs daily in the morning,
- Not plan activities that conflict with the MH activities,
- Begin transport 10-15 minutes prior to the beginning of the groups,
- Reviewing and following the Moran Hall bingo facilitation protocols.

Susie will frame information in a positive manner in order to decrease resident and staff resistance to changes in the program and encourage support by not putting responsibility onto others.

**Comments:** See Moran Hall activity protocols on the computer disk with 2003 calendars. One copy will be included with this plan.

**Effective Date:** ~~5/13/03~~ 7/1/03

**Follow-up Date:** ~~7/15/03~~ 9/1/03

| Employee | Date |
|---|---|
| _Hanson, CTRS_ | 5/13/03 |
| Supervisor | Date |

Follow-up     Did employee achieve Goal? _____ Yes _____ no

Comments:

| Employee | Date |
|---|---|
|  |  |
| Supervisor | Date |

CCSF 00016

# DEVELOPMENTAL PLAN

**Employee**: Susie Abrams
Title: HWIII

**Target Performance**: Improved Planning Skills

**Current Status**:  RN's have not had information about trips, residents have not had the appropriate resources to participate in trips,  and calendars (large and small) have not matched.

Goal:
- Susie will communicate information about bustrips at least a week in advance to the RNs to ensure residents have adjusted medication schedules, funds for shopping, etc. 100% of the time.
- Susie will make sure the small and large calendars are the same a 100% of the time.
- Susie will follow the daily schedule of activities 90% of the time.

**Comments**:  I would recommend discussing the trips in IDT where you can seek input. Have to copies of the bustrip form when getting the NM to sign the form and give her one, as well as put the information in the desk calendar.

**Effective Date**:  ~~3~~ ~~5/13/03~~ 7/1/03
**Follow-up Date**:  ~~7/15/03~~ 9/1/03

_____     _____
Employee                                          Date

_____     _____
Supervisor   , LTRS                          5/13/03
Date

Follow-up    Did employee achieve Goal?    _____Yes    _____no

Comments:

_____     _____
Employee                                          Date

_____     _____
Supervisor                                        Date

CCSF 00017

# DEVELOPMENTAL PLAN

**Employee: Susie Abram**
**Title: HWIII**

**Target Performance:** Timely and appropriate completion of required documentation
**Current Status:** Susies rate of completing documentation has been unexceptable, especially, during September, when she usually takes an extended vacation. Residents have transferred to the unit without assessments being complete, out-dated forms have been used and sections of the form have been left incomplete. Concerns about the accuracy of the MDS coding have been raised.

**Goal:**
- All documentation will be completed on time at least 90% of the time.
- Susie will complete all sections of the assessment form 100% of the time.
- The current form will be used for assessments 100% of the time.
- Susie will complete an initial assessment or transfer note within 7 days of admission to her assigned unit.
- She will keep the attendance book in the nurses' station.
- Susie will complete the MDS worksheet for assigned residents prior to her vacation.
- She will complete assigned documentation on residents who are due for review during vacation, either before or after the time off. And all documents will be completed within a month of her return from vacation.
- Susie will consult one IDT member before completing the MDS worksheet on residents due for review.

**Comments:** See documentation policy.

**Effective Date:** ~~5/13/03~~  7/1/03
**Follow-up Date:** ~~7/15/03~~  9/1/03

---

Employee _____    Date _____

_C. _____ anson, CTRS_    5/13/03
Supervisor _____    Date _____

Follow-up    Did employee achieve Goal?    _____ Yes    _____ no

Comments:

Employee _____    Date _____

Supervisor _____    Date _____

**CCSF 00018**

To: Christine Hansen

From: Susie Abram

Re:    Job Performance

Date:  May 13, 2003


Thank you for allowing me the opportunity to respond to the job performance of 6/02- 3/03.


The first area of concern is the assessment.  I have tried to accurately code the MDS.  I'm sorry the D3 staff believed that the resident's involvement in activities were overestimate.  My time with the resident and the resident's involved in activites were based upon the starting time and ending times as provided by the D3's wall clock.  As per the assessments, I have written and placed the needed material for assessments in the proper place.  The assessment forms used were the that were provided.  It was stated that a through picture of the resident's need and interest wasn't provided.  Maybe as the supervisor, Christine Hansen, a workshop could be conducted outlining what makes an appropriate assessment.


The next area of concern was documentation.


What has always been apart of the required regularly documentation: admitting into or transferring out of Ward D3 as been part of timely progress material. My vacation has always been for the entire month of September.  I'm glad that the supervisor was able to help reach the goal.  If it is okay complete the MDS material a month before the required date, please put this is letter form, and I will complete the MDS documentation a month before my vacation. Please accept my apology.


The third area of concern is the planning.


Before events are written on the large calendar, I must talk and meet with the Nurse Manager.  The Nurse Manager must give her approval for the new month's activities.  During the community meetings on Thursdays, the residents and the CNA of D3 and myself will discuss and plan the next bus trip. The residents had voted to purchase with their own "monies" food away from the hospital's food. This item of having their own monies applied only to the shopping mall trips. The nursing staff takes the patient to "Patient Accounts" for the personal monies.


The fourth area of concern was implementation.  I have always and will continue to support all activies to enhance the resident's life.  The statement, "we are taking things away from the patient." only applied to the bingo that was played on Fridays, on Ward D3.  My committment and support has been for residents.  I'm off on Mondays.  The dates Wednesday and Friday, I'm asking and telling the staff and the residents to come to Moran Hall.  Many of the residents refuse and wish to remain at the bedside.  On Thursdays, I will sit at a back table with the Ward D3 residents who feel more secure being near me. When residents at different tables (several other back tables) call "bingo", I will call out the winning numbers. The volunteers who come to the Moran Hall on Thursdays feel somewhat threat if members of the Activity Departments call the bingo numbers or pass out the prizes to the residents. I will continue to be work toward the goal of what enhances and enriches the resident's life.  Please demonstrative the

correct procedure that would increase my job performance to service.

The fifth area of concern was communication.  During my twenty-two years of service, I have strived to meet and exceed the goal of effective communication. During the meetings, all my attention is focuse

d on the topic(s) of the meetings, and the speaker delivering the message of the meeting.  I have dir

ect eye contact with the speaker.  Once when my front tooth was loose and finally came out of my mout

h, I asked the supervisor, Christine Hansen, to please excuse me, "I'm embarassed that my right front tooth is missing."  Problem-solving improvements are issues that I'm willing toward reaching a goal. I'm sorry that to mention the word "lawyer" caused a problem.  I'm wanting someone to be in my corner.  I had thought that as a supervisor, Christine Hansen, could and would be fair and want the best for her employees.  I'm sorry that my calling in sick on 11/20/02, caused a problem.  A safety training is still needed.  Would the supervisor, Christine Hansen, please conduct the meeting or make arrangement for the needed training.  It is not true that I was loud and uncooperative and a 3rd party from HR was needed.

The sixth area of concern was patient, visitor and staff relations.  I want to support the need of others team members.  The plans that made by the Psychosocial Cluster have become apart of the program that best meets the needs of the resident.  The cleanliness of the cubicle space and the orderliness of the supply cabinet on the ward are places that I feel the most relaxe, in these areas, it may seem as if orderliness isn't present, but I know and find everything that I need.  The deflection of responsibility is stated as a problem.  After telling and encouraging the residents to try new things, as a last resource, I would tell the residents let's try the new item my boss speaks highly of the things.

CCSF 00021

By:     William G. Frazier
Re:     Result of Performance Appraisal Reviewer Conference with Susie Abram
        held on June 13, 2003
Date:   July 14, 2003

Susie Abram and I met on June 13th, at 1:00 p.m. to discuss her concerns related
to her annual performance appraisal. Ms. Abram expressed several concerns
about the accuracy of the performance appraisal and concerns that she had related
to the supervision she was receiving from her supervisor, Christine Hanson. I
committed to discussing those concerns with Ms. Hanson.

Susie and I discussed the changes taking place within the organization and the
changing nature of Activity Therapy interventions and responsibilities. I
indicated my support of the efforts being taken by Christine to improve the
services and therapeutic benefits of Activity Therapy program within the
Psychosocial Cluster. I encouraged Susie to make a clear effort to comply with
Christine Hanson's direction and to reciprocate support for the program
enhancements within the cluster. I encouraged Susie to contact me when she felt
that she is being treated unfairly so that the issues can be resolved immediately.

In the spirit of cooperation, I am asking Christine to adjust the dates of the
developmental plans to take effect on July 1, 2003.

*Changes where made.* C. Hanson, CTRS
7/14/03

# EXHIBIT H

August 11, 2003

On Tuesday, July 29th, I met with SEIU, Local 790 Field Representative, Ruben Garcia-Rodriguez and Susie Abram. Ruben had notifies me that the topic of the meeting was related to their wanting to make a complaint about Christine Hanson who is responsible for the supervision of Susie Abram.

Ruben starting the meeting off by indicating that they wanted to make the complain and that they believed that "there is a discriminatory situation." The following is a list of incidents that they reported to me at the meeting. I was aware of many of these incidents.

1. Christine requires that Susie complete her planning calendar of a computer while not making the same requirement of other staff that she supervises.

2. During a planned meeting in Christine's office, Susie informed Christine that she was allergic to the Christine's dog. The meeting was then moved to the 4th floor Volunteer Lounge, but Christine brought her dog into the lounge during the meeting.

3. At a time when Susie was on vacation, Christine had the lock on the storage cabinet on Susie's assigned unit, D3 cut off. Susie indicated that she found that storage closet a mess upon her return with her compact discs on the floor. Susie reported that she lost many of her personal CDs.

4. Susie claimed that Christine had given a letter to Tracy Griffin, a co-worker of Susie, in which Christine indicated that Susie was "a problem."

5. Susie claimed that Christine sent a memo to Susie in which Christine indicated that Susie had a problem with the interdisciplinary team (IDT). Both Ruben and Susie object to this memo, as the claim that Susie has a problem with the IDT is Christine's opinion and not the opinions of the IDT members.

6. Susie claimed that Christine direct Volunteer Coordinator, Bob Deel, not to provide Susie with volunteer support for an outing that Susie was planning to a casino.

7. Susie claimed that Christine is continuously harassing Susie about not supporting programming in Moran Hall. Susie claims that she bring more residents to Moran Hall program that her colleagues on the third floor and that attendance records would prove that.

8. Susie claimed that Christine required Susie to meet with her and a representative from the Human Resource Services Department. I agreed that this seems improper if the meeting was related to disciplinary action. Ruben

CCSF 01273

stated that it is the stance of the union that such a meeting constitutes disciplinary action.

9. Susie claims that Christine insists that all written communication be done via e-mail although Christine knows that Susie is not skilled and uncomfortable with e-mail.

10. Susie claimed that on several occasions, Christine has yelled at Susie in from of her peers.

I indicated that I was aware of many of these issues either from interaction with Susie and/or Christine. I indicated that many issues related to Susie's performance and relationship with her supervisor had been brought to my attention. I cited a specific example related to Susie's mismanagement of receipts from a bus trip and unusual documentation of ward money utilization. Susie denied problems with the bus trip and ward money receipts and declared that she would be interested to see copies of the documents in question.

I indicated my support for Christine and the initiatives that she had been taking to improve the programming within her assigned cluster as well as enhancing the performance of the staff for whom she is responsible. Ruben and Susie indicated that they had no problems with program and performance improvement. They acknowledged the role of the supervisor in these processes. However, they we felt that Christine behavior in regards to Susie was extreme and inappropriate.

