# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SUSIE ABRAM,

                    PLAINTIFF,

-VS-                                        CASE NO.   C07-3006 EDL

CCSF, DEPARTMENT OF PUBLIC
HEALTH; WILLIAM FRAZIER,
DIRECTOR OF THERAPEUTIC ACTIVITIES,
LAGUNA HONDA HOSPITAL,

                    DEFENDANTS.
_____/

**CERTIFIED COPY**

**DEPOSITION OF SUSIE ABRAM**

**WEDNESDAY, FEBRUARY 13TH, 2008**

REPORTED BY:   GINA L. PETERSEN
                CSR NO. 9447

**BONNIE L. WAGNER & ASSOCIATES**
**41 SUTTER STREET, SUITE 1605**
**SAN FRANCISCO, CA  94104**
**(415) 982-4849**

1

**A P P E A R A N C E S:**

2

3     FOR THE PLAINTIFF:

4                                    LAW OFFICES OF CURTIS G. OLER
                                     BY:  CURTIS G. OLER
5                                          ATTORNEY AT LAW
                                     820C LAGUNA STREET
6                                    SAN FRANCISCO, CALIFORNIA   94102

7

8     FOR THE DEFENDANTS:

9                                    OFFICE OF THE CITY ATTORNEY
                                     BY:  JONATHAN C. ROLNICK
10                                        ATTORNEY AT LAW
                                     1390 MARKET STREET, FIFTH FLOOR
11                                   SAN FRANCISCO, CALIFORNIA   94102

12

      ALSO PRESENT:
13

14                                   WILLIAM G. FRAZIER
                                     CHARLENE OLER
15

16

17

18

19

20

21

22

23

24

25

**DEPOSITIONS EXCERPTS FOR MSJ**

| Abram Vol 1 1- | Exhibits for Vol 2 | Abram Vol. 2 124- | Exhibits for Vol 2 |
|---|---|---|---|
| 8:12-22 | | 124: 10-125 | 3 |
| 8: 24-9:12 | | 125: 10-24 | 4 |
| 10: 5-11:14 | | 126: 12-127:22 | 5 |
| 12:18-14:11 | | 133:22-134:22 | 6 |
| 18:11-21 | | 129:10-130:13 | 7 |
| 20:5-15 | | 130:14-131-13 | 9 |
| 20:16-21:3 | | 131:12-23 | 10 |
| 27:19-28:9 | | 132:15-133:21 | 11 |
| 30:1-25 | | 134:23-135:22 | 12 |
| 36:3-21 | | 141:-142:13 | 16 |
| 36:22-37:10 | | 143:21-144:15 | 22 |
| 37:14-40:22 | | 152:24-156:22 | |
| 38:2-6 | | 159:11-160:23 | |
| 38:7-18 | | 162:11-12 | |
| 40:8-22 | | 162:20-164:3 | |
| 45:24-46:7 | | 164:4-167:18 | |
| 46:8-18 | | 176:9-177:20 | |
| 51:23-52:24 | | 182:14-17 | |
| 55:1-13 | | 182:14-184:22 | |
| 56:23-57:23 | | 192:3-195:22 | |
| 56:23-57:23 | | 196:13-17 | |
| 57:24-59:15 | | 197 | |
| 59:16-60:8 | | 220:15-224:16 | |
| 61:9-15 | | | |
| 63:21 | | | |
| 61:23-62:18 | | | |
| 81:8-84:13 | | | |
| 86:12-15 | | | |
| 91:8-96:1 | | | |
| 92: 5-12 | | | |
| 99:8-100:8 | | | |
| | | | |
| | | | |
| | | | |

