# EXHIBIT B

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

SUSIE ABRAM,

        PLAINTIFF,

   VS.

                      CASE NO. C07-3006 EDL

CITY AND COUNTY OF SAN FRANCISCO,
DEPARTMENT OF PUBLIC HEALTH;
WILLIAM FRAZIER, DIRECTOR
OF THERAPEUTIC ACTIVITIES,
LAGUNA HONDA HOSPITAL,

        DEFENDANTS.



_____/

DEPOSITION OF

SUSIE ABRAM

VOLUME II

WEDNESDAY, FEBRUARY 27, 2008

REPORTED BY:  LESLIE CASTRO, CSR #8876

BONNIE L. WAGNER & ASSOCIATES
COURT REPORTING SERVICES
41 SUTTER STREET, SUITE 1605
SAN FRANCISCO, CALIFORNIA 94104
(415) 982-4849

119

1        BE IT REMEMBERED THAT, PURSUANT TO NOTICE, AND ON

2   WEDNESDAY, FEBRUARY 27, 2008, COMMENCING AT THE HOUR OF

3   10:00 O'CLOCK A.M. THEREOF, AT THE OFFICE OF THE CITY

4   ATTORNEY, FOX PLAZA, SEVENTH FLOOR, 1390 MARKET STREET,

5   SAN FRANCISCO, CALIFORNIA 94102, BEFORE ME,

6   LESLIE CASTRO, A CERTIFIED SHORTHAND REPORTER IN AND FOR

7   THE STATE OF CALIFORNIA, PERSONALLY APPEARED

8                        SUSIE ABRAM

9   CALLED AS A WITNESS BY THE DEFENDANTS, WHO, BEING BY ME

10  FIRST DULY (PREVIOUSLY) SWORN, WAS THEREUPON EXAMINED

11  AND TESTIFIED AS HEREINAFTER SET FORTH.

12

13      APPEARANCES:

14      CURTIS G. OLER, ATTORNEY AT LAW, 820C LAGUNA

15  STREET, SAN FRANCISCO, CALIFORNIA 94102, APPEARED AS

16  COUNSEL ON BEHALF OF THE PLAINTIFF.

17

18      OFFICE OF THE CITY ATTORNEY, FOX PLAZA, FIFTH

19  FLOOR, 1390 MARKET STREET, SAN FRANCISCO, CALIFORNIA

20  94102, REPRESENTED BY JONATHAN ROLNICK, DEPUTY CITY

21  ATTORNEY, APPEARED AS COUNSEL ON BEHALF OF THE

22  DEFENDANTS.

23  ALSO PRESENT:  CHARLENE OLER

24                      ---oOo---

25

1                              PROCEEDINGS

2

3    FURTHER EXAMINATION BY MR. ROLNICK:

4

5        MR. ROLNICK:  Q  MS. ABRAM, YOU UNDERSTAND THAT

6    YOU'RE STILL UNDER OATH HERE --

7        A.   YES.

8        Q.   -- THIS MORNING?

9        A.   YES.

10       MR. ROLNICK:  I'D LIKE TO HAVE MARKED AS EXHIBIT 3

11   THIS LETTER.

12       (WHEREUPON, DEFENDANTS' NO. 3 WAS

13       MARKED FOR IDENTIFICATION.)

14       MR. ROLNICK:  Q  MS. ABRAM, IF YOU COULD TAKE A

15   MOMENT AND LOOK AT THAT LETTER, I JUST HAVE A FEW

16   QUESTIONS ABOUT IT.

17                    (PAUSE IN THE PROCEEDINGS.)

18       MR. ROLNICK:  Q  MS. ABRAM, DO YOU RECOGNIZE THIS

19   LETTER?

20       A.   YES, I DO.

21       Q.   THE LETTER IS DATED DECEMBER 23, 2003, AND

22   IT'S ADDRESSED TO YOU.

23            AND THAT WAS YOUR HOME ADDRESS AT THE TIME?

24       A.   YES.

25       Q.   AND IT'S FROM AN IRENE GUERRERO.  AND IN THIS

1   LETTER IT INFORMS YOU THAT YOU'VE REQUESTED LEAVE FROM

2   NOVEMBER 19, 2003 THROUGH FEBRUARY 1, 2004, AND THAT

3   THIS LEAVE HAS BEEN APPROVED; IS THAT CORRECT?

4       A.   YES.

5       Q.   AND YOU RECALL RECEIVING THIS LETTER FROM

6   MS. GUERRERO SOMETIME IN LATE DECEMBER, 2003?

7       A.   YES.

8       Q.   NOW, IT INDICATES HERE THAT YOUR LEAVE EXPIRED

9   ON FEBRUARY 1, 2004.

10          YOU DID NOT RETURN TO WORK ON THAT DATE, DID

11  YOU?

12      A.   NO, I DID NOT.

13      Q.   AT ANY TIME -- DID YOU CONTACT YOUR SUPERVISOR

14  OR ANYONE FROM THE CITY SHORTLY BEFORE FEBRUARY 1, 2004

15  TO ADVISE THEM THAT YOU WOULD NOT BE RETURNING ON THAT

16  DATE?

17      A.   NO, I DIDN'T.  BUT MY PSYCHIATRIST SENT THEM A

18  LETTER.

19      Q.   DO YOU RECALL WHAT THAT LETTER STATED?

20      A.   NO, I DON'T.

21      Q.   BUT YOU HAD NO PERSONAL CONTACT WITH ANY OF

22  YOUR SUPERVISORS OR THE CITY ABOUT THE FACT THAT YOU

23  WOULD NOT BE RETURNING ON THAT DATE?

24      A.   NO, NOT THAT I COULD RECALL.

25      Q.   AND I SEEM TO RECALL THAT AT SOME POINT IN

1    TIME YOU ALSO FILED A WORKERS' COMPENSATION CLAIM; IS

2    THAT CORRECT?

3         A.   YES.

4         Q.   AND DO YOU RECALL APPROXIMATELY WHEN YOU FILED

5    THAT WORKERS' COMPENSATION CLAIM?

6         A.   IF I CAN RECALL, IT WAS IN 2003 WHEN I

7    COLLAPSED ON THE JOB AND WAS TAKEN OUT BY THE AMBULANCE

8    TO SAN FRANCISCO GENERAL HOSPITAL.

9         Q.   AND THAT'S THE INCIDENT WE TALKED ABOUT THE

10   FIRST DAY OF YOUR DEPOSITION; IS THAT CORRECT?

11        A.   YES.

12        MR. ROLNICK:   AND I'D LIKE TO MARK AS EXHIBIT 4,

13   ANOTHER EXHIBIT HERE.

14        (WHEREUPON, DEFENDANTS' NO. 4 WAS

15        MARKED FOR IDENTIFICATION.)

16        MR. ROLNICK:   Q   AND BEFORE YOU TAKE A LOOK AT IT,

17   MS. ABRAM, LET ME START BY IDENTIFYING EXHIBIT 4 AS A

18   LETTER DATED JULY 19, 2004.   IT'S ADDRESSED TO YOU AT

19   5145 TWIN CREEK COURT IN ANTIOCH.   IT'S FROM AN

20   ARLENE LUM.   AND THIS EXHIBIT IS FIVE PAGES BEGINNING

21   WITH CCSF 197 THROUGH CCSF 202.

22        DO YOU SEE THOSE MARKINGS DOWN ON THE LOWER

23   RIGHT-HAND CORNER?

24        A.   YES.

25        Q.   AND THOSE ARE NUMBERS THAT WE ADDED AFTER THE

1  FACT WHEN WE TURN THESE DOCUMENTS OVER TO YOUR ATTORNEYS

2  IN THIS LAWSUIT.

3        AND THIS DOCUMENT IN ADDITION TO THE JULY 19TH

4  LETTER, IT INCLUDES A VARIETY OF OTHER LETTERS FROM

5  DIFFERENT DATES THAT WERE ALSO ADDRESSED TO YOU AT THE

6  SAME ADDRESS.

7        SO I'D LIKE YOU RIGHT NOW TO TAKE A LOOK AT

8  EACH ONE OF THESE LETTERS.  BUT IT APPEARS THAT THEY

9  WERE ALL SENT TO YOU AT THE SAME TIME, THAT THE LETTERS

10  THAT FOLLOW THE JULY 19TH LETTER WERE ENCLOSED WITH THE

11  JULY 19 LETTER TO YOU.

12              (PAUSE IN THE PROCEEDINGS.)

