CURTIS G. OLER (Bar No. 63689)
LAW OFFICES OF CURTIS G. OLER
Post Office Box 15083
San Francisco, California 94115
Telephone: 415 346-8015
Facsimile: 415 346-8238

Attorney for Plaintiff
  Susie Abram

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SUSIE ABRAM,<br><br>            Plaintiff,<br><br>vs.<br><br>CITY AND COUNTY OF SAN FRANCISCO, DEPARTMENT OF PUBLIC HEALTH; WILLIAM FRAZIER, DIRECTOR OF THERAPEUTIC ACTIVITIES, LAGUNA HONDA HOSPITAL,<br><br>            Defendants. | Case No. C07-3006 PJH<br><br>PLAINTIFF SUSIE ABRAM'S DECLARATION IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT<br><br>Date: June 18, 2008<br>Time: 9:00 A.M.<br>Ctrm: 3, 17th Floor<br><br>Action Filed: June 8, 2007 |

I, SUSIE ABRAM, depose and say:

1. I am an African-American (Black) female and was employed as an Activity Therapist at Laguna Honda Hospital and Rehabilitation Center from April, 1982 until on or about June 20, 2005.

2. During my entire tenure of employment, I at all times performed all of my assigned and related duties in an excellent manner providing loyal and dedicated care to the patients of Laguna Honda Hospital.

Decl. of Susie Abram ISO Opp MSJ                    1

3. My employment at Laguna Honda was enjoyable and I looked forward to coming to work each day until I came under the direct supervision of Activity Therapist Supervisor Christine Hanson in 2002.

4. After coming under the supervision of Hanson, I began to experience a variety of discriminatory actions by her even though I had continued to perform all of my duties as excellently as I had done before.

5. Those actions included, but were not limited to a) false performance evaluations; b) unwarranted threats of disciplinary actions; c) unwarranted disciplinary actions; d) humiliation; e) unwarranted close scrutiny; f) continuing harassment; and g) continuing hostility.

6. I have read the declaration of Christine Hanson in support of defendants' motion for summary judgment and have found it to be substantially false and misleading as indicated below.

7. In paragraph 4 thereof, Hanson states among other things, that "[F]rom the start, I found Abram had job performance issues. First she lacked necessary skills in a variety of areas. It was clear to me that Abram's skill set did not meet the increasing demands of her job. For example, she frequently failed to provide required documentation on a timely basis for the residents under her care or prepared documentation that was incomplete or inaccurate."...

As a matter of fact, at the time Abram came under Hanson's supervision, there were no 'issues' concerning Abram's performance. I had already during the several years of my employment, exhibited and continued to exhibit more than excellent skills in all phases of my employment. I was also providing accurate documentation as required on a timely basis.

8. In paragraph 5 thereof, Hanson states "[I]n the area of program planning, I found her delivery of services to be repetitive, and failed to provide the kind of well thought out skill development and therapeutic activities our residents needed. Abram resisted my efforts to provide a variety of new or different programs for the residents under her care. An example, was her resistance to eliminating bingo from her unit schedule."

Hanson's statements here are false and ridiculous. For years I had been successfully

Decl. of Susie Abram ISO Opp MSJ        2

1 creative in planning activities and programs for the patients with no complaints from anyone.

2     9. In paragraph 6 thereof, Hanson states "I also confronted repeated problems with the quality of the monthly program calendars Abram was required to submit to me for approval. These calendars were used to plan resident activities over the course of the month and were an important planning tool for the Activity Therapy Department, not just the Abram and the residents under her care. Abram's calendars were difficult to read and often lacked the necessary detail expected for Activity therapists.

    As a matter of fact, Hanson refused to provide me with appropriate computer training for calendaring while others were provided with such. I was compelled to solicit my son's assistance to set up a computer calendaring program.

    10. In paragraph 7 thereof, Hanson states "[A]nother area in which I found Abram's skills to be lacking was her ability to plan and carry out off-site activities such as a trip to a restaurant, shopping mall, movie, museums, picnics, etc. She often failed to think through all aspects of the off-site trips she offered her residents and made excessive demands for support. For example, in April 2003, Abram scheduled a trip to Cache Creek Casino for a group of residents. This activity raised several issues including the propriety of taking a group of elderly residents with psychosocial mental disorders on an all day trip to a gambling establishment where alcohol would be served.

    Hanson falsely questions my already demonstrated ability to plan and carry out off site activities, but presents no rational basis therefor.

    11. In paragraph 8 thereof, Hanson states "[I]n addition to issues related to her job skills, a second concern about Abram's job performance was her resistance, and at times hostility, to my efforts to monitor and improve her job performance. She was unnecessarily confrontational about even minor issues or disagreements."