Ruben and Susie informed me that it was Susie intention to exercise her options through the upcoming bidding process to seek another unit assignment that would result in her having a supervisor other than Christine.

I indicated that I did not have sufficient information to respond adequately to these issues. I indicated that I would investigate their claims and meet with them at a later date to report my findings and proposed actions. I indicated that I would try to have the investigation completed by the next week. I have since contacted Ruben and Susie and indicated my investigation would take longer, as due to vacation schedules within the Activity Therapy and Volunteer Services department.

Findings:

I conducted an investigation into each of the claims. The following are my findings.

1.    Calendars:    During the meeting with Susie and Ruben, I responded to their issue by indicated that I was aware of concerns that Susie' calendars were difficult to read, but acknowledged that the discussion focussed on the small, planning calendars.   I indicated that I found her large calendars, which are posted

on the unit, to be difficult to read. Susie indicated that she did not agree, and that no other supervisors had problems with the calendars. I indicated that it was my recollection that previous performance appraisal by previous supervisors indicated problems with the legibility of Susie's calendars. I pointed out that while Christine was requiring Susie to complete her planning calendar on the computer, Christine was assisting her including scheduled instructional sessions.

I questioned Christine on this issue. She indicated that she was requiring Susie to complete the planning calendar on computer because the hand-written calendar was too difficult to read. Christine states the illegibility of the planning calendar made was problematic in the review and approval process. Christine indicated that she was requiring other staff to complete their calendars on the computer. Christine acknowledged that not all staff were completing the planning calendars on the computer at this time, but she plans to working with her staff and eventually requiring them all to complete the calendars on the computer. Christine reports that although she requires Susie to complete the calendar on the computer, Susie has at times not complied with the requirement and submitted the calendar in hand written form.

I reviewed past performance appraisal for Susie and found entries citing problems with the legibility of her calendars.

Christine indicated that she requires  of her  assigned staff to complete the planning  calendars on computer. I reviewed calendar book and was able to confirm Christine's claim.

It is my opinion that Christine's requiring Susie to complete the planning calendar is appropriate. Susie's handwriting is difficult to read at times. The computer is a tool that is widely use in the health care industry today. Susie's learning to use the computer will be helpful to her and the Activity Therapy Department in the future. Christine has provided Susie with instruction to develop this skill

2.    The Dog:    I had stated during the meeting with Ruben and Susie that I had observed Susie utilizing Christine's dog for animal therapy visits on her unit. Christine reports that during a regularly scheduled meeting between Christine and Susie, she was informed that Susie was allergic to the dog. Christine stated that this incident was the first time that Susie had made any indication that she had problems with the dog.  Christine indicated that she proposed that the meeting be moved to the 4th floor Volunteer Lounge, adjacent to the department. It was Christine's belief that the more open venue of the Volunteer Lounge could offer Susie with the necessary relief. The dog has difficulty coping with Christine's absence and will whine and bark continuously. Christine stated that she did not want to leave the in her office and subject her colleagues to the noise coming from her dog.

CCSF 01275

Christine stated that since this incident, the dog has not been present during a meeting involving Susie. Christine showed me a schedule of when the dog comes to the hospital and pointed out that the dog does not come on days when she and Susie are scheduled to meet.

It is my opinion that Christine's dog is problematic at times. His presence in the department has been disruptive, especially when Christine is not with him. This is my personal opinion. No other staff have complained about the dog. The dog is used for animal assisted therapy interventions. Christine has taken measures to avoid subjecting Susie to the dog. It is my opinion that Christine has taken adequate precautions since the incident in question and I find no evidence of malice toward Susie in relation to the dog.

3.     The Storage Cabinet:          During the meeting with Ruben and Susie, I indicated that it was my belief that the purpose of Activity Therapy Storage cabinet on each of the units was to store recreation supplies and equipment, not the personal property of staff. I indicated that it was my recollection that Christine had accepted Susie's claim that her personal compact discs had been lost and that Christine had facilitated a police report and had arranged the replacement of the CDs. I indicated that it was my recollection that Susie did not take advantage of the opportunity.

Susie indicated that her concern was more with her property being tampered with in her absence. Susie indicated that the Nursing staff had keys to the cabinet and that Christine could have accessed the contents of the cabinet through them.

It is my opinion that Christine's action in this case was extreme. While I condone her efforts on behalf of the residents of the unit, I believe that alternatives could have been arranged until Susie's return, at which time access to the cabinet could have been established.

7.     Moran Hall Programming:     During the meeting with Susie and Ruben, I expressed my concern that Susie was not supportive of the Moran Hall programming and the rationale for moving activities from the units and into a communal space. I indicated that I had overheard Susie on occasions expressing her dissatisfaction with Moran Hall programming including claims that residents did not prefer to come to Moran Hall.

I reviewed the attendance records that are maintained on the 3rd floor for program off the units. This system had been set up to capture the participation of residents across the units. Different staff have responsibilities for transporting residents, implementing the activity, and recording attendance for all residents on different days. It is impossible to determine staff involvement form resident participation records. High participation for a particular unit does not necessari8ly indicate that the assigned staff was responsible for supporting the program. Residents may have attended independently, Nursing staff may have facilitated attendance, or

CCSF 01192

with Susie and her colleagues on the third floor in the past during which they had expressed her opinion that the Moran hall programming was a problem and the residents did not want to go to Moran Hall.

I reviewed the attendance records that are maintained on the 3rd floor for program off the units. This system had been set up to capture the participation of residents across the units. Different staff have responsibilities for transporting residents, implementing the activity, and recording attendance for all residents on different days. It is impossible to determine staff involvement form resident participation records. High participation for a particular unit does not necessari8ly indicate that the assigned staff was responsible for supporting the program. Residents may have attended independently, Nursing staff may have facilitated attendance, or another Activity Therapist may have been responsible facilitated attendance from another unit.

I acknowledge that staff other than Susie have expressed dissatisfaction with Moran Hall programming. Resident preference and lack of cooperation from the Nursing staff have been cited as barriers. I remain committed to programming in Moran hall as it promotes socialization and normalization.


8.     Meeting with HR Representative:     During the meeting with Ruben and Susie, I indicated that the way that the information about this incident had been presented, this appeared to be a clear violation of the right to representation I was surprised that the union had not taken previous action.

I questioned Christine Hansonon this issue. Christine reported that this meeting began as a regularly scheduled meeting between her and Susie. Christine reported that Susie became loud and belligerent during the meeting and that Christine thought it best to close the door to her office. Christine reported that Susie objected to the door being closed. Christine felt that the meeting needed to continue, but could not unless their was some privacy. Christine then suggested that they meet in a conference room downstairs. Susie objected to meeting downstairs as well. Christine informed Susie that she was obligated to meet with her supervisor without representation when discussing routine operations. The two proceeded to a conference room on the first floor. Christine felt that because Susie was becoming upset, that she needed someone to facilitate the meeting. Christine went to the Human Resource Services Department and asked Willie Ramirez to assist and Mr. Ramirez agreed. I contacted Mr. Ramirez and asked him to provide his view of the happening on that day. Mr. Ramirez confirmed the information provided by Christine Hanson. He indicated that Susie was objecting to the meeting and that he reiterated that she is required to meet with her supervisor when the meeting is not disciplinary in nature. Mr. Ramirez reported that Susie became "loud and inappropriate" during the meeting.

CCSF 01180

Based on my investigation of this incident, I find that the actions of Christine Hanson were appropriate.

CCSF 01181

# EXHIBIT I

# EMPLOYEE CONFERENCE FORM

NOTIFICATION DATE
8/12/03

| EMPLOYEE | CLASS |
|---|---|
| Susie Abram | HWIII, 2587 |

| DEPARTMENT/WORK LOCATION | SHIFT |
|---|---|
| DPH/LHH/Activity Therapy | Days |

| HOURS | DAYS OFF | SUPERVISOR | TITLE |
|---|---|---|---|
| 8:30-5pm | Sunday-Monday | Christine Hanson | HWIV, 2588 |

| YOU ARE SCHEDULED FOR A CONFERENCE ON: | DATE: | TIME: | PLACE: |
|---|---|---|---|

### YOU HAVE THE RIGHT TO REPRESENTATION AT THIS CONFERENCE

HAS CONFERENCE BEEN HELD WITH EMPLOYEE PREVIOUSLY REGARDING DISCIPLINARY PROBLEMS?   YES  X    NO  ◯

| SUBJECT(S), DATE, AND DISPOSITION OF PRIOR CONFERENCE(S) | 1 12/11/95 Inattention to duty and insubordination Written warning | 2 | 3 | 4 |
|---|---|---|---|---|

LIST CHARGE(S): Inattention to duty; Not professionally managing a cluster wide activity and dishonesty in providing information to your supervisor

SUBJECT(S) OF THIS CONFERENCE: On 7/24/03, the 3rd floor had a summer/garage sale. Each unit had a table and was accountable for their own money. When I observed the sale, I noted that your table was very disorganized and messy. In fact, it appeared uninviting to potential buyers. I was informed that after the sale you failed to clean up after yourself and other staff did it for you. They felt if they left the mess, it would reflect badly on the 3rd floor in general.

I approached you at the end of the day and asked you how the sale went. You responded by not making eye contact, pulling the sucker out of your mouth and said, "fine", and returned the sucker to your mouth. I felt shut off and didn't inquire any further.

Since you were not forthcoming with information about information, I decided that it would be best to collect the funds from all individuals with responsibility during the sale. On Tuesday, 7/29/03, I asked you to be prepared to turn in the funds from the sale the following day. You were resistive, but told me, "I'll give you the measly $30 we made". Wednesday afternoon you came to my office, counted out some money and returned it to the small bag you were carrying it in. You told me there was $50. You stated you had spoken with the IDT and were planning to get a DVD player for the unit while I was on vacation and would need the money. I was very happy you had been speaking with the IDT on how to spend the funds and was happy to allow you to keep the funds to purchase the item.

However, that evening I spoke with D3 NM, G Davary. She informed me that when you had spoken with her there was not mention or decision to purchase a DVD player. She also informed me that you had told her I requested half of your money the unit had earned during the sale, $50, and that you could spend the other half for the unit. You never gave money to me. Furthermore, the NM reported that you claimed to have made $100 on the day of the sale. You reported the same amount, $100, to Lisa Randon-Walker on 7/25/03, the day following the sale.

With all of the conflicting numbers and stories, I can not be sure what you made during the sale. Nor am I confident you would tell me the truth. Whatever the amount, your management of this activity and corresponding funds have been grossly inadequate.

Because of the above information, I am recommending that there be a 2-day suspension for the inattention to duty and dishonesty.