Find new cites

When Lisa done w/
Brief

1    COURT WILL ASSUME, THAT YOU UNDERSTOOD MY QUESTION.

2           NOW, LAWYERS SOMETIMES ASK VERY LONG AND

3    CONVOLUTED QUESTIONS, AND YOU MAY NOT UNDERSTAND A WORD I

4    USE OR MY CHOICE OF WORDS OR YOU MAY, SOMEWHERE ALONG THE

5    WAY, GET LOST AND FORGET WHAT I'M ASKING ABOUT, SO BEFORE

6    YOU ANSWER A QUESTION, MAKE SURE YOU UNDERSTAND IT.

7           IF YOU DON'T, THAT IS YOUR CHANCE TO ASK ME A

8    QUESTION; SAY WORDS LIKE, "I DON'T UNDERSTAND YOUR

9    QUESTION.  CAN YOU REPHRASE IT?  CAN YOU TELL ME WHAT YOU

10   MEAN BY X OR Y OR Z?"

11          DO YOU UNDERSTAND THAT?

12       A.  YES.

13       Q.  NOW, WE ARE GOING TO BE GOING HERE FOR SEVERAL

14   HOURS TODAY.  THE PURPOSE OF THIS IS NOT AN ENDURANCE

15   CONTEST; ALTHOUGH, THERE IS SOME ENDURANCE INVOLVED, SO IF

16   YOU FEEL YOU NEED TO GET UP TO USE THE RESTROOM OR STRETCH

17   YOUR LEGS OR TO TAKE A BREAK, PLEASE LET ME KNOW THAT;

18   OKAY?

19       A.  YES.

20       Q.  I TEND TO BE VERY COOPERATIVE ABOUT DOING THAT.

21   THE ONLY OCCASION IN WHICH I WILL SORT OF DENY THAT

22   REQUEST IS IF I ASKED YOU A QUESTION AND YOU HAVEN'T

23   ANSWERED IT YET; OKAY?

24       A.  YES.

25       Q.  WE'LL ALSO TAKE A BREAK FOR LUNCH SOMETIME AROUND

1    NOON, AND YOU WILL HAVE A CHANCE TO TAKE A BREAK THEN AS

2    WELL; OKAY?

3         A.  YES.

4         Q.  FINALLY, YOU NEED TO ANSWER QUESTIONS AUDIBLY

5    WITH YOUR VOICE.

6              THE COURT REPORTER CAN'T TAKE DOWN PHYSICAL

7    MOTIONS, SUCH AS NODDING YOUR HEAD FOR "YES" OR SHAKING

8    YOUR HEAD FROM SIDE TO SIDE FOR "NO," SO YOU NEED TO MAKE

9    SURE YOU ANSWER AUDIBLY SO SHE CAN RECORD WHAT YOUR

10   RESPONSE IS TO ANY QUESTION I ASK; OKAY?

11        A.  YES.

12        Q.  NOW, YOU BEGAN YOUR EMPLOYMENT WITH THE CITY IN

13   APRIL OF 1982; IS THAT RIGHT?

14        A.  YES.

15        Q.  WHAT JOB DID YOU TAKE AT THAT TIME?

16        A.  ACTIVITY THERAPIST.

17        Q.  WAS THERE A CIVIL SERVICE JOB CLASSIFICATION?

18        A.  YES.

19        Q.  WHAT WAS THAT?

20        A.  2587.

21        Q.  DO YOU KNOW THE NAME OF THAT, IS THAT HEALTH

22   WORKER THREE?

23        A.  HEALTH WORKER THREE.

24        Q.  WHEN YOU STARTED WORK IN APRIL OF 1982, WHERE DID

25   YOU WORK?

1        A.  AT LAGUNA HONDA.

2        Q.  THAT WAS WHERE YOU WERE WORKING WHEN YOU LEFT

3   CITY SERVICE AS WELL; IS THAT RIGHT?

4        A.  YES.

5        Q.  AT ANY TIME DURING YOUR EMPLOYMENT WITH THE CITY

6   DID YOU WORK AT ANY OTHER LOCATION WITHIN THE CITY --

7        A.  NO.

8        Q.  -- OTHER THAN LAGUNA HONDA?

9        A.  NO.

10       Q.  DID YOU HOLD ANY POSITION DURING YOUR EMPLOYMENT

11  OTHER THAN ACTIVITY THERAPIST?

12       A.  NO, I DID NOT.

13       Q.  DID YOU EVER HOLD ANY CIVIL SERVICE

14  CLASSIFICATION OTHER THAN THE HEALTH WORKER THREE

15  POSITION?

16       A.  NO.

17       Q.  WERE YOU EMPLOYED AS A PERMANENT CIVIL SERVICE

18  EMPLOYEE?

19       A.  YES.

20       Q.  THAT WAS FROM THE OUTSET IN 1982?

21       A.  YES.

22       Q.  WHAT WAS YOUR LAST DAY OF WORK FOR THE CITY?

23       A.  JULY OF 2005.

24       Q.  IS THAT THE EFFECTIVE DATE OF YOUR RETIREMENT --

25  I'M NOT TRYING TO TRICK YOU HERE.

1        WHAT WAS THE LAST DAY YOU SHOWED UP TO ACTUALLY

2   WORK VERSUS THE DATE THAT YOUR RETIREMENT MAY HAVE BEEN

3   EFFECTIVE?

4        A.  I THINK IT WAS SEPTEMBER OF 2005.

5        Q.  COULD YOU DESCRIBE FOR ME WHAT YOUR JOB DUTIES

6   WERE AS AN ACTIVITY THERAPIST?

7        A.  TO IMPLEMENT ACTIVITIES FOR RESIDENTS, TO DO

8   THEIR PROGRAM PLANNING, TO DO CARE PLANS, TO DO CHARTING,

9   PROVIDE BUS TRIPS FOR OUTINGS, TO BE IN DIT MEETINGS.

10       Q.  ANYTHING ELSE?

11       A.  TO WORK WITH VOLUNTEERS, TO WORK WITH THE

12  FAMILIES OF THE RESIDENTS.

13       Q.  ANYTHING ELSE, ANY OTHER DUTIES?

14       A.  I THINK I HAVE COVERED EVERYTHING.

15       Q.  SO THOSE WOULD BE THE BASIC DUTIES OF AN ACTIVITY

16  THERAPIST; IS THAT CORRECT?

17       A.  YES.

18       Q.  WERE THOSE BASIC DUTIES THE SAME DUTIES

19  THROUGHOUT THE TIME THAT YOU WERE EMPLOYED BY THE CITY AS

20  AN ACTIVITY THERAPIST?

21       A.  THERE WERE SOME CHANGES MADE WHERE WE DID MDS'S.

22       Q.  OTHER THAN THAT, WERE THERE ANY OTHER CHANGES IN

23  THE JOB DUTIES DURING YOUR TENURE WITH THE CITY AS AN

24  ACTIVITY THERAPIST?

25       A.  WE DID PLANNING, PLANNING WITH OTHER DEPARTMENTS

1  WITHIN THE HOSPITAL SUCH AS THE NURSE MANAGERS.

2      Q.  THE PLANNING WITH THE OTHER DEPARTMENTS THAT YOU

3  JUST MENTIONED, WAS THAT ONE OF THE BASIC DUTIES THAT YOU

4  DID THROUGHOUT THE TIME THAT YOU WERE AN ACTIVITY

5  THERAPIST?

6      A.  YES.

7      Q.  NOW, ARE THERE ANY OTHER BASIC ACTIVITIES THAT

8  YOU DID THAT WERE JOB DUTIES AS AN ACTIVITY THERAPIST THAT

9  YOU DID THROUGHOUT THE TIME YOU WORKED AS AN ACTIVITY

10 THERAPIST?

11     A.  COORDINATING BUS TRIPS, DOING PARTIES, PROVIDING

12 EDUCATIONAL PROGRAMS.

13     Q.  ANYTHING ELSE?

14     A.  THAT IS ABOUT IT.

15     Q.  NOW, YOU MENTIONED THAT THERE WERE CHANGES MADE

16 TO MDS, WHAT DOES "MDS" STAND FOR?

17     A.  SIR, IT'S BEEN, LIKE, FIVE YEARS SINCE I HAVE

18 BEEN RETIRED, AND I CANNOT REMEMBER WHAT THE MEANING OF

19 MDS IS, THE LETTERING, BUT THE MDS WAS A FORM THAT WE HAD

20 TO FILL OUT FOR EACH RESIDENT.

21     Q.  OKAY.  SO YOU ARE SAYING ONE OF THE THINGS THAT

22 DID CHANGE OVER YOUR TENURE AS AN ACTIVITY THERAPIST WAS

23 THE MDS FORM?

24     A.  YES.

25     Q.  BUT YOU FILLED OUT MDS FORMS FOR PATIENTS

1    THROUGHOUT THE TIME YOU WORKED AS AN ACTIVITY THERAPIST?

2        A.  NO, IT WAS SOMETHING NEW THAT WAS IMPLEMENTED IN

3    THE DEPARTMENT.

4        Q.  DO YOU REMEMBER WHEN THIS NEW DUTY STARTED TO

5    TAKE PLACE?

6        A.  I CAN'T RECALL THE DAY.

7        Q.  COULD YOU GIVE ME AN ESTIMATE?  WAS IT WITHIN THE

8    LAST TWO YEARS OF YOUR EMPLOYMENT WITH THE CITY OR THE

9    LAST FIVE YEARS OR TEN YEARS?

10           I DON'T WANT YOU TO GUESS, BUT I WANT YOU TO GIVE

11   ME, IF YOU CAN -- LET ME STRIKE THAT.

12           WERE YOU DOING THESE MDS REPORTS UP TO YOUR LAST

13   DAY AT WORK?

14       A.  YES.

15       Q.  HOW MANY YEARS BEFORE YOUR LAST DAY OF WORK WERE

16   YOU DOING THESE MDS REPORTS?

17       A.  I WOULD SAY MAYBE TWO TO THREE YEARS BEFORE.

18       Q.  YOU IDENTIFIED ONE OF YOUR BASIC DUTIES WAS

19   ATTENDING DIT MEETINGS.  WHAT DOES "DIT" STANDS FOR?

20       A.  THAT WAS MEETINGS WITH THE DOCTOR, THE HEAD

21   NURSE, THE DIETICIAN, THE SOCIAL WORKER AND MYSELF.

22       Q.  IS IT POSSIBLE YOU HAVE THOSE INITIALS MIXED UP,

23   THAT IT WAS ACTUALLY IDT?

24       A.  IDT, I'M SORRY.

25       Q.  INTERDISCIPLINARY TEAM -- DO YOU REMEMBER WHAT IT

1    STANDS FOR?

2          A.  I'M NOT SURE.  I CAN'T REMEMBER.

3          Q.  WHAT DID YOU DO WITH THIS GROUP OF PEOPLE?

4          A.  WE DISCUSSED THE RESIDENT CARE PLANS AND THEIR

5    MEDICAL PROBLEMS, WAYS THAT WE CAN ENHANCE THEIR LIVES.

6          Q.  ANYTHING ELSE?

7          A.  WE ALSO HAD CONFERENCES WITH THEIR FAMILY

8    MEMBERS, DISCUSSED THEIR BEHAVIORAL PROBLEMS.

9          Q.  ANYTHING ELSE YOU DID DURING THESE MEETINGS?

10         A.  THEIR PLANS.

11         Q.  DO YOU RECALL ANYTHING ELSE?

12         A.  NO.

13         Q.  HOW OFTEN WOULD THIS GROUP OF PEOPLE MEET TO HAVE

14   THESE KIND OF MEETINGS?

15         A.  ONCE A WEEK.

16         Q.  WHEN YOU SAID YOU DISCUSSED RESIDENT CARE PLANS,

17   YOU DISCUSSED RESIDENTS INDIVIDUALLY?

18         A.  YES.

19         Q.  HOW MANY RESIDENTS WAS THIS GROUP OF PEOPLE

20   RESPONSIBLE FOR, WHAT WAS A TYPICAL NUMBER OF FOLKS?

21         A.  31.

22         Q.  THIS GROUP OF PEOPLE, THE IDT WOULD GO THROUGH

23   PATIENT BY PATIENT DISCUSSING THE ITEMS THAT YOU JUST

24   TESTIFIED ABOUT; IS THAT CORRECT?

25         A.  WE WOULD DO, LIKE, SIX PATIENTS PER MEETING.

1    Q.  OVER THE COURSE OF TIME EVERYBODY, EACH PATIENT,

2  WOULD HAVE THEIR CASE TALKED ABOUT PERIODICALLY, EVERY

3  MONTH OR MONTH AND A HALF?

4    A.  YES, PATIENTS AND FAMILY MEMBERS WERE ALSO TO BE

5  IN THE MEETINGS.

6    Q.  THE PATIENT THAT YOU WERE DISCUSSING WOULD ATTEND

7  THAT PARTICULAR MEETING WHERE THE IDT GROUP DISCUSSED

8  THEIR TREATMENT --

9    A.  YES.

10   Q.  -- AS WELL AS THAT PATIENT'S FAMILY MEMBERS?

11   A.  YES.

12   Q.  YOU SAID THAT YOU WOULD USUALLY IN EACH MEETING

13  DISCUSS APPROXIMATELY SIX PATIENTS.

14       WOULD ALL SIX PATIENTS BE THERE TO HEAR THE

15  DISCUSSION ABOUT THE OTHER PATIENTS OR WOULD THEY COME IN

16  INDIVIDUALLY?

17   A.  INDIVIDUALLY.

18   Q.  COULD YOU IDENTIFY FOR ME WHO YOUR SUPERVISORS

19  WERE DURING YOUR TIME AT LAGUNA HONDA?

20   A.  CHARLOTTE GIBSON, BARBARA TAORMINA, LISA RANDON.

21  I THINK SHE IS MARRIED NOW, SO THAT MIGHT NOT BE HER --

22   Q.  SHE MAY BE GOING BY A DIFFERENT LAST NAME NOW?

23   A.  RIGHT, CHRISTINE HANSON, PAUL -- I CAN'T THINK OF

24  PAUL'S LAST NAME.

25   Q.  PAUL CROGER OR "CROGER"?

1    A.   YES, I THINK THAT IS IT.

2    Q.   ANY OTHER SUPERVISORS THAT YOU HAD?

3    A.   DID I NAME CHARLOTTE GIBSON?

4    Q.   YES, YOU DID; THAT WAS THE FIRST ONE.

5    A.   THOSE ARE THE ONLY ONES.

6    Q.   WHAT I WOULD LIKE TO KNOW NEXT IS WHO WAS YOUR

7    LAST SUPERVISOR BEFORE YOU LEFT THE CITY?

8    A.   BARBARA TAORMINA.

9    Q.   WAS SHE YOUR SUPERVISOR ON MORE THAN ONE

10   OCCASION?

11   A.   YES.

12   Q.   ON THIS LAST OCCASION, APPROXIMATELY HOW LONG WAS

13   SHE YOUR SUPERVISOR?

14   A.   I WOULD ESTIMATE A YEAR OR MORE.

15   Q.   AND DURING THAT TIME -- STRIKE THAT.

16        WHAT DOES THE TERM "CLUSTER" REFER TO?  ARE YOU

17   FAMILIAR WITH THAT TERM?

18   A.   WE HAD CLUSTERS AT MORAN HALL, WHICH MEANT EACH

19   ACTIVITY LEADER WAS TO PROVIDE ACTIVITIES FOR THEIR

20   CLUSTER AND WORK TOGETHER AS A TEAM.

21   Q.   DO YOU KNOW HOW THE DIFFERENT CLUSTERS WERE

22   ORGANIZED?

23   A.   THERE WERE CLUSTERS THAT DID MORAN HALL.  THERE

24   WERE CLUSTERS THAT DID MOVIES, MOVIE SOCIALS, AND THERE

25   WERE CLUSTERS THAT DID BINGO.  THERE WERE PSYCHO-SOCIAL

1  RECALL?

2      A.  MIVIC -- AND I DON'T KNOW HER LAST NAME -- I

3  THINK WAS MR. FRAZIER'S SUPERVISOR.

4      Q.  THIS IS A WOMAN?

5      A.  YES.

6      Q.  IS SHE FILIPINO OR DO YOU KNOW WHAT HER ETHNICITY

7  IS?

8      A.  I THINK SHE IS FILIPINO, BUT I'M NOT SURE.

9      Q.  AGAIN, I DON'T WANT YOU TO SPECULATE OR GUESS.  I

10  MAY ASK YOU, LIKE BEFORE, TO GIVE ME YOUR BEST ESTIMATE,

11  BUT I DON'T WANT YOU TO MAKE UP AN ANSWER TO MAKE ME

12  HAPPY.

13      A.  OKAY.

14      Q.  WHILE WE ARE AT IT, LET ME GIVE YOU AN EXAMPLE.

15  I CAN ASK YOU TO GIVE AN ESTIMATE OF THE LENGTH OF THIS

16  CONFERENCE TABLE, OKAY.

17          IF YOU ARE LIKE ME, YOU MAY NOT BE PARTICULARLY

18  ACCURATE, BUT YOU HAVE SOME PERSONAL KNOWLEDGE FOR DOING

19  SO BECAUSE YOU ARE SITTING HERE IN THIS ROOM AND YOU CAN

20  OBSERVE IT, SO YOU CAN GIVE ME AN ESTIMATE ABOUT THAT.

21          DO YOU UNDERSTAND?

22      A.  YES.

23      Q.  IF I ASKED YOU TO TELL ME HOW LONG IS THE DINING

24  ROOM TABLE IN MY HOME, ALL YOU COULD DO IS GUESS BECAUSE

25  YOU HAVE NEVER BEEN TO MY HOME AND SEEN IT, OKAY, SO THAT

1    IS THE DIFFERENCE BETWEEN AN ESTIMATE AND GUESS AS FAR AS

2    I'M CONCERNED.

3         DO YOU UNDERSTAND THAT DIFFERENCE?

4    A.   YES.

5    Q.   YOU TOOK A LEAVE OF ABSENCE BEGINNING IN NOVEMBER

6    OF 2003; IS THAT CORRECT?

7    A.   YES.

8    Q.   AND YOU WERE OFF ON THAT LEAVE OF ABSENCE, I

9    BELIEVE, STARTING ON NOVEMBER 3RD, 2003; IS THAT CORRECT?

10   A.   YES.

11   Q.   THEN YOU RETURNED TO WORK ON SEPTEMBER 17, 2004;

12   IS THAT CORRECT?

13   A.   YES.

14   Q.   DID YOU WORK AT ALL BETWEEN THOSE TWO DATES?

15   A.   NO.

16   Q.   AND BETWEEN THOSE TWO DATES, DID YOU HAVE ANY

17   COMMUNICATIONS WITH MR. FRAZIER?

18   A.   I RECEIVED A LETTER FROM MR. FRAZIER TELLING ME I