13        MR. ROLNICK:  Q  HAVE YOU HAD A CHANCE TO LOOK AT

14  ALL OF THOSE?

15        A.    YES, I DID.

16        Q.    NOW, LET'S START WITH THE FIRST PAGE, THE

17  JULY 19, 2004 LETTER.

18              DO YOU RECOGNIZE THIS LETTER?

19        A.    YES, I DO.

20        Q.    AND DO YOU RECALL RECEIVING IT SOMETIME AROUND

21  JULY 19, 2004?

22        A.    YES.

23        Q.    AND WHEN YOU RECEIVED THIS LETTER, DID IT

24  INCLUDE THE ADDITIONAL DOCUMENTS THAT ARE ATTACHED TO

25  IT?

1    A.   NO, IT DID NOT.

2    Q.   IT DID NOT?

3    A.   NO.

4    Q.   SO IT'S YOUR RECOLLECTION THAT ALL YOU

5  RECEIVED WAS A JULY 19 LETTER, THE FIRST PAGE OF THIS

6  EXHIBIT?

7    A.   YES.

8    Q.   LET'S GO TO THE NEXT PAGE OF THIS EXHIBIT.

9  THIS IS A FEBRUARY 11, 2004 LETTER ADDRESSED TO YOU

10  AGAIN AT TWIN CREEK COURT IN ANTIOCH.

11       DO YOU RECOGNIZE THIS LETTER?

12    A.   YES, I DO.

13    Q.   AND DO YOU RECALL RECEIVING THIS LETTER ON OR

14  ABOUT FEBRUARY 11, 2004?

15    A.   YES.

16    Q.   AND IN THIS LETTER IT'S FROM A CLAIMS ADJUSTER

17  AT CAMBRIDGE INTEGRATED SERVICES GROUP.  AND THE LETTER

18  NOTIFIES YOU THAT YOUR WORKERS' COMP CLAIM HAS BEEN

19  DENIED; IS THAT RIGHT?

20    A.   YES.

21    Q.   NOW AT THE TIME THAT YOU RECEIVED THIS LETTER

22  AROUND FEBRUARY 11, 2004, DID YOU CONTACT YOUR

23  SUPERVISOR OR ANYBODY WITH THE CITY TO TALK ABOUT WHEN

24  YOU MIGHT BE RETURNING TO WORK?

25    A.    AGAIN, MY PSYCHIATRIST WROTE THEM A LETTER.

1    Q.    AND SO AGAIN, YOU HAD NO PERSONAL CONTACT WITH

2  THE CITY ABOUT RETURNING TO WORK?

3    A.    NO.

4    Q.    NOW, LET'S GO TO THE SECOND TO THE LAST PAGE

5  OF THIS EXHIBIT.

6         NOW, THIS EXHIBIT WHICH IS -- IF WE COULD JUST

7  SET THE RECORD STRAIGHT HERE.   THE LAST LETTER WE WERE

8  TALKING ABOUT, THE FEBRUARY 11, 2004 LETTER, IS BATES

9  LABELED CCSF 198.

10        NOW, I'D LIKE TO TALK ABOUT ANOTHER LETTER

11  THAT'S IN THIS EXHIBIT WHICH IS BATES LABELED CCSF 201.

12  AND THIS IS AN APRIL 3, 2004 LETTER.   AGAIN, ADDRESSED

13  TO YOU AT TWIN CREEK COURT IN ANTIOCH, CALIFORNIA FROM

14  MARTIN LUM.

15        DO YOU RECOGNIZE THIS LETTER?

16    A.    YES, I DO.

17    Q.    AND DO YOU RECALL RECEIVING THIS LETTER

18  SOMETIME AROUND APRIL 30, 2004?

19    A.    SOMETIME AROUND THAT TIME, YES.

20    Q.    AND WHEN I SAY THAT, I DON'T MEAN THAT YOU

21  NECESSARILY RECEIVED IT ON THAT DATE BUT WITHIN A FEW

22  DAYS OF THAT DATE.

23        AND THAT'S WHEN YOU RECEIVED IT AT HOME?

24    A.    YES.

25    Q.    AND IN THIS LETTER MR. LUM WROTE TO YOU "IT IS

1    THE UNDERSTANDING OF THIS OFFICE THAT YOU MAY HAVE A

2    MEDICAL CONDITION THAT COULD POSSIBLY NECESSITATE A

3    REASONABLE ACCOMMODATION PURSUANT TO BOTH THE AMERICANS

4    WITH DISABILITIES ACT PAREN A.D.A. CLOSE PAREN

5    CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT PAREN FEHA.

6              AND AT THE BOTTOM MR. LUM WRITES "IF YOU WOULD

7    CARE TO EXPLORE YOUR OPTIONS UNDER THE AMERICANS WITH

8    DISABILITY ACT, PLEASE CONTACT ME."  AND IT GIVES A

9    PHONE NUMBER.

10             DID YOU RESPOND TO THIS LETTER IN ANY FASHION?

11        A.   NO, I DIDN'T.

12        Q.   SO YOU DIDN'T CALL MR. LUM OR WRITE HIM BACK.

13        A.   NO, I DID NOT.

14        MR. ROLNICK:  NOW, I'D LIKE TO MARK AS EXHIBIT 5

15    ANOTHER LETTER.  AND I'M NOT -- LET'S KEEP THAT EXHIBIT

16    OUT.  I'M NOT TRYING TO CONFUSE YOU, I'M TRYING TO GO

17    WITH THESE LETTERS IN CHRONOLOGICAL ORDER AND THEY

18    WEREN'T GROUPED THAT WAY FOR ME.

19        (WHEREUPON, DEFENDANTS' NO. 5 WAS

20        MARKED FOR IDENTIFICATION.)

21        MR. ROLNICK:  Q  MS. ABRAM, LOOKING AT EXHIBIT 5,

22    DO YOU RECOGNIZE THIS LETTER?

23        A.   YES, I DO.

24        Q.   AND DO YOU RECALL RECEIVING THIS LETTER FROM

25    MR. LUM?  THIS IS A LETTER DATED JUNE 1, 2004.

1          DO YOU RECALL RECEIVING THIS LETTER SOMETIME

2    AROUND EARLY JUNE, 2004?

3          A.    YES.

4          Q.    AND IN THIS LETTER, MR. LUM AGAIN INVITED YOU

5    TO EXPLORE OPTIONS YOU MAY HAVE UNDER THE AMERICANS WITH

6    DISABILITIES ACT; IS THAT CORRECT?

7          A.    YES.

8          Q.    AND HE GAVE YOU A CONTACT PHONE NUMBER AND

9    ASKED THAT YOU CONTACT HIM BY JUNE 16, 2004; IS THAT

10   CORRECT?

11         A.    YES.

12         Q.    DID YOU RESPOND TO THIS LETTER?

13         A.    NO, I DID NOT.  MAY I STATE THE REASON WHY I

14   DIDN'T RESPOND?

15         Q.    WHY DID YOU NOT RESPOND?

16         A.    BECAUSE I WANTED TO WORK AT LAGUNA HONDA WHERE

17   I WAS WORKING WITHOUT BEING HARASSED AND DISCRIMINATED

18   AGAINST.  I DIDN'T WANT TO BE TRANSFERRED TO ANOTHER

19   POSITION AT ANOTHER JOB.

20         Q.    OKAY.  DID YOU TELL MR. LUM THAT?

21         A.    NO, I DID NOT.

22         Q.    DID YOU TELL ANYONE WITH THE CITY THAT?

23         A.    NO, I DID NOT.

24         Q.    AT THE TIME YOU RECEIVED THIS LETTER -- WAS

25   THERE ANYTHING IN THIS LETTER THAT YOU CONSTRUED TO

1   REQUIRE THAT YOU BE TRANSFERRED TO SOMEPLACE ELSE?

2       A.    THE LAST PARAGRAPH.

3       Q.    OKAY.  ANYTHING ELSE?

4       A.    THAT LAST PARAGRAPH THERE.

5       Q.    WHEN YOU SAY THE LAST PARAGRAPH -- AND EXCUSE

6   ME FOR TALKING OVER YOU -- WHEN YOU SAY THE LAST

7   PARAGRAPH, YOU'RE TALKING ABOUT THE PARAGRAPH THAT

8   STARTS OUT "IF QUALIFIED, THE REASONABLE ACCOMMODATION

9   PROCESS COULD INCLUDE EXPLORING PLACEMENT OPTIONS" IS

10  THAT CORRECT.

11      A.    YES.

12      Q.    BUT AGAIN, YOU DID NOT RESPOND IN ANY FASHION

13  TO THIS LETTER; IS THAT RIGHT?

14      A.    NO, I DID NOT RESPOND.

15      Q.    NOW, LET'S GO BACK TO EXHIBIT 4.  AND LET ME

16  DIRECT YOUR ATTENTION TO THE DOCUMENT THAT'S BEEN BATES

17  LABELED CCSF 200 WHICH IS A JUNE 17, 2004 LETTER FROM

18  MR. LUM TO YOU.

19          DO YOU SEE THAT DOCUMENT?

20      A.    YES.

21      Q.    IT APPEARS TO ME SITTING OVER HERE YOU ARE

22  LOOKING AT JULY 19.

23      A.    YOU SAID EXHIBIT 4.

24      Q.    BUT I'M DIRECTING YOU TO A PARTICULAR PAGE.

25      A.    I'M SORRY I WAS LOOKING AT EXHIBIT 4.

1        Q.    IT'S PART OF EXHIBIT 4.  THIS IS A JUNE 17,

2  LETTER.

3        A.    OKAY.

4        Q.    NOW, DO YOU RECOGNIZE THIS LETTER?

5        A.    YES.

6        Q.    AND THIS IS A LETTER THAT YOU RECEIVED

7  SOMETIME AROUND JUNE 17, 2004 FROM MR. LUM; THAT RIGHT?

8        A.    YES.

9        Q.    AND IN THIS LETTER MR. LUM WRITES I WRITE TO

10  FOLLOW-UP WITH MY LETTER APRIL 30, 2004 AND JUNE 1, 2004

11  REGARDING YOUR REASONABLE ACCOMMODATION REQUEST.  "I

12  HAVE ATTACHED A COPY OF MY PREVIOUS LETTER FOR YOUR

13  CONVENIENCE.  TO DATE YOU HAVE NOT CONTACTED ME TO

14  SCHEDULE A MEETING TO DISCUSS YOUR REQUEST.  IF YOU

15  WOULD LIKE TO PURSUE YOUR REQUEST, PLEASE CALL ME."  IT

16  GIVES A PHONE NUMBER "AT YOUR EARLIEST CONVENIENCE.  IF

17  I DO NOT HEAR FROM YOU BY JUNE, 28, 2004, I WILL

18  UNDERSTAND THAT YOU ARE NO LONGER INTERESTED IN PERSUING

19  THE REQUEST AND WILL CLOSE THE FILE ACCORDINGLY."

20        DID YOU RESPOND TO THIS LETTER FROM MR. LUM?

21        A.    NO, I DID NOT RESPOND TO THE LETTER.

22        Q.    NOW, LET'S MOVE TO THE FIRST PAGE OF

23  EXHIBIT 4, WHICH IS THE JULY 19, 2004 LETTER.

24        AGAIN, YOU RECALL RECEIVING THIS LETTER AROUND

25  JULY 19, 2004; CORRECT?

1    A.    YES.

2    Q.    FROM AN ARLEEN LUM; CORRECT?

3    A.    YES.

4    Q.    AND IN THE SECOND PARAGRAPH OF THIS LETTER IT

5    INDICATES THAT "MR. WILLIAM FRAZIER IS EXPECTING YOU TO

6    RETURN TO WORK ON MONDAY, AUGUST 2, 2004 AT YOUR

7    REGULARLY SCHEDULED TIME OF 12:30 P.M. TO 9:00 P.M.

8    PLEASE NOTE THAT SHOULD YOU FAIL TO REPORT TO WORK,

9    YOU'LL BE MARKED ABSENT WITHOUT LEAVE.    EMPLOYEES ABSENT

10    WITHOUT LEAVE FOR FIVE CONSECUTIVE WORK DAYS MAY BE

11    PROCESSED AS AUTOMATIC RESIGNATION PER CIVIL SERVICE

12    RULE 121."

13        DID YOU RESPOND TO THIS LETTER?

14    A.    AGAIN, MY DOCTOR SENT THEM A LETTER REQUESTING

15    THAT I HAVE MORE TIME OFF.

16    Q.    OTHER THAN THAT, DID YOU HAVE ANY PERSONAL

17    COMMUNICATION WITH MS. LUM OR ANYONE ELSE WITH THE CITY

18    ABOUT YOUR RETURN TO WORK?

19    A.    NOT THAT I RECALL.

20    Q.    AND YOU DID NOT RETURN TO WORK ON AUGUST 2ND,

21    2004?

22    A.    NO, I DID NOT.

23    MR. ROLNICK:    LET'S MARK THIS NEXT IN ORDER WHICH I

24    BELIEVE IS 6.

25    ---oOo---

1      (WHEREUPON, DEFENDANTS' NO. 6 WAS

2      MARKED FOR IDENTIFICATION.)

3      MR. ROLNICK:  Q  MS. ABRAM, DO YOU RECOGNIZE THIS

4  LETTER?

5      A.   YES, I DO.

6      Q.   AND THIS IS AN AUGUST 9, 2004 LETTER FROM

7  WILLIE RAMIREZ TO YOU AT THE TWIN CREEK COURT ADDRESS IN

8  ANTIOCH; CORRECT?

9      A.   YES.

10      Q.   AND DID YOU RECEIVE THIS LETTER SOMETIME

11  AROUND AUGUST 9, 2004?

12      A.   YES.

13      Q.   AND LET ME DIRECT YOUR ATTENTION TO THE FINAL

14  FULL PARAGRAPH DOWN AT THE BOTTOM.  THE LETTER STATES:

15  "PLEASE BE INFORMED THAT YOUR ABSENCES FROM AUGUST 2,

16  2004 TO AUGUST 6, 2004 CONSTITUTE AN ABANDONMENT OF YOUR

17  POSITION AND WILL BE RECORDED AS AN AUTOMATIC

18  RESIGNATION.  THE DEPARTMENT WILL FILE FOR YOUR

19  AUTOMATIC RESIGNATION UNLESS YOU RETURN TO DUTY BY

20  AUGUST 23, 2004."

21      DID YOU RETURN TO WORK ON THAT DATE?

22      A.   I THINK SO, BUT I CAN'T RECALL THE DATE.

23      Q.   LET'S SEE IF I CAN REFRESH YOUR RECOLLECTION

24  BECAUSE I BELIEVE YOU TESTIFIED EARLIER -- WE'LL

25  STRAIGHTEN THIS OUT.

1    SO IT'S YOUR RECOLLECTION THAT YOU DID RETURN

2    TO WORK ON THAT DATE?

3    A.    I SAID AS I CAN RECALL IT WAS EITHER AUGUST OR

4    SEPTEMBER, 2004.

5    MR. ROLNICK:  LET'S MARK THIS NEXT IN ORDER 7.

6    (WHEREUPON, DEFENDANTS' NO. 7 WAS

7    MARKED FOR IDENTIFICATION.)

8    (PAUSE IN THE PROCEEDINGS.)

9    MR. ROLNICK:  Q  MS. ABRAM, DO YOU RECOGNIZE WHAT

10   WE'VE MARKED AS EXHIBIT 7?

11   A.    YES.

12   Q.    AND THIS IS A LETTER DATED AUGUST 25, 2004

13   ADDRESSED TO YOU FROM WILLIE RAMIREZ; CORRECT?

14   A.    YES.

15   Q.    AND WHEN YOU RECEIVED THIS LETTER, DID IT

16   INCLUDE THE ATTACHED PAGES TO THIS EXHIBIT, WHICH

17   APPEARS TO BE VARIOUS FORMS FOR REQUESTING A REASONABLE

18   ACCOMMODATION?

19   A.    THIS IS FOR MY DOCTOR TO SIGN?

20   Q.    WELL, SOME OF THE FORMS DO, YES, REFER TO A

21   DOCTOR'S SIGNATURE.  THERE ARE A VARIETY OF DOCUMENTS

22   HERE.

23   MY ONLY QUESTION WAS DID THESE COME INCLUDED

24   WITH THE LETTER?

25   A.    I COULDN'T RECALL.  I THINK THAT THEY WERE.

1      Q.   NOW, DIRECTING YOUR ATTENTION TO THE FIRST

2  PAGE OF THIS EXHIBIT -- WELL, LET ME ASK YOU GENERALLY,

3  DID YOU AT ANY POINT IN TIME FILL OUT A FORM REQUESTING

4  A REASONABLE ACCOMMODATION FROM THE CITY?

5      A.   MY DOCTOR FILLED OUT THE FORMS.

6      Q.   BUT YOU DIDN'T PERSONALLY ASK THE DOCTOR?  DID

7  YOU ASK YOUR DOCTOR TO FILL OUT A REASONABLE

8  ACCOMMODATION REQUEST FORM LIKE THOSE ATTACHED TO THE

9  EXHIBIT?

10     A.   THE FORM THAT'S IN HERE FOR HER TO SIGN, YES.

11     Q.   DO YOU KNOW IF, IN FACT, SHE EVER DID THAT?

12     A.   SHE TOLD ME THAT SHE DID.

13     Q.   NOW, IF YOU LOOK AT THE BOTTOM OF THE PAGE,

14 THE LAST PARAGRAPH, IT NOTES "SHOULD YOU FAIL TO

15 COMPLETE THE PACKET BY SEPTEMBER 17, 2004, WE WILL

16 ASSUME THAT YOU'RE NOT INTERESTED IN ENGAGING THE

17 DEPARTMENT IN THE A.D.A. PROCESS, AND THE AUTOMATIC

18 REGISTRATION PROCESS WILL BE REINITIATED BECAUSE YOU

19 WILL CONTINUE TO BE IN AN AWOL, ABSENT WITHOUT LEAVE

20 STATUS."

21     DOES THAT REFRESH YOUR RECOLLECTION AT TO THE

22 DATE ON WHICH YOU RETURNED TO WORK AS BEING

23 SEPTEMBER 17TH, 2004?

24     A.   AS I COULD RECALL, YES.

25     Q.   NOW, BEFORE THAT DATE, BEFORE SEPTEMBER 17,

1  2004, DID YOU PICK UP THE PHONE AND CALL ANYBODY AND SAY

2  "I'M GOING TO BE RETURNING TO WORK ON THAT DAY"?

3       A.   AS I COULD RECALL, I THINK I DID CALL.  AND I

4  CAN'T REMEMBER WHETHER IT WAS MR. FRAZIER OR MY

5  SUPERVISOR, BUT I DID CALL IN TO LET THEM KNOW THAT I

6  WOULD BE RETURNING ON THE 17TH.  IT MIGHT HAVE BEEN

7  PERSONNEL.

8       Q.   AND WHEN YOU SAY YOUR SUPERVISOR, YOU'RE

9  REFERRING TO MS. HANSON WHO HAD BEEN YOUR SUPERVISOR AT

10 THE TIME YOU BEGAN YOUR LEAVE?

11      A.   YES.

12      Q.   DO YOU RECALL HOW MUCH IN ADVANCE OF

13 SEPTEMBER 17 YOU MADE THAT CALL?

14      A.   I CAN'T RECALL.

15      Q.   A COUPLE OF DAYS, A WEEK?

16      A.   I CAN'T RECALL.  AND I DON'T WANT TO SAY

17 SOMETHING THAT'S NOT TRUE.

18      Q.   OKAY.

19           NOW, ONE OF THE INCIDENTS WE WERE TALKING

20 ABOUT THE FIRST DAY HAD TO DO WITH SOMEBODY YOU

21 TESTIFIED ABOUT CUTTING THE LOCK OFF YOUR LOCKER AND

22 LEAVING OUT SOME PERSONAL ITEMS FOR OTHERS TO PICK

23 THROUGH.

24           DO YOU RECALL THAT?

25      A.   I RECALL STATING THAT I WENT ON VACATION, UPON

1    MY RETURN TO WORK, CHRISTINE HANSON CUT THE PADLOCK OR

2    HAD SOMEONE TO CUT THE PADLOCK ON MY LOCKER.  AND SHE

3    TOOK SOME OF MY CDS AND SOME OF MY OTHER BELONGINGS AND

4    LEFT THEM OUT IN THE DAYROOM WHERE THE RESIDENTS AND

5    OTHER STAFF GO IN FOR ACTIVITIES.

6        Q.   SO THIS WOULD HAVE OCCURRED IN SEPTEMBER,

7    2003; IS THAT RIGHT?

8        A.   NO.  I THINK IT OCCURRED -- AS I CAN RECALL,

9    IT WAS IN 2002, MAYBE '3.

10       Q.   NOW, LET ME ASK YOU:  WHERE WAS THIS LOCKER

11   LOCATED?

12       A.   ON MY UNIT.

13       Q.   SO THIS --

14       A.   ON THE WARD.

15       Q.   SO THIS WAS THE D-3 UNIT?

16       A.   YES.

17       Q.   THE PSYCHOSOCIAL CLUSTER?

18       A.   YES.

19       Q.   AND WHAT WAS THE PURPOSE OF THE LOCKER, WHAT

20   WAS THE LOCKER FOR?

21       A.   THE LOCKER WAS WHERE I WOULD KEEP CDS THAT I

22   WOULD BRING FROM HOME, CRAYONS, MY BINDERS WITH

23   DIFFERENT ACTIVITIES THAT I LIKE TO DO WITH THE

24   RESIDENTS.  NAIL POLISH, COTTON FOR WHEN I WOULD GIVE

25   THE PATIENTS NAIL CARE THAT I BOUGHT WITH WARD MONIES

1    FROM MY WARD.

2          A TAPE DECK PLAYER.  COMBS AND BRUSHES THAT I

3    WOULD USE FOR THE RESIDENTS TO COMB THEIR HAIR.

4    LOTIONS, BINGO PRIZES, BINGO BOARD OR KIT THAT I WOULD

5    USE TO PLAY BINGO WITH MY RESIDENTS.  AND SOME OF MY

6    PERSONAL BELONGINGS.

7          Q.   BUT IS IT FAIR TO SAY THAT IT WAS PRIMARILY

8    FOR HOLDING PROGRAM-RELATED MATERIALS OR

9    ACTIVITY-RELATED MATERIALS THAT YOU WERE USING WITH YOUR

10   PATIENTS?

11         A.   YES.

12         Q.   AND HOW BIG WAS THE LOCKER?

13         A.   I'D SAY ABOUT THIS BIG AND IT WAS TALL

14   (INDICATING).