    Notwithstanding Hanson's demonstrated bias against me, from the very beginning of her supervision of me, I have always maintained a respectful and professional demeanor in my

Decl. of Susie Abram ISO Opp MSJ     3

relationship with her, which never included hostility or a confrontational attitude.

12. In paragraph 9 thereof, Hanson states "[I]n September 2002, in order to provide services to the D3 residents we needed aeeess to materials Abram kept in the unit locker on the D3 ward. She was on a month long vacation and had not left a key to the locker. The purpose of the locker was to store activity related materials, not personal items. Beeause not get into the loeker I requested that Plant Services was made to cut off the lock."

Hanson had the lock cut off my locker while I was on vacation and my eds were missing. The head nurse had a key the head nurse was the one that gave me the lock and key. Hanson boxed all of my belongings, 20 boxes and she put some of my things on the table so other staff eould take them.

13. In paragraph 10 thereof, Hanson states, among other things, that in December, 2002, she initiated a disciplinary action against Abram for inattention to duty and insubordination elaiming that Abram failed to prepare certain quarterly and annual doeumentation regarding the eare of several of her residents.

As a matter of faet, I could not perform such duties in September, 2002, because I was on vacation during that period.

14. In paragraph 11 thereof, Hanson states, among other things that on December 11, 2002, after having met with Abram and her union representative concerning said charges, she felt that a three day suspension was appropriate , but that later, Defendant Frazier reduced the suspension to a written warning in January, 2003.

I wanted to grieve said final disposition, but got no assistance or cooperation from my union therefor.

15. In paragraph 13 thereof, Hanson states, among other things, that in May, 2003, she prepared a performanee evaluation of Abram giving her an overall rating of improvement needed, and issued Abram a Development Plan. Hanson notes three areas of "core competeney (a) improved implementation of activities; (b) improved planning skills; and (d) timely and

Decl. of Susie Abram ISO Opp MSJ                                    4

1 appropriate completion of required documentation."

2 As a matter of fact, Hanson provides no factual basis for such performance rating or the
3 need for a development plan for me. I was the only Activity Therapist given a development plan
4 even though I performed all of my duties at least as well as my coworkers. I disagreed with that
5 evaluation and provided a rebuttal thereto on May 13, 2003.

6 16. In paragraph 15 thereof, Hanson states that in July, 2003, Defendant Frazier agreed to
7 the Development Plan with the dates revised.

8 As indicated above, I needed no development plan since there was no evidence that I was
9 not satisfactorily performing all of my duties as directed. More often than not, I was responsible
10 for more wards than my fellow activity therapists. I was the only activity therapist placed on a
11 development plan.

12 17. In paragraph 16 thereof, Hanson refers to a discrepancy relating to a resident
13 restaurant trip taken on May 9, 2003 in which there apparently was a $1.98 discrepancy.

14 Actually there was in excess a $1.95 at which time I handed Hanson the cash and a printed
15 receipt. Some Activity Therapists are often over budget and are never questioned. The driver
16 Linda was Spanish, she helped to order the food. She added the tip to the receipt. Hanson
17 always fabricated some basis for criticizing my performance while on bus trips with the
18 residents.

19 18. In paragraph 17 thereof, Hanson states, among other things, that "I worked with her
20 on numerous occasions to improve her computer skills to perform these tasks."

21 As a matter of fact, when I turned in my handwritten monthly calendar to Hanson, she
22 threw it back to me stating that I would have to do the calendar on the computer. She offered me
23 no computer training. Hanson told my co-workers not to help me. Lynn refused to use the
24 computer. I am always willing to learn. Hanson was again setting me up for failure when I
25 would ask Hanson for help, she told me to read the book. Hanson gave me a monthly calendar
26 for a year but took it back.

27

28 Decl. of Susie Abram ISO Opp MSJ                    5

19. In paragraph 19 thereof, Hanson claims her protection of sensitive personnel matters on her computer.

As a matter of fact, Hanson placed my suspension notice where all of my coworkers could read it.

20. In paragraph 20 thereof, Hanson states that she instituted a second disciplinary action against Abram in August, 2003 charging Abram with inattention to duty, failure to properly manage a cluster wide activity and dishonesty in connection with a summer garage sale Abram organized for the psychosocial cluster, further stating that the activity was disorganized, Abram failed to ensure clean up after the activity and there were significant questions regarding the funds raised during this activity.