Attachments:

☐ Employee Copy      ☐ Department Copy      ☒ File Copy

CCSF 00298

**DEPARTMENT OF PUBLIC HEALTH**                                                      PAGE

NAME                        CHARGE(S):                        NOTIFICATION DATE:

EMPLOYEE'S STATEMENT (OPTIONAL):

*STATEMENT TO BE GIVEN TO CHRISTINE BY 10/22/03*

ACTION BY IMMEDIATE SUPERVISOR

*Statement attached*

ACTION RECOMMENDED:      O DISCIPLINARY        DISCIPLINARY  *2*     O TERMINATION/
                            WARNING             SUSPENSION _____        DISMISSAL
                                                            DAYS

                         O OTHER, SPECIFY: _____

I ACKNOWLEDGE THIS CONFERENCE, WHILE NOT NECESSARILY AGREEING TO THE ABOVE ALLEGATIONS;

*10/16/03*          *Susie A*                    *G Jason, CTRS*
DATE OF CONFERENCE          EMPLOYEE SIGNATURE              SUPERVISOR SIGNATURE

COPY OF CONFERENCE FORM:

          **X** GIVEN TO EMPLOYEE *10/16/03* OR   O SENT CERTIFIED  _____
                                DATE                  MAIL            DATE

                                                        *10/24/03*
YOU MAY REQUEST A REVIEW OF THIS RECOMMENDATION TO THE REVIEWER BY ___~~10/10/03~~___.
                                                            (Date)

                         ____William Frazier, Director of Therapeutic Activities__
                         **NAME AND TITLE OF REVIEWER**
                         **(Division Head or Designee)**

          ☐ Employee Copy      ☐ Department Copy      ☐ File Copy

CCSF 00299

Rebuttal to employee conference on 10/16/03

I disagree with the charges listed on the employee conference form. I am working very hard to meet the various needs of the residents that I work with. The specific statements listed on the conference form are inaccurate. I feel that this supervisor has biased expectations. This supervisor has never given me any positive feedback. I feel that she is prejudiced against me.

CCSF 00300

Inattention to duty 10/16/03

The conference for the inattention to duty for Susie Abram occurred on 10/16/03 at 10am. In attendance were Susie Abram, Ruben Garcia and Christine Hanson. During the meeting Susie and Ruben explained that the discrepancy with the money occurred because Susie was part of the sale here at the hospital, but also had a sale of her own at her home.

Susie stated she had made approximately $53.00 here at LHH, (This is different amount than what was reported when asked to turn in her money) and another $54.00 at her home, which she has donated to the unit. That was her reason for the difference in the amounts.

She explained the residents were part of the process in spending the money and in the end decided to have a party. Susie presented 2 receipts and claimed that there is about $36.00 remaining.

Ruben asked that the charges be dropped due to the lack of a policy at the time of the incident. Supervisor explained that there is a policy in professionally handling money and implementing programs, both of which Susie failed to follow. And because of this situation, guidelines have been established for future sales.

Also, Supervisor presented other attachments. First was a written statement from the nurse manager from D3. The second two items were documents from the past where Susie had been counseled for not paying attention to detail when reporting use of hospital funds. One was a bustrip and the other was a ward-monthly fund.

I continue to believe that a 2-day suspension is appropriate in the situation.

CCSF 00301

DEPARTMENT OF PUBLIC HEALTH

# REVIEWER

| NAME | CHARGE(S): | NOTIFICATION DATE: |
|------|-----------|--------------------|
| Susie Abram | Inattention to Duty | 8/21/03 |

REVIEW AND RECOMMENDATION BY REVIEWER

A review meeting was held on Thursday, November 4th, at 1:00 p.m. in room B104 at Laguna Honda Hospital. In attendance were Susie Abram, SEIU Local 790 representative Jonathan Frank, and myself, William Frazier. The purpose of the meeting was to review the charges of inattention to duty and dishonesty, which were made by Activity Therapy Supervisor, Christine Hanson. The original employee conference was held in October of 2003 after which, Ms. Hanson had recommended a two-day suspension. The review meeting had originally been scheduled for Novemb 13th, 2003, but Ms. Abram became ill and was unable to participate. Ms. Abram subsequently took a leave of absence from that day until September 17th of 2004.

The meeting began with my explaining the purpose of the meeting and the reason for the delay between the original employee conference and the review meeting. Mr. Frank sought clarification on many points, as he was not familiar with the issues. After receiving that clarification, Mr. Frank indicated that he felt the issue was related to a lack of communication between Ms. Abram and her supervisor and that the recommendation of a two-day suspension was excessive. I explained that the two-day suspension was recommended in consideration of progressive discipline as M: Abram was given a written reprimand for a charge of inattention to duty and insubordination in December of 2002.

The discussion turned to the discrepancy over the amount of money that Ms. Abram reported to different people from rummage sale sponsored by the Activity Therapy staff from the third floor. Ms. Abram explained that she had reporte different amounts to different people because she had made money at a garage sale at her home. She had intended to donate that money and add it to the money that was made at the rummage sale at the hospital. Ms. Abram had reporte a lesser amount to her supervisor and a greater amount to the Nurse Manger from her assigned unit and another Activi Therapy staff member. The greater amount was a combination of the money made at the hospital and the money made at home. This had apparently been the discussion at the original employee conference.

It is apparent that a great deal of miscommunication has taken place in regards to this case. The discrepancy between the larger amount of money reported to the Nurse Manager and the smaller amount reported to the Activity Therapy Supervisor is explained by the additional sale that Ms. Abram claims to have held at her house. However, that information did not come out until the employee conference. The employee conference documentation indicates a several different amounts of money reported by Ms Abram at different times in the process. ($30, $50, $53, and $100) There was an apparent lack of clarity about what would be purchased with the funds including at DVD player or a part for the unit. At the review meeting, Ms. Abram also reported that a trip to a casino was also being considered. There was also conflicting information about how that determination would be made either by the IDT or the residents themselves.

At the review meeting, Ms. Abram was adamant that her handling of the situation was appropriate and that Ms. Hanso was perpetuating conflict between the two. It is my opinion that Ms. Abram is at least responsible for a portion of the miscommunications, but she fails to acknowledge that or except responsibility.
I do not believe that Ms. Abram kept any of the money for herself or intended to do so. It was within the proper authority and responsibility as a supervisor for Ms. Hanson to question Ms. Abram about funds related to a program sanctioned by the Activity Therapy Department.

CCSF 00302

Based on the information that I have before me, I recommend a one-day suspension for inattention to duty, since M: Abram failed to effectively communicate with her supervisor on this matter and did not take steps to clarify the miscommunication.

ACTION RECOMMENDED:  ◯ DISCIPLINARY        ⊗ DISCIPLINARY        ◯ TERMINATION/
                            WARNING            SUSPENSION   1        DISMISSAL
                                                          ────────
                                                           DAYS

                        ◯ OTHER, SPECIFY: _____        _approved_
                                                                       _mwk 11/2/04_

___11/4/04___          SIGNED: _William L. King_ — DIRECTOR OF THERAPEUTIC ACTIVITIES
DATE OF REVIEW                 REVIEWER (NAME AND TITLE)


COPY OF CONFERENCE FORM:

                        ⊗ GIVEN TO EMPLOYEE _11/19/04_ OR   ◯ SENT CERTIFIED  _____
                                               DATE                  MAIL        DATE

            ☐ Employee Copy      ☐ Department Copy      ☒ File Copy

CCSF 00303

To: Susie Abram
From: Christine Hanson
Date: 10/7/03
RE: conference

On 8/21/03, you received notification of a conference. That conference was postponed due to vacations. Therefore, we need to reschedule. Next week, I have either Tuesday, 10/14/03 or Thursday 10/16/03 between 9-11am both days. Please, contact your union representative for his availability and get back to me by 10/10/03. You can leave me an email, voice mail or note in my box.

If I don't get a response from you by the 10th, I'll need to set the date for the conference and will not be able to reschedule. If you have problems with representation the two people able to represent you in the department are Norman Burns and Ann Wong. The union has a conflict resolution center which you may also access, 575-1740.

CCSF 00304

GIFT FOR REIMBURSEMENT — SAN FRANCISCO
... ... S ONLY

Date: 5/2/03

To: Accounting Department

From: Christine Hanson          Yr 2045
         Print Name                     Telephone

COPY

Reimbursement Amount: $ 178.76

Check payable to: LHH - Activity Therapy

Request to be funded from:

a. Nursing . . . . . . . . . . . .   ———
b. ADHC . . . . . . . . . . . .   ———          Fund:          Miscellaneous Gift fund
c. Volunteers . . . . . . . . . .   ———          Index Code:   ...........
d. Activity . . . . . . . . . . . .   ———          Sub-Object:   0399
e. AIDS . . . . . . . . . . . .   ———          Grant/Other:  ..........
f. Hospice Care . . . . . . . .
g. Other  LHH Express    X

Reason for Expenditure: Susie assisted 10 Residents from
DB to Chevys Restaurant for lunch

Patients Name (if applicable)

1. L. Kypgofou          5. B. Nieto          9. H. Welch
2. R. Woods            6. C. Shepherd      10. S. Head
3. C. Santiago         7. S. Bauer         11. _____
4. K. Lyons            8. S. Huston        12. _____

Requested by: ___Hanson, CTRS___   Date: 5/9/03
                        Authorized Employee

Approved by: _____   Date _____
                        Division Head

Approved by: _____   Date _____
                        Controller

Note: Original receipts must be attached.                    Gift.xml

CCSF 00305

```
**************  *********
CK #  486          DATE 05/02/0
LE # 45            TIME   12:0
COPY
   1-DINING : NELSON        --

ITEMS ORDERED           AMOU

 1 SPICY WINGS            6.99
 2 FM TWO COMBO          13.96
 1 OTHER SIDES>, Tomalito 0.95
 1 DIET P                 1.99
 1 LMNADE                 1.99

************************************

SUBTOTAL           25.90
       TAX          2.14


TOTAL DUE          28.04
                   3.90
        # OF GUESTS 31.94

NEED SOMEWHERE TO HAVE YOUR OFFICE
PARTY?  JOIN US AT CHEVYS FOR A FUN AND
```

```
  *****************************
CHECK #  478        DATE 05/02/0
TABLE # 44          TIME   12:0

--   1-DINING : NELSON      --

ITEMS ORDERED           AMOU

 1 GUAC SMALL            2.50
 1 FM FAJ BEEF              8
 3 FM FAJ CK              25
 4 FM TWO COMBO          27
 1 FM FAJ RITO BF        7.00
 1 FM RELLENO COMBO      7.99
 5 COFFEE                9.95
 4 PEPSI                 7.96
 1 ROOT B                1.99
 2 VIRG STRAW MRG        5.50

*****************************

SUBTOTAL          106.79
      TAX           8.82


TOTAL DUE         115.61
               tip  16.05
          # OF GUEST 31.669
Dessert              17.00
NEED SOMEWHERE TO HAVE YOUR FUN
PARTY?  JOIN US AT CHEVYS FOR A FUN AND
FESTIVE EVENT.     CALL THE MANAGER
TO BOOK THE PARTY TODAY?  98.76
```

Total $ 148.76
31.94
180.70

To: Susie Abram
From: Christine Hanson *CH*
Date: 5/9/03
RE: Restaurant outing to Chevys

I went ahead and completed the receipts for the trip to Chevys you took the D3 residents on 5/2/03. I completed the form for the staff lunch receipt and included $1.98 of my money to cover the amount over the allotment the staff lunches cost. I need you to pay me the $1.98. I have included a copy of the gift fund reimbursement form for your review.

There is another issue that must be addressed regarding this trip. I am not sure you understand the money and receipts are your responsibility. The receipt for residents lunches includes a hand written amount for desserts. This is not acceptable. I called the restaurant for clarification. They informed me all items on the receipts should be itemized by computer. When I inquired about the situation, you told me the driver had done the writing on the receipt. All receipts and funds are your responsibility. In the future, if there are problems with receipts, you will be held accountable.