19   NEEDED TO COME BACK TO WORK.

20   Q.   OKAY.  OTHER THAN THAT LETTER, DID YOU HAVE ANY

21   COMMUNICATION WITH MR. FRAZIER DURING THIS PERIOD OF TIME?

22   A.   I'M TRYING TO THINK, BECAUSE I DON'T WANT TO --

23   NO, ONLY BY HIS LETTER REQUESTING THAT I RETURN TO MY

24   DUTIES AT WORK.

25   Q.   DURING THIS LEAVE OF ABSENCE FROM NOVEMBER 3RD,

1   2003, TO SEPTEMBER 17TH, 2004, DID YOU HAVE ANY

2   COMMUNICATION WITH CHRISTINE HANSON?

3       A.  NO.

4       Q.  DID YOU HAVE ANY COMMUNICATION DURING THIS PERIOD

5   OF TIME WITH BARBARA TAORMINA?

6       A.  NO.

7       Q.  JUST SO I'M RIGHT, IS IT "TAORMINA" OR

8   "TAORMINO," DO YOU RECALL?  I WANT TO MAKE SURE WE HAVE

9   THIS RIGHT.

10      A.  I'M NOT SURE.

11          MR. ROLNICK:  BILL, DO YOU KNOW?

12          MR. FRAZIER:  WITH AN "A."

13  BY MR. ROLNICK:

14      Q.  DURING THIS LEAVE OF ABSENCE THAT WE ARE

15  DISCUSSING NOVEMBER 3RD, 2003, TO SEPTEMBER 17TH, 2004,

16  OTHER THAN THE LETTER YOU RECALL RECEIVING FROM

17  MR. FRAZIER, DID YOU HAVE ANY COMMUNICATION WITH ANYONE

18  ELSE FROM LAGUNA HONDA HOSPITAL?

19      A.  YES, I RECEIVED A PHONE CALL FROM TRACY GRIFFIN

20  TELLING ME THAT ALL OF MY BELONGINGS IN MY CUBICLE WAS

21  BOXED UP AND SOME OF MY PERSONAL THINGS WAS PLACED OUT ON

22  THE TABLE UP FOR GRABS.

23      Q.  OTHER THAN THAT PHONE CONVERSATION WITH

24  MS. GRIFFIN, DID YOU HAVE ANY OTHER COMMUNICATION DURING

25  THIS LEAVE OF ABSENCE WITH ANYONE FROM LAGUNA HONDA

1   HOSPITAL?

2        A.  I RECEIVED A CALL FROM THE STAFF, A GET-WELL CARD

3   FROM THE STAFF THAT EVERYONE SIGNED.

4        Q.  AGAIN, DURING THE LEAVE OF ABSENCE, OTHER THAN

5   THE PHONE CALL AND THE CARD, THAT GET-WELL CARD, AND THE

6   LETTER FROM MR. FRAZIER, WERE THERE ANY OTHER

7   COMMUNICATIONS YOU HAD DURING THIS LEAVE OF ABSENCE WITH

8   EMPLOYEES OF LAGUNA HONDA HOSPITAL OR THE CITY?

9        A.  I RECEIVED A LETTER FROM THE PERSONNEL ANALYST

10  ALSO REQUESTING MY RETURN BACK TO WORK.

11       Q.  DO YOU RECALL ANY OTHER COMMUNICATIONS WITH ANY

12  CITY EMPLOYEE DURING THIS LEAVE OF ABSENCE?

13       A.  I RAN INTO MICHELLE IN A SUPERMARKET, AND WE

14  GREETED ONE ANOTHER WITH HER CHILDREN.  WE ONLY SAID, "HI"

15  TO EACH OTHER, AND SHE WAS ASKING ME HOW I WAS DOING AND

16  THAT -- I HELD HER KIDS AND PLAYED WITH HER KIDS FOR A

17  SHORT TIME.

18       Q.  DO YOU RECALL ANYTHING ELSE ABOUT THAT

19  CONVERSATION WITH MICHELLE OTHER THAN WHAT YOU HAVE

20  ALREADY TESTIFIED TO?

21       A.  NO, THAT WAS IT.

22       Q.  WHAT IS MICHELLE'S LAST NAME?

23       A.  I CAN'T REMEMBER HER LAST NAME.

24       Q.  AT THE TIME, DID MICHELLE WORK AT LAGUNA HONDA?

25       A.  YES.

1      Q.  NOW, YOU SAID YOU SAW LISA RANDON AT THE AIRPORT

2   IN LAS VEGAS.

3          DO YOU RECALL WHEN THAT HAPPENED?

4      A.  I CAN'T RECALL THE DATE.

5      Q.  DID YOU HAVE A CONVERSATION WITH HER?

6      A.  A BRIEF CONVERSATION, "HELLO, HOW ARE YOU DOING?

7   WHAT ARE YOU DOING HERE?" I EXPLAINED THAT I WAS JUST

8   COMING BACK FROM MY AUNT'S FUNERAL.

9      Q.  DO YOU RECALL ANYTHING ELSE ABOUT YOUR

10  CONVERSATION WITH MS. RANDON THAT DAY?

11     A.  NO, THAT WAS THE ONLY THING SAID.

12     Q.  OKAY.

13     A.  OH, I ASKED HER IF SHE WON ANY MONEY AND WAS SHE

14  UP THERE TO GAMBLE AND SHE SAID "YES" SHE WENT THERE TO

15  GAMBLE.

16     Q.  DID SHE TELL YOU IF SHE WON MONEY?

17     A.  NO, SHE NEVER DID SAY.

18     Q.  TRACY GRIFFIN OR GRIFFITH?

19     A.  GRIFFIN.

20     Q.  WAS SHE AN ACTIVITY THERAPIST AS WELL?

21     A.  YES.

22     Q.  YOU MENTIONED YOU HAD ONE PHONE CONVERSATION WITH

23  HER?

24     A.  YES.

25     Q.  AND SHE TOLD YOU -- I'M JUST PARAPHRASING, SO

1    CORRECT ME IF I'M WRONG -- THAT THE BELONGINGS YOU HAD AT

2    THE HOSPITAL THAT WERE IN YOUR CUBICLE HAD BEEN BOXED UP

3    AND THERE WERE SOME OTHER THINGS THAT SHE TOLD YOU HAD

4    BEEN PUT OUT ON A TABLE FOR PEOPLE TO PICK THROUGH AND

5    TAKE IF THEY WANT?

6         A.   YES.

7         Q.   THAT WAS HER UNDERSTANDING OF WHAT WAS GOING ON?

8         A.   YES.

9         Q.   DO YOU RECALL WHEN THAT CONVERSATION TOOK PLACE?

10        A.   IT WAS IN 2004 -- I MEAN 2000 -- I CAN'T RECALL.

11   IT WAS WHILE I WAS OFF ON LEAVE.

12        Q.   LET ME SEE IF I CAN HELP YOU.  WAS IT EARLY IN

13   YOUR LEAVE OR LATE IN THE LEAVE THAT YOU GOT THIS PHONE

14   CALL FROM HER?

15        A.   IT WAS LATE IN THE LEAVE.  I GUESS, MAYBE, SIX

16   MONTHS OR LESS.

17        Q.   SIX MONTHS OR LESS INTO YOUR LEAVE?

18        A.   YES.

19        Q.   NOW, ONE OF YOUR CLAIMS IN THE CASE OR YOUR CLAIM

20   IN THE CASE IS THAT YOU HAVE BEEN THE VICTIM OF HARASSMENT

21   AND DISCRIMINATION BASED UPON YOUR RACE?

22        A.   YES.

23        Q.   AND YOUR RACE BEING AFRICAN-AMERICAN?

24        A.   YES.

25        Q.   CAN YOU TELL ME WHO IT IS YOU BELIEVE

1  DISCRIMINATED AGAINST YOU OR HARASSED YOU BECAUSE OF YOUR

2  RACE?

3       A.  BILL FRAZIER.

4       Q.  IS THERE ANYONE ELSE EMPLOYED BY THE CITY WHO YOU

5  BELIEVE DISCRIMINATED AGAINST YOU OR HARASSED YOU BECAUSE

6  OF YOUR RACE?

7       A.  CHRISTINE HANSON.

8       Q.  ANYONE ELSE?

9       A.  NO.

10      Q.  CAN YOU TELL ME THE FIRST TIME THAT YOU BELIEVE

11  MR. FRAZIER DISCRIMINATED AGAINST YOU BECAUSE OF YOUR

12  RACE?

13      A.  WHEN I WAS TOLD THAT EVERY TIME I COOK ON MY WARD

14  THAT RESIDENTS BECOME ILL.

15      Q.  DO YOU RECALL WHEN THAT OCCURRED?

16      A.  IT WAS EITHER IN 2002 OR 2003.

17      Q.  SO PRIOR TO THAT TIME, YOU ARE NOT AWARE OF ANY

18  CONDUCT BY MR. FRAZIER THAT YOU CONSIDERED TO BE

19  DISCRIMINATION ON THE BASIS OF YOUR RACE?

20      A.  YES, I DO HAVE OTHER THINGS.

21      Q.  OKAY.  I JUST WANT TO MAKE SURE WE ARE CLEAR

22  HERE.

23          I UNDERSTAND THERE ARE OTHER ACTIVITIES HE MAY

24  HAVE ENGAGED IN THAT YOU BELIEVE WERE DISCRIMINATORY

25  BUT --

1     A.  YES.

2     Q.  -- WHAT I'M TRYING TO FIND OUT IS WHEN THE

3  DISCRIMINATORY CONDUCT BEGAN.

4     MY QUESTION IS NOT WHETHER HE DID OTHER

5  DISCRIMINATORY ACTS.  MY QUESTION IS:  PRIOR TO -- I TAKE

6  IT THIS WAS A STATEMENT HE MADE TO YOU?

7     A.  YES.

8     Q.  AND HE MADE THIS STATEMENT TO THE BEST OF YOUR

9  RECOLLECTION SOMETIME IN 2002 OR 2003?

10     A.  YES.

11     Q.  BEFORE THAT TIME, BEFORE HE MADE THIS STATEMENT,

12  WAS THERE ANYTHING HE DID OR SAID THAT YOU BELIEVE

13  CONSTITUTED DISCRIMINATION AGAINST YOU BECAUSE OF YOUR

14  RACE?

15     A.  HE ALLOWED THE LOCK ON MY LOCKER TO BE CUT AND

16  THINGS TO BE TAKEN OUT OF MY LOCKER AND PLACED OUT ON THE

17  TABLE IN THE WARD -- OF THE WARD THAT I WAS ASSIGNED TO.

18     Q.  THAT WAS THE INCIDENT THAT YOU HAD THE PHONE

19  CONVERSATION WITH MS. GRIFFIN OR A DIFFERENT OCCASION?

20     A.  THIS IS A DIFFERENT INCIDENT.

21     Q.  DO YOU RECALL WHEN THAT TOOK PLACE?

22     A.  THAT TOOK PLACE IN, I THINK, 2002 OR 2003.

23     Q.  LET ME TRY TO ASK THIS A DIFFERENT WAY.

24     AGAIN, I'M NOT TRYING TO FOOL YOU.  I'M TRYING TO

25  FIGURE OUT WHAT THE TIME FRAME IS THAT WE ARE LOOKING FOR.

1    DID MR. FRAZIER ENGAGE IN ANY DISCRIMINATORY

2  CONDUCT BEFORE THE CALENDAR YEAR 2002?

3    A.  I WAS DOING A BLACK HISTORY PROGRAM, HAD BEEN

4  DOING THE BLACK HISTORY PROGRAM FOR THE SEVEN YEARS PRIOR

5  TO MR. FRAZIER BEING HIRED THERE.

6    I HAD PLANNED THIS PROGRAM FOR THE WHOLE HOSPITAL

7  AND WHEN I WOULD PLAN THE PROGRAM, IT WOULD BE A YEAR IN

8  ADVANCE WITH THE PERFORMERS.  THIS PARTICULAR YEAR, I HAD

9  CONTACTED DIFFERENT PERFORMERS AND HAD SET A MEETING WITH

10  MR. FRAZIER TO LET HIM KNOW HOW MUCH THE PROGRAM WAS GOING

11  TO COST, HOW MUCH THE PERFORMERS WERE CHARGING.

12    A PERFORMER CAME OUT TO MEET WITH ONE OF THE

13  SUPERVISORS TO MAKE SURE THAT HIS MONEY WOULD BE PAID TO

14  HIM THE FOLLOWING DAY, WHICH WOULD BE THE DAY OF THE

15  PROGRAM.  HE MET WITH THE SUPERVISOR AND MYSELF, AND HE

16  WAS ASSURED THAT HE WOULD HAVE HIS CHECK THE NEXT DAY.

17  THAT DIDN'T HAPPEN.  HE DIDN'T GET HIS CHECK.

18    THE PROGRAM WAS ALSO CHANGED FROM THE DATE THAT

19  HAD BEEN PLANNED A YEAR IN ADVANCE.  MR. FRAZIER CHANGED

20  THAT DATE TWO WEEKS PRIOR TO THE TIME THAT THE PROGRAM WAS

21  SUPPOSED TO HAPPEN.  THIS MADE IT IMPOSSIBLE FOR SOME OF

22  THE PERFORMERS TO GET OUT BECAUSE THEY HAD ALREADY SET

23  THIS SPECIFIC DATE ON THEIR CALENDAR, SO, THEREFORE, A LOT

24  OF THEM COULDN'T COME OUT AND PARTICIPATE BECAUSE OF THE

25  DATE BEING CHANGED.

1      Q.  THESE INCIDENTS, WITH RESPECT TO THE BLACK

2   HISTORY PROGRAM THAT YOU JUST DESCRIBED, WHEN DID THESE

3   HAPPEN, WHAT CALENDAR YEAR OR MONTH?

4      A.  I THINK THIS WAS IN 2001.

5      Q.  WOULD THIS HAVE BEEN AROUND JANUARY OR

6   FEBRUARY 2001?

7      A.  FEBRUARY.

8      Q.  MR. FRAZIER HAD ALSO ASKED IF WE HAD ANY

9   COMPLAINTS ABOUT THE BLACK HISTORY PROGRAM, AND HE SET UP

10  A MEETING TO MEET WITH MYSELF AND SANDRA JOHNSON WHO IS NO

11  LONGER EMPLOYED AT LAGUNA HONDA.  SHE WAS THE VOLUNTEER

12  COORDINATOR, AND SHE HELPED ME COORDINATE THE BLACK

13  HISTORY PROGRAM BY BRINGING VOLUNTEERS IN TO HELP ASSIST

14  RESIDENTS TO THE PROGRAM.

15          WE MET WITH MR. FRAZIER, AND WE TOLD HIM WHAT OUR

16  FEELINGS WAS.  OUR FEELINGS WAS THAT HE WAS DISCRIMINATING

17  AGAINST THE BLACK HISTORY PROGRAM BY GIVING US A HARD

18  TIME, BY NOT GIVING US THE RIGHT AMOUNT OF FUNDS THAT WE

19  ASKED FOR.

20          MR. FRAZIER AND SANDRA GOT INTO A SHOUTING MATCH.

21  HE BECAME UPSET AND WAS GOING TO LEAVE THE MEETING BUT

22  THEN CHANGED HIS MIND AND THEN DECIDED TO COME BACK AND

23  SIT AND DISCUSS IT WITH US SO WE COULD TRY TO STRAIGHTEN

24  OUR FEELINGS OUT.

25      Q.  WAS THIS IN RELATIONSHIP TO THE SAME

1     Q.  WERE THERE ANY OTHER ACTIONS OR STATEMENTS BY

2   MR. FRAZIER BEFORE 2000 THAT YOU CONSIDER TO HAVE BEEN

3   DISCRIMINATION BECAUSE OF YOUR RACE?

4     A.  BECAUSE -- I THINK MR. FRAZIER WAS HIRED IN 2000

5   SO...

6     Q.  THAT WOULD HAVE BEEN THE EARLIEST HE COULD HAVE

7   ENGAGED IN ANY DISCRIMINATORY ACTIONS AGAINST YOU IN YOUR

8   RECOLLECTION?

9     A.  YES.

10    Q.  ANY DISCRIMINATION OCCURRED FROM 2000 FORWARD;

11  CORRECT?

12    A.  YES.

13    Q.  AM I CORRECT THAT YOU BELIEVE THAT MR. FRAZIER'S

14  DISCRIMINATORY ACTIONS TOWARD YOU ALSO CONSTITUTED RACIAL

15  HARASSMENT?

16    A.  YES.

17    Q.  WHY DO YOU BELIEVE THAT MR. FRAZIER -- THIS

18  CONDUCT WE JUST DISCUSSED AND OTHERS WAS MOTIVATED BY YOUR

19  RACE?

20    A.  IT WAS RETALIATION BECAUSE I COMPLAINED.

21    Q.  WHAT DID YOU COMPLAIN ABOUT?

22    A.  I COMPLAINED ABOUT THE FAVORITISM THAT

23  MR. FRAZIER WAS DOING IN THE DEPARTMENT.

24    Q.  WHO DID YOU COMPLAIN TO?

25    A.  TO MR. FRAZIER.

1      Q.  DID YOU COMPLAIN TO ANYBODY ELSE?

2      A.  NO, NOT AT THAT TIME.

3      Q.  WHEN DID YOU FIRST COMPLAIN TO MR. FRAZIER ABOUT

4  FAVORITISM?

5      A.  WHEN I WAS FORCED TO USE THE COMPUTER WITHOUT

6  COMPUTER TRAINING AND ONE OF MY OTHER COLLEAGUES REFUSED

7  TO USE THE COMPUTER, AND AT THAT TIME, SHE DIDN'T HAVE TO

8  USE IT.  SHE CONTINUED TO DO HER WORK BY HAND.

9      Q.  WHO WAS THAT COLLEAGUE?

10     A.  LYNN OR CAROL, AND I DON'T KNOW HER LAST NAME.

11     Q.  IT WAS ANOTHER ACTIVITY THERAPIST?

12     A.  YES.

13     Q.  AND HER NAME WAS EITHER LYNN OR CAROL?

14     A.  I THINK IT'S CAROL LYNN.  I THINK HER FIRST NAME

15  IS CAROL BUT WE ALL CALLED HER LYNN.

16     Q.  OKAY.

17     A.  LANCASTER I THINK WAS THE PRONUNCIATION OF HER

18  LAST NAME.

19     Q.  WHEN WERE YOU FIRST FORCED TO USE A COMPUTER

20  WITHOUT TRAINING?

21     A.  I THINK IT WAS IN THE YEAR OF 2002.

22     Q.  WAS THERE COMPUTER TRAINING AVAILABLE?

23     A.  YES.

24     Q.  WERE YOU DENIED THE OPPORTUNITY TO TAKE THAT

25  TRAINING?

1      A.   NO.

2      Q.   WAS THIS TRAINING THAT YOU HAD TO SIGN UP FOR?

3      A.   YES.

4      Q.   DID YOU EVER SIGN UP FOR THE TRAINING?