15         Q.   SO IT WAS TWO TO THREE FEET WIDE AND ABOUT

16   FIVE FEET TALL?  I JUST WANT TO GIVE --

17         A.   I'M NOT GOOD --

18         Q.   I JUST WANT TO GET YOUR BEST ESTIMATE.

19         A.   I WOULD SAY -- HOW WIDE DID YOU SAY AGAIN?

20         Q.   I SAID TWO TO THREE FEET WIDE.

21         A.   SO THAT WOULD BE ABOUT LIKE THIS (INDICATING)?

22         Q.   I THINK SO.

23         A.   AND THE LENGTH?

24         Q.   THE HEIGHT ABOUT FIVE FEET?

25         A.   MAYBE OR MAYBE TALLER.

1    Q.    IT WAS ABOVE YOUR HEAD?

2    A.    OH, YES.

3    Q.    WAS ABOVE YOUR HEAD?

4    A.    OH, YES, IT WAS ALMOST TO THE CEILING.

5    Q.    SO FROM THE FLOOR TO ALMOST UP TO THE CEILING?

6    A.    RIGHT.

7    Q.    AND AT LEAST TWO TO THREE FEET WIDE?

8    A.    YES.

9    Q.    AND DID IT HAVE SHELVES IN IT?

10   A.    YES.

11   Q.    AND WAS THIS THE KIND OF LOCKER THAT YOU MIGHT

12   SEE IN A GYM WHERE YOU CAN HANG CLOTHES AS WELL OR WAS

13   IT ALL SHELVING?

14   A.    THESE WERE SHELVES.  AND SOME OF THE CDS THAT

15   MS. HANSON LEFT OUT WERE CDS THAT I HAD BORROWED FROM

16   OTHER PEOPLE TO COPY TO TAPE.  AND I THINK IT WAS ABOUT

17   TEN CDS THAT SHE LEFT OUT OR MORE THAT WERE BORROWED

18   FROM OTHER PEOPLE.  ALSO, MY TAPE DECK WAS LEFT OUT.

19   AND IT WAS BROKEN.

20   Q.    DO YOU RECALL WHETHER OR NOT THE HOSPITAL

21   REIMBURSED YOU FOR ANYTHING THAT YOU HAD LOST?

22   A.    NO.

23   Q.    THE HOSPITAL DID NOT?

24   A.    NO.  I DID NOT GET REIMBURSED FOR ANY OF THOSE

25   THINGS.  I WAS TOLD THAT I WOULD GET REIMBURSED BUT I

1    NEVER DID.  I THINK I EVEN MADE OUT A SHEET A LIST OF

2    THINGS THAT WAS TAKEN BUT NOTHING EVER CAME OF IT.

3        Q.    AND I JUST WANT TO MAKE SURE I HAVE THIS

4    CLEAR:  YOU WERE SAYING EARLIER THAT SOME OF THE

5    MATERIALS YOU HAD IN HERE YOU BOUGHT WITH HOSPITAL FUNDS

6    FOR ACTIVITY PURPOSES CORRECT.

7        A.    RIGHT.

8        Q.    DID THAT INCLUDE THE TAPE DECK?

9        A.    NO.  OH, NO, THE TAPE DECK WAS FROM THE

10   HOSPITAL.

11       Q.    SO THAT HAD BEEN PURCHASED WITH HOSPITAL

12   MONEY?

13       A.    RIGHT.

14       Q.    YOU SAID THERE WERE APPROXIMATELY TEN CDS THAT

15   WERE LEFT OUT?

16       A.    YES.

17       Q.    AND WHEN YOU SAY THEY WERE LEFT OUT, DOES THAT

18   MEAN TEN CDS THAT YOU LOST OR TEN CDS THAT YOU SAW

19   LAYING AROUND WHEN YOU RETURNED FROM YOUR VACATION?

20       A.    WHEN I RETURNED FROM MY VACATION, I FOUND THE

21   CD COVERS, SOME ON THE FLOOR, SOME WAS ON THE TABLE.

22   AND WHEN I ASKED WHAT HAD HAPPENED -- SHE COULD GO IN

23   AND GET THE STUFF AND THE CNAS COULD DO THE RESIDENTS

24   NAILS OR HAVE MUSIC FOR THEM.  EVEN THOUGH WE HAD CDS IN

25   THE MAIN DEPARTMENT IN THE SUPPLY ROOM WHERE THEY COULD

1   GET ACTIVITY SUPPLIES FROM THE SUPPLY ROOM.

2           AND WHEN I ASKED WHAT HAD HAPPENED AND THEN I

3   SEEN MY LOCKER WAS CUT FIRST THING I THOUGHT WAS OH, GOD

4   SOMEBODY BROKE IN MY LOCKER AND TOOK THE CDS AND LEFT

5   THE COVERS OUT.  AND I WAS TOLD BY, IF I COULD RECALL IT

6   WAS EITHER THE HEAD NURSE OR ONE OF THE CNAS, THAT THE

7   LOCKER HAD BEEN CUT ON MY LOCKER.

8           AND FIRST THING I THOUGHT SOME VISITOR HAD KIM

9   IN AND CUT THE LOCK ON MY LOCKER TO GET INTO MY LOCKER.

10  AND I WAS TOLD NO.  CHRISTINE HANSON HAD I THINK ONE OF

11  THE ELECTRICIANS OR ONE OF THE -- ONE OF THE MEN THAT

12  WORKED THERE IN THE HOSPITAL TO HAVE HE HAD A THING THAT

13  CUT THE LOCK AND HE CUT THE LOCK OFF OF MY LOCKER.

14      Q.   NOW, WHO WAS THE HEAD NURSE YOU SAY HAD HAD

15  THE KEY TO THE LOCKER?

16      A.   AT THAT TIME I THINK IT WAS GOLDIE.

17      Q.   IS THAT THE NURSE'S FIRST NAME OR LAST NAME?

18      A.   I THINK THAT'S HER FIRST NAME -- OR IT MIGHT

19  BE HER LAST NAME.  BECAUSE THAT'S WHAT WE CALLED HER,

20  GOLDIE.

21      Q.   NOW, THE CDS SOME OF THOSE YOU SAID BELONGED

22  TO OTHER ACTIVITY THERAPISTS?

23      A.   NO.  SOME OF THOSE BELONGED TO SOME OF MY

24  FAMILY MEMBERS.

25      Q.   AND THESE WERE MUSIC CDS?

1        A.    YES.

2        Q.    AND THERE WERE APPROXIMATELY TEN OF THEM THAT

3   WERE LOST?

4        A.    YES.  WHEN I ASKED CHRISTINE WHY SHE CUT THE

5   LOCK ON MY LOCKER, SHE SAID, "WELL, I HAD TO GET SOME

6   CDS OUT FOR THE RESIDENTS."

7             AND I SAID, "OKAY.  BUT THAT'S FINE BUT YOU

8   LEFT THEM OUT."  I SAID, "WHY DIDN'T YOU PUT THEM BACK

9   IN MY LOCKER AFTER USING THEM?"

10            AND SHE JUST SHRUGGED HER SHOULDERS AND SAID,

11  "WELL, THESE CDS BELONG TO THE HOSPITAL."

12            AND I CORRECTED HER.  I SAID, "NO, THEY

13  DIDN'T, THOSE CDS BELONGED TO SOME OF MY FAMILY MEMBERS

14  THAT I HAD BORROWED TO TAPE FROM THE CD ONTO A REGULAR

15  TAPE WHERE I WOULD HAVE MUSIC FOR THE RESIDENTS."

16       Q.    NOW, YOU SAY THAT THESE THINGS WERE LEFT OUT

17  IN THE DAYROOM?

18       A.    YES.

19       Q.    IS THAT SORT OF AN ACTIVITY ROOM WHERE YOU DO

20  MANY OF THE ACTIVITY THERAPY FOR THE RESIDENTS?

21       A.    YES.

22       Q.    SO IT'S A COMMON ROOM THAT EVERYBODY HAS

23  ACCESS TO?

24       A.    YES.

25       Q.    AND IS THE LOCKER LOCATED IN THE DAYROOM?

1      A.    YES.

2      Q.    AND HOW MANY OTHER LOCKERS ARE IN THE DAYROOM?

3      A.    JUST THAT ONE.

4      Q.    THAT'S A SINGLE LOCKER FOR THAT CLUSTER?

5      A.    YES.

6      MR. ROLNICK:  LET'S MARK THIS NEXT IN ORDER AS 8.

7      (WHEREUPON, DEFENDANTS' NO. 8 WAS

8      MARKED FOR IDENTIFICATION.)

9      THE WITNESS:  CAN I GO BACK ON THE RECORD AS

10   SAYING --

11      MR. ROLNICK:  Q  WE'RE STILL ON THE RECORD.

12      A.    BY SAYING NONE OF MY OTHER CO-WORKERS HAVE A

13   LOCK ON THEIR LOCKERS CUT WHEN THEY WOULD GO ON

14   VACATION.  AND I WAS JUST OVERWHELMED TO COME BACK GEAR

15   TO FIND MY THINGS -- AND I DON'T REALLY KNOW WHAT ALL

16   MS. HANSON PUT OUT ON THE TABLE BECAUSE I WAS SO

17   DEVASTATED THAT SHE DID LEAVE MY THINGS OUT.

18        I CAN'T REALLY REMEMBER WHAT ALL WAS TAKEN

19   FROM MY LOCKER.  BECAUSE I WOULD SPEND A LOT OF MY OWN

20   MONEY TO MAKE SURE THAT I HAD THE RIGHT THINGS FOR MY

21   RESIDENTS BECAUSE THEY WERE HIGH FUNCTIONING AND THEY

22   KIND OF KNEW WHAT THEY WANTED.  SO IF THEY TOLD ME THEY

23   WANTED PURPLE NAIL POLISH AND PURPLE LIPSTICK AND A

24   CERTAIN TYPE OF MAKEUP, I WOULD TRY AND GO TO GET THAT

25   FOR THEM, EVEN IF IT CAUSED ME TO USE MY OWN MONEY.

1    Q.    BUT THESE ARE YOUR WORDS?

2    A.    OH, YES.

3    Q.    AND IF I CAN SUMMARIZE:   IT SEEMS LIKE YOUR

4  OBJECTION HAS TO DO WITH A PARTICULAR PART OF THE

5  PERFORMANCE APPRAISAL ON PAGES 4 AND 5 HAVING TO DO WITH

6  SOMETHING THAT MR. CROEGER HAD SAID ABOUT YOUR CALENDARS

7  BEING UP AT THE FIRST OF EVERY MONTH; IS THAT RIGHT?

8    A.    YES.

9    Q.    AND THEN DID YOU -- IF YOU LOOK AT THE NEXT

10  PAGE, THIS APPEARS TO BE A RESPONSE FROM MR. CROEGER TO

11  YOUR SHORT MEMO; IS THAT RIGHT?

12    A.    YES.

13    Q.    AND THEN IF YOU FLIP THE PAGE, ONE MORE TIME

14  TO THE DOCUMENT THAT'S MARKED CCSF 58.   THIS SEEMS IF

15  YOU LOOK -- IF YOU READ THIS THROUGH, IT APPEARS THAT

16  YOU AND MR. CROEGER EXCHANGED THESE TWO DOCUMENTS AND

17  THEN YOU HAD A DISCUSSION SHORTLY THEREAFTER; IS THAT

18  RIGHT?

19    A.    AS I CAN RECALL, YES.

20    Q.    AND THEN LOOKING AT PARAGRAPH 3, IT APPEARS

21  THAT YOU AND MR. CROEGER DISCUSSED AGAIN THIS ISSUE OF

22  THE TIMELINESS OF THE CALENDARS; IS THAT RIGHT?

23    A.    YES.

24    Q.    AND THEN ON THE NEXT PARAGRAPH DOWN IT APPEARS

25  THAT YOU ALSO DISCUSSED ANOTHER ISSUE THAT YOU HAD WITH

1   THE PERFORMANCE EVALUATION, WHICH WAS A SECTION WHERE HE

2   HAD NOTED DEVELOPMENT WAS NEEDED.  AND IT SAID -- AND

3   THE FORM APPEARED TO STATE DECLINES IN OTHER THAN

4   ROUTINE SITUATIONS.

5            AND IF YOU LOOK AT THE REVIEW, WHICH IS ON THE

6   FOLLOWING PAGE, THAT APPEARS TO BE ITEM 6, ADAPTABILITY

7   TO WORK SITUATION.

8            IS THAT WHAT YOU WERE REFERRING TO?

9        A.   AS I CAN RECALL, YES.

10       Q.   AND AT THIS TIME, IF YOU LOOK AT THE FINAL

11  PARAGRAPH ACCORDING TO MR. CROEGER, YOU TOLD HIM THAT

12  YOU DISAGREED WITH THE REVIEW AND THAT YOU WEREN'T GOING

13  TO SIGN IT RIGHT?

14       A.   YES.

15       Q.   NOW, IF WE CAN GO TO A LITTLE BIT EARLIER IN

16  THIS DOCUMENT.  AND I'M LOOKING AT PAGE CCSF 47.

17       A.   47?

18       Q.   YES.

19       A.   OKAY.

20       Q.   ACTUALLY, LET ME STRIKE THAT.  MAKE IT 50.

21            AND THERE'S A SECTION HERE CALLED

22  "ADAPTABILITY TO WORK SITUATION."  DO YOU SEE THAT?

23       A.   YES.

24       Q.   AND THEN THE THIRD PARAGRAPH DOWN DISCUSSES AN

25  EVENT IN JUNE OF 1999, A BUS TRIP.

1          DO YOU SEE THAT?

2     A.    YES.

3     Q.    AND IT APPEARS THAT THIS HAS TO DO WITH A BUS

4  TRIP TO GO FISHING WITH SOME PATIENTS.

5     A.    YES.

6     Q.    AND THERE'S SOME DISCUSSION HERE ABOUT THE

7  ACQUISITION OF FISHING POLES FOR THIS TRIP; IS THAT

8  CORRECT?

9     A.    YES.

10    Q.    AND IS THIS THE BUS TRIP THAT WE WERE TALKING

11 ABOUT DURING THE FIRST DAY OF YOUR DEPOSITION?

12    A.    WILL YOU GIVE ME A FEW MINUTES TO READ THIS

13 BECAUSE I'VE DONE SEVERAL BUS TRIPS WITH THE RESIDENTS

14 FOR FISHING.  SO I NEED TO READ THIS.

15          (PAUSE IN THE PROCEEDINGS.)