As a matter of fact, I brought bags and bags of things from my home for the sale. I also had a sale at my home for the residents. Hanson asked me how much money I made. I told her $30 to $40. I did not know because I had not had an opportunity to count all the money. We sold nothing over $0.50. Later, Len asked me how much I made and I said $100.00. Lisa overheard me talking to Len and told Hanson that I had made more money not knowing that I was talking about a sale that I did at my home. I had residents from the ward and I had 3 volunteers. We did clean up after the sale. Hanson stated that our table was messy. What do you expect when having a sale. People go through the things that you have, and the table is going to get messy.

21. In paragraphs 21 and 22 thereof, Hanson states, among other things, that although she recommended a three day suspension in connection with said disciplinary action, Frazier reduced it to a one day suspension.

22. In paragraph 23 thereof, Hanson notes that I took an extended leave of absence from November, 2003 to September, 2004.

In November, 2003 as a result of the continuing efforts of Defendant Frazier to proceed with the pending disciplinary actions against me, ruining my exemplary career with the City, I

Decl. of Susie Abram ISO Opp MSJ            6

suffered a nervous breakdown and was compelled to leave work to seek psychotherapy therefor. I remained off from work on medical disability until September, 2004.

23. In paragraphs 25 and 26 thereof, Hanson states that she initiated a formal disciplinary action against Abram regarding her failure to meet the goals of the development plans instituted following her May, 2003, performance evaluation, indicating that Abram failed to show satisfactory performance improvement in several of the core competency areas identified in the development plan, and recommended a four day suspension. She further states she presented the employee conference form to Abram and her union representative on October 23, 2003. Abram appealed Hanson's recommendation to Frazier and later filed a grievance.

Said grievance was pending at the time I was finally forced from the job in June, 2005.

24. In paragraph 27 thereof, Hanson states, among other things, that she was advised by Frazier sometime after Abram returned from leave that she had complained about the behavior of her dog Teemu, a 40 pound boxer mix.

As a matter of fact, Teemu was an abused adopted pit bull of which I was extremely afraid. At no time did I take Teemu to my ward, even though I had taken a dog previously owned by Hanson to the ward. Hanson let the dog off his leash and the dog ran into my cubicle and growled at me. I was so scared, I urinated all over myself. The dog was never on a leash. The dog was at the office door of Hanson's office so I could not get out of the department without passing that dog. Hanson was walking on the side of me with the dog. She told the dog not to bother me because I was afraid of him. Hanson would have that dog at work almost every day. He would not be on a leash. He ate my lunch one day.

25. have read the declaration of William Frazier in support of defendants' motion for summary judgment and have found it to be substantially false and misleading as indicated below.

26. In paragraph 8, Frazier states that "[A]ll of Abram's supervisors advised me of job performance issues with Abram."

Decl. of Susie Abram ISO Opp MSJ                    7

1  As a matter of fact, I had no performance 'issues' as such. I always performed all of my
2  assigned and related duties in at least a satisfactory manner, and at least as well as my fellow
3  Activity Therapists. I had no particular difficulty with record keeping and documentation and
4  Frazier, who had no direct supervision over me, provides no basis for his general conclusory
5  accusations. None of the wards I worked on were ever cited by the state for activities all the
6  years that I worked at Laguna Honda. For my care plans, quarterly reports, notes, annual
7  assessments, participation records, etc., (when there was an activity therapist and a ward was
8  cited by the state for activities (Chiyani) got a bad write up, nothing happened to her. Place to do
9  animal visits, farm. They never had to work ate like all other Activity Therapists. I also
10 requested extra help from Laura Blue. All Activity Therapists were having problems with the
11 paper changes. My care plans all notes were checked by my supervisors often and approved.
12 Only supervisor that wrote me up for a bad job performance, disciplinary actions was Ms.
13 Hanson in all the years that I worked there. Other than Dunn calendars were approved by
14 supervisors every month.

15  27. In paragraph 9, Frazier states, among other things, that I was resistant, and at times
16 hostile, and confrontational and that he himself had issues with my performance.

17  As indicated above, I always performed my duties in at least a satisfactory manner.
18 Frazier's statement is completely untrue. I was never resistant, hostile, or confrontational with
19 supervisors or anyone. Frazier said I created a hostile environment for him. I was only back to
20 work two weeks and in fact, he created a hostile working environment for me. He said he did not
21 like my behavior, that I refused to ride the elevator with him or the bus. By him allowing dogs to
22 bite at me and having to pass by a dog that was threatening to me, and having dogs off leashes
23 was a hostile work environment for me.

24  28. In paragraphs 10 and 11 thereof, Frazier suggests, among other things, that in
25 connection with the Black History Program for 2001 at Laguna Honda, he was interested in an
26 educational theme and that he subsequently met with Abrams and a coworker about the program

Decl. of Susie Abram ISO Opp MSJ                 8

1. after the program relative to their "frustration and irritation".