Lisa Randon
08/03/2003 02.00 PM

To:  Christine Hanson/DPH/SFGOV,
cc:  William Frazier/DPH/SFGOV
Subject:

Per our conversation:

On July 25, 2003, I had a conversation with Susie Abram and Lynn Lustgarten regarding the sale that they had on the 3rd floor earlier during the month. We were discussing how well the sale went. Lynn expressed that she had made around $100.00 and Susie added that she had also made around $100.00. The conversation went on to what the money would be used for. Susie said that the decision regarding the money would be left up to her residents.

Lisa Randon-Walker

CCSF 00308



Ghodsi Davary                 To: Christine Hanson/DPH/SFGOV
08/26/2003 09:39 AM           cc:
                              Subject: Re: 3rd Floor Sale

On afternoon of July25th,03,when I asked Susie Abram how much she has made during the Sale.She told me $100.00.In another conversation with Susie Abram
prior to our IDT Meeting about aweek after the Sale,She was discussing with me Residents'wishes for the money she had made.At this time.She said she has only $50.00,and the rest of it wasgiven to County.

Goldie Davary,N.M E3.G3

CCSF 00309

## Laguna Honda Hospital Volunteers Revolving Fund
## Ward Money Replenishment Request

Ward _D3_

Activity Therapist _Lusie D_

Month Covered: _March_

TOTAL DOLLAR AMOUNT GIVEN          $45.00

AMOUNT EXPENDED                    45.00

CASH REMAINING

ITEMS PURCHASED: _Food for Walk Groups_

NUMBER OF RECEIPTS ATTACHED: _5_

I certify that the above items were purchased for use in the Activity Therapy Programming on the above stated ward at Laguna Honda Hospital. I understand I will not be compensated over and above the monthly amount of $45.00 for my ward purchases.

_____          _3/25/03_
Signature of Activity Therapist    Date

_____          _3/27/03_
Activity Therapy Supervisor        Date
Approved for Replenishment

# (S) SAFEWAY

WELCOME TO SAFEWAY

```
        MH CRND FLAT
2.74 lb @ 1.79 /lb = 4.90
SC 7627 CLUB MH CRND FLAT                8.19 F
        SFWY BRISKET POINT               3.29 F
3.68 lb @ 1.29 /lb = 4.75
SC 875 CLUB SFWY BRISKET                 8.80 F
        LEMON JUICE                      4.05 F
202.59  CAKE MIX-YEL                     1.58 F
        2 @ 1.34                         5.18 F
SC 6852 CLUB PILLSBURY CAK
203.29  PLSBRY PIE CRUSTS                2.68 F
202.59  SAND MUFFIN                      6.58 F
        HAIR PINS                        5.18 F
****    TAX              .25 BAL         2.99 T
VF      PERSONAL CHECK                  28.73
                                        28.73
        CHANGE
                                          .00
        TOTAL SAVINGS          10.02
3/10/03 11:37 1259 06 0064 9259
```

---

```
    SUSIE ABRAM            8100
Club Card Savings          $ 10.02
Total Savings Value   26% $ 10.02
```

Your qualifying purchases have
been accumulated towards eScrip.
Thank you.

Watch Indie Fridays on Bravo Network
Great Independent Films commercial?
Free, three Friday nights in March

BUY TURBOTAX DELUXE NOW!
$10 Rebate!FREE eFile & TurboTax State
At selected stores. Restrictions apply.

YOU HAVE PURCHASED   0 OF  8 TOWARD
      YOUR  1st  FREE BAGEL
      See Store for Details.

YOU HAVE PURCHASED   0 OF  7 TOWARD
      YOUR  1st  FREE DELI SANDWICH
      See Store for Details.

LET US HEAR FROM YOU!
1-877-723-3929 or visit SAFEWAY.COM

CCSF 00311

# (S) SAFEWAY

WELCOME TO SAFEWAY

```
         MH CRND FLAT
  2.74 lb @ 1.79 /lb = 4.90          8.19 F
SC 7627 CLUB MH CRND FLAT
    SFWY BRISKET POINT               3.29 F
  3.68 lb @ 1.29/lb = 4.75          8.80 F
SC  875 CLUB SFWY BRISKET
    LEMON JUICE                      4.05 F
202.59 CAKE MIX-YEL                  1.58 F
      2 @ 1.34                       5.18 F
SC 6852 CLUB PILLSBURY CAK
203.29 PLSBRY PIE CRUSTS             2.68 F
202.59 SANO MUFFIN                   6.58 F
       HAIR PINS                     5.18 F
 **** TAX            .25 BAL         2.99 T
VF     PERSONAL CHECK               28.73
                                    28.73

    CHANGE                            .00

       TOTAL SAVINGS      10.02
3/10/03 11:37 1259 06 0064 9239
```

```
     SUSIE ABRAM            8100
   Club Card Savings       $ 10.02
   Total Savings Value  26% $ 10.02
```

Your qualifying purchases have
been accumulated towards eScrip.
            Thank you.

Watch Indie Fridays on Bravo Network
Great independent films, commercial
Free, three Friday nights in March

     BUY TURBOTAX DELUXE NOW!
$10 Rebate!FREE eFile & TurboTax State
At selected stores; Restrictions apply

YOU HAVE PURCHASED   0 OF   8 TOWARD
      YOUR  1st  FREE BAGEL
      See Store for Details.

YOU HAVE PURCHASED   0 OF   7 TOWARD
    YOUR  1st  FREE DELI SANDWICH
      See Store for Details.

    LET US HEAR FROM YOU!
1-877-724-3929 or visit SAFEWAY.COM

CCSF 00312

Sun — 10:15 Cath Service
Mon — 1:30 Bingo Moran Hall
Tues —
Wed— Education group 2pm Moran Hall
Thurs — 10 AM Community meeting
              1:30 Bingo Moran Hall
Fri — 2pm Blackjack Moran Hall

1-17
1-20

2-6
2-12

759 6.560

CCSF 00313

CCSF 00314

CCSF 00315

To: Susie Abram
From: Christine Hanson
Date: 4/7/03
RE: signing out early

After our discussion on 4/4/03 we decided that the follow incident would be documented in a memo and put in your file.

On 3/28/03, I needed you to give me complete information on the residents that attended the bustrip that day to turn in the final request to Barbara. I needed the last name of one of your residents. I went into the main area of the department looking for you between 4:45-4:50. I called out your name and walked to the back of the department. AT staff made a comment that you had already left. You were not in the A-wing. I went to the time sheet and you had already signed out for 5:00pm. I went to the B-side to check if you were over there. You were not. I did not authorize your leaving early, you had not signed up for shopping time. Barbara saw you sign out early and head down the hallway towards the door.

You have admitted to signing out early, but claim you were in the bathroom when I was looking for you. It is the departmental policy to sign out between 4:55 and 5:00 to get paid until 5:00. If you have an emergency, which you need to leave early, you must inform your supervisor.

The leadership of this department expects that you will comply with this policy.

cc. William Frazier
cc. Employee File

RECEIVED
03 APR 14 PM 12:00
HUMAN RESOURCES
DEPT. OF PUBLIC HEALTH-S.F.
LAGUNA HONDA HOSPITAL

CCSF 00316

4-10-03

DEAR CHRISTINE,

I SIGNED OUT AT 10 TO 5, BUT I DID NOT LEAVE. I WAS IN THE BATHROOM. I HAD NOT TAKEN A LUNCH BREAK THAT DAY. I DO NOT UNDERSTAND WHY YOU DID NOT TALK TO ME ABOUT LEAVING BEFORE WRITING ME UP. WHY ARE YOU SO NEGATIVE AND SO PETTY WHEN IT COMES TO ME. I DO NOT FEEL THAT THE MEMO SHOULD BE PLACED IN MY FILE. WHY DID YOU NOT ASK ME? INSTEAD,.YOU BELIEVED A CO WORKER. I FEEL THAT YOU ARE HARASSING ME AND IT HAS TO STOP! IN THE NEAR FUTURE, I WILL NOT SIGN OUT BEFORE I LEAVE.

SUSIE ABRAM

CC: BILL F
RUBEN G

# EXHIBIT J

# EMPLOYEE CONFERENCE FORM

| EMPLOYEE<br>Susie Abram | | CLASS<br>HWIII, 2587 | | NOTIFICATION DATE<br>10/16/03 |
|---|---|---|---|---|
| DEPARTMENT/WORK LOCATION<br>LHH/Activity Therapy | | | | SHIFT<br>Days |
| HOURS<br>8:30-5pm | DAYS OFF<br>Sun-Mon | SUPERVISOR<br>Christine Hanson | | TITLE<br>AT supervisor |

| YOU ARE SCHEDULED FOR A CONFERENCE ON:<br>**Thursday** | DATE:<br>10/23/03 | TIME:<br>10Am | PLACE:<br>B104 |
|---|---|---|---|

YOU HAVE THE RIGHT TO REPRESENTATION AT THIS CONFERENCE

HAS CONFERENCE BEEN HELD WITH EMPLOYEE PREVIOUSLY REGARDING DISCIPLINARY PROBLEMS?   YES **X**   NO **O**

| SUBJECT(S), DATE, AND DISPOSITION OF PRIOR CONFERENCE(S) | 1<br>12/11/02 Inattention to Duty and Insubordination | 2<br>10/16/03 Inattention to Duty | 3 | 4 |
|---|---|---|---|---|

LIST CHARGE(S): Inattention to Duty, specifically, 1) failure to meet goals of your developmental plan and 2) failure to follow through with planned activities.

SUBJECT(S) OF THIS CONFERENCE: Before beginning to explain the need for this conference, I think it is necessary to note that the developmental plans (see attached) were created in response to the performance appraisal completed in June. Susie exercised her write to have the director of Activity Therapy review the appraisal and developmental plans. Therefore, the developmental plans are from 7/1/03 to 9/1/03. The union representative, Ruben Gracia, was informed about the corrective action prior to Susies vacation in September. He requested that the conference be postponed until her return in October. The following situations are examples of failure to meet developmental plan goals,

- Improve Planning skills - Susie will follow the daily schedule of activities at least 90% of the time, complete outing planning forms 2 weeks in advance, per policy.

  - On 7/2/03 preparation for the 3rd of July event was not completed, as instructed. (See attachment)

  - On 7/3/03 because Susie was not prepared for the event the day before, she was not able to assist with the set up for the 3rd floor party in the afternoon. The balloons she held on to had to be prepared by volunteers moments before the party. Susie was on the 4th floor most of the morning, which was not part of her assignment. And she arrived 10 minutes late to the 3rd floor party in the afternoon.

  - On 7/9/03 the movie was not on for the residents to watch while you were in Rounds each week. This occurred each week throughout the observation period.

  - On 7/10/03 I visited the unit at 11:30, Susie was in the dinning room with the social worker, and the door was closed. Scheduled was exercise. It was not happening. Prior to this day, Lucy Fisher approached the issue of extended time in the dinning room in our planning meeting. Susie stated it was not a problem and that you had been doing it this way for a long time. In actuality, it was a problem and she failed to stay on schedule. (See Attachment of schedule which Susie agreed to in the planning meeting with the D3 nurse manager, the nursing supervisor and myself).

  - For the Picnic bustrip on 7/17/03, the Outing planning form was not completed 2 weeks in advance. Barbara asked me for the form 2 days prior to the trip.

3-4-05

Case 3:07-cv-03006-PJH   Document 18   Filed 08/14/2008   Page 82 of 110

with her cart. The nurse manager reports Susie went to the unit around 1:30 and then left offering the scheduled activity. Later that afternoon Susie assisted a resident back to the unit during music therapy around 2:20. I did not see her return, nor was she on the unit at 3:30 when I went to return residents from the sacred altar project. Susie's time from approximately 2:30-5pm is unaccounted for.