5      A.   ONE TIME.

6      Q.   DID YOU, IN FACT, TAKE THE TRAINING?

7      A.   YES.

8      Q.   WHEN DID YOU TAKE THE TRAINING?

9      A.   I GUESS IT WAS SIX MONTHS AFTER BEING FORCED TO

10   USE THE COMPUTER.   IT WAS GIVEN IN THE HOSPITAL.

11      Q.   WAS THERE TRAINING AVAILABLE BEFORE YOU WERE

12   FORCED TO USE THE COMPUTER?

13      A.   NO.

14      Q.   NOW, WHY DO YOU BELIEVE THAT MR. FRAZIER'S

15   CONDUCT WAS MOTIVATED BY YOUR RACE?

16      A.   CAN YOU REPHRASE THAT QUESTION?

17      Q.   SURE.   YOUR CLAIM IN PART IS THAT MR. FRAZIER

18   DISCRIMINATED AGAINST YOU AND HARASSED YOU BECAUSE YOU'RE

19   AFRICAN-AMERICAN; CORRECT?

20      A.   YES.

21      Q.   WHAT I'M TRYING TO FIND OUT IS WHAT DID

22   MR. FRAZIER DO OR SAY THAT LEADS YOU TO BELIEVE THAT HIS

23   CONDUCT WAS MOTIVATED BY YOUR RACE RATHER THAN SOMETHING

24   ELSE?

25      A.   HE TREATED ME DIFFERENTLY FROM THE REST OF THE

1    STAFF.

2         Q.  DID MR. FRAZIER EVER MAKE ANY RACIAL SLURS?

3         A.  NOT THAT I CAN REMEMBER.

4         Q.  DID YOU EVER HEAR MR. FRAZIER TALK ABOUT AFRICAN

5    AMERICANS IN A DEROGATORY FASHION?

6         A.  NOT THAT I CAN RECALL.

7         Q.  DID ANYONE EVER TELL YOU THEY HEARD MR. FRAZIER

8    TALK IN THAT FASHION?

9         A.  YES.

10        Q.  WHO?

11        A.  SOMEONE TOLD ME THAT THEY HEARD MR. FRAZIER SAY

12   HE WAS WHITE, AND HE IS ALWAYS RIGHT.

13        Q.  WHO WAS THAT SOMEONE?

14        A.  I THINK IT WAS NORMAN BURNS.

15        Q.  OTHER THAN MR. BURNS, DID ANYONE ELSE EVER TELL

16   YOU THAT THEY HEARD MR. FRAZIER TALK IN A WAY THAT WAS

17   DEROGATORY OR DEMEANING OF AFRICAN-AMERICANS?

18        A.  NOT THAT I CAN RECALL.

19        Q.  HOW DID MR. FRAZIER TREAT YOU -- LET ME STRIKE

20   THAT.

21             YOU SAID THAT THE REASON YOU BELIEVE HE

22   DISCRIMINATED AND HARASSED YOU BECAUSE OF YOUR RACE IS

23   BECAUSE HE TREATED YOU DIFFERENT THAN THE REST OF THE

24   STAFF.

25             WHEN YOU REFER TO "THE STAFF," WHO ARE YOU

1  REFERRING TO?

2      A.  MY COLLEAGUES THAT I WORKED WITH.

3      Q.  THE OTHER ACTIVITY THERAPISTS?

4      A.  YES.

5      Q.  HOW DID HE TREAT YOU DIFFERENTLY THAN THE OTHER

6  ACTIVITY THERAPISTS?

7      A.  WHEN I WOULD GO TO MR. FRAZIER WITH THE PROGRAM,

8  SAY, A BUS TRIP FOR INSTANCE, I WOULD ALWAYS HAVE TO GO

9  THROUGH HARASSMENT ABOUT THAT TRIP.  BEING THERE 20-SOME

10  YEARS DOING BUS TRIPS, I FELT LIKE MY OTHER CO-WORKERS,

11  WHO HAD BEEN THERE LESS TIME THAN ME, HAD NO PROBLEMS WITH

12  GETTING THEIR BUS TRIPS OKAY'ED OR GETTING MONIES FOR

13  THEIR HOSPITAL-WIDE PROGRAMS.

14      WHEN I WENT TO MR. FRAZIER TO COMPLAIN ABOUT MY

15  BELONGINGS BEING BOXED UP, TWENTY BOXES OF MY BELONGINGS

16  BEING BOXED UP AND SOME OF MY THINGS BEING PUT OUT ON THE

17  TABLE FOR GRABS, HE SHOWED NO REMORSE OR DIDN'T EVEN

18  APOLOGIZE FOR WHAT HAD HAPPENED.  HIS STATEMENT TO ME WAS,

19  "I THOUGHT YOU WASN'T COMING BACK."  I NEVER ONCE CALLED

20  TO SAY I WAS RESIGNING.

21      ON ONE OCCASION, A UNION REP CALLED ME, AND I WAS

22  SITTING BY THE COMPUTER WAITING FOR THE UNION REP'S CALL.

23  MR. FRAZIER WOULD NOT ALLOW ME TO SPEAK TO THE UNION

24  REPRESENTATIVE.  HE TOLD THE UNION REP THAT I WAS NOT IN

25  THE DEPARTMENT, AND I WAS SITTING RIGHT BY THE COMPUTER

1    WHERE I COULD BE VISUALLY SEEN BY MR. FRAZIER.

2         WHEN OTHER CO-WORKERS NEEDED TO MEET WITH THE

3    UNION OR CONTACT THE UNION, THEY WERE NOTIFIED THAT THE

4    UNION WAS CALLING THEM.

5         Q.  HOW DO YOU KNOW THAT?

6         A.  BECAUSE I WOULD BE THERE SOMETIMES IN THE

7    DEPARTMENT.

8         Q.  WERE ANY OF YOUR OTHER ACTIVITY THERAPISTS

9    AFRICAN-AMERICAN?

10        A.  YES.

11        Q.  WHO WERE THE OTHER AFRICAN-AMERICAN ACTIVITY

12   THERAPISTS?

13        A.  SHARON GROVER, WANDIA HOKE.

14        Q.  ANYONE ELSE?

15        A.  MYSELF, TRACY GRIFFIN, AND THERE IS A NEW PERSON

16   THAT WAS HIRED RIGHT BEFORE I RETIRED AND I THINK HER NAME

17   WAS JEVOVIA.  I'M NOT SURE OF HER NAME BECAUSE I WAS ONLY

18   WORKING WITH HER FOR A VERY SHORT TIME BECAUSE THEN I

19   RETIRED.

20        Q.  AND MR. FRAZIER TREATED YOU DIFFERENTLY THAN HE

21   TREATED THESE OTHER ACTIVITY THERAPISTS?

22        A.  YES, I WAS SINGLED OUT.

23        Q.  OTHER THAN WHAT YOU ALREADY TESTIFIED TO, WHAT

24   OTHER ACTS OF DISCRIMINATION OR HARASSMENT DID MR. FRAZIER

25   ENGAGE IN WITH RESPECT TO YOU BECAUSE OF YOUR RACE?

1        A.  CAN WE TAKE A BREAK?

2        Q.  YOU CAN ANSWER MY QUESTION, AND THEN WE CAN TAKE

3    A BREAK.

4            MR. OLER:  WHAT WAS THE QUESTION?  I'M SORRY.

5            MR. ROLNICK:  CAN YOU READ THE QUESTION BACK

6    PLEASE.

7                    (WHEREUPON, THE RECORD WAS READ.)

8            THE WITNESS:  BY ALLOWING MY SUPERVISOR TO HARASS

9    ME BY INTIMIDATING ME WITH HER DOG.  HAVING THE DOG TO RUN

10   OFF THE LEASH AND RUN INTO MY CUBICLE, AND MR. FRAZIER

11   KNEW THAT I WAS AFRAID OF THIS DOG, THAT I HAD BEEN

12   THREATENED BY CHRISTINE HANSON THAT IF I WOULD YELL AT HER

13   OR SCREAM AT HER THAT HER DOG WOULD EAT ME UP.

14           I WENT TO MR. FRAZIER TELLING HIM THAT I WAS

15   AFRAID TO WORK WITH THIS DOG, AND THE DOG WAS ALLOWED TO

16   RUN OFF THE LEASH INTO MY CUBICLE, AND I URINATED ALL OVER

17   MYSELF BECAUSE I WAS SO AFRAID OF THIS DOG.  THE DOG

18   GROWLED AT ME AND SNAPPED AT ME.

19                   (WHEREUPON, A BREAK WAS TAKEN.)

20   BY MR. ROLNICK:

21       Q.  LET'S GO BACK ON THE RECORD.  I WANT TO START BY

22   TRYING TO CLEAR UP ONE OF THE DATES WE TALKED ABOUT

23   EARLIER.

24                   (WHEREUPON, DEFENDANTS' EXHIBIT 1

25                    WAS MARKED FOR IDENTIFICATION.)

1    THEN AND NOW?

2         A.  NO.

3         Q.  DO YOU LIVE ALONE?

4         A.  YES, I DO.

5         Q.  HOW LONG HAVE YOU LIVED ALONE?

6         A.  OH MY, I WOULD SAY 20 YEARS.

7         Q.  DO YOU LIVE IN THE CITY?

8         A.  NO.

9         Q.  YOU LIVE IN ANTIOCH?

10        A.  YES.

11        Q.  YOU LIVE AT THE ADDRESS LISTED ON THIS LETTER,

12   TWINCREEK COURT?

13        A.  YES.

14        Q.  IS THERE SOME REASON WHY YOU HAVEN'T MADE ANY

15   EFFORT TO FIND WORK SINCE YOU LEFT THE CITY?

16        A.  I'M AFRAID THAT I'LL BE TREATED THE WAY I WAS

17   TREATED WHILE WORKING UNDER MR. FRAZIER.  I DON'T WANT TO

18   PUT MYSELF THROUGH THAT AGAIN.

19        Q.  OTHER THAN THAT, IS THERE ANY OTHER REASON WHY

20   YOU HAVEN'T SOUGHT EMPLOYMENT?

21        A.  NO.

22        Q.  ARE YOU OTHERWISE PHYSICALLY CAPABLE OF

23   PERFORMING WORK SIMILAR TO WHAT YOU WERE DOING AS AN

24   ACTIVITY THERAPIST?

25        A.  MENTALLY, NO.

1      Q.  PHYSICALLY?

2      A.  NO.

3      Q.  YOU ARE NOT PHYSICALLY CAPABLE OF PERFORMING THE

4  SAME KIND OF DUTIES?

5      A.  NO.

6      Q.  WHEN YOU SAY YOU ARE NOT PHYSICALLY CAPABLE, IS

7  THAT YOUR OPINION OR HAS SOME MEDICAL PROFESSIONAL TOLD

8  THAT TO YOU?

9      A.  THAT IS MY OPINION AND MY PSYCHIATRIST'S OPINION.

10     Q.  WHO IS YOUR PSYCHIATRIST?

11     A.  WELL, SHE IS NOT NOW.

12     Q.  WHO WAS YOUR PSYCHIATRIST WHO TOLD YOU YOU

13 WEREN'T PHYSICALLY CAPABLE OF PERFORMING SERVICES SIMILAR

14 TO THE SERVICES YOU WERE PERFORMING AS AN ACTIVITY

15 THERAPIST?

16     A.  WHAT IS HER NAME?  I CAN'T THINK OF HER NAME.

17     Q.  IS IT DR. REVOIR (PHONETIC)?

18     A.  YES.

19     Q.  WHEN IS THE LAST TIME YOU SAW DR. REVOIR?

20     A.  2005.

21     Q.  HAVE YOU SEEN ANY MENTAL-HEALTH PROFESSIONAL

22 SINCE THAT TIME?

23     A.  NO, I HAVEN'T.

24     Q.  NOW, THE OTHER INDIVIDUAL WHO YOU CLAIM HARASSED

25 AND DISCRIMINATED AGAINST YOU WAS MS. HANSON?

1        A.  YES.

2        Q.  DID MS. HANSON ENGAGE IN ANY DISCRIMINATORY

3   CONDUCT BEFORE SHE BECAME YOUR SUPERVISOR?

4        A.  NO.

5        Q.  DID MS. HANSON ENGAGE IN ANY HARASSING CONDUCT

6   BEFORE SHE BECAME YOUR SUPERVISOR?

7        A.  NO.

8        Q.  DID YOU EVER HEAR MS. HANSON MAKE A RACIAL SLUR?

9        A.  NOT THAT I CAN RECALL.

10        Q.  DID ANYONE EVER TELL YOU THAT THEY HEARD

11   MS. HANSON MAKE A RACIAL SLUR?

12        A.  NOT THAT I CAN RECALL.

13        Q.  DID YOU EVER HEAR MS. HANSON MAKE A STATEMENT

14   THAT YOU BELIEVED WAS DEROGATORY TOWARD AFRICAN-AMERICANS?

15        A.  NOT THAT I CAN RECALL.

16        Q.  DID ANYONE EVER TELL YOU THAT THEY HEARD

17   MS. HANSON MAKE SUCH A STATEMENT?

18        A.  NOT THAT I CAN RECALL.

19        Q.  WHEN YOU WERE SUPERVISED BY MS. HANSON, WAS THERE

20   A PARTICULAR CLUSTER OF PATIENTS THAT YOU WERE WORKING

21   WITH?

22        A.  YES, THERE WERE, BUT I CAN'T REMEMBER.

23        Q.  I MAY HAVE THIS WRONG, BUT AT THAT TIME, WAS MS.

24   HANSON RESPONSIBLE FOR THE PSYCHO-SOCIAL CLUSTER?

25        A.  YES, YES.

1      Q.  WHO WERE THE PATIENTS THAT ARE IN THE

2  PSYCHO-SOCIAL CLUSTER?

3      A.  THE THIRD FLOOR WAS CONSIDERED THE PSYCHO-SOCIAL

4  CLUSTER.  PATIENTS THAT HAD BEHAVIORAL PROBLEMS.

5      Q.  OF A PSYCHOLOGICAL OR SOCIAL NATURE?

6      A.  YES.

7      Q.  DID THIS CLUSTER OF PATIENTS -- STRIKE THAT.

8          IN YOUR EXPERIENCE, WAS THE PSYCHO-SOCIAL CLUSTER

9  OF PATIENTS MORE DIFFICULT TO WORK WITH THAN THE OTHER

10 CLUSTERS OF PATIENTS?

11     A.  YES.

12     Q.  IN YOUR EXPERIENCE, WAS THE PSYCHO-SOCIAL CLUSTER

13 OF PATIENTS DIFFICULT TO MANAGE?

14     A.  YES.

15     Q.  THEY WERE LESS RESPONSIVE TO THE EFFORTS OF THE

16 ACTIVITY THERAPISTS; IS THAT CORRECT?

17     A.  YES.

18     Q.  AS AN ACTIVITY THERAPIST WORKING WITH THE

19 PSYCHO-SOCIAL CLUSTER, DID THAT REQUIRE THE ACTIVITY

20 THERAPIST TO WORK HARDER THAN THE ACTIVITY THERAPIST

21 WORKING WITH DIFFERENT CLUSTERS OF PATIENTS?

22     A.  I WOULDN'T NECESSARILY SAY THAT BECAUSE WE ALL

23 WORKED HARD, SO MY ANSWER TO THAT IS NO.

24     Q.  WERE THE PSYCHO-SOCIAL CLUSTER PATIENTS MORE

25 DIFFICULT TO COMMUNICATE WITH?

1      Q.  ALL OF THE ACTIVITY THERAPISTS HAD THEIR PERSONAL

2   CUBICLES ON THE FOURTH FLOOR AT LAGUNA HONDA; IS THAT

3   CORRECT?

4      A.  YES.

5      Q.  DID ALL THE SUPERVISORS ALSO HAVE A CUBICLE AT

6   THAT LOCATION AS WELL?

7      A.  THEY HAD OFFICES NOT CUBICLES.

8      Q.  YOU HAD A CUBICLE, AND HOW HIGH WAS THE WALL OF

9   THE CUBICLE?  IT DIDN'T GO FLOOR TO CEILING, DID IT?

10      A.  NO.

11      Q.  FIVE OR SIX FEET UP?  COULD YOU LOOK OVER IT?

12      A.  YES.

13      Q.  IT WASN'T SO HIGH THAT YOU COULD STAND UP AND

14   LOOK OVER INTO SOMEONE ELSE'S CUBICLE?

15      A.  YES, I COULD STAND AND LOOK OVER INTO SOMEBODY

16   ELSE'S CUBICLE.

17      Q.  BUT THE SUPERVISORS, SUCH AS MS. HANSON AND

18   MS. TAORMINA AND THE OTHER SUPERVISORS, THEY HAD ACTUAL

19   PHYSICAL OFFICES WITH DOORS AND FOUR WALLS?

20      A.  YES.

21      Q.  WERE THOSE OFFICES AT THE SAME LOCATION, THE

22   FOURTH FLOOR OF LAGUNA HONDA?

23      A.  YES.

24      Q.  HOW CLOSE WERE THOSE OFFICES TO THE CUBICLES THAT

25   THE ACTIVITY THERAPISTS USED?

1    A.  THEY WERE, LIKE, DOWN THE HALL IN LIKE ANOTHER

2  SECTION OF THE WHOLE DEPARTMENT.  LIKE, AS YOU FIRST ENTER

3  INTO THE DEPARTMENT, THEN THERE WAS OFFICES.  THE

4  SECRETARY'S OFFICE, MR. FRAZIER'S OFFICE, BARBARA'S OFFICE

5  ON ONE SIDE.

6    Q.  RIGHT.

7    A.  CHRISTINE SURJON'S OFFICE WAS ON THE OTHER SIDE

8  TO THE LEFT, IF I'M NOT MISTAKEN, AND TO THE RIGHT WAS

9  CHRISTINE HANSON'S OFFICE.

10    Q.  YOU WOULD GO DOWN THAT HALL TO GET TO THE

11  LOCATION OF THE CUBICLES FOR THE ACTIVITY THERAPISTS?

12    A.  YES.

13    Q.  YOU WOULD COME INTO A LARGER ROOM WITH MORE OPEN

14  SPACE WITH THE CUBICLES THERE?

15    A.  YES.

16    Q.  AT THE TIME YOU LEFT THE HOSPITAL IN 2005,

17  APPROXIMATELY HOW MANY OTHER ACTIVITY THERAPISTS WORKED AT

18  LAGUNA HONDA?

19    A.  I WOULD SAY 40.

20    Q.  OKAY.  YOU HAD APPROXIMATELY 40 COLLEAGUES?

21    A.  AS I CAN RECALL, I THINK I WOULD SAY FROM 35 TO

22  40.