16    THE WITNESS:  OKAY.

17    MR. ROLNICK:  Q  IS THIS THE FISHING TRIP THAT WE

18 WERE TALKING ABOUT THE FIRST DAY OF YOUR DEPOSITION

19 WHERE YOU HAD HAD A CONFLICT WITH MR. FRAZIER ABOUT

20 ACQUIRING FISHING POLES FOR THIS TRIP?

21    A.    OH, GOD, WE'RE TALKING ABOUT 99, AND I HAD

22 SEVERAL FISHING TRIPS, AND I HAD CONFLICTS WITH

23 MR. FRAZIER ABOUT THE FISHING TRIPS.  AND I CAN'T RECALL

24 IF THIS IS -- WAS ONE OF THE FISHING TRIPS.

25    Q.    DID YOU HAVE -- WERE THERE SEVERAL OCCASIONS

1    WHERE YOU HAD CONFLICTS WITH MR. FRAZIER ABOUT THE

2    FISHING POLES?

3        A.    I THINK I DID HAVE ANOTHER CONFLICT WITH HIM

4    REGARDING THE FISHING BUS TRIP.

5        Q.    DID THAT OTHER CONFLICT HAVE TO DO WITH

6    WHETHER OR NOT THERE WERE GOING TO BE FISHING POLES?

7        A.    I THINK THE CONFLICT WAS ABOUT ME GOING -- I

8    WENT OUT TO THE FISHING AREA WHERE WE WERE GOING TO GO

9    TAKE THE RESIDENTS FISHING TO MAKE SURE THAT THE PLACE

10   WAS A SAFE PLACE FOR THE RESIDENTS, FIRST OF ALL.

11            TO MAKE SURE THAT THE BUS WOULD ACCOMMODATE,

12   THAT THEY HAD A PLACE FOR THE BUS TO BE ACCOMMODATED TO

13   LET THE RESIDENTS OFF THE BUS AND ON THE BUS.

14            BECAUSE ONE OF THE SUPERVISORS HAD SAID THAT

15   THE BUS WOULD NOT FIT WHERE I WAS GOING TO TAKE THE

16   RESIDENTS.  AND THAT THE PLACE DID NOT HAVE FISHING

17   POLES.  AND THE SUPERVISOR WAS JOHN CHAN.  AND I STATED

18   TO THEM THAT I HAD MADE A TRIP TO THE SITE ON MY OWN

19   TIME TO MAKE SURE THAT IT WAS ACCOMMODATING FOR THE

20   RESIDENTS AND THAT TO MAKE SURE THAT THE BUS WOULD FIT,

21   TO MAKE SURE THAT THEY HAD FISHING POLES FOR THE

22   RESIDENTS TO USE BECAUSE WE DIDN'T HAVE ANY FISHING

23   POLES.

24            AND I WAS TOLD THAT THEY WOULD GIVE US THE

25   FISHING POLES FOR 14, 15 RESIDENTS.  AND THAT I WAS

1    ASSURED THAT THE RESIDENTS WOULD CATCH AT LEAST THREE OR

2    FOUR FISH A PIECE.

3         BUT THEN JOHN CHAN REPORTED THAT THE BUS

4    WOULDN'T FIT AND THAT THIS PLACE DIDN'T HAVE POLES.  AND

5    WHEN I CAME BACK TO MR. FRAZIER, I TOLD HIM THAT I HAD

6    WENT OUT ON MY OWN TIME TO MAKE SURE THAT, NUMBER ONE,

7    IT WAS A SAFE PLACE TO TAKE THE RESIDENTS, TO MAKE SURE

8    THAT THE BUS WOULD FIT AND TO MEET WITH THE OWNERS OF

9    THIS PLACE.

10        Q.   AND WHAT WAS THE CONFLICT WITH MR. FRAZIER

11   ABOUT THAT PARTICULAR FISHING TRIP?

12        A.   HE STATED THAT JOHN CHAN HAD SAID THAT THE BUS

13   WOULDN'T FIT, MAYBE I SHOULD CANCEL THE TRIP.  AND I

14   ASSURED HIM THAT THE BUS WOULD FIT, IT WAS A SAFE PLACE

15   FOR THE RESIDENTS, THEY HAD THE FISHING POLES, I HAD

16   ENOUGH VOLUNTEERS, I HAD PUT IN FOR THE VOLUNTEERS WAY

17   BEFORE TIME.

18        Q.   AND DID YOU TAKE THAT FISHING TRIP?

19        A.   YES, WE DID.  THE RESIDENTS ENJOYED IT.  THEY

20   CAUGHT FISH, WE FRIED THE FISH THE NEXT DAY.  WE MADE

21   POTATO SALAD.  THEY TALKED ABOUT THAT FISHING TRIP FOR

22   MONTHS.

23        Q.   OTHER THAN MR. FRAZIER SAYING "WELL, MR. CHAN

24   HAS REPORTED 'X' TO ME," AND YOU'RE SAYING "WELL, I

25   CHECKED IT OUT MYSELF," DID HE SAY ANYTHING ELSE ABOUT

1   THAT FISHING TRIP?

2      A.   OTHER THAN I SHOULD CANCEL IT?   NO.

3      Q.   BUT YOU DIDN'T CANCEL IT.

4      A.   NO.

5      Q.   AND HE DIDN'T FORCE YOU TO CANCEL IT; CORRECT?

6      A.   NO.   BECAUSE AFTER GOING TO HIM TELLING HIM

7   THAT I HAD MADE SURE THAT EVERYTHING WAS SAFE AND THAT

8   THE BUS FIT, HE WAS HESITANT ABOUT OKAYING IT.

9         BUT I DID CONVINCE HIM AND TOLD HIM, YOU KNOW,

10   THE RESIDENTS WAS LOOKING FORWARD TO GOING.   THESE ARE

11   MEN THAT HAD SAID SINCE THEY WAS IN WHEELCHAIRS THAT

12   THEY WOULD NEVER BE ABLE TO GO FISHING EVER AGAIN.

13      Q.   NOW, DID THIS INCIDENT THAT INVOLVED MR. CHAN

14   DID THAT HAPPEN BEFORE OR AFTER THE FISHING TRIP THAT'S

15   REPORTED HERE IN THIS PERFORMANCE EVALUATION THAT WE'VE

16   MARKED AS EXHIBIT 9?

17      A.   I THINK THIS IS THE SAME BUS TRIP.

18      Q.   SO IT'S THE SAME TRIP.   SO THE TRIP WE WERE

19   JUST TALKING ABOUT WAS THE SAME TRIP THAT'S REFLECTED

20   HERE THAT OCCURRED SOMETIME AROUND JUNE OF 1999?

21      A.   AS I CAN RECALL.   WE'RE TALKING WAY BACK IN

22   '99, THAT'S A LOT OF YEARS.

23      Q.   AND WHERE WAS THE FACILITY THAT YOU TOOK THE

24   FOLKS?

25      A.   IT WAS IN HALF MOON BAY.

1      Q.   AND IF YOU'LL LOOK AT EXHIBIT 9 AND ON PAGE --

2   THE PAGE THAT'S MARKED CCSF 50, THIS PARAGRAPH

3   CONCERNING THE FISHING TRIP.

4      A.   PAGE 9.

5      Q.   I'M SORRY.  EXHIBIT 9.  I THINK YOU'RE ON THE

6   RIGHT PAGE.  DON'T GO FLIPPING, WE'RE LOOKING AT PAGE

7   50.  WE'RE ON THE SAME SPOT WE WERE AT BEFORE, CCSF 50.

8      A.   OKAY.

9      Q.   NOW, THE PARAGRAPH WE WERE JUST TALKING ABOUT

10  ABOUT THE FISHING TRIP --

11     A.   YES.

12     Q.   -- AND THIS IS THE REVIEW THAT WAS WRITTEN BY

13  MR. CROEGER.

14          AND HERE IN THE PARAGRAPH HE DESCRIBES A

15  CONFLICT BETWEEN YOU AND MR. FRAZIER ABOUT HOW YOU WERE

16  GOING TO SECURE FISHING POLES FOR THIS TRIP; CORRECT?

17     A.   YES.

18     Q.   IT HAD BEEN YOUR UNDERSTANDING THAT

19  MR. FRAZIER HAD SAID THE HOSPITAL WAS GOING TO BUY THE

20  POLES; CORRECT?

21     A.   HE SAID THAT THE DEPARTMENT WOULD TRY TO GET

22  THE POLES, THE ACTIVITY DEPARTMENT.

23     Q.   OKAY.  AND AT THE FISHING FACILITY YOU WENT

24  TO, THEY RENTED YOU THE POLES THERE?

25     A.   I CAN'T REMEMBER IF THEY RENTED US THE POLES

1    OR IF THEY GAVE US THE POLES.

2         Q.    BUT THE POLES WERE PROVIDED BY THE FACILITY?

3         A.    YES.

4         Q.    AND AT WHAT TIME DID YOU UNDERSTAND THAT WAS

5    HOW YOU WERE GOING TO GET THE POLES?

6         A.    I'M SORRY?

7         Q.    WHEN DID YOU UNDERSTAND -- OBVIOUSLY, IN

8    PLANNING THIS TRIP IT APPEARS FROM THIS EVALUATION AND

9    FROM YOUR TESTIMONY THE OTHER DAY THERE WAS SOME

10   QUESTION AS TO HOW YOU WERE GOING TO HAVE FISHING POLES

11   FOR THIS FISHING TRIP.

12        A.    THAT'S THE REASON WHY I WENT TO THE FISHING

13   AREA BEFORE THE TRIP TO MAKE SURE THAT THE RESIDENTS

14   WOULD HAVE FISHING POLES, TO MAKE SURE THAT IT WAS A

15   SAFE PLACE TO TAKE THE RESIDENTS, AND TO MAKE SURE THAT

16   THE BUS WOULD FIT.

17        Q.    OKAY.  AND HOW SOON BEFORE THE FISHING TRIP

18   DID YOU DO THAT SITE VISIT?

19        A.    I REALLY CAN'T RECALL.  IT WAS ON THE WEEKEND

20   BECAUSE IT WAS ON MY DAY OFF.  AND I KNOW I CALLED THE

21   PLACE BEFORE I WENT TO MAKE AN APPOINTMENT WITH THE

22   OWNER OF THE PLACE TO MAKE SURE -- BECAUSE I DIDN'T WANT

23   TO DRIVE ALL THE WAY TO HALF MOON BAY AND NOT ANYBODY BE

24   THERE.  SO I THINK A WEEK PRIOR TO GOING I MADE AN

25   APPOINTMENT WITH THE OWNER OR MAYBE TWO WEEKS PRIOR.

1      MR. ROLNICK:  LET'S MARK AS NEXT IN ORDER

2  EXHIBIT 10.

3      (WHEREUPON, DEFENDANTS' NO. 10 WAS

4      MARKED FOR IDENTIFICATION.)

5      MR. OLER:  WE NEED A BREAK WHENEVER YOU'RE READY TO

6  GO FORWARD.

7      MR. ROLNICK:  DO YOU WANT TO TAKE A 10 MINUTE

8  BREAK?

9              (BRIEF BREAK.)  (11:20-11:31)

10     MR. ROLNICK:  WHY DON'T WE GO BACK ON THE RECORD.

11     Q.    MS. ABRAM, WE JUST MARKED AS EXHIBIT 10

12  ANOTHER PERFORMANCE APPRAISAL THAT YOU RECEIVED IN

13  MARCH, 2001, IS THAT CORRECT, EXHIBIT 10?

14     A.    YES.

15     Q.    AND THIS PERFORMANCE REVIEW WAS CONDUCTED BY

16  LISA RANDON DONE; IS THAT CORRECT?

17     A.    YES.

18     Q.    AND SHE WAS YOUR SUPERVISOR DURING THIS PERIOD

19  OF TIME?

20     A.    YES.

21     Q.    NOW, IT ALSO APPEARS THAT YOU REFUSED TO SIGN

22  THIS EVALUATION AS WELL; IS THAT CORRECT?

23     A.    YES.

24     Q.    AND IF YOU LOOK AT THE FINAL PAGE OF THIS

25  EXHIBIT, IT'S A DOCUMENT IT SAYS ACROSS THE TOP IT HAS

1    SOME HANDWRITING THERE APPEARS TO BE A DATE JUNE 19, '01
2    PERFORMANCE APPRAISAL REBUTTAL.
3              IS THIS A DOCUMENT THAT YOU PREPARED?
4         A.   YES.
5         Q.   AND DID YOU PREPARE THIS YOURSELF ON THE
6    COMPUTER?
7         A.   YES.
8         Q.   AND THAT'S YOUR SIGNATURE IN THE MIDDLE OF THE
9    PAGE JUST BELOW WHERE THE HANDWRITTEN "THANK-YOU" IS
10   WRITTEN.
11        A.   YES.
12        Q.   AND THE HANDWRITING BELOW THAT, DO YOU
13   RECOGNIZE THAT TO BE MS. RANDON'S HANDWRITING?
14        A.   YES.
15        Q.   AND SO THIS IS THE LIST OF ALL THE ITEMS IN
16   THE PERFORMANCE APPRAISAL THAT YOU DISAGREED WITH?
17        A.   YES.
18        Q.   AND THESE ARE THE REASONS WHY YOU REFUSED TO
19   SIGN IT?
20        A.   YES.
21        Q.   AND MS. RANDON GAVE YOU AN OVERALL EVALUATION
22   OF COMPETENT AND EFFECTIVE; IS THAT CORRECT?
23        A.   YES.
24        Q.   NOW, IN THE BOX THAT'S NOTED FOR REVIEWER
25   CERTIFICATION, AND THAT'S SIGNED BY MR. FRAZIER, IT