    As a matter of fact, Frazier's statement is false and misleading. Sandra Johnson, head of the volunteer services called a meeting because she was upset with Frazier in how he handled the Black History program. Frazier became very angry in the meeting. He first asked us to express our feelings and when we did he became angry and wanted to leave and end the meeting. He first asked us to express our feelings and when we did, he became angry and wanted to leave and end the meeting. Frazier changed the date of the Black History program that was planned a year in advance, two weeks before the event, which made it difficult for the bank and other performers to adjust their own calendars. He did not have payment ready the day of the program as he had promised. Frazier was in the Rosie Parks play. The day of the play, Frazier did not show up or let me know that he would not be able to attend. We welcomed everyone's input. The educational black inventors, with a movie to go along with each invention. Chinese New Years was not educational, Cinco de Mayo was not educational. Nothing was said about these programs.

29. In paragraphs 12 through 17, Frazier states, among other things, that in early April, 2001, Abram was frustrated with the manner in which he handled a conflict between a co-worker Pat Zelaya-Wagner and her in which Zelaya-Wagner claimed Abram shared unfavorable information about her with several residents and co-workers.

    As a matter of fact, the situation was much ado about nothing. Frazier e-mailed me saying that one of my colleagues had a complaint bout me. He would not tell me the person's name. He never attempted to resolve the issue or bring the co-worker and me together. He took me to the personnel analyst. Then the co-worker was called into the meeting. Wanda wrote a letter stating nothing was meant by what was said.

30. In paragraphs 18 and 19 thereof, Frazier states, among other things that in April, 2001, when he discussed with Abram her plans for frying chicken at Laguna Honda for patients and expressed that the Nutritional Department had concerns and Abram informed him that she

Decl. of Susie Abram ISO Opp MSJ                       9

felt his actions were intended to harm her reputation at the hospital.

As a matter of fact, Frazier said that every time I cook, people got sick from my cooking. The cooking activity was planned with the Nutritional consultant and with the residents. All activity therapists cook. Some of them cook all the time. Frazier said nothing to them. They were white. I was not hostile toward Frazier. I showed him that the meat was fresh and that it came from Safeway.

31. In paragraph 20, Frazier states among other things that Abram expressed "frustration" about his "meddling" in connection with an outside fishing trip Abram had planned for her resident wards.

As a matter of fact, I never accused Frazier of meddling since he is the Director of the department and has the responsibility to direct its activities. I went on my own time to make sure that the area was safe for the residents, that the bus would be able to turn around and that there would be fishing poles for the residents. I also had a meeting with the owners of the fishing facility.

32. In paragraph 21 thereof, Frazier asserts that Hanson initiated three disciplinary actions against Abram in December, 2002, August, 2003 and October 2003, all of which were claimed to be motivated by deficiencies in her job performance.

As a matter of fact, neither of said disciplinary actions was warranted as already discussed above. Hanson was the only supervisor to take disciplinary action against me.

33. In paragraphs 22 and 23 thereof, Frazier states that in December, 2002, Hanson initiated a disciplinary action against Abram for "inattention to duty and insubordination - refusal of assignment" recommending a three day suspension therefor and thereafter he reduced such recommendation to a written warning.

As a matter of fact, neither this disciplinary action nor other disciplinary actions taken against me were warranted. These disciplinary actions are unsupported by any evidence and are based simply upon general, false, fabricated, conclusory representations about my job

Decl. of Susie Abram ISO Opp MSJ                          10

performance.

My white counterparts were not subjected to such unwarranted discipline. These actions were taken against me because of my race and color and in retaliation against me because I continued to complain about the unlawful discriminatory treatment of me by Frazier and Hanson to Frazier and Hanson and Willie Ramirez in Human Resources who refused to listen to my complaints.

34. In paragraphs 24 through 29, Frazier states, among other things, that in May, 2003, Hanson issued a performance appraisal to Abram, to which she disagreed, and which she refused to sign, that he met with Abram and her union representative in July, 2003, at which time Abram complained to him about a continuing pattern and practice of racial discrimination by Hanson against her. Frazier further states that he determined Abram had not been the victim of any unfair treatment, but that Hanson could have handled some of these issues more effectively.