- On 7/31/03 Susie was observed in the department at 9:30am. Thursdays Susie has agreed to be on the unit by 9-9:15 to facilitate a news group.

- On 8/11/03 I had returned from a vacation. In my absence, Susie needed to get the backup supervisor, Christin Serzant, to approve the D3 August calendar per policy. I looked for the calendar when I returned, and found it in the book, unapproved. I brought this to Susie's attention during our supervision meeting on 8/12/03. The reason she gave for the calendar not being compliant was she thought it had been approved. I explain that it had not been. The calendar remains unapproved, and doesn't meet the departmental standards. (See Attachment)

- On 8/20/03 Barbara approached me for the D3 outing planning form. The outing was scheduled for the next day. Later she brought the form to me for my signature. Susie didn't follow procedures to get the outing approved, nor did she complete it in a timely manner.

I visited D3 approximately 2 times per week from 7/1/03-8/28/03, (from 7/31/03-8/10/03 I was on vacation). That is approximately 12 visits. During those visits I never saw Susie implementing an activity on D3. Clearly Susie was not able to meet the goal of 90% of scheduled activities implemented noted in the developmental plan. Moreover, Susie was not able to appropriately complete the bustrip planning forms even once during the observation period.

- Susie will support MH/cluster programs.                          **CCSF 00112**

- Moran Hall attendance is attached for the month of July (See attachment). There are many days without attendance from D3. Attendance has not been completed for the Thursday Bingo, for which Susie is responsible. During our supervision meeting on 8/12/03 we discussed this issue. The copies I had made prior to my vacation no longer matched the original attendance. The documents were altered after the 29th of July. Susie had no explanation for the discrepancy.

- I have also observed the cluster programs regularly. I have not seen Susie positively engage residents during the activities. (i.e. singing with residents during music therapy, assisting with bingo appropriately as described in the protocol) Nor have I seen her in the gardening group, at all.

- Team members have reported many problems. (i.e. Susie was responsible for the attendance book during July/Aug./Sept. The book was reported missing. After a week another team member assembled a new book. That same day the original book was located on D3. Susie neglected to provide the attendance book before the 1st of the month in July and September making it difficult for anyone to take attendance)

- Another AT team issue occurred on the day of the summer sale, 7/24/03. Susie failed to "share" donations made by the dementia cluster and volunteers. Susie made several staff uncomfortable when refusing to accept coupons from a resident for merchandise. Moreover, Susie didn't assist in the clean up process. Lastly, to my knowledge no residents were involved in the process of organizing and running the sale from D3.

Due to the lack of progress made in meeting the developmental plan goals and Susie's attitude regarding her responsibility and commitment to improvement coupled with the above noted corrective action, I am recommending a 4-day suspension.

Attachments: Moran Hall attendance records, beginning in July 03 schedule of activities on D3, July 4th memo, 7/20/03 memo of supervisors vacation and calendar expectations, copy of the August calendar (unapproved), developmental plans

**DEPARTMENT OF PUBLIC HEALTH**                                                    PAGE

NAME                          CHARGE(S):                          NOTIFICATION DATE:

EMPLOYEE'S STATEMENT (OPTIONAL):

10/27/03

No statement given

ACTION BY IMMEDIATE SUPERVISOR

ACTION RECOMMENDED:     O DISCIPLINARY          X DISCIPLINARY     4     O TERMINATION/
                          WARNING                 SUSPENSION ____        DISMISSAL
                                                              DAYS

                        O OTHER, SPECIFY: _____

I ACKNOWLEDGE THIS CONFERENCE, WHILE NOT NECESSARILY AGREEING TO THE ABOVE ALLEGATIONS;

10/23/03                                              C. _anson, CTRS
DATE OF CONFERENCE          EMPLOYEE SIGNATURE                    SUPERVISOR SIGNATURE

COPY OF CONFERENCE FORM:

         X GIVEN TO EMPLOYEE 10/23/03 OR    O SENT CERTIFIED _____
                             DATE              MAIL             DATE

                                                    10/31/03
YOU MAY REQUEST A REVIEW OF THIS RECOMMENDATION TO THE REVIEWER BY ___10/10/03_____.
                                                                   (Date)

                              ____William Frazier, Director of Therapeutic Activities__
                              NAME AND TITLE OF REVIEWER
                              **(Division Head or Designee)**

         ☐ Employee Copy      ☐ Department Copy      ☐ File Copy

CCSF 00113

The conference that was scheduled for 10/23/03 happen as scheduled. In attendance were Susie Abram (employee), Ruben Garcia (union representative) and Christine Hanson (supervisor). During the meeting, Ruben explained that Susie did the best she could, and she felt she met the goals set in the developmental plans. Therefore, they didn't agree with the charges. Supervisor asked if there were any issues in the conference form that needed more explanation. They stated they did not have any questions. Ruben and Susie did express they would be appealing the charges.

CCSF 00114

DEPARTMENT OF PUBLIC HEALTH

# REVIEWER

PAGE 3

| Susie Abram | Inattention to Duty | October 16, 2003 |
|---|---|---|
| NAME | CHARGE(S): | NOTIFICATION DATE: |

## REVIEW AND RECOMMENDATION BY REVIEWER

A review meeting was held on Thursday, January 20th at 1:00 in Room B104 at Laguna Honda Hospital. In attendance were Susie Abram, SEIU Local 790 representative Ruben Garcia, and myself, William Frazier. The purpose of the meeting was to review the charges of inattention to duty, failure to meet the goals of a developmental plan, which were made by Activity Therapy Supervisor, Christine Hanson. The original employee conference was held October 23rd, 2003, after which Ms. Hanson recommended a four-day suspension. The review meeting had not been scheduled before Ms. Abram took a leave of absence from November 13th, 2003 to September 17th of 2004.

At the meeting, Mr. Garcia stated that he and Ms. Abram did not agree with the charges and asked that the disciplinary action be dismissed. I responded that without any specific information to dispute the findings of Ms. Hanson, I could not justify dismissing the disciplinary action. An agreement was reached that Ms. Abram and Mr. Garcia would produce a written response that would provide evidence to dispute the charges including the names of persons who could verify the information. A due date for the response to be submitted was set at seven days from the date of the meeting, or January 27th.

I received an e-mail message from Ms. Abram on Wednesday, January 26th requesting that she be given additional time to complete her statement as she had been out sick on the preceding Monday and Tuesday. Ms. Abram also was out sick on Friday January 28th. I responded to her message on Friday, January 28th indicating that I would extent the due date for her statement until Tuesday, February 1st. I did not receive the statement from Ms. Abram or Mr. Garcia by the close of business, February 1st.

On February 2nd, I received an e-mail message from Ms. Abram indicating that she felt that she had executed her duties as appropriate and that the decision on the review had already been made in her opinion. She indicated that she planned to file a grievance and asked that she be informed about the duration of the suspension and when the suspension would be scheduled.

Ms. Abram and Mr. Garcia failed to provide any information at the review meeting to dispute the events that led to the charges of inattention to duty. They were provided with an additional opportunity to contest the charges, but chose not to respond.

The purpose of the developmental plan is to improve the performance of a staff member in the execution of his or her responsibilities. My priority in this situation is to have Ms. Abram improve and sustain her performance, not that she be suspended.

Even though, I am reducing the suspension from 4 to 2 days as a good faith effort, Ms. Abram must also assume responsibility for the improvement of her performance as well as the lack of progress in reaching the goals established in the plan.

I will direct Ms. Abram's current supervisor to work with her closely, providing the necessary support and direction in order to ensure that Ms. Abram's performance continues to improve.

---

ACTION RECOMMENDED:    ○ DISCIPLINARY WARNING    X DISCIPLINARY SUSPENSION  2 DAYS    ○ TERMINATION/ DISMISSAL

○ OTHER, SPECIFY: _____

CCSF 00115

February 18th, 2005                   SIGNED: _William B. Fay_    DIRECTOR OF THERAPEUTIC ACTIVITIES
DATE OF REVIEW                          REVIEWER (NAME AND TITLE)

COPY OF CONFERENCE FORM:

X  GIVEN TO EMPLOYEE  2/25/05    OR    ◯ SENT CERTIFIED    _____
                          DATE                  MAIL              DATE

☐ Employee Copy      ☐ Department Copy      ☐ File Copy

CCSF 00116



# 4th of July Duties

### Victoria
On the 2nd, distribute decorations to main building floors (give copies of the food orders), and clear off your cart that way we can decorate it. Decorations= 1 box in the soda room, 2 boxes in my office.

### Norman
On the 2nd, decorate 2 carts and load them up with games from the b-wing (ring toss, wooden games, balloon V-ball, etc.).

On the 3rd, assist w/ balloons 8:30-9:15, 9:30 pick up volunteers (Information w/ John). You will be escorting the volunteers and the 2 games carts to the following areas; 10:30-11:00 5th floor, 11:10-11:40 4th floor.

### Susie
On the 2nd, decorate 2 carts and load them up with games from the B-wing (toss across, wooden games, balloon V-ball, target games, etc)

On the 3rd, assist w/ balloons 8:30-9:15, 9:30 pick up volunteers (information w/ John). You will be escorting the volunteers with the game carts to the following floors; 11:00-11:30 6th floor, 11:40-12:10 7th floor.

### Susie and Norm
You will need to organize a couple of carts to take with you to the 3rd floor for the afternoon. We have pumps for the balloons to make balloon animals. I'll give them to you for the game carts along with some of the special balloons. Please check with Bob about volunteers for the afternoon. You will need to organize picking them up.

## DEVELOPMENTAL PLAN

Employee: Susie Abrams
Title: HWIII

Target Performance: Improved Planning Skills

Current Status:  RN's have not had information about trips, residents have not had the appropriate resources to participate in trips,  and calendars (large and small) have not matched.

Goal:
- Susie will communicate information about bustrips at least a week in advance to the RNs to ensure residents have adjusted medication schedules, funds for shopping, etc. 100% of the time.
- Susie will make sure the small and large calendars are the same a 100% of the time.
- Susie will follow the daily schedule of activities 90% of the time.

Comments:  I would recommend discussing the trips in IDT where you can seek input. Have to copies of the bustrip form when getting the NM to sign the form and give her one, as well as put the information in the desk calendar.

Effective Date: 3 5/13/03  7/1/03
Follow-up Date:  7/15/03  9/1/03


Employee                                    Date



C. Vanson, LTRS                    5/13/03
Supervisor                                  Date

Follow-up    Did employee achieve Goal?    ___Yes ___no

Comments:



Employee                                    Date


Supervisor                                  Date

CCSF 00109

To: Susie Abram
From: Christine Hanson
Date: 10/29/03
RE: Employee statement

The date noted in the conference for an employee statement was 10/28/03. That date has pasted. Therefore, I have copied the paperwork for you as is and forwarded the original to William Frazier. Please note the request for an appeal deadline is 10/31/03.

CCSF 00110

## DEVELOPMENTAL PLAN

Employee: Susie Abram
Title: HWH

Target Performance: Timely and appropriate completion of required documentation
Current Status: Susies rate of completing documentation has been unexceptable,
especially, during September, when she usually takes an extended vacation. Residents
have transferred to the unit without assessments being complete, out-dated forms have
been used and sections of the form have been left incomplete. Concerns about the
accuracy of the MDS coding have been raised.