23    Q.  YOU MENTIONED THERE WERE SOME ISSUES WITH

24  MS. HANSON'S DOG.

25        DO YOU KNOW WHAT KIND OF DOG SHE HAD?

1          A.  AN ADOPTED PITBULL.

2          Q.  SHE BROUGHT THE DOG TO WORK AT SOME POINT IN

3      TIME?

4          A.  EVERY DAY.

5          Q.  AT SOME POINT IN TIME DID SHE STOP BRINGING THE

6      DOG TO WORK?

7          A.  I DON'T KNOW BECAUSE DURING THE TIME THAT I WAS

8      THERE, UP UNTIL THE TIME I RETIRED, THE DOG WAS STILL

9      COMING THERE.

10         Q.  DID ANYBODY ELSE BRING THEIR DOG TO WORK BESIDES

11     MS. HANSON?

12         A.  YES.

13         Q.  WHO ELSE BROUGHT THEIR DOG TO WORK?

14         A.  TONY BAILEY.

15         Q.  TONY BAILEY?

16         A.  I THINK I'M SAYING THE NAME RIGHT.

17         Q.  B-A-I-L-E-Y?

18         A.  I THINK SO.  I'M NOT SURE.

19         Q.  ANYBODY ELSE?

20         A.  PAT WAGNER.

21         Q.  ANYONE ELSE?

22         A.  VICTORIA -- I CAN'T REMEMBER VICTORIA'S LAST

23     NAME.

24         Q.  ANYBODY ELSE WHO BROUGHT THEIR DOG TO WORK?

25         A.  THOSE ARE THE ONLY PEOPLE I RECALL.

1     Q.  MR. BAILEY WAS AN ACTIVITY THERAPIST?

2     A.  NO, I DON'T KNOW WHAT HIS POSITION WAS, BUT I

3 KNOW HE WASN'T AN ACTIVITY THERAPIST.  HE DIDN'T DO

4 ACTIVITIES LIKE MYSELF.

5     Q.  DID HE WORK WITH LAGUNA HONDA PATIENTS, TO YOUR

6 KNOWLEDGE?

7     A.  NO, NOT TO MY KNOWLEDGE.

8     Q.  DO YOU RECALL WHAT KIND OF DOG MR. BAILEY HAD?

9     A.  I DON'T KNOW WHAT KIND OF DOG MR. BAILEY HAD.  HE

10 WAS LARGE -- SHE WAS A LARGE DOG, MEAN, AND WOULD SNAP AT

11 YOU AND TRY TO BITE YOU.

12     Q.  DID MR. BAILEY WORK IN CLOSE PROXIMITY TO YOU?

13     A.  MR. BAILEY WORKED ON THE OTHER SIDE OF THE

14 DEPARTMENT.

15     Q.  HE WAS WITHIN YOUR DEPARTMENT?

16     A.  YES.

17     Q.  WHAT WAS THE OVERALL NAME OF THAT DEPARTMENT?

18     A.  THE ACTIVITY DEPARTMENT.

19     Q.  OKAY.  HE HAD SOME ROLE IN THE ACTIVITY

20 DEPARTMENT, BUT YOU DON'T RECALL HIM BEING AN ACTIVITY

21 THERAPIST OR WORKING DIRECTLY WITH PATIENTS?

22     A.  NO, I RECALL MR. BAILEY BEING THE PERSON THAT

23 DELIVERED THE CHRISTMAS TREES, ORGANIZING THE DVDS AND THE

24 CDS, THE SUPPLY ROOM AS A WHOLE.  WE WOULD GO TO

25 MR. BAILEY TO SIGN OUT DIFFERENT SUPPLIES THAT WE NEEDED

1    FOR ACTIVITIES.

2         Q.  HE HAD CLERICAL DUTIES AND MAINTAINED PROPERTY OF

3    THE DEPARTMENT AND THOSE SORT OF THINGS?

4         A.  AS I RECALL.  I THINK THAT IS WHAT HIS JOB WAS.

5    I'M NOT SURE.

6         Q.  DID HE HAVE AN OFFICE OR CUBICLE?

7         A.  HE HAD AN OFFICE.

8         Q.  AND THAT OFFICE WAS DOWN THE HALL FROM WHERE YOUR

9    CUBICLE WAS?

10        A.  NO, THE OFFICE WAS ON THE OTHER SIDE OF THE

11   DEPARTMENT.

12        Q.  WAS HE ON THE FOURTH FLOOR OF THE MAIN BUILDING?

13        A.  YES.

14        Q.  AND MS. WAGNER WAS AN ACTIVITY THERAPIST?

15        A.  CORRECT.

16        Q.  PAT WAGNER?

17        A.  YES.

18        Q.  OKAY.  DO YOU RECALL WHAT KIND OF DOG SHE HAD?

19        A.  A LITTLE SMALL DOG.

20        Q.  DID SHE BRING THE DOG TO WORK EVERY DAY?

21        A.  NOT EVERY DAY.

22        Q.  IN THE SPACE OF A WEEK, HOW OFTEN DO YOU ESTIMATE

23   SHE BROUGHT THE DOG TO WORK?

24        A.  I REALLY CAN'T RECALL HOW MANY TIMES SHE BROUGHT

25   THE DOG TO WORK.

1      Q.  DID YOU EVER OBSERVE MS. WAGNER ENGAGE WITH HER

2   PATIENTS AND HER DOG BEING PRESENT AND THAT WAS IN SOME

3   WAY WHAT SHE WAS WORKING WITH THE PATIENTS ON?

4      A.  YES.

5      Q.  THE DOG SORT OF PLAYED A ROLE IN THE ACTIVITIES

6   SHE WAS PROVIDING TO HER PATIENTS?

7      A.  YES.

8      Q.  DID YOU EVER SEE MS. HANSON DO THE SAME THING

9   WITH HER DOG?

10      A.  YES.

11      Q.  THIS WOMAN VICTORIA, YOU DON'T REMEMBER HER LAST

12   NAME, WAS SHE AN ACTIVITY THERAPIST?

13      A.  YES.

14      Q.  DO YOU RECALL WHAT KIND OF DOG SHE HAD?

15      A.  A LITTLE SMALL DOG, LIKE -- KIND OF LOOKED LIKE A

16   BULLDOG.

17      Q.  IF WE CAN GO BACK TO MS. WAGNER FOR A MOMENT.

18   YOU SAY YOU DON'T REMEMBER HOW FREQUENTLY SHE BROUGHT THE

19   DOG IN, BUT SHE DID BRING THE DOG IN ON A REGULAR BASIS

20   OVER THE MONTHS OR YEARS?

21      A.  TO MY RECOLLECTION, YES.

22      Q.  I'M TRYING TO DISTINGUISH IF SHE BROUGHT THE DOG

23   IN A FEW TIMES OVER THE COURSE OF A COUPLE OF MONTHS AND

24   THEN YOU NEVER SAW THE DOG AGAIN OR WOULD THE DOG SHOW UP

25   ON A REGULAR BASIS OVER THE MONTHS?

1        A.  THAT IS HARD FOR ME TO SAY BECAUSE AFTER BEING

2   THREATENED WITH THE DOG AND AFTER LULU SNAPPING AT ME AND

3   I COULDN'T GO GET SUPPLIES BECAUSE I WAS AFRAID OF LULU

4   BECAUSE LULU WOULD BITE ME.  I WOULD GO TO THE DEPARTMENT

5   AND GET OUT OF THERE.

6        Q.  YOU DIDN'T STICK AROUND?

7        A.  I DIDN'T STICK AROUND.

8        Q.  LULU WAS CHRISTINE HANSON'S DOG?

9        A.  LULU WAS TONY'S DOG.

10       Q.  DO YOU REMEMBER THE NAME OF WAGNER'S DOG?

11       A.  NO.

12       Q.  DO YOU REMEMBER THE NAMES OF ANY OF THE OTHER

13  DOGS?

14       A.  KIMO WAS CHRSTINE'S DOG AND I CAN'T RECALL THE

15  NAME OF VICTORIA'S DOG.

16       Q.  DID YOU OBSERVE VICTORIA WORKING WITH HER DOG AND

17  THE PATIENTS AS YOU TALKED ABOUT PAT AND CHRISTINE HANSON

18  DOING?

19       A.  YES.

20       Q.  WAS CHRISTINE'S "KIMO" AS IN K-I-M-O OR "KIMO" AS

21  IN CHEMOTHERAPY, C-H-E-M?

22       A.  I DON'T KNOW.

23       Q.  WHAT WERE THE ACTS OF DISCRIMINATION BASED UPON

24  RACE BY MS. HANSON?

25            WHAT DID SHE DO TO YOU THAT YOU CONSIDERED TO BE

1  DISCRIMINATORY OR HARASSING BECAUSE OF YOUR RACE?

2      A.  CUTTING THE LOCK ON MY LOCKER AND GOING INTO MY

3  LOCKER, PUTTING THE THINGS OUT ON THE TABLE AND LEAVING

4  THEM THERE WHILE I WAS OUT ON LEAVE OR VACATION.  I CAN'T

5  REMEMBER WHICH ONE THAT IT WAS.  THEN, BOXING UP ALL OF MY

6  THINGS AND PUTTING SOME OF MY PERSONAL THINGS OUT ON THE

7  TABLE UP FOR GRABS, MY SEEING GLASSES, DIDN'T KNOW WHERE

8  THEY WERE.

9      I GAVE A GARAGE SALE, AND I WAS ACCUSED OF

10 MISAPPROPRIATING FUNDS BY MRS. HANSON.  I GAVE A BUS TRIP

11 TO CACHE CREEK, AND I PUT IN A FORM FOR FOUR VOLUNTEERS.

12 CHRISTINE HANSON WENT TO THE VOLUNTEER COORDINATOR AND

13 TOLD HIM ONLY TO GIVE ME ONE VOLUNTEER FOR 15 RESIDENTS.

14     GOING TO MY NURSE MANAGER AND TELLING HER THAT I

15 WAS A PROBLEM AND TELLING MY CO-WORKER TRACY GRIFFIN THAT

16 I WAS A PROBLEM, LEAVING MY WRITE-UPS, MY INSUBORDINATE

17 WRITE-UP OF MY MISAPPROPRIATION OF FUNDS, IN THE

18 DEPARTMENT SO EVERYONE COULD READ IT.

19     WHEN I GAVE THE BUS TRIP TO CACHE CREEK, UPON MY

20 RETURN FROM THE BUS TRIP WE WERE LATE.  MS. HANSON CAME IN

21 YELLING AND SCREAMING AT ME TELLING ME THAT I WAS LATE,

22 AND WHY WAS I LATE GETTING BACK TO THE DEPARTMENT.  SHE

23 DID NOT DO THIS TO MY WHITE CO-WORKERS.

24     Q.  WELL, LET ME ASK YOU:  OTHER THAN WHAT YOU

25 ALREADY LISTED, ARE THERE ANY OTHER ACTS OF DISCRIMINATION

1  OR HARASSMENT BY MS. HANSON BECAUSE OF YOUR RACE?

2      A.  I HAVE TRIED TO SUPPRESS A LOT OF THE STUFF THAT

3  HAS BEEN DONE TO ME BECAUSE IT HAS PRACTICALLY DESTROYED

4  ME, AND I'M TRYING TO REMEMBER TO THE BEST OF MY ABILITY

5  ABOUT THE THINGS THAT CHRISTINE HANSON AND WILLIAM FRAZIER

6  HAD DONE TO ME.

7          I WAS IN A MEETING WITH A SOCIAL WORKER AND THE

8  DOCTOR HAD GIVEN US AN ASSIGNMENT TO DO FOR THE RESIDENTS.

9  CHRISTINE CAME INTO THE ROOM YELLING AND SCREAMING AT ME

10  AND TELLING ME THAT I SHOULDN'T BE IN THE ROOM TALKING,

11  THAT I SHOULD BE OUT IN THE WARD DOING ACTIVITIES WITH THE

12  RESIDENTS.  I STATED TO CHRISTINE THAT THE DOCTOR HAD

13  GIVEN ME AN ASSIGNMENT WITH THE SOCIAL WORKER AND THAT I

14  WAS DISCUSSING AND GETTING IT TOGETHER WITH THE SOCIAL

15  WORKER, AND THAT I WOULD BE OUT INTO THE WARD DOING MY

16  ACTIVITIES WITH THE RESIDENTS.

17          I ALSO SHOWED HER WHERE I HAD CHANGED MY CALENDAR

18  ON THE WARD.  SHE TOLD ME THAT WASN'T GOOD ENOUGH, I

19  SHOULD HAVE BEEN OUT THERE DOING THE ACTIVITIES.  WE JUST

20  FINISHED OUR IDT MEETING AND THE DOCTOR HAD GIVEN THE

21  SOCIAL WORKER AND MYSELF THIS ASSIGNMENT TO DO.  CHRISTINE

22  WOULD WRITE ME UP FOR EVERY LITTLE THING.

23          SHE WOULD YELL AT ME.  I WOULD BE ON MY LUNCH

24  BREAK, SOMETIMES SHE WOULD COME AND SEE ME SITTING ON THE

25  THIRD FLOOR HAVING LUNCH WITH OTHER COLLEAGUES, AND SHE

1    WOULD COME AND LOOK AT HER CLOCK AND STAND AT THE END OF

2    THE HALL, AND THEN SHE WOULD WALK AWAY.

3          I GAVE A BARBECUE FOR MY D3 RESIDENTS, AND

4    CHRISTINE CAME.  FIRST, SHE WAS LOOKING OUT AT THE WINDOW

5    LOOKING TO SEE WHAT I WAS DOING.  SHE CAME TO THE BARBECUE

6    AND TOOK A WHOLE PAN OF CHICKEN AND JUST THREW IT ON THE

7    BARBECUE PIT TELLING ME THAT THE BARBECUE STARTED LATE AND

8    THAT I SHOULD BE ON TIME WITH MY ACTIVITIES.  I SAID TO

9    HER PUTTING ALL THIS BARBECUE ON THE GRILL, THE CHICKEN IS

10   NOT EVER GOING TO GET DONE.  SHE LOOKED AT ME AND LAUGHED

11   AND SAID, "YOU KNOW, I COULD WRITE YOU UP FOR YOUR

12   ACTIVITY STARTING SO LATE," AND I SAID TO HER, "WHY ARE

13   YOU PICKING ON ME?  WHY ARE YOU HARASSING ME?  YOU DON'T

14   WRITE ANYBODY ELSE UP WHEN THEY ARE LATE STARTING THEIR

15   ACTIVITIES."

16        Q.  HOW DO YOU KNOW SHE DIDN'T WRITE ANYBODY ELSE UP

17   FOR STARTING ACTIVITIES UP LATE?

18        A.  NO ONE EVER COMPLAINED ABOUT HER WRITING THEM UP.

19        Q.  NO ONE EVER TOLD YOU THEY HAD BEEN WRITTEN UP BY

20   CHRISTINE FOR STARTING AN ACTIVITY LATE?

21        A.  CHRISTINE WAS IN A SHOUTING MATCH WITH ANOTHER

22   CO-WORKER, THIS CO-WORKER WAS I THINK -- FONG WAS CHINESE.

23   YOU COULD HEAR THEM ALL OUT IN THE HALLWAY YELLING AND

24   CUSSING AT EACH OTHER.

25          I HAD A MEETING WITH CHRISTINE AFTER SHE

1  THREATENED ME THAT HER DOG WOULD EAT ME UP.  HE WAS

2  SITTING IN THE OFFICE AND I STATED TO HER "CHRISTINE,

3  COULD WE PLEASE NOT MEET WITH THE DOG IN THE OFFICE?  I'M

4  AFRAID OF HIM AFTER YOU DONE THREATEN ME THAT HE WOULD EAT

5  ME UP.  I HAVE URINATED ON MYSELF BECAUSE I'M SCARED OF

6  THE DOG, AND I'M HAVING NIGHTMARES ABOUT THE DOG."

7          SHE SAID, "OKAY," AND MARCHED ME DOWN TO THE

8  FIRST FLOOR TO THE PERSONNEL ANALYST AS IF I HAD

9  THREATENED HER OR YELLED AND SCREAMED AT HER WHEN I ONLY

10  SAID, "COULD YOU REMOVE THE DOG OUT OF THE ROOM OR COULD

11  WE GO IN THE BACK OF THE DEPARTMENT AND MEET IF YOU ARE

12  NOT GOING TO REMOVE THE DOG."

13          I HAD NO UNION REPRESENTATION.  THEN, I REFUSED

14  TO SIT IN A MEETING WITH CHRISTINE AND THE PERSONNEL

15  ANALYST WITHOUT UNION REPRESENTATION.  FONG WASN'T MARCHED

16  DOWN TO THE FIRST FLOOR FOR YELLING AND SCREAMING, AND I

17  MEAN THEY WAS YELLING AND SCREAMING AND CUSSING AT EACH

18  OTHER.

19          CHIOMI, ANOTHER CO-WORKER WHO IS, I THINK,

20  JAPANESE, WAS IN A SHOUTING MATCH OPEN IN THE DEPARTMENT

21  AT A COMPUTER.  CHRISTINE DIDN'T WRITE CHIOMI UP OR MARCH

22  HER DOWN TO THE FIRST FLOOR WITH THE PERSONNEL ANALYST.

23      Q.  HOW DO YOU KNOW THAT MS. HANSON DIDN'T WRITE UP

24  OR OTHERWISE DISCIPLINE MR. FONG BECAUSE OF THE YELLING

25  MATCH?

1      A.   MS. FONG.

2      Q.   MS. FONG?

3      A.   FONG TOLD ME SHE DIDN'T.

4      Q.   HOW DO YOU KNOW THAT MS. HANSON DIDN'T DISCIPLINE

5   MS. CHIOMI ABOUT THIS YELLING MATCH THAT YOU DESCRIBED?

6      A.   CHIOMI NEVER SAID SHE WAS DISCIPLINED FOR THE

7   SHOUTING MATCH THEY HAD, AND SHE WOULD HAVE TOLD ME ABOUT

8   IT.

9      Q.   NOW, YOU STATED THAT MS. HANSON DID ALL THESE

10   THINGS TO YOU BUT DIDN'T DO THESE THINGS TO WHITE

11   CO-WORKERS.

12          OTHER THAN THAT, WHAT OTHER FACTS ARE THERE THAT

13   LEAD YOU TO BELIEVE THAT MS. HANSON'S CONDUCT WAS

14   MOTIVATED BY YOUR RACE?

15      A.   BECAUSE OF THE RETALIATION AND BECAUSE I'M BLACK.

16          MR. ROLNICK:  LET'S TAKE A BREAK FOR LUNCH HERE.

17          OFF THE RECORD.

18                          (WHEREUPON, A BREAK WAS TAKEN.)