1  APPEARS THAT HE'S INDICATED THAT YOU AND HE MET TO

2  DISCUSS THIS EVALUATION; IS THAT CORRECT?

3       A.   I DON'T RECALL MEETING WITH MR. FRAZIER ON

4  THIS.

5       Q.   AND LOOKING AGAIN AT THAT LAST PAGE, THE

6  DOCUMENT THAT YOU PREPARED, IS THAT YOUR HANDWRITING AT

7  THE VERY TOP WITH THE DATE ON IT?

8       A.   YES, I THINK THAT'S MINE.

9       Q.   AND DO YOU RECALL WHY YOU WROTE THAT IN THERE,

10  THE DATE IN THERE?

11      A.   I DON'T RECALL WHY I WROTE THE DATE.

12      Q.   ONE OF THE THINGS THAT YOU WROTE IN YOUR

13  REBUTTAL ITEM 6 WRITES "THERE'S NOTHING ABOUT BLACK

14  HISTORY."  AND IF I CAN DIRECT YOUR ATTENTION TO THE

15  PAGE THAT'S MARKED CCSF 38, WHICH IS THE SECOND PAGE OF

16  THIS EXHIBIT.

17           AND IF YOU LOOK DOWN AT THE BOTTOM PARAGRAPH

18  MS. RANDON APPEARS TO HAVE WRITTEN "SUSIE WAS ALSO THE

19  LEAD ON PLANNING AND IMPLEMENTING THE BLACK HISTORY

20  MONTH SHOW WHICH WAS A HOSPITAL-WIDE EVENT ON 2/25/00.

21  THE SHOW IN NORMALLY ONE AND A HALF HOURS LONG HAS

22  RESIDENTS INVOLVED."

23           WHAT WAS YOUR COMPLAINT ABOUT THERE BEING

24  NOTHING ABOUT BLACK HISTORY?

25      A.   SHE DIDN'T SAY HOW GOOD THE BLACK HISTORY

1 PROGRAM WAS.

2    Q.    SO THAT WAS THE NATURE OF YOUR OBJECTION TO

3 THE REVIEW?

4    A.    OR HOW WELL, THAT I HAD IT ORGANIZED.  HOW I

5 HAD WENT THROUGHOUT THE HOSPITAL, GETTING WORKERS FROM

6 ALL DEPARTMENTS OF THE HOSPITAL.  IF I FOUND OUT THAT

7 THEY COULD SING OR DANCE OR IF THEY HAD A GROUP, I WOULD

8 GO TO THEM AND ASK THEM IF THEY WOULD PERFORM FOR THE

9 BLACK HISTORY PROGRAM.  I EVEN HAD LISA PERFORMING AS

10 ONE OF THE SUPREMES IN THE BLACK HISTORY PROGRAM.

11    Q.    IS MS. RANDON AFRICAN AMERICAN?

12    A.    YES.

13    Q.    WHAT ABOUT MS. GIBSON, WAS SHE AFRICAN

14 AMERICAN OR IS SHE AFRICAN AMERICAN.

15    A.    NO.

16    Q.    HOW ABOUT MR. CROEGER?

17    A.    NO.

18    Q.    HE'S A WHITE MALE?

19    A.    YES.

20 MR. ROLNICK:  LET'S MARK NEXT IN ORDER NUMBER

21 EXHIBIT 11.

22    (WHEREUPON, DEFENDANTS' NO. 11 WAS

23    MARKED FOR IDENTIFICATION.)

24 MR. ROLNICK:  Q  DO YOU RECOGNIZE THIS EXHIBIT AS

25 ANOTHER PERFORMANCE EVALUATION PREPARED BY MS. RANDON

1    FOR YOU AND DELIVERED IN JULY OF 2002?

2       A.   YES.

3       Q.   AND SHE WAS YOUR SUPERVISOR DURING THE PERIOD

4    OF REPORTING HERE WHICH WAS JANUARY 1, '01 THROUGH MARCH

5    OF 2002; IS THAT CORRECT?

6       A.   IF I CAN RECALL, YES.

7       Q.   AND IT APPEARS EACH OF THE CATEGORIES THAT YOU

8    WERE RATED, THAT MS. RANDON RATED YOU AS A THREE FOR

9    COMPETENT AND EFFECTIVE; IS THAT RIGHT?

10      A.   YES.

11      Q.   NOW, YOU ALSO APPEAR TO HAVE REFUSED TO SIGN

12   THIS EVALUATION; IS THAT CORRECT?

13      A.   YES.

14      Q.   SHE RATED YOU OVERALL AS COMPETENT AND

15   EFFECTIVE AS WELL; IS THAT CORRECT?  IF YOU LOOK AT THE

16   LAST PAGE ON THE TOP.

17           DID SHE RATE YOU COMPETENT AND EFFECTIVE

18   OVERALL?

19      A.   YES.

20      Q.   AND WHY DID YOU DECIDE NOT TO SIGN THIS?

21      A.   THERE WAS SOME THINGS IN THIS APPRAISAL THAT I

22   DIDN'T AGREE UPON.  AND I'M NOT GOING TO SIGN AN

23   APPRAISAL IF I DON'T THINK IT'S DONE FAIRLY.  AND IF I

24   DON'T AGREE WITH IT, I'M NOT SIGNING IT.

25      Q.   DO YOU RECALL WHAT YOU THOUGHT WAS UNFAIR

1   ABOUT THIS APPRAISAL?

2       A.   NO, I DON'T RECALL WHAT WAS UNFAIR ABOUT THE

3   APPRAISAL?

4       MR. ROLNICK:  LET'S MARK NEXT IN ORDER EXHIBIT 12.

5       (WHEREUPON, DEFENDANTS' NO. 12 WAS

6       MARKED FOR IDENTIFICATION.)

7       MR. ROLNICK:  Q  DO YOU RECOGNIZE THIS DOCUMENT?

8       A.   YES, I DO.

9       Q.   AND IS THIS A DOCUMENT THAT YOU PREPARED

10  YOURSELF?

11      A.   NO, I'M NOT THAT GOOD AT THE COMPUTER.

12      Q.   DO YOU KNOW WHO PREPARED THIS FOR YOU?

13      A.   I CAN'T REMEMBER WHO PREPARED THIS FOR ME.  IT

14  COULD HAVE BEEN MY SON, I'M NOT SURE.

15      Q.   DOES THIS DOCUMENT REFLECT YOUR REBUTTAL TO

16  THE DOCUMENT THAT WE WERE JUST LOOKING AT, EXHIBIT 11?

17      A.   THIS SAYS AUGUST 6TH, 2002.

18      Q.   BUT IS THIS YOUR REBUTTAL TO THIS EVALUATION?

19      A.   YES, IT IS A REBUTTAL.

20      Q.   TO EXHIBIT 11?

21      A.   I THINK THAT IT IS.

22      Q.   IF YOU'LL LOOK AT EXHIBIT 12, THE ITEM MARKED

23  QUESTION 4.

24      A.   EXHIBIT 12?

25      Q.   YES, THE ONE THAT YOU HAVE IN YOUR HAND, I

1   BELIEVE.

2        A.    NINE, EIGHT, SIX.

3        Q.    IT'S THE ONE IN YOUR RIGHT HAND.

4        A.    OH, OKAY.  I'M SORRY.

5        Q.    IF YOU LOOK DOWN TO THE PARAGRAPH THAT BEGINS

6   QUESTION 4.

7        A.    UH-HUH.  YES.

8        Q.    YOU WROTE IN HERE "IN ALL MY YEARS OF

9   ARRANGING AND COORDINATING BLACK HISTORY PROGRAM, THIS

10  IS ONE YEAR WHERE I FELT VERY BELITTLED.  I FELT AS IF

11  THE SUPERVISOR FOR THIS PROGRAM SAW ONLY THE NEGATIVE IN

12  EACH OF THE STEPS THAT WERE IMPLEMENTED BY MYSELF.  I

13  FELT A SENSE OF LASSITUDE AND RELUCTANCE FROM THE

14  SUPERVISOR OF THIS PROGRAM."

15            WHO WAS THE SUPERVISOR THAT YOU WERE REFERRING

16  TO?

17       A.    I THINK I WAS REFERRING TO MR. FRAZIER.

18       Q.    AND YOU'RE ALSO REFERRING TO MR. FRAZIER WHEN

19  YOU WRITE "THE DIRECTOR OF ACTIVITIES AND THE ACTIVITY

20  THERAPIST'S SUPERVISOR EXPRESSED THE DESIRE FOR THE

21  THEME OF THE BLACK HISTORY PROGRAM TO BE EDUCATIONAL."

22       A.    YES.

23       Q.    IS THAT THE DIRECTOR OF ACTIVITIES AND THE

24  ACTIVITY THERAPIST'S SUPERVISOR IS BOTH MR. FRAZIER OR

25  ARE YOU REFERRING TO MR. FRAZIER ON THE ONE HAND AS THE

1    DIRECTOR OF ACTIVITIES AND SOMEBODY ELSE AS THE ACTIVITY

2    THERAPIST'S SUPERVISOR?

3         A.    YES, I WAS REFERRING TO MR. FRAZIER AS THE

4    DIRECTOR OF OUR DEPARTMENT AND ALSO TO THE ACTIVITIES

5    SUPERVISOR.

6         Q.    YOUR SUPERVISOR?

7         A.    YES.

8         Q.    AND THAT WOULD HAVE BEEN MS. RANDON; IS THAT

9    CORRECT?

10        A.    EITHER IT WAS MS. RANDON OR MS. HANSON.

11        Q.    NOW, A LINE OR SO DOWN YOU SAY "A CHANGE OF

12   THE PERFORMING DATE OF THE BLACK HISTORY WAS MADE TWO

13   WEEKS BEFORE THE ORIGINAL DATE.  WHY," QUESTION MARK.

14             THIS WAS ONE OF THE INCIDENTS THAT WE TALKED

15   ABOUT THE FIRST DAY OF YOUR DEPOSITION; IS THAT RIGHT?

16        A.    YES.

17        Q.    AND THAT WAS MR. FRAZIER WHO MADE A CHANGE

18   ABOUT A PERFORMING DATE; IS THAT CORRECT?

19        A.    YES.

20        Q.    AND IT SEEMS TO ME FROM YOUR MEMO HERE THAT

21   THIS CAUSED SOME PROBLEMS ABOUT RECEIVING MONEY TO PAY

22   FOR THE PERFORMERS; IS THAT RIGHT?

23        A.    YES.

24        Q.    AND IT ALSO SOUNDS LIKE IT LEAD TO SOME

25   PROBLEMS ABOUT ARRANGING FOR THEM TO HAVE PARKING SPACES

1   AT THE HOSPITAL; IS THAT ALSO CORRECT?

2      A.   YES.

3      Q.   AND WERE YOU EVER DISCIPLINED FOR ANY OF THESE

4   ISSUES RELATED TO BLACK HISTORY MONTH?

5      A.   I'M SORRY.   COULD YOU REPEAT THAT QUESTION?

6      Q.   I WAS JUST WONDERING WHETHER THESE ISSUES

7   RESULTED IN ANY DISCIPLINE FOR YOU SURROUNDING BLACK

8   HISTORY MONTH DURING THIS YEAR?

9      A.   I DIDN'T RECEIVE A WRITE-UP REGARDING ANYTHING

10  REGARDING THE BLACK HISTORY PROGRAM.   BUT I FELT LIKE I

11  WAS BEING SET UP, DISCRIMINATED AGAINST.   BECAUSE OF THE

12  FACT THAT I HAD PLANNED THIS BLACK HISTORY PROGRAM A

13  YEAR IN ADVANCE OR LESS WITH ALL OF THESE PERFORMERS,

14  WITH THE VOLUNTEERS AND TO HAVE THE PROGRAM TO BE

15  CHANGED TWO WEEKS BEFORE THE DATE WAS OVERWHELMING FOR

16  ME.

17     Q.   WAS IT MR. FRAZIER WHO CHANGED THE DATES?

18     A.   YES.

19     Q.   DID HE GIVE YOU ANY REASON AS TO WHY THE DATE

20  OR DATES WERE CHANGED?

21     A.   I DON'T REMEMBER WHAT THE REASON WAS FOR THE

22  CHANGE OF DATE.   BUT I DO REMEMBER GOING AND TALKING TO

23  MR. FRAZIER AND TELLING HIM THAT WHY DIDN'T HE LET ME

24  KNOW MONTHS IN ADVANCE BECAUSE PEOPLE THAT WAS

25  PERFORMING HAD TAKEN OFF FROM WORK TO DO THIS FOR THE

1    HOSPITAL.

2           ONE OF THE BAND LEADERS HAD MET WITH THE

3    SUPERVISOR, AS I STATED BEFORE, TO MAKE SURE THAT HE

4    WOULD HAVE HIS MONEY FOR HIS BAND THE DAY OF THE EVENT.

5    HE MET WITH MYSELF AND JOHN CHAN.  HE WAS TOLD THAT HE

6    WOULD HAVE HIS CHECK THE DAY OF THE EVENT AFTER THE

7    EVENT WAS OVER.

8           WHEN THE EVENT CAME TO THE ENDING, JOHN CHAN

9    TOLD HIM THAT HE COULDN'T GIVE HIM HIS MONEY, THAT THEY

10   WOULD HAVE TO MAIL HIM A CHECK LATER.  THE BAND LEADER

11   GOT UPSET WITH ME AND SAID THAT HE HAD PAID HIS BAND OUT

12   OF HIS POCKET THINKING THAT HE WOULD GET THE MONEY ON

13   THAT DAY.

14          AND THAT WE HAD PROMISED HIM THAT HE WOULD

15   HAVE HIS MONEY.  HE MADE A TRIP OUT TO MEET WITH US TO

16   MAKE SURE THAT HE WOULD HAVE HIS MONEY SO HE KNEW --

17   WOULD KNOW HOW TO DISTRIBUTE THIS MONEY TO HIS BAND.

18      Q.    SO YOU SAY YOU DON'T RECALL WHAT THE REASON

19   WAS AS TO WHY THE DATE WAS MOVED, BUT MR. FRAZIER DID

20   GIVE YOU SOME REASON FOR MOVING THE DATE?

21      A.    I'M REALLY, REALLY TRYING TO THINK WHAT THE

22   REASON WAS, BUT I JUST CAN'T.  I WAS JUST SO OVERWHELMED

23   WITH HIM CHANGING THE DATE.

24      Q.    BUT MY QUESTION IS A LITTLE DIFFERENT.

25          HE DID GIVE YOU A REASON FOR CHANGING THE

1      A.   AS I COULD RECALL, IT WAS -- IF I'M NOT

2   MISTAKEN, I THINK JOHN CHAN WAS THERE, AND I THINK

3   DESI SMITH -- I THINK HER NAME IS SMITH.