I refused to sign untrue statements made about me. I had also refused to sign Lisa and Paul's appraisals too because of too many inconsistencies. Paul called me a bitch and gave me the fuck you sign with his hand,. Tracy was there. I did make complaints about being discriminated against by being required to complete monthly calendars on the computer. Hanson did not require other staff to do so. Hanson cut the lock off my locker while I was on vacation resulting in the loss of my personal cds that Hanson left out on a table for others to take. Hanson told Tracy that I was a problem. Hanson told Bob Deal to give me one volunteer, when I put in for 4 volunteers for the casino trip. I bided out of Hanson's unit. She made my life a living hell. Frazier was fully cognizant and informed of all actions taken by Hanson against me but notwithstanding, did nothing to prevent their continuation and in fact continued to ratify Hanson's conduct.

35. In paragraphs 30 and 31 thereof, Frazier states that Hanson issued a second disciplinary action against Abram for "inattention to duty, failure to properly manage a cluster wide activity and dishonesty" in connection with a summer/garage sale, recommending a two day

Decl. of Susie Abram ISO Opp MSJ                    11

suspension therefor which was appealed to him after which I reduced such suspension to one day.

As a matter of fact, I brought bags and bags of things from my home for the sale. I also had a sale at my home for the residents. Hanson asked me how much money I made. I told her $30 to $40. I did not know because I had not had an opportunity to count all the money. We sold nothing over $0.50. Later, Len asked me how much I made and I said $100.00. Lisa overheard me talking to Len and told Hanson that I had made more money not knowing that I was talking about a sale that I did at my home. I had residents from the ward and I had 3 volunteers. We did clean up after the sale. Hanson stated that our table was messy. What do you expect when having a sale. People go through the things that you have, and the table is going to get messy.

36. In paragraphs 32 through 38 thereof, Frazier states, among other things, that Hanson initiated a formal disciplinary action against Abram in October, 2003, for the third time for " failure to meet goals of the development plans instituted following her May 2003 appraisal", recommending a four day suspension therefor, after which Abram appealed the same to him. He further states that on January 20, 2005, he met with Abram and her union representative relative thereto. He states that shortly thereafter, in February, 2005, he agreed with Hanson that discipline was warranted, and reduced her suspension from four days to two.

Frazier further states that on September 27, 2004, after Abram was able to return to work having been off from work under psychotherapy for ten months, that he met with Abrams, her union representative and Willie Ramirez, a Department personnel officer, to discuss the status of the two outstanding disciplinary matters. He recommended converting the August, 2003 matter from a one day suspension to a written warning and requiring Abram to serve a two day suspension for the October, 2003 matter. He further states Abram rejected this offer, and that Abram grieved both disciplinary matters. As of June, 2005, neither grievance had made it to final binding arbitration. Abram resigned her employment before the grievances were resolved.

Decl. of Susie Abram ISO Opp MSJ                12

As a matter of fact, shortly after my return to work that meeting was conducted after being off under psychotherapy for ten months. (After emotionally and physically collapsing on the job because of the extraordinary stress caused by the continuing unwarranted disciplinary actions against me, I had been compelled to leave work.) I rejected the one day suspension because I had done nothing wrong.

During the ten months of my supervision by Barbara Taormina after my return, I experienced no difficulties whatever in connection with the performance of any of my duties as an activity therapist.

I was forced to resign my position in June, 2005, as a result of the continuing efforts of Defendants to unlawfully pursue the pending disciplinary actions against me which were without cause or justification and which had ruined my career.

37. In paragraph 43 thereof, Frazier states, "[A]lthough Abram repeatedly complained to me about what she felt was unfair treatment by Hanson and me, she did not once indicate that she believed this allegedly unfair treatment was the result of racial animus. She indicated over and over that she felt she was being singled out, but never indicated why she felt this was the case other than to state her belief that the job performance and/or behavior of the other Activity Therapist were not subjected to similar scrutiny. To the extent Ms. Hanson and I scrutinized Abram, such scrutiny focused on the nature and quality of Abram job performance, not her race."

Frazier admits that I repeatedly complained to him about "unfair" treatment by Hanson and him as already exhaustively set out above.

38. My continuing complaints of the discriminatory treatment by Frazier and Hanson were ignored and only resulted in stepped up hostility and unwarranted criticism of my employment which forced me to finally quit my employment to protect my sanity.

39. I could no longer bear Defendants' unwarranted persistence in pursuing unwarranted disciplinary actions against me, the continuing discriminatory treatment to which my white counterparts were not subjected, the retaliation which resulted from my continuing complaints,

and the harassment described above which had ruined my career as an Activity Therapist with the City and almost destroyed me emotionally.

I declare under penalty of perjury of the laws of the State of California that I have personal knowledge of the above, which is true and correct, and if called upon to do so, could and would competently testify thereto.

Executed this 28th day of May, 2008, at San Francisco, California.

_____
SUSIE ABRAM