Goal:
- All documentation will be completed on time at least 90% of the time.
- Susie will complete all sections of the assessment form 100% of the time.
- The current form will be used for assessments 100% of the time.
- Susie will complete an initial assessment or transfer note within 7 days of admission to her assigned unit.
- She will keep the attendance book in the nurses' station.
- Susie will complete the MDS worksheet for assigned residents prior to her vacation.
- She will complete assigned documentation on residents who are due for review during vacation, either before or after the time off. And all documents will be completed within a month of her return from vacation.
- Susie will consult one HCH member before completing the MDS worksheet on residents due for review.

Comments: See documentation policy.

Effective Date: ~~5/13/03~~  7/1/03
Follow-up Date: ~~7/15/03~~  9/1/03

Employee _____    Date _____

_C. Hanson, CTRS_    5/13/03
Supervisor    Date

Follow-up    Did employee achieve Goal?    Yes _____  no

Comments:

Employee _____    Date _____

Supervisor _____    Date _____

CCSF 00111

# DEVELOPMENTAL PLAN

Employee: Susie Abram
Title: HWIII

Target Performance: Improved Implementation of Activities

Current Status: Susie is not contributing to the success of Moran Hall programs. She plans other activities to avoid participation in cluster programs, does not follow the protocol for the bingo program when facilitating, frames changes in a less than desirable manner to decrease the likelihood of residents and staff supporting the programs.

Goal: Susie will support MH cluster based programs by:
- Enlisting at least 4 residents from her unit per activity to participate in each program.
- Assist transport residents to the programs daily.
- Remind staff and residents of the programs daily in the morning.
- Not plan activities that conflict with the MH activities.
- Begin transport 10-15 minutes prior to the beginning of the groups.
- Reviewing and following the Moran Hall bingo facilitation protocols.

Susie will frame information in a positive manner in order to decrease resident and staff resistance to changes in the program and encourage support by not putting responsibility onto others.

Comments: See Moran Hall activity protocols on the computer disk with 2003 calendars. One copy will be included with this plan.

Effective Date: ~~5/13/03~~ 7/1/03

Follow-up Date: ~~7/15/03~~ 9/1/03

_____
Employee                              Date

_____
Supervisor                            Date    5/13/03

Follow-up    Did employee achieve Goal?    Yes ____ No ____

Comments:

_____
Employee                              Date

_____
Supervisor                            Date

CCSF 00117

D3

COPY

| Last Name | First Name | Birthdate / Admit Date / Rel. Date | Religion |
|---|---|---|---|
| GARCIA | MARIA | | JEH WITNES |
| DEAT | LISA | | NO PREF |
| HILL | BEVERLY | | CATHOLIC |
| RIVERA | LAURDIA | | NO PREF |
| WILLIAMS | GRATEIS | | BAPTIST |
| BROWN | CHARLIE | | NO PREF |
| JOHNSON | LAVERNE | | METHODIST |
| | | | NO PREF |
| | SYLVIA | | GREEK |
| EVAN | PATTY | | BAPTIS |
| | | | JEWS |
| | | | BAPTIS |
| | | | BLACK |
| | SUZANNE | | BAPTIS |
| | | | CATHOLIC |
| WOODS | | | NO PREF |
| ROBERTS | ELLY | | JEWS |
| | JEAN | | CHRISTIAN |
| | | | CATHOLIC |
| | ISABELLA | | CATHOLIC |
| WEBER | | | NO PREF |
| LEE | | | NO PREF |
| | | | BAPTIS |
| | SANDRA | | JEWISH |
| RILEY | VALRY | | NONE |
| GORDON | MARINA | | FUS CHRIS |
| SHEPHERD | COFFELY | | NONE |
| BAYER | EDUARD | | CATHOLIC |

Total Number of Inmates for Week: 34

CCSF 00119

P3

Bingo B&H
21  22  23   24   Sprin

COPY

CCSF 00120

To: Acute and Psychosocial AT's
From: Christine Hanson
Date: 7/20/03
RE: August calendars and my vacation

Folks,

I am going on vacation from 7/31 until 8/10. Please be sure to complete your calendars by the 28th. That will ensure I will be able to return them to you before I go.

To: Acute and Psychosocial AT's
From: Christine Hanson
Date: 7/20/03
RE: August calendars and my vacation

*Calendar & vacation info.*

Folks,

I am going on vacation from 7/31 until 8/10. Please be sure to complete your calendars by the 28th. That will ensure I will be able to return them to you before I go.

To: Acute and Psychosocial AT's
From: Christine Hanson
Date: 7/20/03
RE: August calendars and my vacation

Folks,

I am going on vacation from 7/31 until 8/10. Please be sure to complete your calendars by the 28th. That will ensure I will be able to return them to you before I go.

To: Acute and Psychosocial AT's
From: Christine Hanson
Date: 7/20/03
RE: August calendars and my vacation

Folks,

I am going on vacation from 7/31 until 8/10. Please be sure to complete your calendars by the 28th. That will ensure I will be able to return them to you before I go.

1PM        Weekly review, massage and Nails
2-3PM      Music Therapy (MH)
3:30/4     Planning meetings
6-9        evening program

Wednesday
9AM        On unit/ Paperwork, planning, computer and assist residents to the movie
10AM           IDT
11:30AM    1:1 visits (off-unit)
12:30-1:30 Lunch
1:30PM     On unit/Preparing residents for the next group
2-3PM          Gardening or ceramics
3:30PM     1:1 visits (isolation)
3:30       every other Wednesday Prosocial

Thursday
9AM        news group
10:30AM    Community Meeting
11-12AM    Exercise
12:30-1:30 Lunch
1:30-2:30  Facilitate bingo in MH
3PM        strolls, pathfinding and hospital tours
3:30       every 2nd and 4th Thursday AT staff meeting or inservice

Friday  (often a bustrip day)
9:15       news group
10AM           sing-a –long, or cooking
12-12:30   Paperwork and planning
12:30-1:30 Lunch
1:30PM     On unit
2-3PM          Brainstormers
3:30PM     1:1 visits (reading)


Saturday  (often special events pull Susie from the unit and MH)
9AM        on unit (movies)

10:45AM    Fitness Group MH
12-1PM     Lunch
1:00PM     Assist residents to the movie
3:30       weekend planning group

CCSF 00122

THERAPIST _____

## REMINDER CHECKLIST

- Attendance Sheets
- Food Service Orders
- Updated Rosters
- Sign Out Equipment
- Bus Trip
- Invitation to Program Planning
- Movie Guide
- MDS Sheet review from Previous Month
- Ward Receipts from Previous Month

- • DUE FIRST DAY OF THE MONTH
- • DUE THE FIRST FRIDAY OF THE MONTH

Total Number of Activities Planned _____

WARD ROUNDS _____

HEAD NURSE SIGNATURE _____

SUPERVISORS SIGNATURE _____

Turn in 7/31/03
3:56 PM

Returned not signed
7/30/03
E. Jineen, CHS

• DATE: _____ TIME: _____ ACTIVITY: _____
SUBSTITUTED ACTIVITY: _____
UNPLANNED ABSENCE _____ PLANNED ABSENCE _____ MEETING _____
OTHER _____ SUPERVISOR _____

• DATE: _____ TIME: _____ ACTIVITY: _____
SUBSTITUTED ACTIVITY: _____
UNPLANNED ABSENCE _____ PLANNED ABSENCE _____ MEETING _____
OTHER _____ SUPERVISOR _____

• DATE: _____ TIME: _____ ACTIVITY: _____
SUBSTITUTED ACTIVITY: _____
UNPLANNED ABSENCE _____ PLANNED ABSENCE _____ MEETING _____
OTHER _____ SUPERVISOR _____

• DATE: _____ TIME: _____ ACTIVITY: _____
SUBSTITUTED ACTIVITY: _____
UNPLANNED ABSENCE _____ PLANNED ABSENCE _____ MEETING _____
OTHER _____ SUPERVISOR _____

• DATE: _____ TIME: _____ ACTIVITY: _____
SUBSTITUTED ACTIVITY: _____
UNPLANNED ABSENCE _____ PLANNED ABSENCE _____ MEETING _____
OTHER _____ SUPERVISOR _____

• DATE: _____ TIME: _____ ACTIVITY: _____
SUBSTITUTED ACTIVITY: _____
UNPLANNED ABSENCE _____ PLANNED ABSENCE _____ MEETING _____
OTHER _____ SUPERVISOR _____

• DATE: _____ TIME: _____ ACTIVITY: _____
SUBSTITUTED ACTIVITY: _____
UNPLANNED ABSENCE _____ PLANNED ABSENCE _____ MEETING _____
OTHER _____ SUPERVISOR _____

CCSF 00123

Laguna Honda Hospital
375 Laguna Honda Blvd.
San Francisco, CA 94116
(415) 664-1580

# ACTIVITY PROGRAM - AUGUST 2003

WARD D3    A.T.

**OTHER PROGRAM ACTIVITIES:**

**RESIDENTS' COUNCIL**
Friday, August 15th, 2003
7th Floor Conference Room
11:00 a.m.

Special Events - August 2003

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|--------|--------|---------|-----------|----------|--------|----------|
| BIRTHDA | | | | | | |
| **3** | CATH MASS 10:15 | SPANISH CLUB 10:00 | | | NEWS GROUP 9:15 | ART 10:30 5TH FL |
| | MUSIC 8TH FL 1:30 | 4TH FL VOL | | | SING A LONG 10:00 | FITNESS 10:45 MH |
| | EXERCISE 4TH FL 1:45 | BINGO MH 1:30 | | | BRAINSTORMERS HM 2 | MOVIE 7TH FL CONF RM |
| | BINGO 7TH FL 3:00 | | | | US VISITS READING 3:0 | WEEKEND PLANNING |
| | | | | | | 3:30 |
| **10** | CATH MASS 10:15 | BIBLE STUDY G3 10:30 | NEWS GROUP/PALS L.C. | NEWS GROUP 9:15 | NEWS GROUP 9:15 | ART 10:30 5TH FL |
| | MUSIC 8TH FL 1:30 | WEEKLY REVIEW 1:15 | MOVIE 10:00 | COMMUNITY 10:30 | SING A LONG 10:00 | FITNESS 10:15 MH |
| | EXERCISE 4TH FL 1:45 | MUSIC TX MH 2:00 | V ISITS 1:15 11:30 | EXERCISE 11 * | BRAINSTORMERS HM 2 | MOVIE 7TH FL CONF RM |
| | BINGO 7TH FL 3:00 | IND LIVING WKSHOP | BIRTHDAY 2:00 | BINGO 1:30 MH | US VISITS READING 3:0 | 1:30 |
| | | LB 8TH FL | | | | WEEKEND PLANNING |
| | | | | | | 3:30 |
| **17** | CATH MASS 10:15 | BIBLE STUDY G3 10:00 | NEWS GROUP | | NEWS GROUP 9:15 | ART 10:30 5TH FL |
| | MUSIC 8TH FL 1:30 | WEEKLY REVIEW 1:15 | MOVIE 10:00 | | SING A LONG 10:00 | FITNESS 10:45 MH |
| | EXERCISE 4TH FL 1:30 | MUSIC TX MH 2:00 | V ISITS 1:15 11:30 | | US VISITS READING 3:0 | MOVIE 7TH FL CONF RM |
| | BINGO 7TH FL 3:00 | LB 8TH FL | CERAMICS 03 | | | 1:30 |
| | | | (GARDENING 03 | | | WEEKEND PLANNING |
| | | | 2:00 | | | 3:30 |
| **24/3** | CATH MASS 10:15 | SPANISH CLUB 10:00 | NEWS GROUP 9:15 | BUS TRIP 8:30 | NEWS GROUP 9:15 | ART 10:30 5TH FL |
| | MUSIC 8TH FL 1:30 | BINGO MH 1:30 | MOVIE 10:00 | BINGO 1:30 MH | SING A LONG 10:00 | FITNESS 10:45 MH |
| | BINGO 7TH FL 3:00 | | V ISITS 1:15 11:30 | | BRAINSTORMERS HM 2 | MOVIE 7TH FL CONF RM |
| | | | MUSIC TX MH 2:00 | | US VISITS READING 3:0 | 1:30 |
| | | | GARDENING 03 3:M | | CALENDAR PLANNING | WEEKEND PLANNING |
| | 24 | 25 | 26 | | CALENDAR DECORAT 1:30 | 30 |
| | SPANISH CLUB 10:00 | BIBLE STUDY G3 10:00 | NEWS GROUP 9:15 | NEWS GROUP 9:15 | | 2:00 |
| | BINGO MH 1:30 | WEEKLY REVIEW 1:15 | MOVIE 10:00 | COMMUNITY 10:30 | | |
| | | MUSIC TX MH 2:00 | GARDENING 03 3:M | EXERCISE | | |
| | | LB 8TH FL | | BINGO 1:30 MH | | |