19          MR. ROLNICK:  MS. ABRAM, WE ARE BACK ON THE

20   RECORD.  YOU UNDERSTAND YOU ARE STILL UNDER OATH.

21          THE WITNESS:  YES.

22   BY MR. ROLNICK:

23      Q.   WERE YOU AWARE THAT THE CITY HAD POLICIES AND

24   PROCEDURES PROHIBITING RACE DISCRIMINATION AND HARASSMENT?

25      A.   YES.

1      Q.   YOU WERE AWARE THAT THERE WAS A PROCEDURE BY

2    WHICH YOU COULD FORMALLY LODGE A COMPLAINT OF HARASSMENT

3    AND DISCRIMINATION AGAINST A CO-WORKER?

4      A.   YES.

5      Q.   WHAT DID YOU UNDERSTAND THAT PROCESS TO BE?

6      A.   GOING TO EOC OR GOING TO EAP OR EEAP -- I THINK

7    IT'S EE -- EEAP OR FILING WITH THE UNION.

8      Q.   ARE YOU REFERRING TO THE EEOC, THE EQUAL

9    EMPLOYMENT OPPORTUNITY COMMISSION?

10     A.   YES, ONE OF THE PLACES AND THEN EMPLOYMENT

11   ASSISTANCE.

12     Q.   WERE YOU AWARE THAT YOU COULD GO DOWN TO THE

13   DEPARTMENT OF HUMAN RESOURCES AND FILL OUT A COMPLAINT?

14     A.   YES.

15     Q.   WERE YOU AWARE THAT YOU COULD DO THAT WITH THE

16   PERSONNEL ANALYST THAT HAPPENED TO BE WORKING AT LAGUNA

17   HONDA?

18     A.   YES.

19     Q.   YOU MENTIONED THIS MORNING THAT YOU HAD

20   COMPLAINED TO MR. FRAZIER ABOUT HIS CONDUCT.

21     A.   YES.

22     Q.   ON HOW MANY OCCASIONS DID YOU COMPLAINED TO

23   MR. FRAZIER ABOUT HIS -- STRIKE THAT.

24          WHAT I'M INTERESTED IN KNOWING IS ABOUT

25   COMPLAINTS YOU MADE REGARDING RACIAL DISCRIMINATION OR

1    HARASSMENT VERSUS SOME OTHER KIND OF WORK-RELATED

2    COMPLAINT.

3          DID YOU EVER COMPLAIN TO MR. FRAZIER ABOUT HIS

4    CONDUCT BEING RACIAL DISCRIMINATION OR HARASSMENT?

5          A.  YES.

6          Q.  DO YOU RECALL WHEN THE FIRST TIME YOU DID THAT

7    WAS?

8          A.  I THINK IT WAS IN 2002, THE LATTER PART OF 2000

9    OR THE BEGINNING OF 2003 -- I MEAN, 2001.

10          Q.  LATE 2001 OR EARLY 2002?

11          A.  LATE 2002/EARLY 2001.

12          Q.  OR EARLY 2003.

13          ARE YOU TALKING ABOUT TWO DIFFERENT COMPLAINTS?

14          A.  NO, I'M TALKING ABOUT DIFFERENT COMPLAINTS.

15          Q.  IS IT YOUR RECOLLECTION THAT YOU COMPLAINED TO

16    MR. FRAZIER ON TWO OCCASIONS THAT YOU CONSIDERED HIS

17    CONDUCT TO BE RACIAL DISCRIMINATION OR HARASSMENT?

18          A.  YES.

19          Q.  THE FIRST TIME WOULD HAVE BEEN EARLY 2001?

20          A.  LATE 2000 AND EARLY 2001.

21          Q.  DO YOU RECALL WHAT PROMPTED YOUR COMPLAINT IN

22    LATE 2000?

23          A.  I HAD CAME FROM A RESIDENT CALLING ME A BLACK

24    BITCH AND SPITTING IN MY FACE DOWN TO THE DEPARTMENT, AND

25    I WAS REALLY FLUSTRATED (SIC) BECAUSE THIS HAPPENED TO ME,

1    AND I NEEDED TO GO TO MY CUBICLE AND COOL OUT AND GO BACK

2    UP TO THE UNIT.  I RAN INTO MR. FRAZIER, AND HE ACCUSED ME

3    OF GIVING HIM A BAD LOOK, THAT I WAS LOOKING AT HIM IN A

4    HOSTILE MANNER.  I TOLD HIM THAT I WANTED TO MEET WITH HIM

5    BECAUSE -- I EXPLAINED TO HIM THAT A PATIENT HAD JUST SPIT

6    IN MY FACE AND CALLED ME A BLACK BITCH, AND I WASN'T -- IF

7    I WAS LOOKING AT HIM IN A HOSTILE MANNER, IT WASN'T

8    BECAUSE I HAD ANYTHING AGAINST HIM.

9         I ALSO MET WITH MR. FRAZIER AND I FELT LIKE HE

10   WAS HARASSING ME AND DISCRIMINATING AGAINST ME WHEN I HAD

11   MET WITH HIM REGARDING A BUS TRIP, A FISHING BUS TRIP,

12   THAT HE HAD PROMISED TO -- THAT HE WOULD SEE IF HE COULD

13   GET THE FISHING POLES FOR THE RESIDENTS TO GO ON A FISHING

14   TRIP, AND WE HAD A MEETING AND HE SAID HE COULDN'T GET THE

15   POLES.  I HAD ALREADY WENT TO THE AREA WHERE WE WERE GOING

16   TO FISH TO MAKE SURE THAT THE BUS WOULD FIT IN THE AREA

17   AND THAT IT WAS SAFE FOR MY RESIDENTS.

18        I MET WITH THE OWNER OF THE PLACE, GOT THE

19   RESIDENTS ALL -- I TOOK 15 RESIDENTS -- ALL FISHING POLES.

20   I MET WITH BILL AND ASKED HIM WHY DID HE TELL ME THAT HE

21   WAS GOING TO BE ABLE TO GET THE FISHING POLES AND HE

22   DIDN'T.  I HAD RESIDENTS, LIKE 15 RESIDENTS, THAT WAS

23   LOOKING FORWARD TO GOING.  FROM THAT, HE CALLED A MEETING

24   WITH ANOTHER SUPERVISOR AND HIMSELF AND MYSELF STATING

25   THAT THEY DIDN'T HAVE THE FUNDS FOR FISHING POLES.  THEN

1      A.  SHE SUPPORTED ME AND WOULD TELL ME THAT I NEEDED

2   COUNSELING TO HELP ME WITH THE STRESS AND THAT I SHOULD

3   SEE A PSYCHIATRIST TO GET HELP.

4      Q.  DID SHE SUGGEST TO YOU THAT YOU FILE A COMPLAINT

5   OF DISCRIMINATION OR HARASSMENT AGAINST MR. FRAZIER?

6      A.  SHE TOLD ME I SHOULD FILE AN EEOC COMPLAINT.

7      Q.  DID YOU DO THAT?

8      A.  YES.

9      Q.  DID SHE TELL YOU YOU OUGHT TO FILE A COMPLAINT

10  WITH THE CITY?

11     A.  SHE MIGHT HAVE SAID TO FILE WITH THE CITY.

12     Q.  DID YOU DO THAT?

13     A.  I DID IT WITH EEOC.

14     Q.  SO DID YOU EVER FILE A COMPLAINT WITH THE

15  DEPARTMENT OF HUMAN RESOURCES AGAINST MR. FRAZIER?

16     A.  NO.

17     Q.  DID YOU EVER FILE A COMPLAINT OF DISCRIMINATION

18  OR HARASSMENT AGAINST MS. HANSON WITH THE CITY?

19     A.  NO.

20     Q.  WHO IS THE DIETICIAN YOU SPOKE WITH ABOUT

21  MR. FRAZIER'S DISCRIMINATION AND HARASSMENT?

22     A.  PATSY.

23     Q.  DO YOU KNOW HER LAST NAME?

24     A.  NO, I DON'T RECALL HER LAST NAME.

25     Q.  WAS PATSY THE DIETICIAN FOR YOUR CLUSTER AT THE

1  TIME?

2       A.  YES.

3       Q.  WHAT DID SHE SAY TO YOU?

4       A.  SHE TOLD ME TO PRAY.

5       Q.  DID SHE TELL YOU ANYTHING ELSE?

6       A.  THAT I SHOULD SET UP A MEETING WITH BILL AND

7  CHRISTINE AND JUST LET THEM KNOW HOW I FELT.

8            MR. ROLNICK:  LET ME MARK THIS AS THE NEXT

9  EXHIBIT IN ORDER.

10                      (WHEREUPON, DEFENDANTS' EXHIBIT 2

11                       WAS MARKED FOR IDENTIFICATION.)

12            MR. ROLNICK:  TAKE A MOMENT TO REVIEW THAT.

13            THE WITNESS:  (WITNESS COMPLIES.)

14  BY MR. ROLNICK:

15       Q.  DO YOU RECOGNIZE THIS LETTER?

16       A.  YES.

17       Q.  AND THIS LETTER IS DATED OCTOBER 8, 2003, AND

18  IT'S ADDRESSED TO YOU AND IT'S YOUR HOME ADDRESS AT THE

19  TIME; IS THAT CORRECT?

20       A.  YES.

21       Q.  A LETTER FROM MARTIN LUM?

22       A.  YES.

23       Q.  YOU RECEIVED THIS LETTER AROUND THE DATE OF THE

24  LETTER, OCTOBER 2003?

25       A.  YES.

1    Q.  WERE YOU FAMILIAR WITH MR. LUM?

2    A.  I NEVER MET HIM, NO.

3    Q.  WAS HIS NAME FAMILIAR TO YOU?

4    A.  NO.

5    Q.  YOU RECEIVED THIS LETTER.

6        DID YOU RESPOND TO THIS LETTER?

7    A.  I THINK I DID RESPOND TO THIS LETTER.

8    Q.  HOW DID YOU RESPOND?

9    A.  I'M NOT SURE HOW I RESPONDED TO THIS LETTER.

10   Q.  IF YOU LOOK IN THE SECOND PARAGRAPH -- LET'S

11   START WITH THE FIRST PARAGRAPH.

12       IT SAYS -- MR. LUM WRITES, "ACCORDING TO A

13   MEMORANDUM DATED APRIL 14, 2003, FROM YOUR MANAGER TO YOU,

14   YOUR MANAGER INDICATED THAT YOU WERE ALLEGING ACCUSATIONS

15   OF DISCRIMINATION."

16       DO YOU RECALL THE MEMORANDUM THAT HE IS REFERRING

17   TO THERE?

18   A.  YES.

19   Q.  WHO WAS THE MANAGER THAT HE IS REFERRING TO?

20   A.  I THINK BILL FRAZIER.

21   Q.  THEN HE WRITES IN THE SECOND PARAGRAPH HE SAYS,

22   "IF YOU WISH TO PROCEED WITH YOUR COMPLAINT OF EMPLOYMENT

23   DISCRIMINATION AND HAVE ADDITIONAL INFORMATION TO

24   ESTABLISH A BASIS FOR YOUR COMPLAINT, PLEASE PROVIDE IT TO

25   ME DIRECTLY AT THE ADDRESS BELOW."

1           DID YOU DO THAT?

2       A.  I CAN'T RECALL BECAUSE AT THAT TIME I HAD

3   CONSULTED WITH AN ATTORNEY.

4       Q.  DO YOU RECALL AT ANY TIME PROVIDING MR. LUM WITH

5   INFORMATION RELATED TO YOUR COMPLAINTS OF EMPLOYMENT

6   DISCRIMINATION?

7       A.  I HAD GOT AN ATTORNEY, SO I FELT LIKE WITH

8   MR. LUM BEING A PART OF THE CITY, THAT HE WOULDN'T HELP ME

9   LIKE THE UNION, SO I HAD GOT AN ATTORNEY, AND I CAN'T

10  RECALL WHETHER I RESPONDED TO THIS LETTER OR NOT.

11      Q.  YOU DON'T RECALL ONE WAY OR THE OTHER WHETHER YOU

12  EVER PROVIDED MR. LUM WITH INFORMATION ABOUT YOUR

13  COMPLAINT OF EMPLOYMENT DISCRIMINATION?

14      A.  I KIND OF THINK I DID, BUT THEN ON THE OTHER

15  HAND, I HAD HIRED AN ATTORNEY, SO I'M NOT SURE.  I CAN'T

16  RECALL.

17      Q.  DO YOU RECALL EVER PROVIDING MR. LUM WITH

18  INFORMATION ABOUT YOUR COMPLAINTS OF EMPLOYMENT-RELATED

19  HARASSMENT?

20      A.  THE SAME ANSWER.  I DON'T RECALL.  I MIGHT HAVE,

21  BUT SINCE I HAD GOTTEN AN ATTORNEY, I CAN'T RECALL WHETHER

22  I DID OR NOT.

23      Q.  DO YOU RECALL EVER PROVIDING INFORMATION ABOUT

24  YOUR COMPLAINTS OF EMPLOYMENT DISCRIMINATION TO ANYONE

25  WITH THE SAN FRANCISCO DEPARTMENT OF PUBLIC HEALTH, OFFICE

1    OF EQUAL EMPLOYMENT OPPORTUNITY, ANYONE OTHER THAN

2    MR. LUM?

3        A.  I CAN'T RECALL.

4        Q.  DO YOU RECALL EVER PROVIDING ANY INFORMATION

5    ABOUT YOUR COMPLAINTS OF EMPLOYMENT-RELATED HARASSMENT TO

6    ANYONE IN THE SAN FRANCISCO DEPARTMENT OF PUBLIC HEALTH,

7    OF THE OFFICE OF EQUAL EMPLOYMENT OPPORTUNITY?

8        A.  I CAN'T RECALL.

9        Q.  DID YOU EVER CALL MR. LUM TO TALK ABOUT YOUR

10    COMPLAINTS?

11        A.  I DON'T RECALL.

12        Q.  YOU DON'T RECALL DOING THAT?

13        A.  NO, I DON'T.

14        Q.  WE TALKED A LITTLE BIT EARLIER ABOUT YOUR

15    COMPLAINTS REGARDING HARASSMENT AND DISCRIMINATION THAT

16    YOU MADE TO MR. FRAZIER SHORTLY BEFORE YOUR COLLAPSE.

17        DO YOU RECALL IF YOU MADE ANY FURTHER COMPLAINTS

18    TO HIM ABOUT WHAT YOU BELIEVED WAS HIS DISCRIMINATORY OR

19    HARASSING CONDUCT TOWARD YOU?

20        A.  UPON MY RETURN TO WORK AFTER COLLAPSING FROM THE

21    STRESS OF BEING FORCED TO USE THE COMPUTER, I MET WITH

22    MR. FRAZIER AND BEING AFRAID THAT I WAS GOING TO GET