4      Q.   WHAT'S HER POSITION; DO YOU RECALL?

5      A.   DESI WAS AN ACTIVITY THERAPIST AS WAS MYSELF.

6      Q.   DO YOU RECALL ANYBODY ELSE BEING AT THIS

7   MEETING?

8      A.   I CAN'T RECALL IF THERE WAS ANYONE ELSE.

9      Q.   AND WHAT DO YOU RECALL MS. JOHNSON SAYING

10  SPECIFICALLY ABOUT WHY SHE BELIEVED DISCRIMINATION WAS

11  AT PLAY?

12     A.   IF I COULD REMEMBER CORRECTLY, SHE WAS UPSET

13  WITH THE FACT THAT THE DATE WAS CHANGED, WHICH WE HAD

14  PLANNED A YEAR IN ADVANCE.   THE MONIES WASN'T THERE FOR

15  THE PERFORMERS AS THEY WERE PROMISEED THAT IT WOULD BE

16  THERE.

17         SHE WAS ALSO UPSET BECAUSE WE HAD A PERSON

18  THAT HAD A DISPLAY OF ALL KINDS OF THINGS THAT THE BLACK

19  INVENTORS HAD MADE.   AND HE ALSO HAD VIDEOS EXPLAINING

20  TO THE RESIDENTS THE NAME OF THE INVENTOR.   HE ALSO HAD

21  THE DISPLAY -- HE HAD TEN TABLES OF ALL TYPES OF --

22  MR. FRAZIER WANTED US TO CUT DOWN THE TABLES.

23     Q.   ANYTHING ELSE THAT SHE FELT WAS

24  DISCRIMINATION?

25     A.   SHE ALSO FELT LIKE WHEN THE WHITE ATS WOULD

1   PUT ON A PROGRAM, THEY DIDN'T HAVE TO GO THROUGH THE

2   PROBLEMS AND THINGS THAT WE HAD TO GO THROUGH WITH.

3   THEY WOULD RECEIVE THEIR MONIES ON TIME.   THEIR

4   PROGRAMS, THE DATES WERE NEVER CHANGED ON THEIR

5   PROGRAMS.

6        Q.   DID SHE GIVE ANY SPECIFIC EXAMPLE?

7        A.   SHE DID, BUT I CAN'T REMEMBER WHAT THE

8   EXAMPLES WERE.

9        Q.   NOW, THE BLACK HISTORY MONTH PROGRAM, YOU WERE

10  THE COORDINATOR FOR THIS FOR A NUMBER OF YEARS, IS THAT

11  RIGHT, YOU AND MS. JOHNSON?

12       A.   NO.   I WAS COORDINATOR.   I THINK ABOUT MAYBE

13  FIVE YEARS BEFORE SANDRA CAME ON BOARD.

14       Q.   AND THEN YOU WERE ALSO COORDINATOR FOR A FEW

15  YEARS AFTER SHE CAME ON BOARD?

16       A.   NO.   I THINK AFTER THAT INCIDENT WITH THE

17  PEOPLE NOT BEING PAID ON TIME AND THE DATE, THAT THEY

18  HAD SAID THEY WOULD PAY THEM -- AFTER THE PROGRAM BEING

19  CHANGED TWO WEEKS BEFORE, I COULDN'T TAKE IT ANYMORE.

20  AND I STOPPED DOING IT.

21       Q.   WHEN YOU WERE THE COORDINATOR, THIS WAS A

22  SINGLE PROGRAM DURING THE MONTH OF FEBRUARY EACH YEAR?

23       A.   YES.

24       Q.   SO IT WASN'T SPREAD OUT OVER A NUMBER OF DAYS?

25       A.   PRIOR TO THIS, 2002, TO THE BLACK HISTORY

1    PROGRAM, IF I CAN RECALL, I THINK WE DID HAVE ONE BLACK

2    HISTORY PROGRAM THAT WAS TWO DAYS, BUT I'M NOT SURE.

3        Q.    BUT IN MOST CASES, IT WAS A ONE-DAY EVENT?

4        A.    RIGHT.

5        Q.    AND FROM THESE PERFORMANCE EVALUATIONS IT

6    LOOKS LIKE THE PROGRAM WAS TYPICALLY ABOUT AN HOUR AND A

7    HALF LONG?

8        A.    YES.  AND I HAD ISSUES WITH THAT BECAUSE

9    SOMETIMES THE PROGRAM WOULD GO TWO HOURS AND I WAS TOLD

10   IT HAD TO -- FIRST, IT WAS SUPPOSED TO GO ONLY ONE HOUR.

11   AND I COMPLAINED SAYING THAT I CAN'T GET THIS DONE IN

12   ONE HOUR, AT LEAST GIVE ME TWO HOURS.

13           AND THEN I WAS TOLD "NO, YOU'VE GOT TO KEEP IT

14   DOWN TO AN HOUR AND A HALF."  THEN I KEPT GOING AND

15   GOING AND SAYING "YOU'VE GOT TO GIVE ME TWO HOURS."  AND

16   THEN HE FINALLY AGREED TO GIVE ME TWO HOURS.

17       Q.    WHEN WAS THAT?

18       A.    THAT WAS FOR THIS PROGRAM IN 2002.  BECAUSE

19   AFTER DOING THIS IN 2002, IF I COULD RECALL, I DIDN'T DO

20   ANY MORE (INDICATING).

21       Q.    AND WAS THIS PROGRAM FOR ALL OF THE PATIENTS

22   AT THE HOSPITAL OR JUST FOR THE CLUSTER THAT YOU WORKED

23   WITH?

24       A.    FOR THE ENTIRE HOSPITAL.

25       Q.    AND WERE THERE OTHER PROGRAMS LIKE THIS THAT

1    WERE FOR THE ENTIRE HOSPITAL?

2         A.    YES.

3         Q.    WHAT OTHER PROGRAMS WERE LIKE THAT?

4         A.    CHINESE NEW YEAR'S.  HALLOWEEN, THE HAUNTED

5    HOUSE.  NEW YEARS EVE BASH.

6         Q.    ANYTHING ELSE?

7         A.    CHRISTMAS, THE CHRISTMAS SHOW.  DID I SAY

8    CHINESE NEW YEAR'S?

9         Q.    YES, YOU DID.

10         I HAVE CHINESE NEW YEAR'S EVE, HALLOWEEN, NEW

11    YEAR'S EVE BASH, CHRISTMAS SHOW.

12         ANY OTHER HOSPITAL-WISE PROGRAMS?

13         A.    ST. PATRICKS DAY.  VALENTINES TALENT SHOW.

14    EASTER, EASTER EGG HUNT.

15         Q.    ANY OTHER HOSPITAL-WISE PROGRAMS THAT YOU

16    RECALL?

17         A.    I'M SURE THAT THERE ARE MORE, BUT I CAN'T

18    RECALL THEM.

19         Q.    OTHER THAN THE BLACK HISTORY PROGRAM, WERE YOU

20    INVOLVED IN COORDINATING ANY OF THESE OTHER

21    HOSPITAL-WIDE PROGRAMS?

22         A.    DURING 2002?

23         Q.    AT ANY TIME.

24         A.    THE BLACK HISTORY PROGRAM WAS THE ONLY PROGRAM

25    THAT I COORDINATED.  ALL THE OTHER PROGRAMS I

1      MR. ROLNICK:  WHY DON'T WE GO BACK ON THE RECORD.

2      Q.   MS. ABRAM, OTHER THAN THE ONE OCCASION THAT

3  WE'VE BEEN DISCUSSING ABOUT BLACK HISTORY MONTH IN 2002,

4  WAS THERE ANY OTHER OCCASION ON WHICH MR. FRAZIER

5  CHANGED DATES FOR THAT PROGRAM?

6      A.   NOT THAT I COULD RECALL.

7      Q.   AND HOW OFTEN OR HOW FREQUENTLY DID YOU SEE

8  MR. FRAZIER WHEN YOU WERE WORKING?

9      A.   EVERY DAY.  'CAUSE I WOULD -- I'VE -- OUT OF

10  THE 23 YEARS THAT I'VE WORKED AT LAGUNA HONDA OR 20

11  YEARS I'VE NEVER BEEN LATE.  I'M ALWAYS THERE 6:30,

12  QUARTER TO 7:00.  AND MR. FRAZIER WOULD COME IN AROUND

13  THAT TIME, ALSO.  AND THEN ON A TUESDAY NIGHT PROGRAM, I

14  WOULD WORK WITH HIM.

15      Q.   WHEN YOU SAY YOU WOULD WORK WITH HIM ON A

16  TUESDAY NIGHT PROGRAM, WOULD YOU WORK CLOSELY?  I'M

17  TRYING TO FIND OUT HOW OFTEN YOU WORKED IN PROXIMITY OR

18  WORKED CLOSELY WITH HIM.

19      A.   WELL, I WOULD WORK, LIKE, ON THE THIRD FLOOR

20  IN MARIN HALL, AND MR. FRAZIER SOMETIMES IT WOULD JUST

21  BE THE TWO OF US.  AND HE WOULD WORK THE DANCE PARTY ON

22  THE SIXTH FLOOR OR HE WOULD GO TO CLARENDON HALL.

23      Q.   OTHER THAN -- AND THOSE WERE TUESDAY NIGHTS

24  YOU SAID?

25      A.   TUESDAY NIGHT.

1    Q.    EVERY TUESDAY NIGHT?

2    A.    EVERY TUESDAY NIGHT.

3    Q.    OTHER THAN THOSE TIMES, HOW CLOSELY DID YOU

4    WORK WITH MR. FRAZIER?

5    A.    WELL, WHEN WE DID THE HAUNTED HOUSE FOR

6    HALLOWEEN, I PLAYED AS THE WITCH AND HE PLAYED AS THE --

7    I CAN'T THINK OF THE NAME OF THE CHARACTER, BUT IT WAS A

8    MAN WITH HIS HEAD, I THINK, CUT OFF.

9    Q.    I GUESS THE QUESTION I'M TRYING TO GET

10   ANSWERED IS ON A DAY-IN AND DAY-OUT BASIS, WHAT

11   PERCENTAGE OF YOUR WORKDAY DID YOU SPEND IN PROXIMITY TO

12   MR. FRAZIER.

13   A.    CAN YOU REPEAT THAT QUESTION?

14   Q.    SURE.  ON A GENERAL DAY-TO-DAY BASIS, WHAT

15   PERCENTAGE OF YOUR TIME DID YOU SPEND IN PROXIMITY, IN

16   THE SAME WORKSPACE AS MR. FRAZIER?

17   A.    VERY LITTLE.  BECAUSE WHEN I WOULD GET TO WORK

18   AT 8:30, I'D LEAVE THE DEPARTMENT AFTER I WOULD SIGN UP

19   AND DO THE COMPUTER.  BECAUSE I WOULD DO THE COMPUTER

20   EVERY DAY TO TRY TO LEARN THAT COMPUTER.  MY ACTIVITIES

21   USUALLY START AROUND 10:00.  I WOULD LEAVE THE

22   DEPARTMENT AND GO TO MY UNIT AND THAT'S WHERE I WOULD

23   REMAIN UP UNTIL 4:00 O'CLOCK OR 4:30.

24   Q.    OKAY.

25   A.    AND THEN I WOULD SIGN UP -- WE HAD A BOOK I

1    WOULD SIGN UP FOR THE COMPUTER AND THEN IT WOULD BE TIME

2    TO GO HOME.

3         Q.    AND I'M TRYING TO GET A SENSE OF A TYPICAL

4    DAY.

5              YOU WOULD SHOW UP FOR WORK.  MR. FRAZIER WOULD

6    ALREADY BE THERE, TYPICALLY?

7         A.    I WOULD ALWAYS GET THERE FIRST AND THEN HE

8    WOULD COME IN LATER.

9         Q.    SO YOU WOULD SEE EACH OTHER IN THE HALLWAY?

10        A.    NO.  I WOULD BE IN THE BACK OF THE DEPARTMENT

11   IN THE -- I GUESS WE WOULD CALL IT THE STAFF ROOM.  AND

12   I WOULD BE IN THE BACK BECAUSE I DIDN'T START UNTIL

13   8:30.  SO I WOULD BE IN THE BACK READING MY NEWSPAPER

14   UNTIL -- UNTIL IT WAS TIME FOR ME TO START DOING MY

15   DAILY JOB.

16        Q.    SO WHEN WOULD YOU SEE MR. FRAZIER FIRST DURING

17   A TYPICAL DAY?

18        A.    IF WE HAD A STAFF MEETING.

19        Q.    OKAY.  HOW OFTEN DID YOU HAVE STAFF MEETINGS?

20        A.    I KNOW FOR SURE ONCE A MONTH, BUT SOMETIMES IT

21   WOULD BE MORE THAN THAT.  IT WOULD DEPEND ON WHAT WAS

22   OCCURRING IN THE HOSPITAL.

23        Q.    IF THERE WASN'T A STAFF MEETING, WHAT WOULD BE

24   YOUR FIRST INTERACTION WITH MR. FRAZIER ON A TYPICAL

25   DAY?

1      A.    MY ONLY INTERACTION WITH HIM WOULD BE, LIKE,

2  IN THE MORNING WHEN HE WOULD COME IN AND I WOULD BE

3  LEAVING THE DEPARTMENT GOING TO MY WARD.  IF I WOULD SEE

4  HIM, I WOULD SAY GOOD MORNING AND THEN GO DOWN TO MY

5  WARD.

6      Q.    AND THEN ON A TYPICAL DAY YOU PROBABLY

7  WOULDN'T SEE HIM THE REST OF THE DAY; IS THAT RIGHT?

8      A.    THAT VARIED.

9      Q.    OKAY.

10     A.    BECAUSE SOMETIMES HE WOULD BE IN HIS OFFICE

11 AND HE WOULD COME OUT INTO THE DEPARTMENT AND I WOULD BE

12 ON THE COMPUTER, SO I WOULD SEE HIM.

13     Q.    SO YOU'D SEE HIM?

14     A.    YES.

15     Q.    BUT WHAT ABOUT ON A TYPICAL DAY, HOW OFTEN

16 WOULD YOU ACTUALLY WORK WITH HIM?

17     A.    THAT DEPENDS ON WHAT WAS GOING ON.  IF THERE

18 WAS IN-SERVICE, I WOULD SEE HIM.  OR IF HE CALLED A

19 SPECIAL MEETING, I WOULD SEE HIM.  OR IF HE JUST

20 HAPPENED TO GO TO MY WARD TO CHECK TO LOOK IN MY CHARTS,

21 I WOULD SEE HIM.  I CAN'T THINK OF -- I CAN'T RECALL OF

22 ANY OTHER TIMES.

23     Q.    NOW, YOU MENTIONED AND WE TALKED ABOUT THIS

24 EARLIER, THE COMPUTER AND TRAINING.