**CHECK WITH A.T. OR CALL 4-2704 FOR INFORMATION**

**OTHER PROGRAM ACTIVITIES**

**MONDAY**
10:00am – Coffee Cart
10:30am – Spanish Club
1:30pm – Music for Relaxing
2:00pm – Society of Our Lady
3:00pm – Music for Healing
3:00pm – Birthday Celebration
3:30pm – Arts Vesper Group
7:00pm – Music/Kennedy Singers
7:00pm – Art Lovers Club at the Arts

**TUESDAY**
10:00am – Coffee Cart
10:30am – Bible Study
1:30pm – Music for Relaxing
2:00pm – Brainstormers
7:00pm – Photography, 8405, 3rd

**WEDNESDAY**
9:00-11:30am – Art with Elders
10:00am – Coffee Cart
10:30am – Community Council
10:30am – Enlarged Services
1:00-3:00pm – Legal Aid
1:30pm – Music for Healing
7:00pm – Bingo, 4th with Elders

**THURSDAY**
10:30am – Baptist Services
10:30am – Community
1:30pm – Music for Relaxing
2:00pm – Movie Concert
7:00pm – Music for Healing

**FRIDAY**
9:00-11:30am – Art with Elders
10:00am – Coffee Cart
1:00-3:00pm – Legal Aid
1:30pm – Music for Healing
7:00pm – Bingo, 7th Floor

**SATURDAY**
10:00am – Pottery Barn, 4th Fl
10:30am – Outdoor Farm Area Cart
1:00am – Music for Relaxing
1:30pm – Music for Healing

**SUNDAY**
9:00-11:30am – Outdoor Farm Area Cart
11:00am – Music for Relaxing
1:30pm – Outdoor Farm Area Cart
1:30pm – Music for Healing

*Other Program Activities*

CCSF 00124

**THERAPIST** _Susie D_

## REMINDER CHECKLIST

Attendance Sheets ✓

Food Service Orders —

Updated Rosters —

Sign Out Equipment —

Bus Trip —

Invitation to Program Planning —

Movie Guide —

MDS Sheet review from Previous Month —

Ward Receipts from Previous Month —

- DUE FIRST DAY OF THE MONTH

- DUE THE FIRST FRIDAY OF THE MONTH

Total Number of Activities Planned _____

WARD ROUNDS _____

HEAD NURSE SIGNATURE _____

SUPERVISORS SIGNATURE _____

_Returned not signed_
_7/23/03 8pm_
_C. Jackson, CTRS_

_Turn in 7/21/03_
_3 50 PM_

CCSF 00125

Laguna Honda Hospital
375 Laguna Hando Blvd.
San Francisco, CA 94116
(415) 664-1580

# ACTIVITY PROGRA

**OTHER PROGRAM ACTIVITIES:**

## RESIDENTS' COUNCIL
Friday, August 15th, 2003
7th Floor Conference Room
11:00 a.m.

**Special Events - August 2003**

| | SUNDAY | MONDAY | TUESDAY | WED |
|---|---|---|---|---|
| | BIRTHDA | | | |

| | Sunday | Monday | Tuesday | |
|---|---|---|---|---|
| **3** | | | | |
| **10** | CATH MASS 10;15 / MUSIC 6TH FL 1;30 / EXERCISE 4TH FL 1;45 / BINGO 7TH FL 3;00 (3) | SPANISH CLUB 10;00 / 4TH FL VOL. / BINGO MH 1;30 (4) | BIBLE STUDY G3 10;30 / WEEKLY REVIEW 1;15 / MUSIC TX MH 2;00 / IND LIVING WKKKSHOP LIB 3RD FL / SOCIAL 3RD FL MH 7;00 (5) | N / M / V / B |
| **17** | CATH MASS 10;15 / MUSIC 6TH FL 1;30 / EXERCISE 4TH FL 1;45 / BINGO 7TH FL 3;00 (10) | SPANISH CLUB 10;00 / 4TH FL VOL. / BINGO MH 1;30 (11) | CHURCH SING A LON / BIBLE STUDY G3 10;30 / WEEKLY REVIEW 1;15 / MUSIC TX MH 2;00 / IND LIVING WKSHOP 2;00 / LIB 3TH FL | MH / V. / GA / MH |
| **24/3** | CATH MASS 10;15 / MUSIC 6TH FL 1;30 / EXERCISE 4TH FL 1;45 / BINGO 7TH FL 3;00 (18) | SPANISH CLUB 10;00 / BINGO MH 1;30 | BIBLE STUDY G3 10;30 / WEEKLY REVIEW 1;15 / MUSIC TX MH 2;00 / ~~LIB 3TH FL~~ | NE / MC / V 1 / CE |
| | CATH MASS 10;15 / MUSIC 6TH FL 1;30 / BINGO 7TH FL 3;00 (24) | SPANISH CLUB 10;00 / BINGO MH 1;30 (25) | BIBLE STUDY G3 10;30 / WEEKLY REVIEW 1;15 / MUSIC TX MH 2;00 / ~~LIB 3TH FL~~ | NE / MC / V 1 / GA |

CCSF 00126

# CHECK WITH A.T. OR CALL

# 1 - AUGUST 2003

WARD D-3    A.T. Susie Alsro

| | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|

### OTHER PROGRAM ACTIVITIES:

| …esday | Thursday | Friday | Saturday |
|---|---|---|---|
| | | **1** NEWS GROUP 915 SING A LONG 10:00 BRAINSTORMERS HM 2:0 I;IS VISITS READING 3:0 | **2** ART 10;30 5TH FL FITNESS 10;45 MH MOVIE 7TH FL CONF RM 1;30 WEEKEND PLANNING 3;30 |
| **6** JP 9:15 …O 11;30 :00 | **7** NEWS GROUP 9;15 COMMUNITY 10;30 EXERCISE 11° BINGO 1;30 MH | **8** NEWS GROUP 10:45 SING A LONG 10;00 BRAINSTORMERS HM 2;0 I;IS VISITS READING 3:0 | **9** ART 10;30 5TH FL FITNESS 10;45 MH MOVIE 7TH FL CONF RM 1;30 WEEKEND PLANNING 3;30 |
| …O 11;30 G3 | **14** NEWS GROUP 9;15 COMMUNITY 10;30 EXERCISE 11°° BINGO 1;30 MH | **15** NEWS GROUP 915 SING A LONG 10;00 BRAINSTORMERS HM 2;0 I;IS VISITS READING 3:0 | ART 10;30 5TH FL FITNESS 10;45 MH MOVIE 7TH FL CONF RM 1;30 WEEKEND PLANNING 3;30 |
| **20** JP 9:15 …O 11;30 2;00 MH | **21** BUS TRIP 8;30 BINGO 1;30 MH | **22** NEWS GROUP 915 SING A LONG 10;00 BRAINSTORMERS HM 2;0 I;IS VISITS READING 3:0 | **23** ART 10;30 5TH FL FITNESS 10;45 MH MOVIE 7TH FL CONF RM 1;30 WEEKEND PLANNING 3;30 |
| JP 9:15 …O 11;30 G3 MH | **29** NEWS GROUP 9;15 COMMUNITY 10;30 EXERCISE 11°° BINGO 1;30 MH | NEWS GROUP 915 SING A LONG 10;00 BRAINSTORMERS HM 2;0 I;IS VISITS READING 3;0 CALENDAR PLANNING CALENDAR DECORATE 2:00 | **30** ART 10;30 5TH FL FITNESS 10;45 MH MOVIE 7TH FL CONF RM 1;30 WEEKEND PLANNING 3;30 |

### MONDAY
| | |
|---|---|
| 10:00am | Coffee Carts |
| 10:30am | Spanish Club, Volunteers' Lounge |
| 1:30pm | Bingo, Moran Hall |
| | Art Therapy, 7th Floor Conference Rm. |
| 2:00pm | Society of Our Lady, Room A310 (Every Monday) |
| 2:00pm | Stroke Support Group, 4th Fl., Volunteers' Lounge (last Monday of each month) |
| 7:00pm | Blackjack Club, 4th Floor, 1st, 3rd and 4th Mondays |
| 7:00pm | Laguna Tonight, Moran Hall, 2nd and 4th Mondays |

### TUESDAY
| | |
|---|---|
| 10:00am | Coffee Carts |
| 10:45am | Catholic Mass, Chapel |
| 1:30pm | Music, 6th Floor, Alcove |
| 2:00pm | Photography, B400, 2nd & 4th Tuesday, 4th Floor, Volunteer Lounge |
| 7:00pm | Entertainment Tonight, 4th Floor Alcove |
| 7:00pm | Bingo Social, Moran Hall Bowling, (location to be announced) |

### WEDNESDAY
| | |
|---|---|
| 9:00-11:30am | Art with Elders, 3rd Floor, Moran Hall |
| 10:00am | Coffee, Pastries, Music, 4th Floor |
| 10:30am | Episcopal Service, Main Chapel (2nd Wed.) |
| 10:45am | Spanish Mass, Main Chapel |
| 1:00-3:00pm | Head Trauma Group, M-4 Kitchen |
| 1:00-3:00pm | Art with Elders, Moran Hall |
| 1:30pm | Bingo, 4th Floor, Volunteer Lounge |
| 7:00pm | A.A. Meeting, 4th Floor, Residents Kitchen |
| 7:00pm | Mindbender, 5th Floor, Marina Beach Alcove |

### THURSDAY
| | |
|---|---|
| 10:30am | Baptist Services, 7th Floor Conference Room |
| 1:30pm | Bingo, Moran Hall |
| 7:00pm | Music Concert, 6th Floor, Mission Alcove District |
| 7:00pm | Trivia, 4th Floor, North Beach Alcove |

### FRIDAY
| | |
|---|---|
| 9:00am | Head Trauma Group, M-4 Kitchen |
| 10:00am | Coffee Carts |
| 7:00pm | Young Independent Peoples Social, 1st, 2nd, 3rd & 5th Fridays - Moran Hall, 4th Fridays - 4th Floor Volunteer Lounge |