23    KICKED OUT OF HIS OFFICE AGAIN BECAUSE HE WILL TELL YOU TO

24    GET OUT OF HIS OFFICE IF YOU -- I HAD A FEAR OF BEING

25    KICKED OUT OF HIS OFFICE, BUT WE MET AND I TOLD HIM THAT I

1    FELT LIKE I WAS BEING HARASSED BY HIM, BEING WRITTEN UP

2    FOR LEAVING THE DEPARTMENT TWO MINUTES EARLY, AND I WAS

3    GOING BY THE CLOCK IN THE DEPARTMENT ON THE WALL.  I

4    DIDN'T FEEL LIKE I SHOULD BE WRITTEN UP FOR IT, AND MY

5    OTHER WHITE CO-WORKERS AND SPANISH CO-WORKERS WOULD LEAVE,

6    AND THEY DIDN'T EVER GET WRITTEN UP OR YELLED AT FOR

7    LEAVING A MINUTE OR TWO EARLY.

8         PEOPLE WOULD GET UP -- CLIMB UP ON A CHAIR AND

9    CHANGE THE CLOCK WE HAD IN OUR DEPARTMENT, AND I WAS

10   LEAVING BY THE CLOCK ON THE WALL, AND I TOLD HIM THAT I

11   FELT LIKE HE WAS TREATING ME DIFFERENT THAN MY OTHER

12   CO-WORKERS BY WRITING ME UP FOR THAT, FOR TWO MINUTES,

13   LEAVING TWO MINUTES EARLY.

14        Q.  WHAT WAS HIS RESPONSE TO YOUR COMPLAINT?  DID YOU

15   TELL HIM THAT YOU THOUGHT THIS WAS RACIALLY MOTIVATED?

16        A.  YES.

17        Q.  WHAT DID HE SAY IN RESPONSE TO YOUR COMPLAINT

18   THAT IT WAS RACIALLY MOTIVATED?

19        A.  THEN AGAIN I WAS KICKED OUT OF HIS OFFICE.

20        Q.  DID HE SUGGEST TO YOU THAT IF YOU HAD A COMPLAINT

21   TO MAKE ABOUT RACIAL DISCRIMINATION OR HARASSMENT YOU

22   SHOULD FILE A COMPLAINT WITH THE HOSPITAL'S EEO?

23        A.  HE TOLD ME TO FILE IT WITH THE UNION IF I HAD ANY

24   COMPLAINTS ABOUT HIM AND TO GET OUT OF HIS OFFICE.

25        Q.  WHEN WAS THE NEXT TIME YOU TOLD MR. FRAZIER THAT

1  YOU BELIEVED HE WAS DISCRIMINATING AGAINST YOU OR

2  HARASSING YOU BECAUSE OF YOUR RACE?

3      A.  THERE WAS ONE TIME WHEN I WENT TO HIM TO ASK HIM

4  TO PLEASE TELL CHRISTINE TO LIGHTEN UP ON ME BECAUSE I

5  COULDN'T TAKE IT, AND IF HE WOULD CHANGE HER FROM BEING MY

6  SUPERVISOR.  I TOLD HIM THAT I FELT LIKE IF IT WAS SOMEONE

7  THAT HE LIKED AND THAT WAS WHITE THAT HE WOULD CHANGE

8  THEIR SUPERVISOR IF THEY WAS HAVING A PROBLEM WITH THEM.

9      AGAIN, I WAS TOLD IF I DIDN'T LIKE THE WAY HE WAS

10  RUNNING THE DEPARTMENT TO TAKE IT TO THE UNION OR FILE A

11  COMPLAINT ON HIM.

12      Q.  AM I CORRECT THAT DURING YOUR APPROXIMATELY LAST

13  TEN MONTHS TO A YEAR WITH THE CITY THAT BARBARA TAORMINA

14  WAS YOUR SUPERVISOR; IS THAT RIGHT?

15      A.  YES.

16      Q.  WERE YOU AWARE OF OTHER CIRCUMSTANCES IN WHICH

17  MR. FRAZIER HAD CHANGED AN EMPLOYEE'S SUPERVISOR IN

18  RESPONSE TO A COMPLAINT BY THE EMPLOYEE?

19      A.  YES, I HAD ONE CO-WORKER, KATIE RICHARDSON, WHO

20  WAS WHITE, WENT TO BILL TO GET HER WARD CHANGED, AND IT

21  WAS CHANGED.

22      Q.  DO YOU REMEMBER WHEN THAT HAPPENED?

23      A.  NO, I CAN'T RECALL WHEN IT HAPPENED.

24      Q.  DO YOU KNOW THE REASON WHY THE CHANGE WAS

25  REQUESTED?

1      A.  BECAUSE SHE COULDN'T GET ALONG WITH THE HEAD

2  NURSE AND THE CNA THAT SHE WORKED WITH.

3      Q.  WHO WAS THAT HEAD NURSE?

4      A.  I REALLY DON'T KNOW THE HEAD NURSE'S NAME.

5      Q.  DO YOU KNOW WHO THE CNA WAS?

6      A.  NO, I DON'T.

7      Q.  AND WAS MS. RICHARDSON AN ACTIVITY THERAPIST?

8      A.  YES.

9      Q.  HOW DO YOU KNOW SHE HAD REQUESTED THIS CHANGE?

10     A.  BECAUSE SHE WOULD COMPLAIN ABOUT WORKING ON THAT

11 UNIT.

12     Q.  WHICH UNIT WAS SHE CHANGED FROM?

13     A.  I CAN'T RECALL.

14     Q.  DO YOU KNOW WHICH UNIT SHE WAS CHANGED TO?

15     A.  IT WAS EITHER F -- I DON'T WANT TO LIE ABOUT THE

16 WARD BECAUSE THIS HAS BEEN QUITE A FEW YEARS BACK, AND I'M

17 REALLY NOT SURE OF WHAT WARD THAT SHE WAS ON, BUT I KNOW

18 FOR A FACT THAT SHE WAS GIVEN ANOTHER UNIT AND THAT SHE

19 DID COMPLAIN BECAUSE SHE WOULD COME INTO THE DEPARTMENT

20 CRYING SOMETIMES, SAYING THAT SHE COULDN'T PUT UP WITH THE

21 CNA AND THE HEAD NURSE ON THAT WARD.

22     Q.  OKAY.

23     A.  I WANT TO SAY IT WAS THE AIDS WARD OR THE REHAB

24 WARD, BUT I'M REALLY NOT SURE.  I'M THINKING IT WAS ONE OR

25 THE OTHER.

1    DISCRIMINATING AGAINST YOU OR HARASSING YOU OTHER THAN THE

2    PEOPLE WE HAVE JUST IDENTIFIED?

3         A.  A LOT OF MY FRIENDS.

4         Q.  DID YOU COMPLAIN TO ANYBODY ELSE WHO WORKED FOR

5    THE CITY AND COUNTY OF SAN FRANCISCO?

6         A.  OTHER THAN THE PEOPLE THAT I HAVE ALREADY GIVEN

7    YOU?

8         Q.  CORRECT.

9         A.  NOT THAT I CAN RECALL.

10        Q.  WHAT IS YOUR FIANCE'S NAME?

11        A.  DARRYL ROBINSON.

12        Q.  DOES HE WORK FOR THE CITY?

13        A.  YES.

14        Q.  DOES HE WORK AT LAGUNA HONDA?

15        A.  NO.

16        Q.  DO YOU KNOW WHERE HE WORKS?

17        A.  PUBLIC WORKS.

18        Q.  WHAT CO-WORKERS DID YOU COMPLAIN TO ABOUT

19    MS. HANSON?

20        A.  TRACY GRIFFIN.

21        Q.  OKAY.

22        A.  SHARON GROVER, WANDIA HOKE.  I THINK I SAID HER

23   LAST NAME CORRECTLY, NORMAN BURNS -- VICTORIA -- I CAN'T

24   REMEMBER VICTORIA'S LAST NAME, SUSAN LINDSEY, ANGELA.

25        Q.  DO YOU HAVE A LAST NAME FOR ANGELA?

1        A.  I CAN'T THINK OF HER LAST NAME.

2        Q.  ANYBODY ELSE?

3        A.  NOT THAT I CAN RECALL AT THIS TIME.

4            MR. ROLNICK:  WHY DON'T WE TAKE A BREAK HERE.

5                         (WHEREUPON, A BREAK WAS TAKEN.)

6            MR. ROLNICK:  BACK ON THE RECORD.

7   BY MR. ROLNICK:

8        Q.  ON HOW MANY OCCASIONS DID MS. HANSON DISCIPLINE

9   YOU?

10       A.  I WOULD SAY AT LEAST TEN TIMES OR MAYBE MORE.

11       Q.  IS IT YOUR BELIEF THAT ALL OF THOSE OCCASIONS HER

12  MOTIVATION TO DO SO WAS YOUR RACE?

13       A.  MY RACE AND TO GET ME TO RESIGN OR FIRED OR FOR

14  ME TO QUIT.

15       Q.  CAN YOU TELL ME THE OCCASIONS THAT SHE

16  DISCIPLINED YOU?

17       A.  MISAPPROPRIATING FUNDS, INAPPROPRIATE BEHAVIOR,

18  SPEAKING AT AN IN-SERVICE ON HARASSMENT IN THE WORKPLACE.

19           SHE STATED THAT I MADE PEOPLE FEEL UNCOMFORTABLE,

20  AND WE WERE TOLD AT THE IN-SERVICE TO SAY WHAT WE FELT

21  ABOUT BEING DISCRIMINATED AND HARASSED IN THE WORKPLACE.

22       Q.  OKAY.

23       A.  THE CHEVY'S BUS TRIP, I OVERSPENT $1.90.  I WAS

24  YELLED AT WHILE I WAS AT THE COMPUTER, TELLING PEOPLE THAT

25  I WAS A PROBLEM, MAINLY MY NURSE MANAGER.

1    Q.  WHO WAS THAT?

2    A.  I THINK IT WAS GOLDY, AND I CAN'T THINK OF HER

3  LAST NAME, TELLING MY CO-WORKER, TRACY GRIFFIN, THAT I WAS

4  A PROBLEM.

5    Q.  ANY OTHER OCCASIONS ON WHICH MS. HANSON

6  DISCIPLINED YOU BECAUSE OF YOUR RACE?

7    A.  DID I SAY MISAPPROPRIATING FUNDS?

8    Q.  YES, YOU DID.

9    A.  LEAVING MY WRITE-UPS OUT IN THE OPEN WHERE

10  EVERYONE COULD READ THEM.

11    Q.  OKAY.

12    A.  LETTING HER DOG OFF THE LEASH TO HARASS ME.

13    Q.  A LOT OF THESE THINGS SOUND LIKE WHAT WE TALKED

14  ABOUT BEFORE, ITEMS THAT YOU IDENTIFIED AS CONDUCT THAT

15  WAS DISCRIMINATORY OR HARASSING.

16       WHAT I'M ASKING ABOUT IS WHETHER MS. HANSON

17  DISCIPLINED YOU AND THOSE OCCASIONS SHE DISCIPLINED AND

18  YOU BELIEVED THAT THE DISCIPLINE WAS BECAUSE OF YOUR RACE.

19       WHAT I MEAN BY "DISCIPLINE," I MEAN SUSPENDING

20  YOU, PUTTING A WARNING IN YOUR PERSONNEL FILE OR GIVING

21  YOU A VERBAL WARNING IN HER OFFICE, THOSE SORTS OF

22  ACTIVITIES.

23       NOW, I KNOW WITH RESPECT TO THE MISAPPROPRIATION

24  OF FUNDS AND THE INAPPROPRIATE BEHAVIOR, THERE WERE

25  ACTUALLY DISCIPLINARY PROCESSES IN PLACE WITH RESPECT TO

1  THOSE OTHER THINGS.

2       WHAT I'M INTERESTED IN NOW IS FOR YOU TO IDENTIFY

3  THOSE OCCASIONS -- ONE OF YOUR COMPLAINTS, ONE OF THE

4  THINGS YOU SAY IN THE COMPLAINT, IS THAT YOU WERE

5  DISCRIMINATED AGAINST BECAUSE THERE WERE UNWARRANTED

6  DISCIPLINARY ACTIONS.

7       I WANT TO KNOW WHAT THOSE UNWARRANTED

8  DISCIPLINARY ACTIONS WERE BY MS. HANSON.

9       A.  A LOT OF THINGS THAT I WAS DISCIPLINED BY

10  CHRISTINE FOR I TRIED TO -- I JUST TRIED TO SUPPRESS IT

11  BECAUSE IT MADE ME SO ANGRY.  I'M SORRY IF I GOT OFF BASE.

12       Q.  THAT IS ALL RIGHT.

13       A.  THERE WERE SO MANY THINGS SHE DISCIPLINED ME FOR.

14  I WAS WRITTEN UP FOR MY CUBICLE BEING CLUTTERED.  I WAS

15  DISCIPLINED FOR SPEAKING, TALKING WITH MY CO-WORKER THAT I

16  WORK WITH ON TUESDAY NIGHT.  I WAS TOLD WE SHOULDN'T SIT

17  TOGETHER AND WE SHOULDN'T TALK DURING ACTIVITY TIME.  I

18  WAS DISCIPLINED VERBALLY BY CHRISTINE HANSON FOR ARRIVING

19  LATE FROM A BUS TRIP.  I WAS DISCIPLINED FOR SPEAKING AT A

20  WORKSHOP ON HARASSMENT AND DISCRIMINATION IN THE

21  WORKPLACE.

22       Q.  THAT IS THE ONE WE TALKED ABOUT EARLIER; RIGHT?

23       A.  YES, I'M SORRY.

24       Q.  LET ME REMIND YOU WHAT WE HAVE.  THERE IS THE

25  MISAPPROPRIATION OF FUNDS ISSUE, AND THERE WAS A

1    DISCIPLINARY SUSPENSION RELATED TO THAT ONE?

2         A.  YES.

3         Q.  THERE WAS THE INAPPROPRIATE BEHAVIOR OCCURRENCE,

4    AND THERE WAS ALSO A DISCIPLINARY SUSPENSION RELATED TO

5    THAT AS WELL.

6         A.  INATTENTION TO DUTY.

7         Q.  THERE WAS A DISCIPLINARY SUSPENSION ISSUE RELATED

8    TO THAT?

9         A.  YES.

10        Q.  YOU GRIEVED THOSE FIRST TWO ITEMS; CORRECT?

11        A.  YES.

12        Q.  THOSE GRIEVANCES WERE ULTIMATELY WITHDRAWN; IS

13   THAT CORRECT?

14        A.  YES.

15        Q.  OKAY.

16        A.  THEY WERE NEVER GRIEVANCED TO THE THIRD OR FOURTH

17   LEVEL.

18        Q.  THERE IS THE ONE WE JUST MENTIONED, NUMBER THREE,

19   THE SPEAKING OUT IN THE IN-SERVICE PROGRAM ABOUT

20   HARASSMENT AND DISCRIMINATION IN THE WORKPLACE; RIGHT?

21        A.  YES.

22        Q.  YOU MENTIONED THAT THERE WAS DISCIPLINE RELATED

23   TO A CHEVY'S BUS TRIP AND OVERSPENDING YOUR BUDGET BY

24   $1.90?