25          DID YOU RECEIVE ANY HANDS-ON TRAINING FROM

1    MS. HANSON ABOUT OPERATING THE COMPUTER?

2        A.    MS. HANSON WAS SO RUDE TO ME WITH THAT

3    COMPUTER.  ONE TIME I ASKED HER TO HELP ME AND SHE

4    STATED TO ME I SHOULD GET A BOOK.  AND I STATED TO HER I

5    HAVE A BOOK, BUT I CAN'T COMPREHEND WITH THE BOOK.

6            SHE HAD GIVEN SOME OF MY WHITE COLLEAGUES A

7    DISK THAT COULD GO INTO THE COMPUTER TO DO YOUR CALENDAR

8    FOR A YEAR, A MONTHLY CALENDAR FOR A YEAR.  AND I JUST

9    HAPPENED TO SEE MY CO-WORKER WITH THIS CALENDAR ON THE

10   COMPUTER.  AND I ASKED HIM "HOW DID YOU GET YOUR

11   CALENDAR ON THE COMPUTER?"

12           HE SAID, "OH, I COULD GET IT FOR A YEAR."  AND

13   HE SAID, "HASN'T CHRISTINE GIVEN YOU YOUR DISK YET?"

14           AND AT THAT TIME SHE HADN'T GIVEN ME THE DISK.

15   AND THEN WHEN I ASKED HER IF SHE COULD GIVE ME THE DISK

16   FOR THE YEARLY CALENDAR, SHE GAVE THE DISK TO ME.  I

17   DIDN'T KNOW WHERE TO PUT THE DISK BUT ONE OF MY

18   CO-WORKERS SHOWED ME WHERE TO PUT THE DISK.

19           WHEN I GOT THE SWING OF FINALLY GETTING THE

20   CALENDAR IN THE COMPUTER, CHRISTINE HANSON TOOK THE

21   DISKS AWAY FROM ME AND TOLD ME I HAD TO GET A DISK OF MY

22   OWN.  AND I WAS, LIKE, I DON'T KNOW ANYTHING ABOUT THE

23   DISK.  I DON'T KNOW HOW TO GET IT.  I DON'T KNOW WHERE

24   TO GET IT FROM.  AND I WAS JUST OVERWHELMED.

25           SO I CALLED MY SON AND I WAS CRYING, UPSET,

1    BECAUSE I NEEDED MY JOB.

2            AND NOT ONLY THAT, I WAS WILLING TO LEARN, I

3    WAS WILLING TO WORK WITH THEM AS A TEAM.  BUT I FELT

4    THAT IT WAS UNFAIR TO GIVE ME A DEVELOPMENT PLAN OF THIS

5    NATURE.

6        Q.   WELL, MY QUESTION WAS DURING THIS JUNE 13

7    MEETING, DID HE YELL AT YOU?

8        A.   HE TOLD ME TO GET OUT OF HIS OFFICE.

9        Q.   DID HE YELL AT YOU DURING THIS JUNE 13

10   MEETING?

11       A.   I WAS TOLD TO GET OUT OF HIS OFFICE.

12       Q.   DID HE SAY THAT IN A LOUD VOICE?

13       A.   IT WAS LOUD ENOUGH FOR ME.  AS I STATED

14   BEFORE, IF YOU WENT INTO MR. FRAZIER'S OFFICE AND IF YOU

15   DIDN'T AGREE WITH WHAT HE SAID, HE WOULD KICK -- HE

16   WOULD KICK ME OUT OF HIS OFFICE.

17       Q.   DID YOU EVER SEE HIM DO THAT TO OTHER PEOPLE?

18       A.   I'VE ONLY HEARD HIM YELLING AND CUSSING AND

19   SCREAMING IN HIS OFFICE.  I DON'T KNOW WHO WAS IN THERE

20   BECAUSE THE DOOR WAS CLOSED.  BUT THE WHOLE DEPARTMENT

21   COULD HEAR IT.

22            AND I ONLY COULD SPEAK FOR THE WAY HE TREATED

23   ME, AND WHAT HE DID FOR ME.  AND HOW HE WOULD KICK ME

24   OUT OF THE OFFICE WHEN I WOULD GO IN THERE AND COMPLAIN.

25            AND IF I DIDN'T AGREE WITH WHAT HE WANTED ME

1    TO AGREE WITH, HE WOULD KICK ME OUT OF THE OFFICE AND

2    TELL ME TO GO TO THE UNION.

3        SKWRAO:  WHY DON'T WE MARK THIS NEXT IN ORDER AS

4    EXHIBIT 16.

5        (WHEREUPON, DEFENDANTS' NO. 16 WAS

6        MARKED FOR IDENTIFICATION.)

7        SKWRAO:  Q  DO YOU RECOGNIZE THIS DOCUMENT?

8        A.    YES, I DO.

9        Q.    IS THIS A MEMORANDUM THAT YOU RECEIVED FROM

10   MR. FRAZIER --

11       A.    YES.

12       Q.    -- IN APRIL OF 2001?

13       A.    YES, IT IS.

14       Q.    AND THIS MEMO CONCERNED PROPOSED ACTIVITY YOU

15   WERE DOING WITH THE RESIDENTS IN THE D-3 CLUSTER TO COOK

16   FRIED CHICKEN; IS THAT RIGHT?

17       A.    YES.

18       Q.    AND MR. FRAZIER TALKED TO YOU AROUND THIS TIME

19   ABOUT SOME CONCERNS THAT HE HAD HEARD FROM THE

20   NUTRITIONAL SERVICES DEPARTMENT ABOUT THIS ACTIVITY; IS

21   THAT CORRECT?

22       A.    THAT'S WHAT HE STATED.  MR. FRAZIER HAD HURT

23   MY FEELINGS SO BAD WITH THIS ACTIVITY.  FIRST OF ALL, HE

24   MADE THE STATEMENT THAT EVERY TIME I COOK, THE RESIDENTS

25   WOULD GET SICK.  THAT REALLY TORE ME UP.  I WENT TO THE

1    UNION ABOUT IT.

2            THE UNION TOLD HIM THAT HE SHOULD APOLOGIZE TO

3    ME FOR MAKING THAT STATEMENT, THAT THAT WAS NOT RIGHT.

4    THE WHITE COLLEAGUES, THEY WOULD COOK SOMETIMES TWO OR

5    THREE TIMES A WEEK, HE NEVER MADE ANY KIND OF COMMENT TO

6    THEM LIKE THAT.

7        Q.    HOW DO YOU KNOW THAT?

8        A.    I SOMETIMES WOULD BE IN THE DEPARTMENT WHILE

9    WE WOULD PREPARE OUR CARTS.  WE HAD CARTS AND WE WOULD

10   PREPARE THE FOOD, THE ELECTRIC SKILLET OR THE CROCK POT

11   ON THE CART.  HE WOULD COME THROUGH THE DEPARTMENT

12   SOMETIMES, HE NEVER WOULD SAY ANYTHING TO THEM WITH

13   THEIR FOOD ON THE CART.

14       Q.    SO YOU NEVER HEARD HIM SAY SIMILAR THINGS TO

15   OTHER PEOPLE?

16       A.    NO.

17           WHEN I HAD TALKED TO MR. FRAZIER AND I TOLD

18   HIM THAT HE HURT MY FEELINGS SAYING THAT, AND WHY WOULD

19   HE SAY THAT, I THEN -- THEN HE SAID TO ME THAT THE

20   DIETICIAN DEPARTMENT WAS THE ONE THAT WAS COMPLAINING.

21   THE DIETICIAN THAT WORKED MY WARD WAS IN A GROUP

22   COMMUNITY MEETING WHEN ONE OF THE RESIDENTS WANTED TO

23   COOK THIS SPECIAL FRIED CHICKEN THAT SHE LEARNED HOW TO

24   COOK FROM HER GRANDMOTHER.

25           AND I FOUND IT -- AND THE DIETICIAN WAS IN

1    THIS MEETING THAT WE WAS HAVING WITH THE RESIDENTS

2    BECAUSE IT WAS A COMMUNITY MEETING.  AND THE DIETICIAN

3    WAS SAYING "OH, SUSIE, YOU SHOULD -- YOU GUYS SHOULD

4    COOK THIS FRIED CHICKEN."  WE VOTED AMONG THE RESIDENTS

5    AND THIS IS WHAT THEY WANTED TO DO WAS FIX THIS FRIED

6    CHICKEN.

7         Q.    WHO WAS THE DIETICIAN?

8         A.    PATSEY WILSON, IF I'M NOT MISTAKEN.

9         Q.    WAS THAT CONVERSATION WHICH LED TO THE PLAN IN

10   APRIL OF 2001 TO COOK FRIED CHICKEN?

11        A.    YES.

12        Q.    DO YOU KNOW IF THE PERSON THAT MR. FRAZIER WAS

13   TALKING ABOUT FROM NUTRITIONAL SERVICES DEPARTMENT WAS

14   PATSEY OR SOMEONE ELSE?

15        A.    IT COULDN'T HAVE BEEN PATSEY BECAUSE SHE WAS

16   THE PERSON IN THE MEETING SHE WAS THE DIETICIAN ON OUR

17   WARD.

18        Q.    HOW DO YOU KNOW IT WAS PATSEY?

19        A.    BECAUSE, YOU KNOW, I WENT AND I ASKED PATSEY

20   BECAUSE I WAS CONFUSED.  I SAID, "PATSEY, WE HAD A

21   COMMUNITY MEETING, YOU ALSO SUGGESTED THAT WE TRY THIS

22   CHICKEN, THIS FRIED CHICKEN THAT THE RESIDENT WANTED TO

23   DO.  DID YOU SAY THAT IT WASN'T -- WE SHOULDN'T DO IT?"

24        SHE SAID, "NO."

25        SO I FELT REALLY BAD ABOUT IT.  AND I WENT TO

1    BILL AND I HAVE THE CHICKEN THAT I HAD BOUGHT FROM

2    SAFEWAY'S AND I SHOWED IT TO HIM.  HE SAID I THREW IT ON

3    HIS DESK BUT I DIDN'T.  I WENT IN, I TOOK THE CHICKEN, I

4    SAID, "BILL," I SAID, "HERE'S THE CHICKEN, I GOT IT FROM

5    SAFEWAY.  I JUST WANT YOU TO SEE THAT IT'S FRESH."

6         HE IN TURN TOLD ME THAT HE WAS GOING DOWN TO

7    THE NUTRITION DEPARTMENT TO FIND OUT IF IT WAS OKAY, IF

8    I COULD DO THIS CHICKEN.  AND I TOLD HIM I SAID, "WELL,

9    THIS WAS OKAYED BY THE DIETICIAN BECAUSE WE HAD A

10   COMMUNITY MEETING AND EVERYBODY AGREED THAT THAT WOULD

11   BE A GOOD THING TO DO.

12        "BECAUSE THIS RESIDENT DON'T VERY SELDOM

13   PARTICIPATES WITHIN THE GROUP.  AND TO GET HER TO

14   SUGGEST TO DO FRIED CHICKEN AND TO GIVE US THE RECIPE,

15   THAT WAS ONE OF MY GOALS THAT I HAD WITH HER TO

16   ACCOMPLISH."

17        Q.   DID YOU GO FORWARD WITH THIS ACTIVITY?

18        A.   YES, I DID.

19        Q.   HE WROTE HERE IN THE FIRST PARAGRAPH "I

20   INDICATED TO YOU THAT STAFF FROM NUTRITIONAL SERVICES

21   DEPARTMENT HAD EXPRESSED THEIR CONCERN ABOUT THE FRYING

22   OF FOOD ON D-3 THAT HAD TAKEN PLACE IN THE PAST."

23        DID HE TELL YOU WHAT THOSE CONCERNS WERE?

24        A.   NO, HE NEVER DID.

25        Q.   DID YOU ASK HIM?

1       A.    I WAS SO HURT AND SO UPSET, I CAN'T REMEMBER

2    WHETHER I ASKED HIM OR NOT.    I CAN'T RECALL.    BUT I

3    DID -- I DO RECALL SAYING TO HIM WHY IS IT YOU'RE

4    SINGLING ME OUT AND HARASSING ME WHEN GIOMI [PHONETIC]

5    DOES PIZZA ON HER WARD ALMOST EVERY WEEK.    OTHER

6    THERAPISTS, WHITE OF COURSE, BE COOKING -- SOMETIMES

7    THEY'D BE COOKING THREE TIMES A WEEK.    YOU NEVER SAY

8    ANYTHING TO THEM.

9            AND THEY'D BE FRYING CHICKEN, MAKING

10   HAMBURGERS, COOKING HOT DOGS.    THEN AGAIN HE TOLD ME IF

11   YOU DON'T LIKE THE WAY I'M RUNNING THE DEPARTMENT, GO TO

12   THE UNION.

13       Q.    DID YOU HAVE ANY OTHER CONFLICT WITH

14   MR. FRAZIER ABOUT COOKING OR FOOD PREPARATION ACTIVITIES

15   FOR YOUR PATIENTS?

16       A.    I THINK THIS IS -- THIS IS THE ONLY ONE THAT I

17   CAN RECALL (INDICATING).

18       SKWRAO:  WHY DON'T WE MARK THIS NEXT IN ORDER

19   17.

20       (WHEREUPON, DEFENDANTS' NO. 17 WAS

21       MARKED FOR IDENTIFICATION.)

22       SKWRAO:  Q  DO RECOGNIZE THIS DOCUMENT?

23       A.    YES.

24       Q.    AND IS THIS A MEMO THAT YOU RECEIVED FROM

25   MR. FRAZIER --

1      A.    YES.

2      Q.    -- AROUND NOVEMBER 22ND, 2004?

3      A.    YES.

4      Q.    AND IN THE SECOND PARAGRAPH, IT NOTES THAT YOU

5  HAD A MEETING WITH MR. FRAZIER ON NOVEMBER 4TH DURING

6  WHICH YOU COMPLAINED ABOUT WHAT YOU BELIEVE WERE HIS

7  FAILURE TO FOLLOW THROUGH ON PLANS TO BAN THE PRESENCE

8  OF MS. HANSON'S DOG FROM THE ACTIVITY THERAPY

9  DEPARTMENT; IS THAT CORRECT?

10     A.    YES.

11     Q.    AND IS IT ALSO CORRECT THAT THE FIRST TIME YOU

12  RAISED THIS ISSUE WITH MR. FRAZIER WAS ON SEPTEMBER 27,

13  2004?

14     A.    I THINK I RESPONDED TO THIS ISSUE BEFORE THIS

15  2004.  BECAUSE CHRISTINE THREATENED ME WITH THE DOG.