### SATURDAY
| | |
|---|---|
| 10:00am | Pottery Barn, 4th Fl. North Beach Alcove |
| 10:30am | Lutheran Service, Main Chapel |
| 10:45am | LHH Fitness Center (Exercise & Games) 3rd Floor, Moran Hall |
| 1:30pm | Movie Matinee, 7th Fl. Conference Rm. |
| 2:00pm | Music in the Alcove 4th Fl., North Beach Alcove |

### SUNDAY
| | |
|---|---|
| 9:00-11:30am | Outside Farm Area Open |
| 10:15am | Roman Catholic Mass, Main Chapel |
| 11:00am | Sade Fountain, 3rd Fl., Moran Hall |
| 1:30pm | Music for Dancing, 6th Floor Mission District Alcove |
| 1:30pm | Outside Farm Area Open |
| 2:00pm | Fitness, 5th Floor, Marina Beach Alcove |
| 3:30pm | Bingo, 7th Floor, Conference Room |

'Other Program Activities
Moran Hall, 3rd Floor, Open Everyday

## 04 FOR INFORMATION

CCSF 00127

- DATE: _____ TIME:_____ ACTIVITY: _____

SUBSTITUTED ACTIVITY: _____

UNPLANNED ABSENCE _____ PLANNED ABSENCE _____ MEETING _____

OTHER _____SUPERVISOR_____

- DATE: _____ TIME:_____ ACTIVITY: _____

SUBSTITUTED ACTIVITY: _____

UNPLANNED ABSENCE _____ PLANNED ABSENCE _____ MEETING_____

OTHER _____SUPERVISOR_____

- DATE: _____ TIME:_____ ACTIVITY: _____

SUBSTITUTED ACTIVITY: _____

UNPLANNED ABSENCE _____ PLANNED ABSENCE _____ MEETING _____

OTHER _____SUPERVISOR_____

- DATE: _____ TIME:_____ ACTIVITY: _____

SUBSTITUTED ACTIVITY: _____

UNPLANNED ABSENCE _____ PLANNED ABSENCE _____ MEETING _____

OTHER _____SUPERVISOR_____

- DATE: _____ TIME:_____ ACTIVITY: _____

SUBSTITUTED ACTIVITY: _____

UNPLANNED ABSENCE _____ PLANNED ABSENCE _____ MEETING _____

OTHER _____SUPERVISOR_____

- DATE: _____ TIME:_____ ACTIVITY: _____

SUBSTITUTED ACTIVITY: _____

UNPLANNED ABSENCE _____ PLANNED ABSENCE _____ MEETING _____

OTHER _____SUPERVISOR_____

- DATE: _____ TIME:_____ ACTIVITY: _____

SUBSTITUTED ACTIVITY: _____

UNPLANNED ABSENCE _____ PLANNED ABSENCE _____ MEETING _____

OTHER _____SUPERVISOR_____

CCSF 00128

# EXHIBIT K

INTRADEPARTMENTAL MEMORANDUM
Activity Therapy Department

To:    Susie Abram
From:  William Frazier
Re:    Review meeting
       10/25/04

Thank you for copying me on your e-mail to Jonathan Frank. I am writing today to seek clarification on your intentions and to provide you with clarification on the manner in which I am processing this issue, as it has been complicated by your leave of absence.

You were scheduled for a meeting on November 13th, 2003 to review the charges of inattention to duty and the recommendation of a two-day suspension made by Christine Hanson. You became ill prior to the meeting that day and could not participate. You subsequently took a leave of absence until September 1/th of this year. The review meeting that I have scheduled for November 4th is a rescheduled meeting to replace the meeting of November 13th, 2003. Ruben Garcia had requested that review meeting on your behalf.

It is my assumption based on the e-mail message that you sent on Jonathan Frank that you do not plan to attend the review meeting on November 4th. Would you please let me know if my assumption is correct? I wish advise you that if you no longer want to have a review meeting of this issue, I will have to make a decision on the recommendation for a two-day suspension without the benefit of input from you or your representative.

Ruben Garcia had also requested a review meeting on your behalf last year for the second disciplinary action. I would offer you the opportunity to have the review meeting for the second action once the first action has been resolved. If you were to decline that offer, I would again have to make a decision without the benefit of input from you or your representative.

During the meeting on September 27th, 2004, attended by you, Ruben Garcia, Willie Ramirez, and me, I offended you resolution to both disciplinary actions that were pending. That offer was made in recognition that your leave of absence was attributed to stress. I suggested implementation of reduced disciplinary recommendations without further discussion to alleviate your need to deal with further stress upon your return. I suggested that the first disciplinary action could be resolved if you agreed to a written reprimand for the charge of inattention to duty, mismanagement of program funds. Your supervisor had recommended a two-day suspension. I suggested a two-day suspension for the second charge of inattention to duty, failure to meet goals of your developmental plan for which your supervisor had recommended a five-day suspension. You chose to defer making that decision on September 27th, but approximately two weeks later indicated to me that you would not accept my offer and wanted to proceed through the regular channels in order to contest that disciplinary action. Please be advised that since you declined my offer to resolve these issues, the recommendations that I had attached to each charge no longer apply. I is my intention to review each issue per usual with attention to the concept of progressive discipline.

CCSF 01303

Please let me know what your plans are so that I respond accordingly.  I will be glad to answer any questions that you may have.  Thank you.

Cc:    Jonathan Frank
       Barbara Taromina

CCSF 01304

# EXHIBIT L

**City and County of San Francisco**                    **Department of Human Resources**

**Gavin Newsom**
**Mayor**

**Philip A. Ginsburg**
**Human Resources Director**

2005 JUN 24 AM 8: 31

_Via Facsimile and US Mail_

June 22, 2005

Yvonne Martinez
Union Representative
SEIU, Local 790
1390 Market Street, Suite 1118
San Francisco, CA 94102

      RE:   _Susie Abram Grievance (1-Day Suspension), ERD Reference No. 81-05-1305_
             _Susie Abram Grievance (2-Day Suspension), ERD Reference No. 81-05-1340_

Dear Ms. Martinez:

     This letter confirms our mutual agreement to schedule the above-referenced matters for expedited arbitration before Arbitrator Alexander "Buddy" Cohn on **Monday, September 26,** 2005. Ms. Abram's 1-day suspension will be heard from 10:00 AM to 12:00 PM and her 2-day suspension will be heard from 1:00 PM to 3:00 PM. The hearings will take place in Conference rooms 300 B&C on the third floor of 44 Gough Street.

     As a reminder, since these are expedited arbitration proceedings, no attorneys will be present, unless by mutual agreement. A representative from the Department of Public Health will act as the City's advocate and you, the Grievant's advocate.

     Please do not hesitate to contact me at (415) 557-4981 if you have any questions regarding these matters.

                         Sincerely,

                         Mary Hao
                         Labor Relations Manager

cc:    Ed Gazzano, DPH
       Carol Sam, DPH
       Willie Ramirez, DPH
       Arbitrator Alexander Cohn

                                  cc: Bill Frazier _(handwritten)_ } please mark your calendar
                                  Chris Hanson _(handwritten)_

L:\SHARE\ERD\Grievances\SEIU\L790\AbramS.Local 790.L04.1 Day Suspension.MMH.doc

**CCSF 01251**

44 Gough Street, San Francisco, CA 94103-1233 • (415) 557-4800 • www.sfgov.org/dhr

# EXHIBIT M

# INTRADEPARTMENTAL MEMORANDUM
## Activity Therapy Department

To:    Susie Abram
From:  William Frazier
Re:    Dogs in the Activity Therapy Department
       11/22/04

I wish to address the issue about dogs in the Activity Therapy Department. You raised this issue during the meeting on November 4th. Your concerns have forced me to evaluate the presence of the dogs in the department. I write to inform you of the outcome of my deliberations.

During the meeting on November 4th on an unrelated topic, you complained that I had not followed through my plans to ban the presence of Christine Hanson's dog Teemu from the Activity Therapy Department. This issue was originally discussed during a meeting on September 27th, during which you claimed that Teemu had been allowed to run free in the department and that the dog jumped up on you while you were in your cubicle, starling you and causing you to urinate on yourself. My response at the time of the September 27th meeting was that the dog would have to be banned from the department. You indicated that you were not in favor of this because Christine Hanson already had ill feelings toward you and you did not want to exacerbate the situation. You indicated that you would like to see Teemu kept on leash in such a manner that would not allow him to come into the hallway. Following that meeting on the September 27th, I asked Christine to make sure that her dog be kept well within her office and not be allowed into the hallway. It had been my opinion that Christine had adequately complied with my request. Such was my response to you on November 4th.

During the November 4th meeting, you also indicated that you had concerns about Tony Bailey's dog Lulu. This was the first time you had complained about Tony's dog. You claimed that Lulu had recently nipped at you.

I do not believe that the presence of the two dogs in question or the several other animals that are a part of department's Animal Assisted Therapy program creates an inappropriate work environment for the staff. I would like to make several points in regards to your experience. When Teemu first became a part of the Animal Assisted Therapy program, you actually took him on a number of occasions interact with the residents. From my observations, you appeared to be comfortable with the dog. Christine Hanson was your supervisor at the time. Later, during the course of supervising you, Christine confronted you about performance issues and the relationship between you became contentious. You began to complain that you were allergic to her dog. You now claim that you are afraid of the dog. Your attitude towards Christine's dog and the reason for your concern has changed. The timing of change appears to be closely correlated with the actions taken by your supervisor in addressing performance issues.

I have worked at Laguna Honda Hospital for six and a half years. I see that nearly everyday Tony Bailey has come to work, Lulu has been at his side. I have never heard you complain about Lulu until November 4th.

The Animal Assisted Therapy program is a unique element of the services that we provide and is a strength within our overall program. The animals that are a part of the program have brought much joy to the residents of LHH over the years. Dogs require constant attention. For that reason, they are not a part of the "Farm." The Activity Therapy Department and the residents have benefited from individual staff members making their dogs available to our program. Teemu has been utilized effectively by many of the members of the Activity Therapy staff. Both Teemu and Lulu have passed behavioral tests and deemed appropriate as therapy animals. While Lulu has not been used directly within the Animal Assisted Therapy program, her presence is a pleasant addition to life at LHH. Three other staff members have taken the initiative to have their dogs tested so that and included in the program. One staff member had to apply to Canine Companions for Independence and participate in two weeks of training to benefit the Animal Assisted Therapy program. It would be unfair to ban Teemu and Lulu from the department and not the other dogs. If I were to ban all dogs in the department, the program and the residents would suffer.

I feel that it is my responsibility as the manager of the Activity Therapy Department to ensure that the work environment is safe and stress free for all employees. However, I do not believe that the presence of Teemu and Lulu is creating an inappropriate work environment. In fact, I believe that they make the work environment more pleasant.

Following the November 4th meeting, I requested of Christine Hanson that she not bring her dog into work until a had made a decision on whether to ban dogs from the department. She complied with that request. I will notify her that she may begin bringing her dog to work to be used within the Animal Assisted Therapy program. I will continue to expect her to manage the dog in such a way that will not cause stress to you or any other staff member. I will work with Tony Bailey in the same manner and require that he mange his dog in such a way as to not cause stress to any staff member. I would be glad to work with you on this issue so that the interests of the program and the interests of the staff can co-exist to the benefit of the residents. Please see me if you have any questions or wish to provide further input on the issue. Thank you.

Cc:    Jonathan Frank
        Barbara Taormina