25        A.  YES.

1    Q.  YOU SAY YOU WERE WRITTEN UP FOR A CLUTTERED

2  CUBICLE?

3    A.  YES.

4    Q.  YOU SAY THAT YOU WERE VERBALLY REPRIMANDED AND

5  TOLD NOT TO SIT WITH OR TALK WITH A CO-WORKER WHO YOU

6  WORKED WITH ON TUESDAY NIGHT DURING ACTIVITY TIME?

7    A.  YES.

8    Q.  YOU SAID THAT YOU WERE ALSO VERBALLY DISCIPLINED

9  RELATED TO ARRIVING LATE FROM A BUS TRIP.  I ASSUME YOU

10  RETURNED FROM YOUR TRIP LATE?

11    A.  YES.

12    Q.  AND YOU SAY MS. HANSON VERBALLY REPRIMANDED YOU

13  ABOUT THAT AS WELL?

14    A.  YES.

15    Q.  ARE THERE ANY OTHER EXAMPLES OF DISCIPLINE BY

16  MS. HANSEN THAT YOU CONSIDERED TO HAVE BEEN MOTIVATED BY

17  YOUR RACE?

18    A.  SHE WROTE ME UP FOR BAD BEHAVIOR, DISCIPLINED ME

19  FOR HAVING BAD BEHAVIOR AND BEING DISHONEST.

20    Q.  IS THAT DIFFERENT FROM THE MISAPPROPRIATION OF

21  FUNDS; IS THAT A DIFFERENT OCCASION?

22    A.  YES.

23    Q.  DO YOU RECALL ANY OTHER DISCIPLINARY ACTIONS BY

24  MS. HANSEN THAT YOU CONSIDERED TO BE MOTIVATED BY YOUR

25  RACE?

1      A.  I KNOW THERE IS MORE, BUT I CAN'T RECALL.

2      Q.  NOW, THE LAST ITEM YOU MENTIONED ABOUT BEING

3  DISCIPLINED FOR DISHONESTY, WHAT DID SHE ACCUSE YOU OF

4  BEING DISHONEST ABOUT.

5      A.  ABOUT THE GARAGE SALE THAT WAS GIVEN FOR THE

6  RESIDENTS.  I HAD A MEETING WITH MY RESIDENTS, AND THEY

7  WANTED TO GO ON ON THIS TRIP TO CACHE CREEK, AND THEY ALSO

8  WANTED TO DO A PARTY.  THEY WANTED TO ALSO DO A GARAGE

9  SALE.  I BROUGHT THINGS FROM HOME, BAGS OF THINGS FROM

10  HOME, AND I BROUGHT THEM THERE.  WE HAD A GARAGE SALE.

11      I ALSO HAD A GARAGE SALE AT MY HOME IN ORDER TO

12  RAISE MONEY, SELLING THINGS FOR 10 CENTS, 15 CENTS, 25

13  CENTS FOR RESIDENTS.  I ALSO HAD MY RESIDENTS FROM MY WARD

14  TO COME AND HELP SELL THE ITEMS.  I WAS DISCIPLINED AND

15  TOLD THAT I DIDN'T CLEAN MY AREA AND THAT I DIDN'T HAVE

16  ANY RESIDENTS THERE TO HELP AND THAT WAS A PART OF THE

17  ACTIVITY.

18      IN A MEETING IN THE DEPARTMENT, WE WERE ALL

19  SITTING AROUND AND I HAD THIS GARAGE SALE WITH OTHER

20  CO-WORKERS THAT WORKED ON THE THIRD FLOOR -- HAD WARDS ON

21  THE THIRD FLOOR, AND THERE WAS THREE OF US THAT BROUGHT IN

22  THINGS AND HAD TABLES SET UP FOR THE RESIDENTS TO BUY

23  THINGS AND WE MADE $50 AT THE SALE FROM THE HOSPITAL.  I

24  ALSO MADE $50 FROM THE SALE AT MY HOME.  I WAS TALKING TO

25  A CO-WORKER AND I SAID THAT I HAD MADE -- I THINK, FIRST I

1  THINK I SAID I HAD MADE $50, AND I WAS OVERHEARD SAYING

2  THAT I MADE $100.  CHRISTINE SAID THAT I WAS BEING

3  DISHONEST ABOUT THE AMOUNT OF MONEY THAT I HAD MADE.

4      Q.  AND THIS LED TO ONE OF THE DISCIPLINARY

5  SUSPENSIONS?

6      A.  YES.

7      Q.  THAT WAS GRIEVED?

8      A.  NOTHING EVER CAME OF IT.

9      Q.  WAS A GRIEVANCE LODGED WITH RESPECT TO THAT

10  DISCIPLINE?

11      A.  NO, IT WAS NEVER --

12      Q.  THAT DISCIPLINE WAS IN WRITING; IS THAT CORRECT?

13      A.  YES.

14      Q.  YOU SAID THAT YOU WERE WRITTEN UP FOR BAD

15  BEHAVIOR.  WHAT PARTICULAR BEHAVIOR DO YOU RECALL THAT

16  BEING THAT YOU WERE WRITTEN UP FOR?

17      A.  CHRISTINE STATED TO ME THAT MY BODY LANGUAGE WAS

18  NOT APPEALING TO HER.

19      Q.  IS THERE ANY OTHER BAD BEHAVIOR THAT WAS BEHIND

20  THAT DISCIPLINE?

21      A.  I CAN'T RECALL.

22      Q.  THIS DISCIPLINE WAS IN WRITING?

23      A.  YES.

24      Q.  WAS THERE ANY SUSPENSION ASSOCIATED WITH THIS

25  DISCIPLINE?  WAS THERE A PROPOSAL THAT YOU SERVE A

1   SUSPENSION OF A DAY OR TWO OR THREE?

2       A.  AS I CAN RECALL, I WAS GIVEN A WRITTEN WARNING

3   FOR THAT.

4       Q.  OKAY.

5       A.  THE SUSPENSION MAY HAVE BEEN SUGGESTED, ALSO.

6       Q.  THE RETURNING LATE FROM THE BUS TRIP, YOU SAID

7   THERE WAS A VERBAL WARNING?

8       A.  YES.

9       Q.  WHAT EVENT WAS THAT BUS TRIP?  WAS THAT TO CACHE

10  CREEK?

11      A.  YES.

12      Q.  YOU SAID MS. HANSON ALSO GAVE YOU A VERBAL

13  WARNING ABOUT TALKING WITH A CO-WORKER ON TUESDAY NIGHTS?

14      A.  YES.

15      Q.  WHO WAS THAT CO-WORKER?

16      A.  SHARON GROVER.

17      Q.  DID MS. HANSON GIVE YOU A REASON OF WHY YOU

18  SHOULDN'T SIT AND TALK WITH MS. GROVER DURING THE ACTIVITY

19  TIME?

20      A.  NO, SHE DID NOT GIVE US A REASON.  WE EXPLAINED

21  TO HER THAT WE HAD VOLUNTEERS AND THAT WHY WAS SHE

22  TREATING US DIFFERENTLY THAN OTHER NIGHT PROGRAMS.

23          EVERYBODY ON THE NIGHT PROGRAM HAS WORKED

24  TOGETHER, THEY TALK AND PLAN WHAT THEIR NEXT ACTIVITY IS

25  GOING TO BE, YOU PLAN ON IF YOU WANT TO SERVE FOOD, YOU

1   PLAN ON IF YOU WANT TO CHANGE THEIR ACTIVITY.

2       Q.  OKAY.

3       A.  WE FELT WE NEEDED TO SIT DOWN AND TALK AND

4   DISCUSS AND CREATE AND COME UP WITH NEW PROGRAMS.

5       Q.  NOW, THAT WAS A VERBAL WARNING?

6       A.  I KNOW IT WAS VERBAL, BUT I CAN'T RECALL WHETHER

7   SHE WROTE ME UP FOR IT OR NOT.

8       Q.  WE TALKED EARLIER ABOUT USING THE COMPUTER.  WHAT

9   KIND OF TASKS WERE YOU BEING ASKED TO DO ON THE COMPUTER?

10      A.  MY MONTHLY CALENDAR.

11      Q.  ANYTHING ELSE?

12      A.  JUST THE MONTHLY CALENDAR.

13      Q.  THAT WAS THE ONLY TASK ON THE COMPUTER THAT YOU

14  WERE HAVING DIFFICULTY WITH?

15      A.  AND SENDING E-MAILS, RECEIVING E-MAILS.

16      Q.  THAT WAS ANOTHER TASK YOU WERE ASKED TO DO ON THE

17  COMPUTER?

18      A.  YES.

19      Q.  ANY OTHER COMPUTER-RELATED TASKS THAT YOU WERE

20  HAVING DIFFICULTY DOING THAT WAS CAUSING YOU THE PROBLEMS

21  WE WERE DISCUSSING EARLIER?

22      A.  I ALSO HAD TO GO IN THE COMPUTER TO GET THE

23  RESIDENTS -- TO GET THE RESIDENTS -- ALL OF THEIR NAMES

24  AND THEIR BED NUMBERS.

25          WE HAD TO HAVE AN ATTENDANCE BOOK, AND I HAD TO

1    WRITE OUT EVERY RESIDENT'S NAME AND PRINT IT OUT FOR THE

2    ATTENDANCE BOOK.

3        Q.  THIS WAS, LIKE, AN ATTENDANCE SHEET?

4        A.  YES, FOR THE ATTENDANCE BOOK.

5        Q.  ANY OTHER COMPUTER-RELATED ACTIVITIES THAT YOU

6    WERE REQUIRED TO BE PERFORMING?

7        A.  THE CALENDAR WAS ENOUGH, THE MONTHLY CALENDAR WAS

8    ENOUGH.

9        Q.  YOU MENTIONED THERE WAS A CO-WORKER, I BELIEVE,

10   NAMED LYNN --

11       A.  YES.

12       Q.  -- WHO YOU CONTEND WAS NOT USING THE COMPUTER.

13           WAS THERE ANY OTHER ACTIVITY THERAPIST OTHER THAN

14   LYNN WHO WAS NOT USING THE COMPUTER?

15       A.  THERE WAS A LOT OF PEOPLE THAT DIDN'T USE IT.

16       Q.  WHO ELSE?

17       A.  I REALLY CAN'T RECALL, AND THE REASON I KNOW

18   ABOUT LYNN IS BECAUSE I TRIED TO HELP TEACH HER WHAT I

19   KNEW, WHAT PEOPLE HAD HELPED ME WITH, AND SHE WOULD GET

20   FLUSTRATED (SIC) AND SAY SHE WASN'T GOING TO DO IT.

21       Q.  DO YOU KNOW WHETHER LYNN DID HER MONTHLY

22   CALENDARS BY HAND OR ON THE COMPUTER?

23       A.  SHE WAS DOING HER MONTHLY CALENDARS BY HAND.

24       Q.  DO YOU KNOW IF AT ANY POINT IN TIME LYNN BEGAN TO

25   DO HER MONTHLY CALENDARS ON THE COMPUTER?

1      A.  I DON'T KNOW BECAUSE I RETIRED.

2      Q.  DO YOU KNOW WHETHER LYNN WAS USING THE COMPUTER

3  E-MAILS?

4      A.  I DON'T KNOW.

5      Q.  DO YOU KNOW WHETHER LYNN WAS CREATING HER

6  ATTENDANCE SHEETS ON THE COMPUTER OR BY HAND?

7      A.  DURING THE TIME THAT I WAS THERE?

8      Q.  YES.

9      A.  LYNN HAD REFUSED BECAUSE SHE GOT INTO A LITTLE

10 SHOUTING MATCH WITH CHRISTINE AND TOLD HER SHE WASN'T

11 GOING TO USE IT.

12     Q.  BUT DO YOU KNOW IF SHE DID, IN FACT, USE THE

13 COMPUTER?

14     A.  I DON'T KNOW WHETHER SHE USED IT OR NOT.

15     Q.  WERE YOU GIVEN A COMPUTER TERMINAL AT YOUR

16 CUBICLE?

17     A.  NO.

18     Q.  THERE WAS A CERTAIN NUMBER OF COMPUTERS THAT ALL

19 THE ACTIVITY THERAPISTS SHARED?

20     A.  YES.

21     Q.  HOW MANY COMPUTERS WERE THERE?

22     A.  TWO.

23     Q.  DID THE ACTIVITY THERAPISTS WORK IN SHIFTS?

24     A.  YES.

25     Q.  HOW MANY SHIFTS WERE THERE EACH DAY?

1  STATE OF CALIFORNIA          )

2                               )  S.S.

3  COUNTY OF SONOMA             )

4

5      I, A CERTIFIED SHORTHAND REPORTER OF THE STATE OF

6  CALIFORNIA, HEREBY CERTIFY THAT THE WITNESS IN THE

7  FOREGOING DEPOSITION WAS BY ME DULY SWORN TO TESTIFY THE

8  TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH IN THE

9  ENTITLED CAUSE.

10      THAT SAID DEPOSITION WAS TAKEN AT THE TIME AND

11  PLACE THEREIN STATED; THAT THE TESTIMONY OF THE SAID

12  WITNESS WAS REPORTED BY ME,

13

14              **GINA PETERSEN,**

15  A CERTIFIED SHORTHAND REPORTER, THAT THE FOREGOING IS A

16  FULL, TRUE AND COMPLETE RECORD OF SAID TESTIMONY; AND THAT

17  THE WITNESS WAS GIVEN AN OPPORTUNITY TO READ AND CORRECT

18  SAID DEPOSITION AND TO SUBSCRIBE THE SAME.

19      SHOULD THE SIGNATURE OF THE WITNESS NOT BE

20  AFFIXED TO THE DEPOSITION, THE WITNESS SHALL NOT HAVE

21  AVAILED HIMSELF OF THE OPPORTUNITY TO SIGN OR THE

22  SIGNATURE HAS BEEN WAIVED.

23      I FURTHER CERTIFY THAT I AM NOT OF COUNSEL OR

24  ATTORNEY FOR EITHER OR ANY OF THE PARTIES IN THE FOREGOING

25  DEPOSITION AND CAPTION NAMED, OR IN ANY WAY INTERESTED IN

1  THE OUTCOME OF THE CAUSE NAMED IN SAID ACTION.

2      IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND AND

3  AFFIXED MY SEAL OF OFFICE THIS 29th DAY OF February

4  2008.