16  WHEN SHE FIRST BECAME MY SUPERVISOR, SHE SAID TO ME IF

17  YOU YELL OR SCREAM AT ME, KIMO WILL EAT YOU UP.

18     Q.    WHAT KIND OF DOG WAS MS. HANSON'S DOG.

19     A.    HE WAS AN ADOPTED ABUSED PIT BULL.

20     Q.    AT ANY TIME DID YOU USE MS. HANSON'S DOG IN

21  YOUR ACTIVITY WITH PATIENTS.

22     A.    BEFORE CHRISTINE BECAME A SUPERVISOR, SHE WAS

23  AN ACTIVITY THERAPIST, SHE WOULD BRING ANOTHER DOG WHICH

24  WAS NOT A PIT BULL.  I WAS ASKED BY ONE OF MY

25  SUPERVISORS WHY IS IT ALL THE TIME I HAVE ANIMAL VISITS

1    I NEVER TAKES THE DOGS, I ALWAYS TAKE THE BIRDS OR THE

2    RABBITS OR THE PIGS OR THE GOATS.

3           I STATED THAT I HAVE AN ALLERGY TOWARDS DOGS,

4    TOWARDS THE FUR.  AND I WAS TOLD THAT "WELL, YOU KNOW,

5    ANIMAL VISITS IS ONE OF OUR -- ONE OF OUR SCOPES THAT WE

6    HAVE TO COVER."

7           SO IN ANSWER TO YOUR QUESTION, I THINK I DID

8    ONE TIME -- NOT KIMO, THERE'S ANOTHER DOG THAT SHE WOULD

9    BRING THERE.  AND AFTER I TOOK THAT DOG ONE TIME I SWORE

10   I WOULD NEVER EVER TAKE ANOTHER DOG.  I WOULD HAVE TO

11   TAKE A RABBIT OR A BIRD, BUT I WOULD NEVER TAKE DOGS.

12          BECAUSE THIS DOG TRIED TO RUN AWAY.  WHEN I

13   WOULD TAKE HIM TO THE WARD, HE WOULD JUMP UP ON THE

14   RESIDENTS.  AND EVEN MY HEAD NURSE TOLD ME "DON'T BRING

15   THE DOGS BACK ON THE WARD BECAUSE SOME OF THE PATIENTS

16   WAS PETRIFIED OF THOSE DOGS."

17       Q.   DID YOU HAVE ANY FOLLOW-UP CONVERSATIONS OR

18   COMMUNICATIONS WITH MR. FRAZIER AS A RESULT OF THIS

19   NOVEMBER 22ND, 2004 MEMO ABOUT THE DOG?

20       A.   IF I COULD RECALL, AFTER THE DOG RAN INTO MY

21   CUBICLE AND I URINATED ALL OVER MYSELF AND THE DOG WAS

22   RUNNING ALL OVER THE DEPARTMENT NOT ON THE LEASH,

23   GROWLING AT ME, I DID GO TO BILL AND I SAID TO HIM "THE

24   DOGS -- FROM YOUR MEMOS, THE DOG WAS SUPPOSED TO STAY ON

25   THE LEASH.  THE DOG IS NOT BEING ON THE LEASH, HE'S

1    CAN'T SEE VERY WELL -- ONE·IS A PICTURE OF A WHITE DOG

2    AND THE OTHER -- AND A BLACK DOG.

3        A.    YES.

4        Q.    WHAT ARE THE NAMES OF THESE DOGS?

5        A.    THE BLACK DOG IS LULU AND I DON'T KNOW THE

6    OTHER DOG.

7        Q.    DO YOU HAVE THE ORIGINAL PHOTOGRAPHS FOR THESE

8    THAT WE'RE LOOKING AT?

9        A.    MY ATTORNEY HAS THEM.

10        Q.    SO THERE IS, IN FACT, A SECOND DOG IN THIS

11    SECOND PICTURE, THOUGH IT'S VERY HARD TO TELL FROM THIS

12    XEROX COPY, THERE IS A SECOND DOG THERE?

13        A.    I DON'T KNOW WHO -- WHAT THE SECOND DOG IS.  I

14    ONLY KNOW LULU.

15        Q.    BUT THERE IS A SECOND DOG IN THE PICTURE IN

16    THE ORIGINAL PHOTO THAT YOU HAVE?

17        A.    I CAN'T RECALL IF THERE IS OR NOT.  I DON'T

18    WANT TO SAY THERE IS AND THERE MIGHT NOT BE.

19        Q.    AND ON THE FINAL PAGE THERE'S A SINGLE DOG.

20            WHICH DOG IS THIS; DO YOU KNOW?

21        A.    I THINK THIS IS THE DOG THAT WAS ON THIS OTHER

22    PAGE, IF I'M NOT MISTAKEN (INDICATING).

23        Q.    DO YOU KNOW THAT DOG'S NAME OR WHO THAT DOG

24    BELONGS TO?

25        A.    NO, I DON'T.  I THINK THIS DOG BELONGS TO

1    TONY, BUT I'M NOT SURE.

2         Q.    WASN'T LULU TONY'S DOG?

3         A.    YES.

4         Q.    SO YOU THINK TONY BROUGHT TWO DIFFERENT DOGS

5    TO WORK?

6         A.    YES.    TONY HAD I THINK THREE DOGS, IF I'M NOT

7    MISTAKEN.

8         SKWRAO:  LET'S MARK THIS NEXT IN ORDER 22.

9         (WHEREUPON, DEFENDANTS' NO. 22 WAS

10        MARKED FOR IDENTIFICATION'S.)

11        SKWRAO:  Q  MS. ABRAM, DO YOU RECOGNIZE WHAT HAS

12   BEEN MARKED AS EXHIBIT 22?

13        A.    YES.

14        Q.    CAN YOU TELL ME WHAT IT IS?

15        A.    IT'S THINGS THAT I WROTE UP AND THAT MY

16   DAUGHTER-IN-LAW TYPED OUT FOR ME THAT HAD HAPPENED,

17   THINGS THAT HAPPENED TO ME WHILE DURING THE TIME THAT I

18   WAS WORKING AT LAGUNA HONDA.

19        Q.    WHEN DID YOU CREATE THIS DOCUMENT OR WHEN WAS

20   THIS DOCUMENT CREATED?

21        A.    I -- I'M NOT REALLY SURE OF THE YEAR, BUT IT

22   HAD TO BE IN 2000, MAYBE, THAT MY DAUGHTER-IN-LAW AND MY

23   SON -- I WROTE ALL OF THIS OUT, AND THEY DID IT ON THE

24   COMPUTER FOR ME.

25        Q.    SO THIS WAS A RUNNING LIST?

1    A.    YES.

2    Q.    YOU THINK YOU STARTED SOMETIME IN 2000?

3    A.    MIGHT HAVE BEEN '99.

4    Q.    AND WHEN DID YOU FINISH THIS LIST?

5    A.    OH, I'M SORRY.  MY -- I WROTE ALL OF THIS OUT

6    AND GAVE IT TO MY DAUGHTER-IN-LAW TO TYPE THIS OUT FOR

7    ME.  AND IT HAD TO BE IN 2004.

8    Q.    WHY DO YOU SAY THAT?

9    A.    OR 2000 -- IT HAD TO HAVE BEEN IN 2004 OR

10   2003.

11   Q.    WHY DO YOU BELIEVE IT WAS ONE OF THOSE YEARS?

12   A.    BECAUSE I WAS REALLY UPSET.  AND I WOULD CALL

13   MY SON CRYING, COULDN'T EAT, COULDN'T SLEEP, DIDN'T WANT

14   TO GET UP AND WASH UP.  DIDN'T WANT TO -- DIDN'T WANT TO

15   HAVE MY HAIR DONE, MY NAILS DONE.  AND MY SON SUGGESTED

16   TO ME TO WRITE DOWN EVERYTHING THAT HAD EVER HAPPENED TO

17   ME DURING THE TIME THAT I WAS WORKING AT LAGUNA HONDA.

18   Q.    AND THAT'S WHAT THIS DOCUMENT REPRESENTS?

19   A.    YES.

20   Q.    AND IF YOU LOOK AT THE LAST PAGE, AT LEAST IN

21   THE TYPEDWRITTEN PART, IT INDICATES THAT THERE WAS A

22   REVIEW MEETING ON 7/6/2005; CORRECT?

23   A.    YES.

24   Q.    IS THAT THE LAST DATE THAT YOU ADDED ANYTHING

25   TO THIS LIST OR AROUND THAT TIME?

1    A.    YES.

2    Q.    SO AFTER, SAY, JUNE OF 2005, YOU DIDN'T GO

3  BACK AND REVISE THIS EXHIBIT, THIS DOCUMENT?

4    A.    I THINK WE DID, YES.

5    Q.    DO YOU RECALL WHEN?

6    A.    I DON'T RECALL WHEN, BUT MY DAUGHTER-IN-LAW

7  DID REVISE IT?

8    Q.    DO YOU RECALL HOW MANY TIMES AFTER JUNE 2005

9  THAT YOU REVISED THE DOCUMENT THAT NOW IS EXHIBIT 22?

10    A.    I THINK ONLY ONCE.  BECAUSE SHE MADE IT BIG

11  LETTERS FOR ME BECAUSE I WAS HAVING PROBLEMS, REALLY BAD

12  PROBLEMS WITH SEEING.

13    Q.    DO YOU REMEMBER WHEN HE DID THAT FOR YOU, MADE

14  IT IN BIG LETTERS?

15    A.    I CAN'T REMEMBER EXACTLY WHEN.

16    Q.    WAS IT SOMETIME AROUND JUNE OR JULY OF 2005?

17    A.    YES, IT COULD HAVE BEEN.

18    Q.    OTHER THAN MAKING IT IN BIG LETTERS, DID SHE

19  CHANGE ANY OF THE SUBSTANCE THAT WAS IN THE DOCUMENT?

20    A.    I THINK SHE DID.

21    Q.    DO YOU REMEMBER WHAT THOSE CHANGES MIGHT HAVE

22  BEEN?

23    A.    NO, I DON'T REMEMBER.  I KNOW SHE ADDED SOME

24  THINGS ONTO IT 'CAUSE I WAS DOCUMENTING EVERYTHING THAT

25  WAS BEING DONE TO ME.

1      Q.    AND IN DOCUMENTING EVERYTHING, WERE YOU

2  LOOKING AT OTHER DOCUMENTS TO CREATE THIS LIST?

3      A.    NO.

4      Q.    YOU WERE --

5      A.    I WAS -- I'M SORRY.

6      Q.    GO AHEAD, FINISH YOUR ANSWER.

7      A.    I WAS DOING IT -- DOCUMENTING AS THINGS WOULD

8  HAPPEN TO ME.  WHEN CHRISTINE WOULD DO SOMETHING TO ME

9  OR WRITE ME UP, I WOULD WRITE IT DOWN.

10     Q.    SO LET'S TAKE A LOOK AT WHAT'S MARKED AS

11  PAGE 5.  SO FOR EXAMPLE, WHERE IT SAYS "LETTER FROM

12  CHRISTINE 9/2/02," YOU WROTE THAT DOWN AT THE TIME THAT

13  IT OCCURRED?

14     A.    I WROTE THAT DOWN AFTER I GOT THE LETTER.

15     Q.    I GUESS THE QUESTION IS:  WHEN DID YOU ADD IT

16  TO THIS DOCUMENT?  BECAUSE IF YOU LOOK ABOVE, THERE ARE

17  EVENTS THAT COME AFTER IT IN TIME, IT'S NOT IN

18  CHRONOLOGICAL ORDER.

19     A.    NO, IT'S NOT.

20     Q.    SO AT SOME POINT YOU MUST HAVE SAT DOWN WITH

21  OTHER DOCUMENTS TO PULL THIS ALL TOGETHER; IS THAT

22  CORRECT?

23     A.    YES.

24     Q.    WHEN?

25     A.    MY DAUGHTER-IN-LAW DID.

1    Q.    AND WHEN WAS THAT?

2    A.    I'M NOT SURE OF THE DATE.  AND I DON'T WANT TO

3    SAY A DATE THAT'S NOT TRUE.

4    Q.    WAS IT BEFORE OR AFTER YOU LEFT THE CITY?

5    A.    SHE DID SOME OF THIS BEFORE I LEFT THE CITY.

6    Q.    AND SOME OF IT AFTER?

7    A.    I THINK THIS WAS DONE BEFORE I LEFT THE CITY,

8    IF I'M NOT MISTAKEN.

9    Q.    BUT YOU AGREE WITH THE CONTENTS OF WHAT'S IN

10   THIS DOCUMENT?

11   A.    I WROTE THIS.

12   Q.    YOU WROTE IT?

13   A.    EVERYTHING THAT I WROTE HERE HAPPENED TO ME.

14   Q.    SO YOU WROTE IT OUT BY HAND AND YOU GAVE IT TO

15   YOUR DAUGHTER-IN-LAW?

16   A.    YES.

17   Q.    AND WHAT'S HER NAME.

18   A.    LORI ABRAM.

19   Q.    AND WHERE DOES SHE LIVE?

20   A.    DENVER.

21   Q.    AND WAS SHE LIVING THERE AT THE TIME THIS

22   DOCUMENT WAS CREATED?

23   A.    YES.

24   Q.    AND SHE LIVES THERE NOW WITH YOUR SON?

25   A.    YES.

1      Q.    NOW, AT THE BOTTOM OF PAGE 5 AND THE TOP OF

2   PAGE 6, AT THE BOTTOM OF PAGE 6, THERE APPEARS TO BE AN

3   ENTRY IT WAS WRITTEN UP ON 6/16/05, "UNPROFESSIONAL

4   BEHAVIOR."

5         AND THEN CONTINUING ON TO PAGE 6.  IT SAYS

6   "YELLING IN THE HALLWAY PAREN THE MOST RECENT WRITE-UP I

7   RECEIVED FROM BILL -- THE MOST WRITE-UP I RECEIVED WAS

8   FROM BILL FOR TALKING IN THE DEPARTMENT.  HE SAID I

9   SLAMMED MY HAND DOWN ON THE SHREDDER BOARD AND THAT I

10  WAS YELLING."

11        WHO BROUGHT THAT WRITE-UP AGAINST YOU?

12     A.    BILL.

13     Q.    AND THEN IT ALSO REFLECTS A CONFERENCE WITH

14  BILL ON 6/23/05, DOES THAT CONCERN THE 6/16/05 WRITE-UP?

15     A.    I THINK SO, IF I CAN RECALL.

16     Q.    WAS THERE ALSO A WRITE-UP YOU GOT FROM

17  MS. TAORMINA ABOUT SOME ALTERCATION YOU HAD WITH A

18  RESIDENT AT THE HOSPITAL AROUND THIS TIME?

19     A.    NO, I NEVER RECEIVED A WRITE-UP FROM BARBARA

20  ABOUT AN ALTERCATION THAT I HAD -- WITH A WHO?

21     Q.    WITH A RESIDENT.

22     A.    NO.

23     Q.    OR A CO-WORKER?

24     A.    OH, OKAY.  IT WASN'T AN ALTERCATION.

25     Q.    DID IT HAPPEN IN JUNE OF 2005?

1    STATE OF CALIFORNIA                              )

2                                                     )  SS.

3    COUNTY OF CONTRA COSTA                           )

4

5            I HEREBY CERTIFY THAT THE WITNESS IN THE

6    FOREGOING DEPOSITION, NAMED SUSIE ABRAM, WAS BY ME DULY

7    SWORN TO TESTIFY THE TRUTH, THE WHOLE TRUTH, AND NOTHING

8    BUT THE TRUTH IN THE WITHIN-ENTITLED CAUSE; THAT SAID

9    DEPOSITION WAS TAKEN AT THE TIME AND PLACE THEREIN

10   STATED; THAT THE TESTIMONY OF SAID WITNESS WAS REPORTED

11   BY ME,

12                        LESLIE CASTRO,

13   A CERTIFIED SHORTHAND REPORTER AND DISINTERESTED

14   PERSON, AND WAS THEREAFTER TRANSCRIBED INTO TYPEWRITING;

15   AND THAT THE PERTINENT PROVISIONS OF THE APPLICABLE CODE

16   OR RULES OF CIVIL PROCEDURE RELATING TO THE NOTIFICATION

17   OF THE WITNESS AND COUNSEL FOR THE PARTIES HERETO OF THE

18   AVAILABILITY OF THE ORIGINAL TRANSCRIPT OF DEPOSITION

19   FOR READING, CORRECTING AND SIGNING HAVE BEEN COMPLIED

20   WITH.

21           AND I FURTHER CERTIFY THAT I AM NOT OF

22   COUNSEL OR ATTORNEY FOR EITHER OR ANY OF THE PARTIES TO

23   SAID DEPOSITION, NOR IN ANY WAY INTERESTED IN THE

24   OUTCOME OF THE CAUSE NAMED IN SAID CAPTION.

25           IN WITNESS WHEREOF, I HAVE HEREUNTO SET

1    MY HAND AND AFFIXED MY SEAL OF OFFICE THE 11TH DAY OF

2    MARCH, 2008 .

3

4

5

6                                    LESLIE CASTRO

7                                    C.S.R. NO. 8876

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25